# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

NO. 12-9011 and 12-9012 (consolidated with 12-9008 and 12-9009)

SW BOSTON HOTEL VENTURE, LLC; AUTO SALES & SERVICE, INC.;
GENERAL TRADING COMPANY; FRANK SAWYER CORPORATION;
100 STUART STREET, LLC; 30-32 OLIVER STREET CORPORATION;
GENERAL LAND CORPORATION; 131 ARLINGTON STREET TRUST

Debtors.

---

THE PRUDENTIAL INSURANCE COMPANY OF AMERICA
Appellee,

v.

CITY OF BOSTON
Appellant.

---

On Appeal from the Bankruptcy Appellate Panel
For the First Circuit

---

## OPENING BRIEF OF APPELLANT THE CITY OF BOSTON

Joseph F. Ryan, Esq. (1st Cir. No. 70141)
E. Kate Buyuk, Esq. (1st Cir. No. 1155065)
Lyne, Woodworth & Evarts LLP
12 Post Office Square, 2nd Floor
Boston, Massachusetts 02109
Telephone: (617) 523-6655
jryan@lwelaw.com
kbuyuk@lwelaw.com

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Appellant The City of Boston is not required to file a corporate disclosure statement contemplated in Rule of Appellate Procedure 26.1 because it is a governmental party.

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

STATEMENT OF BASIS OF APPELLATE JURISDICTION . . . . . . . . . . . . . . 1
    I.    Basis for Bankruptcy Appellate Panel's Jurisdiction.
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    II.   Basis for Court of Appeals' Jurisdiction. . . . . . . . . . . . . . . . . . . . 2
    III.  Timeliness of Appeals. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    IV.  Appeal from Final Order or Judgment. . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF ISSUES PRESENTED FOR REVIEW . . . . . . . . . . . . . . . . 3

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    I.    Incorporation of Debtors' Statement of Facts. . . . . . . . . . . . . . . . 6
    II.   City Loan. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    III.  Intercreditor Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    IV.  Increasing Value of Collateral and Decreasing Value of Prudential's
        Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    V.   Bankruptcy Court Combined Hearing. . . . . . . . . . . . . . . . . . . . . . 15
    VI.  BAP Decisions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    I.    Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
        A.   Prudential Bears the Burden of Proving That it Was
             Oversecured, to What Extent, and for What Period of Time.
             . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
        B.   "Flexible Approach" Is the Appropriate Method for

Determining Prudential's Entitlement to Postpetition Interest. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

       1.   *Purpose of Valuation Is to Establish Whether Prudential Is Entitled to Postpetition Interest.* . . . . . . . . . . . . . . . . 23

       2.   *Valuation must Be Made as of Date of Sale of the Hotel*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

  C.   The Bankruptcy Court's Factual Finding that Prudential Did Not Become Oversecured Until June 8, 2011 Was Well Supported by the Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . 28

  D.   Other Measuring Dates to Value Prudential's Collateral and Secured Claim Are Inappropriate. . . . . . . . . . . . . . . . . . . . . . 29

       1.   *Petition Date.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

       2.   *Cash Collateral Orders.* . . . . . . . . . . . . . . . . . . . . . . . . . 31

       3.   *Motion for Relief.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

  E.   Interest Is Only Payable from the Date Prudential Became Oversecured – June 8, 2011. . . . . . . . . . . . . . . . . . . . . . . . . . 35

III.  <u>The Bankruptcy Court Finding That Prudential Was Not Entitled to Compound Monthly Postpetition Interest at the Default Rate Was Not Clearly Erroneous</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

  A.   The Loan Documents Do Not Provide for Compounding of the Default Rate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

  B.   Compounding Would Be Inequitable to the City of Boston. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

IV.  <u>The BAP Erroneously Vacated the Bankruptcy Court's Plan Confirmation Order Based on the BAP 506(b) Decision.</u> . . . . . . . . 40

V.  <u>The Purported Assignment of Voting Rights by the City of Boston to Prudential in the Intercreditor Agreement is Unenforceable.</u> . . . . . 40

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)(B) . . . . . 47

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*Ahlers v. Norwest Bank Worthington (In re Ahlers)*, 794 F.2d 388 (8th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Anderson v. Beatrice Foods Co.*, 900 F.2d 388 (1st Cir.1990) . . . . . . . . . . . . . . 20

*Bank of America, National Ass'n v. North LaSalle Street, LP (In re 203 North LaSalle Street Partnership)*, 246 B.R. 325 (Bankr. N.D. Ill. 2000) . . . . . . . .  41-43

*Baybank-Middlesex v. Ralar Distribs., Inc.*, 69 F.3d 1200 (1st Cir. 1995) . . . 21, 31

*Boroff v. Tully ( In re Tully )*, 818 F.2d 106 (1st Cir.1987) . . . . . . . . . . . . . . . . 20

*Brunswick Leasing Corp. v. Wisconsin Central Ltd.*, 136 F.3d 521 (7th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Cmty. Bank of Homestead v. Torcise (In re Torcise)*, 187 B.R. 18 (S.D. Fla. 1995), *rev'd on other grounds*, 162 F.3d 1084 (11th Cir. 1998) . . . . . . . . . . . . . . . . . . . 22

*Cumpiano v. Banco Santander*, 902 F.2d 148 (1st Cir.1990) . . . . . . . . . . . . . . . 20

*Fin. Sec. Assurance, Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . 21, 22, 24-26

*Ford Motor Credit Co. v. Dobbins*, 35 F.3d 860 (4th Cir. 1994) . . . . . . . . . 27, 28

*Heritage Bank Tinley Park v. Steinberg (In re Grabill Corp.)*, 121 B.R. 983 (Bkrtcy. N.D. Ill.,1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*In re Addison Props. Ltd. P'ship, 185 B.R. 776 (Bankr. N.D. Ill. 1995)* . . . . . . . 22

*In re Avondale Gateway Center Entitlement, LLC, No. CV10–1772–PHX–DGC, 2011 WL 1376997 (D.Ariz. April 12, 2011)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

iv

*In re Bradley, 94 B.R. 563 (Bankr. N.D. Iowa 1988)* . . . . . . . . . . . . . . . . . . *21, 35*

*In re Carp, 340 F.3d 15 (1ˢᵗ Cir. 2003)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *20*

*In re Centu. Inv. Fund VII Ltd. Partner., 96 B.R. 884 (Bankr. E.D. Wis. 1989)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *32*

*In re Cormier, 382 B.R. 377 (Bankr. W.D.Mich. 2008)* . . . . . . . . . . . . . . . . . . *30*

*In re Dinsmore, 141 B.R. 499 (Bankr. W.D. Mich. 1992)* . . . . . . . . . . . . . . . . *32*

*In re Hart Ski Mfg. Co., Inc., 5 B.R. 734 (Bkrtcy. Minn., 1980)* . . . . . . . . . . *41, 44*

*In re Hill, 562 F.3d 29 (1ˢᵗ Cir. 2009)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *19*

*In re Laboy, 647 F.3d 367 (1ˢᵗ Cir. 2011)* . . . . . . . . . . . . . . . . . . . . . . . . . . *19, 20*

*In re Landing Assocs., Ltd., 122 B.R. 288 (Bankr. W.D. Tex. 1990)* . . . . . . . . . *22*

*In re Mitchell, 81 B.R. 171 (Bankr.D.Colo. 1988)* . . . . . . . . . . . . . . . . . . . . . *21, 36*

*In re Rothenberg, 173 B.R. 4 (Bankr. D.D.C. 1994)* . . . . . . . . . . . . . . . . . . . . . . *36*

*In re Saco Local Dev. Corp.*, 711 F.2d 441 (1ˢᵗ Cir. 1983) . . . . . . . . . . . . . . . . . . *2*
*In re Urban Communicators PCS LTD. P'ship*, 379 B.R. 232 (Bankr. S.D.N.Y. 2007), *rev'd on other grounds*, 394 B.R. 325 (S.D.N.Y. 2008) . . . . . . . . . . . *26, 30*

*NCNB Texas Nat'l Bank v. Hulen Park Place Ltd. (In re Hulen Park Place Ltd.)*, 130 B.R. 39 (Bankr. N.D. Tex. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *22*

*Perry v. First Citizens Federal Credit Union (In re Perry)*, 391 F.3d 282 (1ˢᵗ Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

*Takisaki v. Alpine Group, Inc. (In re Alpine Group, Inc.)*, 151 B.R. 931 (9th Cir. BAP, 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *25, 28*

*United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d

290 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Winthrop Old Farm Nurseries, Inc. v. New Bedford Inst. for Sav. (In re Winthrop Old Farm Nurseries, Inc.)*, 50 F.3d 72 (1st Cir. 1995) . . . . . . . . . . . . . . . 23, 25, 26

## FEDERAL RULES

Federal Rule of Appellate Procedure 28(i) . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 40

Federal Rule of Bankruptcy Procedure 3018© . . . . . . . . . . . . . . . . . . . . . . . . 42

## FEDERAL STATUTES

11 U.S.C. §362(d)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

11 U.S.C. §362(d)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

11 U.S.C. §363 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

11 U.S.C. §506(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 35

11 U.S.C. §506(b) . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 5, 21, 22, 23, 25, 28, 35

11 U.S.C. §510(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

11 U.S.C. §1126(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

28 U.S.C. §§158(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. §§158(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. §158(d)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**STATE CASES**

*Ellis v. Sullivan*, 241 Mass. 60, 134 N.E. 695 (1922) . . . . . . . . . . . . . . . . . . . . . . . 37

**OTHER AUTHORITIES**

 S. Rep. No. 989, 95th Cong., 2d Sess., 68 (1978), U.S. Code Cong. & Admin. News 1978, pp. 5787, 5854) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

 S. Rep. No. 989, 95th Cong., 2d Sess., 68 (1978), U.S. Code Cong. & Admin. News 1978, pp. 5787, 5854) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

## STATEMENT OF BASIS OF APPELLATE JURISDICTION

I.     Basis for Bankruptcy Appellate Panel's Jurisdiction.

The Bankruptcy Appellate Panel for the First Circuit ("BAP") had

jurisdiction of this matter pursuant to 28 U.S.C. §§158(a)(1) and (c)(1), which

empower the BAP to hear appeals from final judgments, orders and decrees issued

by a bankruptcy court.  The Bankruptcy Court[1] issued decisions and orders that

fully and finally determined whether and in what amount Prudential Insurance

Company of America, on behalf and solely for the benefit of, and with its liability

limited to the assets of, its insurance company separate account, PRISA

("Prudential") was entitled to postpetition interest pursuant to 11 U.S.C. §506(b)

("506(b) Order") (*Addendum ["Add."] 142 et seq.*) and that confirmed Debtors'[2]

Modified First Amended Joint Plan of Reorganization (the "Plan") ("Confirmation

Order"). *Add. 77 et seq*.  Based on the foregoing, the Bankruptcy Court issued its

"Plan Confirmation Order" on November 14, 2011.  *Add 141.*  The 506(b) Order,

Plan Decision and Confirmation Order constituted "final judgments, orders or

_____

[1]Capitalized terms not otherwise defined in this brief have the meaning ascribed to them in the Brief of Appellants SW Boston Hotel Venture, LLC et al. (Case Nos. 12-9008 and 12-9009).

[2]The Debtors in this matter are SW Boston Hotel Venture LLC ("SW Boston"), Auto Sales & Service, Inc., General Trading Company, Frank Sawyer Corporation, 100 Stuart Street, LLC, 30-32 Oliver Street Corporation, General Land Corporation and 131 Arlington Street Trust (collectively, "Debtors").

decrees" over which the BAP had jurisdiction.

II.     Basis for Court of Appeals' Jurisdiction.

This Court has jurisdiction over this matter pursuant to 28 U.S.C.
§158(d)(1), which authorizes the Court to hear appeals from final decisions,
judgments, orders and decrees issued by the BAP.  To be considered "final" the
BAP decisions need not fully resolve all issues in the case, but must finally and
conclusively resolve a specific issue.  *Perry v. First Citizens Federal Credit Union
(In re Perry)*, 391 F.3d 282, 285 (1st Cir. 2004);  *In re Saco Local Dev. Corp.*, 711
F.2d 441, 445-446 (1st Cir. 1983);  *see also Oppositions of the City of Boston (filed
1/4/13 in Case No. 12-9012) and of Debtors (filed 1/4/13 in Case No. 12-9009)
relative to Prudential's Motions To Dismiss Appeal for Lack of Jurisdiction*.

Following Prudential's appeal, the BAP entered a final judgment affirming
in part, reversing in part, and remanding for further proceedings the 506(b)
Decision ("BAP 506(b) Decision").  *Add. 1 et seq*.  At the same time, the BAP
summarily vacated the Confirmation Order based on its reversal of the 506(b)
Decision ("BAP Plan Confirmation Order").  *Add. 34 et seq*.

The BAP 506(b) Decision and BAP Plan Confirmation Order together fully
and finally resolved the disputes over the calculation of Prudential's secured
claim, its entitlement to postpetition interest, and the confirmability of the Plan.

2

They are inextricably intertwined and present a discrete issue over which this Court has jurisdiction.

III.     Timeliness of Appeals.

The BAP issued the BAP 506(b) Decision and the BAP Plan Confirmation Order on October 1, 2012. The City of Boston filed timely notices of appeal of both the BAP 506(b) Decision and the BAP Plan Confirmation Order on October 29, 2012.

IV.     Appeal from Final Order or Judgment.

The City of Boston's appeals are from final orders or judgments that dispose of all parties' claims relative to the calculation of Prudential's secured claim, its entitlement to postpetition interest, and the confirmability of the Plan. *See Section II, supra*.

### STATEMENT OF ISSUES PRESENTED FOR REVIEW

I.     Whether the Bankruptcy Court's factual finding that Prudential did not prove that it had become oversecured and therefore entitled to accrue postpetition interest pursuant to 11 U.S.C. §506(b) before June 8, 2011 – the date of sale of the Hotel – was clearly erroneous.

II.     Whether the Bankruptcy Court's factual finding that the Prudential loan documents do not provide for monthly compounding of interest was clearly

erroneous.

III.    Whether the BAP erred in vacating the Plan Confirmation Order where its sole basis for doing so was its erroneous judgment reversing the Bankruptcy Court orders that limited Prudential's recovery of postpetition interest to the period during which Prudential established that it was oversecured.

IV.    Whether the Bankruptcy Court correctly concluded that the purported assignment of the City of Boston's voting rights to Prudential under an Intercreditor Agreement was invalid and unenforceable.

## STATEMENT OF THE CASE

This appeal will determine whether, at what rate, and for what period of time, Prudential, the Debtors' senior lender on the W Hotel and Residences, is entitled to postpetition interest pursuant to 11 U.S.C. §506(b).  From the beginning of the bankruptcy, through the various cash collateral hearings and Prudential's Motion for Relief, Prudential took the position that it was undersecured.  Only after the Debtors unexpectedly found a purchaser for the Hotel at a fortuitous price, did Prudential assert, by way of its 506(b) Motion, that it was oversecured and therefore entitled to postpetition interest.  Despite its prior protestations that it was undersecured, Prudential asserted in connection with its 506(b) Motion that it

4

was entitled to postpetition interest from the Petition Date at the default rate of 14.5%.

After three days of testimony, the Bankruptcy Court, in a lengthy, well-detailed decision, employed the "flexible approach" to valuing Prudential's secured claim and the collateral and concluded that Prudential had not met its burden of proving that it was oversecured until the date of the Hotel Sale on June 8, 2011. *Add. 146 et seq.* Accordingly, the Bankruptcy Court awarded postpetition interest from that date up to confirmation. The Bankruptcy Court further determined that the default rate of interest (14.5%) would apply, but that Prudential was not entitled to compound interest. *Add. 144-145.*

At the same hearing, the Bankruptcy Court also took testimony concerning the confirmation of Debtors' Plan. In another lengthy opinion, the Bankruptcy Court concluded, over Prudential's objection, that the Plan was confirmable.[3] *Add. 91 et seq.* In so ruling, the Bankruptcy Court concluded that the purported assignment of the City of Boston's voting rights to Prudential under an intercreditor agreement was invalid and unenforceable. The City of Boston is

---

[3]The Bankruptcy Court's detailed Confirmation Order covered a number of issues related to plan confirmation pursuant to 11 U.S.C. Sec. 1129. Pursuant to Fed. R. App. P. 28(i) the City of Boston joins in and adopts by reference each of the Debtors' arguments concerning plan confirmation (*see* Brief of Debtors, Arguments IV(A) - (D)) with the exception of the assignability of the City of Boston's voting rights.

Debtors' junior lender and the only other secured party.

Prudential appealed both the postpetition interest ruling and confirmation of the Plan to the BAP. The BAP erroneously overturned the Bankruptcy Court's factual finding that Prudential was not oversecured until June 8, 2011, concluding (without support) that Prudential had been oversecured from the Petition Date. The BAP upheld the application of default rate interest, but reversed the Bankruptcy Court on the issue of compound interest.

Based solely on its postpetition interest holding, the BAP vacated the Confirmation Order without reaching any of the substantive arguments set forth by the Debtors or the City of Boston.

The Debtors and the City of Boston have each appealed both BAP decisions.

## STATEMENT OF FACTS

I.    Incorporation of Debtors' Statement of Facts.

Pursuant to Federal Rule of Appellate Procedure 28(i), the City of Boston joins in and adopts by reference the Statement of Facts set forth in Debtors' Opening Brief filed in consolidated cases 12-9008 and 12-9009 as if fully set forth herein.

In addition, the City of Boston sets forth the following Statement of Facts.

6

II.    <u>City Loan</u>.

In late 2009, the Debtors had almost completed building the W Hotel and Residences; however a few integral parts of the building remained to be finished. The Debtors had run out of money to complete essential amenities, including the restaurant, spa and theme bar which were necessary to allow the project to open under the prestigious W Hotel flag.  *Add. 228.*

Because Prudential refused to lend any additional money to complete the amenities, there was a substantial risk in late 2009 that the project would shut down, leaving a vacant, unfinished 27 story building which would be a blight in the middle of the Theater District.  *Id.*  The Debtors and Prudential both were at risk of losing significant portions of their investments, and the City of Boston would have been left with an unfinished building that would have been a blight and an economic detriment to an already vulnerable section of the city.

To avoid such catastrophic consequences and to allow the W Hotel and Residences to open under the W Flag, on December 9, 2009, SW Boston and the City of Boston entered into a loan agreement ("City Loan"), whereby the City of Boston agreed to provide $10.5 million to complete the restaurant, spa and theme bar.  *Add. 163, 228.* The Debtors approached the City of Boston as a lender of last resort.  *Id.*

7

The City Loan was made pursuant to an innovative loan program called the Boston Invests in Growth Loan Pool ("Loan Pool") which is structured under the United States Department of Housing and Urban Development ("HUD") Section 108 Loan Guaranty program ("HUD 108 Loan") to stimulate local real estate development. *Add. 227-228*. The developments assisted by the Loan Pool have helped the City of Boston meet a number of important economic development goals for its citizens, including the promotion of tourism, which remains a crucial aspect of Boston's economy, and the generation of additional retail activity. Furthermore, such developments are important generators of jobs and tax revenues for the City of Boston and have a variety of secondary economic impacts. *Add. 228*.

One of the purposes of the Loan Pool is to provide economic assistance to projects which are having difficulty obtaining conventional commercial financing, such as the W Hotel and Residences. Due to the economic downturn in 2009, the need was especially acute. The City of Boston determined that the proposed funding for the restaurant, spa and theme bar to enable the project to open under the W flag met the criteria of the Loan Pool. The City of Boston was very aware that the Project needed to be finished quickly, and that there would be an immediate positive economic impact. If finished, the project would create new jobs and provide significant economic development in Boston's Theater District.

*Add. 228-229.*

The City Loan enabled the project to open under the W flag in a timely manner, and resulted in the hiring of over 250 persons, the majority of whom were low and moderate income people and residents of the City of Boston. *Id. 229.*

In order to fund the City Loan, the City of Boston borrowed the $10.5 million from HUD, pursuant to the HUD 108 Loan program. As security for the HUD 108 Loan the City of Boston provided to HUD a note secured by a pledge of present and future Community Development Block Grant ("CDBG") revenues. CDBG funding is critically important to the City of Boston because it provides dollars for the City of Boston's affordable housing and economic development programs. *Id. 229.*

SW Boston executed a Promissory Note in favor of the City of Boston on December 9, 2009 in the principal amount of $10.5 million to finance the completion of the restaurant, spa and theme bar. *Add. 4, 163, 218; Appendix ["App.] 1558, 1947.* As collateral for the City Loan, SW Boston granted the City of Boston a second mortgage on and assignment of leases and rents with respect to the W Hotel and Residences. *Add. 4, 218; App. 1558, 1947.* Sawyer Corporation, General Land, 30-32 Oliver Street and 131 Arlington Street also guaranteed SW Boston's obligations under the City Loan Documents and secured their guaranties

with second mortgages on additional parcels of real estate. *App. 1558*.

At the time of filing of the bankruptcy in April 2010, the Hotel had been opened only briefly, and the build-out was still not completed. During the course of the bankruptcy and using the proceeds from the City Loan, SW Boston did considerable work to complete the build-out of the spa and theme bar. *Add. 176; App. 1971-72*. These improvements funded by the City of Boston augmented the value of Prudential's collateral at no cost to Prudential. *Add. 176; App. 1563-64*. As a result of these improvements and after the Hotel had about an 18 month established revenue stream, a buyer unexpectedly fortuitously came forward and expressed a willingness to purchase the Hotel for $89.5 million on June 8, 2011 – about $24 million more than the $65.6 million at which the Bankruptcy Court had valued the Hotel in the context of Prudential's Motion for Relief mere months before. *Add. 165-166*.

III.   Intercreditor Agreement.

The Prudential Loan Documents required Debtors to obtain Prudential's consent prior to entering into any junior loans. In order to obtain that Prudential's consent for the City Loan, Prudential required the City of Boston to enter into the Intercreditor Agreement. *Add. 229*. The Intercreditor Agreement acknowledged that the City of Boston's source of the funds was "to be loaned pursuant to Section

108 of the United States Department of Housing and Urban Development

("HUD") Community Development Block Grant Program." *Add. 218*.

The Intercreditor Agreement provides at Sections 2(a)(vii) and 2(b)(vii) that Prudential and the City of Boston both represent and warrant that the Intercreditor Agreement is "subject to (A) applicable bankruptcy, reorganization, insolvency and moratorium laws, and (B) general principals of equity which may apply regardless of whether a proceeding is brought in law or in equity". *Add. 220, 222*.

At Prudential's insistence, the Intercreditor Agreement states that in the event of bankruptcy, the City of Boston will "assign to [Prudential] the voting rights of [the City of Boston] in such proceeding." *Add. 224, 229-230*.

The City of Boston made the City Loan and entered into the Intercreditor Agreement out of necessity to avoid a catastrophic shut-down of a large-scale project in the middle of the Theater District. The City of Boston was not motivated to make the City Loan in order to turn a profit. *Add. 230*. Prior to executing the Intercreditor Agreement, the City of Boston made clear to Prudential that it objected to the voting assignment provision and that it did not consider a provision purporting to give a creditor the rights belonging to the citizens of the City of Boston enforceable. *Id*.

By letters dated December 15, 2010 and May 10, 2011, Prudential, by and

through its attorneys, demanded the City of Boston assign its voting rights to
Prudential.  The City of Boston declined to do so, indicating that the voting rights
provision of the Intercreditor Agreement is unenforceable.  *Id*.

The Intercreditor Agreement contains a Severability Clause which provides
that if any part of the agreement is determined to be invalid or unenforceable, then
it shall be "deemed inoperative" but the balance of the Intercreditor Agreement
shall be valid and enforceable.  *Add. 225*.

IV.    <u>Increasing Value of Collateral and Decreasing Value of Prudential's Claim</u>.

The value of the W Hotel and Residence increased substantially throughout
the bankruptcy proceedings.  Further, the amount of Prudential's secured claim
was consistently being reduced as a result of Debtors' interim payments of
condominium sales proceeds to Prudential.

In its April 2010 schedule, SW Boston estimated the book value of the W
Hotel and Residences to be about $223 million.  *Add. 164.; App. 2254, 2256*.
(Schedule A).  Significantly, the pre-printed official bankruptcy form 6A
"Schedule A Real Property" specifically states:

> **<u>*Note – All values listed are book values unless noted, which book
> values may not reflect the fair market value of the Debtor's
> interest in the property.</u>**

(emphasis in original).  *Id*.

As of the Petition Date, Prudential was owed about $180 million. *Add. 164*.
Shortly after the Petition Date, Prudential drew on a Sovereign letter of credit in
the amount of $17,300,000, thereby reducing the debt balance to $164,778,243.
*Add. 163*.

Prudential filed its Motion for Relief on August 3, 2010. *App. 2067 et seq*.
In the motion, Prudential claimed it was "substantially" undersecured because the
W Hotel and Residence had a value of $141 million, and it was owed $162.4
million. *Add. 165; App. 2068*. Debtors and Prudential stipulated, for purposes of
the Motion for Relief, that the value of the additional collateral held by Prudential
was about $14,754,000. *Add. 165; Add. 1969*.

After hearing, the Bankruptcy Court found that the amount of Prudential's
claim (as of November 2010), exclusive of postpetition interest due, if any, was
about $154 million. *Add 165; App. 1949*. The Bankruptcy Court further
determined that, for purposes of that motion, the value of the Hotel was $65.6
million (*Add. 173; App. 1973*) and the value of the remaining residences was $88
million (*Add. 165, 173; App. 1970*), for a total of $153.6 million[4]. This contrasted

_____

[4]Debtors' expert witnesses testified at the Lift Stay Hearing that the value of the Hotel
was $65.6 million (*App. 1963*) and the value of the unsold residences was $90.6 million (*App. 1953*). Prudential's expert witnesses testified that the value of the Hotel was $55 million
(*App.1957*) and the value of the unsold residences was $86 million (*App. 1950*).

13

sharply to the $223 million book value that SW Boston had listed on its April 2010 Schedule. *Add. 165; App. 2254, 2256.*

While the Bankruptcy Court found that Prudential was undersecured as to the W Hotel and Residences by about $400,000 as of the Lift Stay proceedings in November 2010, the Bankruptcy Court found that when the total value of Prudential's collateral package ($168,354,000) was considered, there was an equity cushion. *Add. 152, 165-166; App. 1980, 1983*). The Bankruptcy Court denied the Motion for Relief. *Add. 165; App. 1992.*

On March 28, 2011, SW Boston filed a motion seeking permission to sell the Hotel to a third party purchaser for $89.5 million. *Add. 152, 166; App. 1919 et seq.*. The Court approved the sale on May 24, 2011. *Add. 166; App. 1835 et seq.*

On April 15, 2011, while Debtors' motion to sell the Hotel was pending, Prudential filed its 506(b) Motion, asserting that it was entitled to postpetition interest at the contract default rate of 14.5% from the Petition Date, as well as its reasonable fees and costs pursuant to 11 U.S.C. §506(b). *Add. 169-171.*

Prudential and Debtors stipulated that as of May 31, 2011, the value of the remaining condominiums and the additional collateral was $82,781,809. *Add. 166.*

The Hotel Sale closed on June 8, 2011. Immediately prior to the sale, taking

into consideration payment of net condominium sales proceeds, the outstanding

debt to Prudential had been $139,156,976.  The net sales proceeds of $83,322,017

from the Hotel sale were paid to Prudential on June 8, 2011 (*Add. 166*), bringing

the principal balance on the Prudential debt down to $55,834,959[5].  *Add. 167*.

V.    Bankruptcy Court Combined Hearing.

On June 27 - 29, 2011, the Court held a combined hearing and took

testimony on Plan Confirmation and Prudential's 506(b) Motion ("Combined

Hearing").  The Judge listened to the testimony of witnesses and expert witnesses

for both the Debtors and Prudential.  For purposes of that hearing, Prudential and

Debtors stipulated that as of June 23, 2011, the value of the remaining

condominiums was $63,772,219 and Prudential's additional collateral was

$14,555,469, for a total of $78,327,688.  *Add. 166; App. 1587*.  At the Combined

Hearing, Prudential submitted no evidence of its fees or costs, and did not provide

any evidence of their reasonableness.  *Add. 171, 202-205*.

The Bankruptcy Court issued a decision on the 506(b) Motion on October 4,

2011.  *Add. 146 et seq*.  The Court found that:

June 8, 2011, the date of the closing of the sale [of the Hotel], is the

---

[5]By the date of the Combined Hearing, the principal balance of the Prudential debt had
been further reduced to $53,537.825, exclusive of postpetition interest, on account of additional
condominium sales proceeds having been paid over to Prudential.  *Add. 172*.

15

appropriate time for fixing Prudential's oversecured status. On that date, it was unequivocally established and beyond dispute that Prudential was an oversecured creditor. *Prudential did not submit evidence of oversecured status at the commencement of the Debtors' case*, and there was no evidence substantiating the values utilized by the Debtors in the Schedules of Assets. The Court's decision with respect to the Lift Stay Motion was based upon expert testimony, not the operation of the market place in which a willing seller and willing buyer agreed to a purchase price.

*Add. 193 (emphasis added)*. Further,

This Court finds that Prudential failed to submit sufficient evidence to warrant the conclusion that it was oversecured in April 2010.

*Add. 194*. The Court concluded that Prudential had only met its burden of proving that it became oversecured as of the date of the Hotel sale on June 8, 2011, and that postpetition interest would accrue, without compounding, at the default rate of 14.5% from that date. *Add. 145, 205*.

On November 14, 2011, the Bankruptcy Court issued its Plan Confirmation Decision and Order. *App. 91 et seq., 141*. In its extensive decision confirming Debtors' Plan, the Bankruptcy Court held that the purported assignment of the City of Boston's voting rights to Prudential pursuant to the Intercreditor Agreement was inconsistent with the letter and spirit of the Bankruptcy Code and was therefore unenforceable. *App. 108-111*.

16

VI.    <u>BAP Decisions</u>.

Prudential appealed both Bankruptcy Court orders.  On October 1, 2012, the BAP issued the BAP 506(b) Decision, which affirmed in part, reversed in part, and remanded for further proceedings the October 4, 2011 Bankruptcy Court's 506(b) Order, granting, in part, and denying, in part, Prudential's 506(b) Motion and the Bankruptcy Court's Prudential Claim Order.  *Add. 1 et seq*.  Specifically, the BAP reversed the Bankruptcy Court's factual finding that Prudential first became oversecured and entitled to postpetition interest from June 8, 2011, and instead decided that Prudential was entitled to postpetition interest from the Petition Date. *Add. 21*.  It further concluded that Prudential was entitled to compound monthly interest at the default rate of 14.5%.  *Add. 26, 30*.

Also on October 1, 2012, the BAP issued the BAP Plan Judgment which vacated and remanded for further proceedings the Bankruptcy Court's Plan Confirmation Order confirming the Debtors' Plan, based solely on the BAP 506(b) Decision.  *Add. 34 et seq*.  The BAP did not substantively review any of the arguments made by the Debtors or the City of Boston concerning plan confirmation.  *Add. 39-40*.

## **SUMMARY OF ARGUMENT**

The Bankruptcy Court and BAP both correctly adopted the "flexible

17

approach" for valuing collateral and determining Prudential's status in light of the increasing value of the W Hotel and Residences throughout the bankruptcy proceedings and the decreasing value of Prudential's claim.  The asserted values at the Petition Date and during the Motion for Relief were estimates only.

Based on the evidence submitted, the Bankruptcy Court correctly found that Prudential became oversecured on the date of the Hotel Sale on June 8, 2011 and that Prudential had failed to establish that it became oversecured prior to that date. Its decision was supported by ample evidence and was not clearly erroneous.  The BAP was constrained to accept the Bankruptcy Court's factual findings unless they were clearly erroneous.

Indeed, up until Prudential filed its 506(b) Motion, it routinely insisted that it was undersecured.  Only when it became clear that Prudential was going to be oversecured because of the pending Hotel Sale, did Prudential changed its tune, asserting that it was entitled to postpetition interest from the Petition Date and that it had been oversecured since the inception of the bankruptcy case. *App. 165*.

The overwhelming weight of authority and common sense dictate that when there is a hard, irrefutable evidence of value arrived at through the sale of collateral on the open market to a disinterested third party, the court should use that value in determining a secured creditor's status, but only as of the date when

18

the sales proceeds are actually realized.

The Bankruptcy Court correctly concluded that the Prudential Loan Documents do not provide for compound interest monthly, and the BAP erred in reversing the Bankruptcy Court's finding.

The BAP erroneously vacated the Bankruptcy Court's Confirmation Order based solely on its erroneous decision concerning postpetition interest. The BAP did not reach the merits of the Bankruptcy Court's Confirmation Order. Because the BAP 506(b) Decision must be overturned, this Court must review the Bankruptcy Court's Plan Confirmation Decision on a substantive level. The Debtors established all elements necessary to confirm the Plan.

The Bankruptcy Court correctly concluded that the purported assignment of voting rights by the City of Boston to Prudential in the Intercreditor Agreement was unenforceable.

## ARGUMENT

I.    <u>Standard of Review</u>.

In an appeal from a Bankruptcy Appellate Panel review of a bankruptcy court order, the Circuit Court of Appeals independently reviews the bankruptcy court's decision *de novo*, but "will only upset the court's factual determinations in the case of clear error". *In re Laboy*, 647 F.3d 367, 373 (1ˢᵗ Cir. 2011) (citing *In re*

*Hill*, 562 F.3d 29, 32 (1ˢᵗ Cir. 2009).  The Court of Appeals "'cede[s] no special deference to the [bankruptcy appellate panel] focusing instead on the bankruptcy court's decision".  *Id*.  This Court must uphold the Bankruptcy Court's factual determinations unless it forms "a strong, unyielding belief that a mistake has been made." *Cumpiano v. Banco Santander*, 902 F.2d 148, 152 (1st Cir.1990). "It follows that if the bankruptcy court's findings are supportable on any reasonable view of the record, [the Court of Appeals is] bound to uphold them." *In re Carp*, 340 F.3d 15, 22 (1ˢᵗ Cir. 2003), citing *Boroff v. Tully ( In re Tully )*, 818 F.2d 106, 109 (1st Cir.1987) and *Anderson v. Beatrice Foods Co.*, 900 F.2d 388, 392 (1st Cir.1990) (warning that appellate review of "fact-dominated issues cannot be allowed to descend to the level of Monday-morning quarterbacking").

II.  <u>Employing the "Flexible Approach" for the Timing of Valuing Prudential's Collateral and Secured Claim, Prudential Is Entitled to Postpetition Interest Only for the Period of Time it Proved it Was Oversecured – From the Date of the Hotel Sale on June 8, 2011.</u>

**A.  Prudential Bears the Burden of Proving That it Was Oversecured, to What Extent, and for What Period of Time.**

This Court must review *de novo* whether Prudential has met its burden of proof to establish its entitlement to postpetition interest.  There can be no dispute that Prudential, as a secured creditor claiming to be entitled to postpetition interest pursuant to 11 U.S.C. §506(b), bears the burden of proving by a preponderance of

20

the evidence that its claim is oversecured, to what extent, and for what period of

time[6]. *Fin. Sec. Assurance, Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New*

*Orleans Ltd. P'ship)*, 116 F.3d 790, 798 (5th Cir. 1997) (citing *Heritage Bank*

*Tinley Park v. Steinberg (In re Grabill Corp.)*, 121 B.R. 983, 991-92 (Bkrtcy. N.D.

Ill.,1990)); *see also, In re Bradley*, 94 B.R. 563, 567 (Bankr. N.D. Iowa 1988) and

*In re Mitchell*, 81 B.R. 171, 173–174 (Bankr.D.Colo. 1988).

A creditor becomes oversecured at the point in time when it proves that the

value of its collateral exceeds the amount of its allowed claim.  *United States v.*

*Ron Pair Enters., Inc.*, 489 U.S. 235, 239, 109 S.Ct. 1026, 103 L.Ed.2d 290

(1989); *Baybank-Middlesex v. Ralar Distribs., Inc.*, 69 F.3d 1200, 1202 (1st Cir.

1995).  Once a creditor establishes that it has become oversecured, it is entitled to

postpetition interest in accordance with §506(b), but only from that date and only

to the extent it is oversecured.  *Id*.; *United Sav. Ass'n of Texas v. Timbers of*

*Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 372-73, 108 S.Ct. 626, 98 L.Ed.2d 740

(1988);  *In re T-H New Orleans Ltd. P'ship*, 116 F.3d at 798 .

**B.    "Flexible Approach" Is the Appropriate Method for Determining Prudential's Entitlement to Postpetition Interest.**

The Court must review *de novo* the Bankruptcy Court's determination that

---

[6]In its Motion for Relief, Prudential endeavored to shift the burden to the Bankruptcy Court to ascertain a date on which it became oversecured.

the "flexible approach" is the proper legal standard to be applied in determining

when to value Prudential's collateral and secured status for purposes of §506(b).

"[N]either Bankruptcy Code §506(b) nor the Bankruptcy Rules define or

establish the time for determining valuation of collateral for purposes of §506(b)."

*In re T-H New Orleans Ltd. P'ship*, 116 F.3d at 798 (citations omitted).  Similarly,

this Court has yet to address what standard applies in determining when valuation

of collateral and a secured party's claim should be made for the purpose of

determining whether a secured party is entitled to postpetition interest under

§506(b).

Other courts that have considered the issue have used one of three

standards: (1) a single valuation date[7] (either petition date or at confirmation); (2)

the "dual valuation approach"[8] (perform valuation using prepetition claim and

---

[7]Courts that employ the single valuation date hold that if a secured creditor is not fully secured on whichever date that court employs as the measuring date, then the secured creditor receives no postpetition interest.  *Cmty. Bank of Homestead v. Torcise (In re Torcise)*, 187 B.R. 18, 23 (S.D. Fla. 1995) (measured at petition date), *rev'd on other grounds*, 162 F.3d 1084 (11th Cir. 1998); *NCNB Texas Nat'l Bank v. Hulen Park Place Ltd. (In re Hulen Park Place Ltd.)*, 130 B.R. 39, 43 (Bankr. N.D. Tex. 1991)(measured at petition date); *In re Landing Assocs., Ltd.*, 122 B.R. 288, 293 (Bankr. W.D. Tex. 1990)(measured at confirmation).  If the Petition Date were used in this case, Prudential would not be entitled to any postpetition interest because it did not offer any evidence of the value of the collateral on the Petition Date.  If the confirmation date was used, Prudential would be entitled to postpetition interest because the parties stipulated that Prudential was oversecured as of confirmation.  *Add. 166*.

[8]"If the collateral package at the time of confirmation exceeds the amount of the creditor's total prepetition claim, the creditor is entitled to interest and costs under Sec. 506(b) to the extent of the surplus."  *In re Addison Props. Ltd. P'ship*, 185 B.R. 776, 784 (Bankr. N.D. Ill.

22

confirmation collateral); or (3) the flexible approach (look to the individual circumstances of the case and the purpose of the valuation).

In this case, both the Bankruptcy Court and the BAP concluded that the "flexible approach" should be employed, though they came to very different conclusions in the application of that standard. Both courts recognized that, where the value of the collateral – here the W Hotel and Residences – was increasing and Prudential's secured claim was being paid down throughout the course of the bankruptcy, it was appropriate to adopt the "flexible approach" to determine whether Prudential was entitled to postpetition interest. *Add. 18-22; 187-193*.

> 1.   *Purpose of Valuation Is to Establish Whether Prudential Is Entitled to Postpetition Interest.*

11 U.S.C. §506(a)(1) expressly provides that in determining a creditor's secured or unsecured status, the value of the creditor's interest in the Debtors' property "shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property." In interpreting §506(a), this Court has noted that the legislative history of §506(a) indicates that Congress intended courts to employ "a flexible approach . . . to fit the circumstances" in determining valuation. *Winthrop Old Farm Nurseries, Inc. v. New Bedford Inst. for Sav. (In re*

1995).

*Winthrop Old Farm Nurseries, Inc.)*, 50 F.3d 72, 73-75 (1st Cir. 1995); *see also In re T-H New Orleans Ltd. P'ship*, 116 F.3d at 799.

Here, the purpose of the valuation was to determine, pursuant to Prudential's own motion, whether Prudential was entitled to postpetition interest pursuant to §506(b). Because the purpose of the valuation was to determine Prudential's secured status, the Bankruptcy Court properly looked at all the unique circumstances of this case to determine the appropriate date on which to value the collateral and Prudential's secured status.

> 2.     *Valuation must Be Made as of Date of Sale of the Hotel.*

While Prudential seeks to maximize its return on its loan by imposing a 14.5% postpetition interest from the Petition Date, the Bankruptcy Court correctly concluded that the appropriate date for valuing the collateral securing Prudential's claim was the date of sale of the Hotel – June 8, 2011 and that it was appropriate to apply that value only going forward.

When Prudential filed its Motion for Relief in August 2010, it asserted that the value of the Hotel and Residences totaled $141 million. *Add. 165*. When the Bankruptcy Court issued its Lift Stay Decision in January 2011, it concluded, based on a review of the parties' conflicting expert testimony, that the value of the W Hotel was $65.6 million, and combined with the Residences, totaled $153.6

million.

In June 2011 the Hotel sold for $89.5 million, about $24 million more than the Court's January 2011 valuation of $65.6 million. *Add. 152; App. 1973.*

Debtors paid Prudential about $83.3 million in net proceeds from the sale of the Hotel. *App. 152.* Further, pursuant to the Bankruptcy Court's various cash collateral orders, Debtors had made various periodic payments totaling about $26.8 million in net proceeds from the sale of condominium units to Prudential from the Petition Date up to the date of the Combined Hearing, thereby reducing Prudential's claim. *Add. at 167, App. 1590.*

This Court has previously expressed support for a flexible approach to valuation in the bankruptcy context. *See In re Winthrop Old Farm Nurseries, Inc.*, 50 F.3d at 75-76; *see also Takisaki v. Alpine Group, Inc. (In re Alpine Group, Inc.)*, 151 B.R. 931, 935 (9th Cir. BAP, 1993) (point of sale, not petition date, is relevant time for determining whether a creditor is oversecured).

In *T-H New Orleans*, the Fifth Circuit was presented with a situation similar to the case at bar. *In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790. The debtor owned a hotel which was subject to a mortgage. *Id.* As in the present case, at the petition date, the mortgage holder was significantly undersecured. *Id.* at 794-795. Also like the case at bar, pursuant to a cash collateral order, the debtor paid down

25

its indebtedness to the mortgage holder during the pendency of the case. *Id*. at 795. At some point between the time the bankruptcy court entered an order determining the amount of the mortgage holder's secured claim in September 1994 and the confirmation of a Chapter 11 plan on March 30, 1995, the value of the hotel had increased and the mortgage holder had become oversecured. *Id*. at 796.

Because the creditor had become oversecured during the course of the bankruptcy, the Court had to consider "when valuation should occur for purposes of determining a creditor's entitlement to postpetition interest." *Id*. The court, in the exercise of its equitable powers, adopted the "flexible approach" to valuing the collateral and the creditor's secured claim where the collateral value was increasing and the amount of the secured claim was being paid down. *Id*. at 798; *see also In re Urban Communicators PCS LTD. P'ship*, 379 B.R. 232 (Bankr. S.D.N.Y. 2007) (Courts have flexibility in determining entitlement to postpetition interest), *rev'd on other grounds*, 394 B.R. 325 (S.D.N.Y. 2008).

This type of approach is consistent with this Court's flexible approach to valuation. *See In re Winthrop Old Farm Nurseries, Inc.*, 50 F.3d at 75-76. "Recognition of that flexibility is, after all, consistent with attention to the needs and concerns of junior creditors." *In re Urban Communicators*, 379 B.R. at 243. It also makes sense that a bankruptcy court would be given a degree of flexibility

26

in valuing collateral and claims, where economic uncertainty and fluctuating value, such as that which has pervaded the market in the past several years, makes valuation more difficult.

As determined by the Bankruptcy Court, under the circumstances presented in this case, it is appropriate to use the June 8, 2011 sale value only from that date forward (as opposed to retroactively assigning that value to an earlier point in time) because, until the sale actually occurred, there was no assurance that SW Boston could achieve the sale price contemplated in the fortuitous purchase and sale agreement. *Add. 193.* Debtors' and Prudential's expert witnesses both agreed at the time of the Motion for Relief hearing that the value of the Hotel was no more than $65.6 million. *See* footnote 4, *supra.* "When valuing secured collateral to determine whether a creditor is oversecured and thus entitled to postpetition interest pursuant to §506(b), if the collateral has been sold, the value of the collateral should be based on the consideration received by the estate in connection with the sale, provided that the sale price is both fair and the result of an arm's-length transaction." *Ford Motor Credit Co. v. Dobbins*, 35 F.3d 860, 871 (4th Cir. 1994) (where value of collateral had fluctuated such that an oversecured creditor became undersecured during the pendency of the case, the appropriate valuation date was the date of sale of the collateral). The *Ford Motor Credit* court

27

explained that "using the sale price . . . makes practical sense because it is 'conclusive evidence of the property's value', and it is the amount of money the collateral actually was able to bring into the estate for distribution." *Id*. at 870 (citing *In re Alpine Group, Inc.*, 151 B.R. at 936).

**C.    The Bankruptcy Court's Factual Finding that Prudential Did Not Become Oversecured Until June 8, 2011 Was Well Supported by the Evidence.**

The Bankruptcy Court made a factual finding, based on the evidence submitted at the Combined Hearing that involved three days of testimony, that Prudential became oversecured on June 8, 2011 – the date of the Hotel Sale. *Add. 193*. The Bankruptcy Court specifically found that "[o]n that date, it was unequivocally established and beyond dispute that Prudential was an oversecured creditor". *Id*. Further, as a factual matter, the court noted that Prudential did not offer *any* evidence to show that it was oversecured on the Petition Date. *Id*. In fact, there was no evidence by any party submitted concerning the estimated book values on Debtors' schedules. *Id*.

The Bankruptcy Court went on to note that its own valuation of the collateral in the context of the Motion for Relief was based on expert testimony, "not the operation of the market place in which a willing seller and wiling buyer agreed to a purchase price". *Add. 193*. The subsequent unexpected sale of the

28

Hotel to a third-party purchaser at a price substantially above any party's expert appraisal, demonstrates that the collateral lacked the increased value until the sale actually closed[9].

Here, Prudential did not establish that it became oversecured until June 8, 2011, the date the Hotel sold. At that time, the Debtors were indebted to Prudential in the amount of $55,834,959. *Add. 167.* The value of the remaining condominiums on that date was $66,069,353. *Add. 174.* The Bankruptcy Court was well grounded in finding that Prudential failed to offer any evidence that it became oversecured prior to June 8, 2011.

### D.   Other Measuring Dates to Value Prudential's Collateral and Secured Claim Are Inappropriate.

Prudential has suggested that the Bankruptcy Court should have looked beyond the evidence submitted to select some other date on which Prudential became oversecured, including the Petition Date, upon entry of cash collateral orders and in connection with the Motion for Relief proceedings. *See e.g. App. 193-195.*

---

[9]The purchase and sale agreement to the third party purchaser contained a number of contingencies, so there was no assurance that the sale would actually take place up until the actual closing date. *Add. 193-194.*

        1.    *Petition Date.*

Prudential submits that it has been oversecured since the inception of this

proceeding, purportedly relying on the collateral values (about $240 million) listed

on Debtors' schedules.  *Add. 164.*  Prudential did not introduce any evidence

concerning the value of the collateral at the Petition Date in connection with the

Combined Hearing.  *Add. 193-194.*  The Bankruptcy Court is not bound to accept

the "book values" set forth in the Debtors' schedules, most especially because

Prudential did not even point to appraisals or expert testimony to support those

figures at Combined Hearing. *See e.g. In re Cormier*, 382 B.R. 377, 409 (Bankr.

W.D.Mich. 2008) ("Scheduled values, as contrasted to amounts claimed exempt,

are not binding upon parties in interest, including creditors and the trustee")[10].

Moreover, Prudential repeatedly insisted that it was not oversecured as of

the Petition Date.  It did not want to be oversecured because that would have

undercut its efforts to oppose Debtors' use of cash collateral and would have

---

[10]In overturning the Bankruptcy Court's 506(b) Order, the BAP relied on an improper interpretation of *In re Urban Communicators PCS Ltd. P'ship*, 379 B.R. 232, when holding that Prudential was oversecured as of the Petition Date.  In *Urban Communicators*, the bankruptcy court had made an express finding that the secured creditor was oversecured as of the petition date.  There was no such finding in this case.  To the contrary, the Bankruptcy Court expressly found, as a factual matter, that Prudential had *not* established that it was oversecured as of the Petition Date.  *Add. 193-194.*

thwarted its efforts to foreclose on the W Hotel and Residences through its Motion for Relief.  Only after the unexpected, fortuitous, inflated offer for the Hotel was received, did it become convenient for Prudential to assert a contrary position and to insist that it always had been oversecured.

      2.    *Cash Collateral Orders.*

Prudential has argued that the Bankruptcy Court "implicitly" found that Prudential was oversecured each time it allowed the Debtors' various motions for use of cash collateral.  *App. 193.*  In fact, the Bankruptcy Court ordered periodic payments of net sales proceeds from the condominiums to Prudential and granted replacement liens to provide adequate protection in accordance with 11 U.S.C. §363.  Nothing in the Court's various orders made any mention of whether Prudential was or was not undersecured, and certainly did not purport to make a factual finding on that point.  *App. 2097, 2098, 2115, 2124, 2139*; *Cf. Baybank-Middlesex v. Raylar Distributions, Inc.*, 69 F.3d at 1203 (court's express finding, after two day evidentiary hearing on use of cash collateral, that creditor was undersecured was a factual finding, not *obiter dictum*).

Unless Prudential was filing its objections in bad faith, the mere fact that Prudential was still challenging Debtors' cash collateral motions even after the Bankruptcy Court entered its decision in the Lift Stay Proceeding and even after

31

the Hotel Sale closed (*see App. 2089*), shows that Prudential did not believe it was oversecured.

Even if the Bankruptcy Court had made a specific finding of valuation for purposes of adequate protection, that finding would not be binding on the court for other valuation purposes throughout the bankruptcy case.  *Ahlers v. Norwest Bank Worthington (In re Ahlers)*, 794 F.2d 388, 398 (8th Cir. 1986), *rev'd on other grounds,* 485 U.S. 197 (1988). ("An initial valuation for adequate protection purposes is not *res judicata* for purposes of determining the value of the collateral, and thus the allowed secured claims of the creditors, under a reorganization plan");  *In re Centu. Inv. Fund VII Ltd. Partner.*, 96 B.R. 884, 886 (Bankr. E.D. Wis. 1989) (valuation for purpose of lifting automatic stay not binding in other aspects of case);  *In re Dinsmore*, 141 B.R. 499, 510 (Bankr. W.D. Mich. 1992) ("A previous determination of value is not binding later on in the case. 'To illustrate, a valuation early in the case in a proceeding under sections 361-363 would not be binding upon the debtor or creditor at the time of confirmation of a plan.'" (citing S. Rep. No. 989, 95th Cong., 2d Sess., 68 (1978), U.S. Code Cong. & Admin. News 1978, pp. 5787, 5854)).

Because the Bankruptcy Court did not make any factual finding as to Prudential's secured status in connection with any of the cash collateral orders,

32

Prudential could not and did not meet its burden of proving, by a preponderance of the evidence, that it was oversecured (and therefore entitled to postpetition interest) at the time of any of the cash collateral hearings or orders.

3.    *Motion for Relief*.

The Bankruptcy Court's valuations in connection with the Motion for Relief are not binding on the Court when making other valuation determinations at other points in the case. *See* Discussion at Section II(D)(2), *supra*, and cases cited therein.

During the Motion for Relief proceedings, all parties anticipated that the Debtors would be retaining both the Hotel and the Residences in connection with any prospective reorganization. There was no indication that the Hotel would or could be sold to a third party purchaser. Both Prudential and Debtors' experts looked at the Boston hotel market and other evidence available to them at the time to opine as to the value of the Hotel in connection with the Motion for Relief. Based on that testimony, the Bankruptcy Court found that Prudential was undersecured as to the W Hotel and Residences, but there was an equity cushion when the entire collateral package was considered, and the W Hotel and Residences were necessary to Debtors' reorganization which was in prospect.

An offer to purchase came in at an unexpectedly high amount of $89.5

33

million in March 2011.  As part of the sale approval, the Bankruptcy Court

required that the Hotel be put out for bid, but no other bidder came forward.  *App.*

*1839-40*.   The Hotel sold for $30 million more than Prudential's expert had

valued it mere months before.  As the Bankruptcy Court noted, this demonstrates

the risk attendant in relying on the appraisal figures that have not been tested by

the open market.  *App. 193*.  A conclusive measure of the value as of the date of

actual sale came about only by virtue of the arms-length sale to a third party

purchaser.

     The sale of the Hotel fundamentally changed the dynamic of the Debtors'

assets and liabilities and resulted in a change in direction with regard to its

reorganization plan.  It would be unfair, unreasonable and inequitable to

retroactively apply the unanticipated windfall Hotel purchase price back to any

earlier valuation date.

     Finally, the Bankruptcy Court was not conducting an analysis of the

collateral's value pursuant to §506(a) or (b) in connection with the Motion for

Relief, nor was it making a determination as to whether Prudential was

oversecured.  Rather, it was conducting an analysis under 11 U.S.C. §§362(d)(1)[11]

---

[11]Prudential asserted in its Motion for Relief that it was entitled to relief pursuant to Sec.
362(d)(1), but it abandoned that argument at the Lift Stay Hearing and did not address it in its
post-trial brief.  *App. 1978*.

and (d)(2). The Bankruptcy Court concluded that, even though SW Boston lacked

equity in the W Hotel and Residences, when the Debtors' assets were aggregated,

there was sufficient value to establish that an effective reorganization was in

prospect, and it denied Prudential's Motion for Relief on those grounds. *App.*

*1992.*

### E.     Interest Is Only Payable from the Date Prudential Became Oversecured – June 8, 2011.

When Prudential filed its 506(b) Motion, it expressly acknowledged that it

would only be entitled to postpetition interest for that period of time during which

it was oversecured. *App. 1714.* Specifically, relying on *In re T-H New Orleans*,

Prudential stated "to the extent a secured creditor's claim fluctuates between being

oversecured and undersecured during the course of a bankruptcy case, *the creditor*

*is entitled to accrue postpetition interest during the period which it is*

*oversecured*." *App. 1714 (emphasis added).*

Now that it suits its purposes, Prudential seeks to ignore all the times it

previously argued it was undersecured and attempts to set forth new theories of

why it should be paid postpetition interest from the inception of the bankruptcy.

A secured creditor is only awarded interest for the period it can establish

that it was oversecured. *See In re Bradley*, 94 B.R. 563, 568-69 (Bankr. N.D.

Iowa 1988); *In re Mitchell*, 81 B.R. 171, 173 (Bankr. D.Dist.Col. 1988); *In re Rothenberg*, 173 B.R. 4, 20 n. 14 (Bankr. D.D.C. 1994).

Prudential established that it was oversecured from the date of the Hotel Sale up to confirmation, and for no other period.  The Bankruptcy Court correctly awarded postpetition interest only from June 8, 2011 to the Plan's Effective Date on December 1, 2011.  *Add. 206-207.*

III.    The Bankruptcy Court Finding That Prudential Was Not Entitled to Compound Monthly Postpetition Interest at the Default Rate Was Not Clearly Erroneous.

The Bankruptcy Court reviewed the Prudential Loan Agreement and took oral testimony concerning the default rate of interest.  *Add. 144-145; 168.*  The Bankruptcy Court correctly concluded that there was no basis to compound monthly postpetition interest where the it had allowed interest at the default rate set forth in the Prudential Loan Documents.  This Court must give deference to the Bankruptcy Court's factual findings, but reviews its legal conclusions *de novo*.

A.    **The Loan Documents Do Not Provide for Compounding of the Default Rate.**

Prudential erroneously asserts that the Prudential Loan Agreement provides for compound interest on default rate interest.  The Prudential Loan Agreement defines the Default Rate as "a rate per annum equal to the lesser of (i) the

maximum rate permitted by applicable law or (ii) five percent (5%) above the

Applicable Interest Rate." *App. 2158*.  The Default Rate definition says nothing

whatsoever about compounding.  Prudential is a sophisticated lender, represented

by sophisticated counsel.  If it had wanted to ensure compounding of the Default

Rate, presumably it would have drafted the Default Rate provision to read "a rate

per annum equal to the lesser of (I) the maximum rate permitted by applicable law,

*compounded monthly* or (ii) five percent (5%) above the Applicable Interest Rate,

*compounded monthly*."  However, the italicized language is blatantly missing from

both the first and second clause of the Default Rate definition.  It is clear that the

Loan Agreement was only intended to compute default interest at 9.5% plus 5%.

Any other reading would torture the clear meaning of that provision of the Loan

Agreement.

The Bankruptcy Court correctly concluded that, as a matter of law,

Prudential is not entitled to compound interest on its postpetition interest award.

*Ellis v. Sullivan*, 241 Mass. 60, 134 N.E. 695 (1922).

### B.     Compounding Would Be Inequitable to the City of Boston.

There would have been no basis for the Bankruptcy Court to have found

that Prudential was entitled to compound interest as a matter of equity.  Indeed, it

would be inequitable to permit Prudential to compound the monthly default rate

37

interest.  The City of Boston is the Debtor's only other secured creditor besides Prudential.  The City Loan is structured under the HUD Section 108 Loan program to stimulate local real estate development.  The City of Boston pledged its present and future affordable housing and economic development revenue to fund the City Loan.  The City of Boston is not a traditional commercial lender looking to make a profit in this situation.  *Add. 230*.  The City Loan made the Hotel sale possible at the fortuitous price Debtors were able to achieve.

If Prudential is permitted to compound its postpetition interest at the default rate of 14.5%, the City of Boston's ability to recover its affordable housing and economic development money may be severely compromised.  It would be inequitable to reward Prudential with the compound default rate, where the City of Boston funds were used to increase the value of Prudential's collateral (e.g. completion of the restaurant, spa and theme bar) during the bankruptcy, enabling the Debtors to achieve the inflated sales price.  Even after the sale of the Hotel, the City's funds were being used to complete the build-out of the theme bar, which continued to add value to the remaining condominium units and to facilitate sale of the Hotel at a price that exceeded everyone's expectations.  *App. 1563-64*.  But for the use of the City of Boston's loan proceeds during the pendency of this bankruptcy, the spa and theme bar would not have been completed, and it is

unlikely that the Debtors would have been able to attain such a high premium for the Hotel.  Prudential did not contribute in any manner whatsoever, to the increase in value of the Hotel during the bankruptcy.  To the contrary, Prudential repeatedly took every imaginable step to thwart the Debtors' reorganization efforts[12].  Prudential should not be rewarded for its obstructionist tactics throughout these bankruptcy proceedings at the expense of the citizens of the City of Boston.  Moreover, without the City Loan proceeds, Prudential may not ever have even been able to recoup its principal balance, let alone *any* amount of postpetition interest.

The City of Boston has gone to great lengths to ensure the viability of this project by pledging its affordable housing and economic development money, and it should not be penalized or taken advantage of for doing so.  The City's ability to collect its claim could be impaired by permitting Prudential to charge a 14.5%

---

[12]*See e.g. App. 578* (Docket Entry #105 Prudential objection to use of cash collateral); *App. 591* (Docket Entry #201 Motion for Relief); *App. 596* (Docket Entry #224 Prudential objection to extension of exclusivity); *App. 601* (Docket Entry #255 Prudential objection to Debtors' motion for authority to lease condominiums); *App. 616* (Docket Entry #357 Prudential objection to extension of exclusivity); *App. 616* (Docket Entry #358 Prudential objection to use of cash collateral); *App. 639* (Docket Entry #499 Prudential limited objection to Hotel Sale); *App. 648* (Docket Entry #546 Prudential's 506(b) Motion); *App. 652* (Docket Entry #575 Prudential omnibus objection to Debtors' disclosure statement); *App. 674* (Docket Entry #690 Prudential objection to plan confirmation); *App. 679* (Docket Entries # 719 and #720 Prudential's plan and disclosure statement); *App. 702* (Docket Entry #829 Prudential objection to use of cash collateral); *App. 707* (Docket Entry #852 Prudential objection to use of cash collateral); *App. 717* (Docket Entry #912 Prudential's application for payment of its attorneys fees).

postpetition rate of interest, compounded monthly, during the period it was

oversecured.

IV.    The BAP Erroneously Vacated the Bankruptcy Court's Plan Confirmation
       Order Based on the BAP 506(b) Decision.

As demonstrated in Section II, *supra*, the BAP incorrectly concluded that

Prudential was oversecured from the Petition Date and entitled to postpetition

interest throughout the bankruptcy proceeding.  Based solely on the BAP 506(b)

Decision, the BAP then vacated the Bankruptcy Court's Confirmation Order.

Pursuant to Federal Rule of Appellate Procedure 28(i), the City of Boston

joins in and adopts by reference the sections of Debtors' Opening Brief (Case Nos.

12-9008 and 12-9009) directed toward plan confirmation issues (Arguments IV(A)

- (D), with the exception of the discussion of the assignment of the City of

Boston's voting rights, which the City of Boston addresses directly in the body of

this Opening Brief.

Because the BAP 506(b) Decision must be vacated, so too, must the BAP

Plan Confirmation Decision.

V.     The Purported Assignment of Voting Rights by the City of Boston to
       Prudential in the Intercreditor Agreement is Unenforceable.

The purported assignment of the City of Boston's bankruptcy voting rights

to Prudential in the Intercreditor Agreement is unenforceable.  It is contrary to the

provisions of the bankruptcy code, the bankruptcy court rules, and public policy.

A number of courts that have considered the issue of the assignability of voting rights in intercreditor agreements have determined that such provisions are unenforceable. *Bank of America, National Ass'n v. North LaSalle Street, LP (In re 203 North LaSalle Street Partnership)*, 246 B.R. 325 (Bankr. N.D. Ill. 2000); *In re Hart Ski Mfg. Co., Inc.*, 5 B.R. 734, 736 (Bkrtcy. Minn., 1980).

In *LaSalle*, the court listed four separate reasons why the voting rights assignment was unenforceable.  First, subordination agreements do not trump 11 U.S.C. §1126(a), which provides that the holder of a claim or interest may vote to accept or reject a plan.  *In re LaSalle*, 246 B.R. at 331.  "[I]t would defeat the purpose of the Code to allow parties to provide by contract that the provisions of the Code should not apply."  *Id*.  Here, the City of Boston is the holder of the City of Boston claim. *Cf. In re Avondale Gateway Center Entitlement, LLC*, No. CV10–1772–PHX–DGC, 2011 WL 1376997 (D.Ariz. April 12, 2011) (subrogated claims, unlike subordinated claims, may result in a transfer of voting rights). Accordingly, the City of Boston was permitted to cast its ballots pursuant to 11 U.S.C. §1126(a).

Second, while 11 U.S.C. §510(a) speaks to the enforcement of subordination agreements, that section only applies to a senior lender's right to

payment, not to the assignment of voting rights.  *In re LaSalle*, 246 B.R. at 331.

"Subordination . . . affects the order of priority of payment of claims in

bankruptcy, but not the transfer of voting rights."  *Id*.

Third, Federal Rule of Bankruptcy Procedure 3018(c) provides that a

Chapter 11 ballot must be signed by "the creditor or equity security holder or an

authorized agent."  "An 'agent' is commonly understood to act at the direction of a

principal."  *Id*. at 331-332 (citing *Brunswick Leasing Corp. v. Wisconsin Central

Ltd.*, 136 F.3d 521, 526 (7th Cir. 1998).  Prudential is not an authorized agent of

the City of Boston.  The City of Boston has supported the Debtors' Reorganization

Plan.  The Plan made provision for the full payment of the Allowed City Claim in

such a way that the City of Boston will be able to repay its HUD 108 Loan,

thereby protecting the portions of the City of Boston's future CDBG revenues

which are threatened by Prudential's actions.  Furthermore, Prudential has taken

the position that it is entitled to default rate postpetition interest in an amount that

exceeds $24 million. Such a position would all but wipe out any chance of the City

of Boston recovering any amount on its claim from the W Hotel and Residences.

Prudential did not support the Plan, and it purported to cast votes against the Plan

on behalf of the City of Boston, against the City of Boston's interests.

Fourth,

42

> Although a creditor's claim is subordinated, it may very well have a
> substantial interest in the manner in which its claim is treated.
> Subordination affects only the priority of payment, not the right to
> payment.  If the assets in a given estate are sufficient, a subordinated
> claim certainly has the potential for receiving a distribution, and
> Congress may well have determined to protect that potential by
> allowing the subordinated claim to be voted.  This result assures that
> the holder of a subordinated claim has a potential role in the
> negotiation and confirmation of a plan, a role that would be
> eliminated by enforcing contractual transfers of Chapter 11 voting
> rights.

*LaSalle*, 246 B.R. at 332.  For the reasons discussed in the preceding

paragraph the City of Boston and the citizens on whose behalf it acts clearly have

an interest in how its claim is treated.  There is sufficient value in the estate to pay

both Prudential[13] and the City of Boston in full, but Prudential's positions in this

matter threaten the City of Boston's ability to collect on its claim.

> The Bankruptcy Code guarantees each secured creditor certain rights,
> regardless of subordination. These rights include the right to assert
> and prove its claim, the right to seek Court ordered protection for its
> security, the right to have a stay lifted under proper circumstances,
> the right to participate in the voting for confirmation or rejection of
> any plan of reorganization, the right to object to confirmation, and the
> right to file a plan where applicable. The above rights and others not
> related to contract priority of distribution pursuant to Section 510(a)
> cannot be affected by the actions of the parties prior to the
> commencement of a bankruptcy case when such rights did not even
> exist. To hold that, as a result of a subordination agreement, the
> "subordinor" gives up all its rights to the "subordinee" would be

---

[13]This assumes that Prudential will not be awarded postpetition compound interest at the
default rate from the Petition Date.

totally inequitable.

*In re Hart Ski Mfg. Co., Inc.*, 5 B.R. 734, 736 (Bkrtcy. Minn. 1980).

Here, the City of Boston is not a normal commercial junior lender subject to control by a commercial senior lender. Rather, it is a political body, acting for the benefit of its citizens. Yet Prudential, a private commercial lender, is seeking to exercise control of the rights of the City of Boston.

The Intercreditor Agreement itself provides that it is subject to general principals of equity. *Add. 220-222*. Equity here dictates that the City of Boston be permitted to cast its own votes on the Debtors' Plan. The City of Boston made the City Loan to save the project from catastrophic shut-down, when Prudential refused to do so. The City of Boston's motivation in making the loan was not to profit, but to serve the best interests of the City of Boston and its citizens not only by completing a project that creates new jobs and provides significant economic development in Boston's Theater District, but also by preventing the specter of an unfinished 27 story tower looming over one of the City of Boston's most important commercial districts. *Add. 228, 230*. The City of Boston was forced to do so because Prudential refused to lend the additional $10.5 million needed to complete the Project. *Id*. Having put the City of Boston into this position and the City of Boston's money having enhanced Prudential's position, it would be

inequitable and unconscionable to permit Prudential now to assert and to exercise rights belonging to the City of Boston and its citizens, in a manner that is to the express detriment of the City of Boston and its citizens.

Furthermore, throughout the entire bankruptcy proceedings, Prudential has made every effort to thwart the Debtors' efforts to reorganize and to minimize the chance that junior creditors would be able to recover the value of their claims.

Both law and equity dictate that the City of Boston's voting rights are not assignable to Prudential.

## **CONCLUSION**

Upon the foregoing points and authorities the Appellee, the City of Boston, respectfully requests that this Court:

A.    Reverse the BAP substitute finding that Prudential was oversecured from the Petition Date and affirm the Bankruptcy Court's finding the Prudential was not oversecured, and therefore entitled to postpetition interest, until June 8, 2011;

B.    Reverse the BAP holding that Prudential is entitled to compound interest on the amount of postpetition interest owed to it and affirm the Bankruptcy Court's finding that Prudential is not entitled to compound interest; and

C.    Reverse the BAP judgment vacating confirmation of the Plan and affirm the

Bankruptcy Court's confirmation of the Plan, including that the City of

Boston's voting rights were not assignable to Prudential.


Respectfully submitted,
THE CITY OF BOSTON
By its attorneys,

*/s/ E. Kate Buyuk*
Joseph F. Ryan, Esq. (1st Cir. No. 70141)
E. Kate Buyuk, Esq. (1st Cir. No. 1155065)
Lyne, Woodworth & Evarts LLP
12 Post Office Square, 2nd Floor
Boston, Massachusetts 02109
Telephone: (617) 523-6655
jryan@lwelaw.com
kbuyuk@lwelaw.com

**CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)(B)**

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 10,522 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using WordPerfect 12 in 14 point font size and Time New Roman font.

/s/ E. Kate Buyuk
E. Kate Buyuk (1st Cir. No. 1155065)
LYNE, WOODWORTH & EVARTS LLP
12 Post Office Square, 2nd Floor
Boston, Massachusetts 02109
Telephone: (617) 523-6655
Facsimile:  (617) 248-9877
Email: kbuyuk@lwelaw.com

## CERTIFICATE OF SERVICE

I, E. Kate Buyuk, hereby certify that on June 17, 2013, I caused a true and correct copy of the foregoing document and addendum to be served by this Court's CM/ECF system on the following registered participants identified on the Notice of Docket Activity and (2) by U.S. Mail (two paper copies):

Charles R. Bennett (crb@murphyking.com)
D. Ethan Jeffrey (dej@murphyking.com)
John C. Elstad (jce@murphyking.com)
Harold B. Murphy (hbm@murphyking.com)
Murphy & King P.C.
One Beacon Street
21st Floor
Boston, MA 02108
*Counsel to SW Boston Hotel Venture, LLC, et al.*

Gina L. Martin (gmartin@goodwinprocter.com)
Goodwin Procter, LLP
Exchange Place
53 State Street
Boston, MA 02109
*Counsel to Prudential Insurance Company of America*

Emanuel C. Grillo, Esq. (Egrillo@goodwinproter.com)
Meagan E. Costello, Esq. (Mcostello@goodwinprocter.com)
Goodwin Procter, LLP
The New York Times Building
620 Eighth Ave.
New York, NY 10118
*Counsel to Prudential Insurance Company of America*

**By U.S. Mail only**:

Bruce F. Smith, Esq. (bankruptcy@jagersmith.com)
Michael J. Fencer, Esq. (Mfencer@jagersmith.com)
Jager Smith, PC
One Financial Center
Boston, MA 02111
Counsel to Official Committee of Unsecured Creditors

/s/ E. Kate Buyuk
E. Kate Buyuk (1st Cir. No. 1155065)
LYNE, WOODWORTH & EVARTS LLP
12 Post Office Square, 2nd Floor
Boston, Massachusetts 02109
Telephone: (617) 523-6655
Facsimile:  (617) 248-9877
Email: kbuyuk@lwelaw.com

# ADDENDUM

Table of Contents

**Bankruptcy Appellate Panel**

Memorandum Regarding Prudential's Appeal of Bankruptcy Court's 506(b) Order – Dated October 1, 2012...................................................................................................Add. 1

Judgment Affirming in Part and Reversing in Part Bankruptcy Court's 506(b) Order – Dated October 1, 2012......................................................................................Add. 32

Memorandum Regarding Prudential's Appeal of Bankruptcy Court's Order Confirming Debtor's Plan – Dated October 1, 2012 .........................................................................Add. 34

Judgment Vacating Bankruptcy Court's Order Confirming Debtor's Plan – Dated October 1, 2012.................................................................................................................Add. 41

Order and Memorandum Denying Motion to Dismiss Appeal in Case No. 11-79 – Dated March 12, 2012.................................................................................................................Add. 43

Order and Memorandum Denying Motion to Dismiss Appeal in Case No. 11-87 – Dated March 12, 2012.................................................................................................................Add. 60

**Bankruptcy Court**

Order Confirming Debtors' Plan – Dated November 16, 2011................................Add. 77

Memorandum Regarding Confirmation of Debtors' Plan – Dated November 14, 2011.................................................................................................................Add. 91

Order Fixing Amount of Prudential's Claim – Dated October 20, 2011................Add. 142

Memorandum Regarding Prudential's 506(b) Motion – Dated October 4, 2011...................Add. 146

Order in Accordance with 506(b) Memorandum – Dated October 4, 2011............Add. 206

**Federal Statutes**

11 U.S.C. §506.................................................................................................Add. 208

11 U.S.C. § 1129 ............................................................................................Add. 210

**Additional Documents**

Intercreditor and Subordination Agreement between Prudential and City of Boston (excerpts only, without exhibits) – Dated December 29, 2009.........................................................Add. 216

Declaration of Keith A. Hunt in Support of the City of Boston's Memorandum Concerning Non-Assignability of Voting Rights (without exhibits)................................................. Add. 227

**FOR PUBLICATION**

# UNITED STATES BANKRUPTCY APPELLATE PANEL
# FOR THE FIRST CIRCUIT

---

### BAP NOS. MB 11-079, MB 11-082, MB 11-085, MB 11-086

---

### Bankruptcy Case No. 10-14535-JNF
### (Jointly Administered)

---

### SW BOSTON HOTEL VENTURE, LLC, et al.,[1]
### Debtors.

---

### THE PRUDENTIAL INSURANCE COMPANY OF AMERICA,
### Appellant / Cross-Appellee,

v.

### CITY OF BOSTON,
### Appellee,

and

### SW BOSTON HOTEL VENTURE, LLC, et al.,
### Appellees / Cross-Appellants.

---

### Appeal from the United States Bankruptcy Court
### for the District of Massachusetts
### (Hon. Joan N. Feeney, U.S. Bankruptcy Judge)

---

### Before Haines, Deasy, and Tester,
### United States Bankruptcy Appellate Panel Judges.

---

**Gina L. Martin Esq., and Emanuel C. Grillo, Esq., on brief for Appellant/ Cross-Appellee.**
**Joseph F. Ryan, Esq., and E. Kate Buyuk, Esq., on brief for Appellee, City of Boston.**
**Harold B. Murphy, Esq., Charles R. Bennett, Jr., Esq., and John C. Elstad, Esq.,**
**on brief for Appellees/ Cross-Appellants.**

---

### October 1, 2012

---

---

[1]  The "Debtors" are SW Boston Hotel Venture LLC ("SW Boston") (Case No. 10-14535-JNF), Auto Sales & Service, Inc. (Case No. 10-14528-JNF), General Trading Company (Case No. 10-14532-JNF), Frank Sawyer Corporation (Case No. 10-14533-JNF), 100 Stuart Street LLC (Case No. 10-14534-JNF), 30-32 Oliver Street Corporation (Case No. 10-16173-JNF), General Land Corporation (Case No. 10-16174-JNF), and 131 Arlington Street Trust (Case No. 10-16177-JNF).

**Deasy, U.S. Bankruptcy Appellate Panel Judge.**

The Prudential Insurance Company of America ("Prudential") appeals from the following orders of the bankruptcy court: (1) the October 4, 2011 order (the "506(b) Order") granting, in part, and denying, in part, the Motion of The Prudential Insurance Company of America for an Order Authorizing the Application of Payments Received during the Chapter 11 Cases to Payment of Postpetition Interest Pursuant to Section 506(b) of the Bankruptcy Code;[2] and (2) the Order Fixing Amount of Allowed Prudential Secured Claim as of October 4, 2011 (the "Prudential Claim Order") entered by the bankruptcy court on October 20, 2011.  The Debtors filed cross-appeals with respect to both orders, arguing that the bankruptcy court erred by awarding Prudential interest at the default rate (the "Default Rate Calculation").  For the reasons set forth below, we **AFFIRM** in part, **REVERSE** in part, and **REMAND** both orders for further proceedings consistent with this opinion.

## BACKGROUND

In 2007, the Debtors, a group of affiliated companies run by Carol Sawyer Parks, sought financing for the development of certain property located at 100 Stuart Street, Boston, Massachusetts (the "Property").  See In re SW Boston Hotel Venture, LLC, 449 B.R. 156, 159 (Bankr. D. Mass. 2011) (reciting stipulated facts in connection with Prudential's motion to lift stay) (the "Lift Stay Decision").  This development became the "W" Hotel and Residences, a mixed-use property located in Boston's downtown theater district, consisting of a hotel (the "Hotel"), residential condominiums (the "Residences"), a parking garage, restaurant, lobby bar,

---

[2]  Unless expressly stated otherwise, all references to "Bankruptcy Code" or to specific statutory sections shall be to the Bankruptcy Reform Act of 1978, as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. No. 109-8, 119 Stat. 23, 11 U.S.C. §§ 101, et seq.  All references to "Bankruptcy Rules" shall be to the Federal Rules of Bankruptcy Procedure.

retail store, spa, and theme bar.  <u>Id.</u>  SW Boston was formed to own and operate the Debtors'
main assets, the Hotel and Residences.

### A.    The Prudential Loan

After financing with another lender fell through, Prudential agreed to finance the
construction of the project.  In January 2008, Prudential and SW Boston entered into a
Construction Loan Agreement, whereby Prudential agreed to provide up to $192.2 million in
financing to SW Boston (the "Prudential Loan").  <u>See</u> <u>Lift Stay Decision</u>, 449 B.R. at 160.[3]  The
Construction Loan Agreement provided for the payment of interest at the rate of 9.5% per
annum, and that after the occurrence of an event of default (as defined therein), the interest rate
would increase to a default rate of 14.5%.  In addition to scheduled debt service payments, the
Debtors were required to pay Prudential 92% of the proceeds of each Residence sale as it
occurred.

### 1.    Prudential's Collateral

To secure SW Boston's obligations under the Construction Loan Agreement, SW Boston
granted Prudential, among other things, a first priority mortgage and security interest on SW
Boston's real and personal property, and all proceeds from the sale of the foregoing.  <u>See</u> <u>Lift
Stay Decision</u>, 449 B.R. at 160.  SW Boston also executed pledge agreements and account
control agreements in favor of Prudential with respect to two accounts in SW Boston's name at
Sovereign Bank.  In addition to the collateral provided by SW Boston, certain of the Debtors

---

[3]  SW Boston ostensibly issued a Promissory Note to Prudential for the full amount of the loan.
Although the Construction Loan Agreement references a Promissory Note in the amount of
$190,255,000.00, Prudential did not attach it to its proofs of claim, and did not offer it into evidence
during the proceedings relevant to this appeal.

other than SW Boston (the "Affiliated Debtors") provided guarantees and pledged additional collateral as security.  See Lift Stay Decision, 449 B.R. at 160-61.

### 2.  Letter of Credit

Under the Construction Loan Agreement, one of the Affiliated Debtors, Frank Sawyer Corporation, was required to arrange for the issuance of a letter of credit for Prudential's benefit as additional security for the loan.  As a result, two of the Debtors' non-debtor affiliates, SE Berkeley Street, LLC and SW McClellan Highway, LLC, obtained from Sovereign Bank a letter of credit in favor of Prudential in the approximate amount of $17.3 million (the "Letter of Credit").  See Lift Stay Decision, 449 B.R. at 161.

### B.  The City Loan

After construction of the project was underway, the City of Boston agreed to lend SW Boston an additional $10.5 million under the terms of a Subordinate Loan Agreement (the "City Loan") to complete construction of certain amenities and facilities.  See Lift Stay Decision, 449 B.R. at 161.  As security for the City Loan, the Debtors granted to the City of Boston a second priority security interest and mortgage on much of the same collateral on which Prudential had a first lien.  Id.  Prudential and the City of Boston entered into an Intercreditor and Subordination Agreement, under which the City of Boston agreed, among other things, to subordinate its liens against, and right to payment from, the collateral pledged to both of them.  See In re SW Boston Hotel Venture, LLC, 460 B.R. 4, 17 (Bankr. D. Mass. 2011) (the "506(b) Decision").

4

### C.      The Commencement of Bankruptcy Proceedings

On April 28, 2010 (the "petition date"), SW Boston and four of the Affiliated Debtors

filed chapter 11 petitions.  The other Affiliated Debtors filed chapter 11 petitions on June 4,

2010.  Shortly after the petition date, Prudential drew the full amount of the Letter of Credit

($17.3 million), and applied the funds to the principal balance due on the Prudential Loan.

### 1.      The Debtors' Use of Cash Collateral

From the inception of the cases, the Debtors requested authority from the bankruptcy

court to use Prudential's cash collateral, i.e. Hotel-related revenue and the proceeds of the sale of

the Residences.  Although Prudential objected in most instances, the bankruptcy court regularly

allowed the Debtors to use cash collateral.

### 2.      The Lift Stay Motion

In August 2010, Prudential filed a Motion for Relief from the Automatic Stay pursuant to

§§ 362(d)(1) and (d)(2) (the "Lift Stay Motion") so that it could enforce its rights and remedies

under the loan documents.  Prudential argued that it was entitled to relief from stay because,

among other things, SW Boston did not have sufficient Residence sales, had not completed the

theme bar, could not close existing Residence sales or obtain new sales, and did not have the

ability to emerge successfully from chapter 11.  The Debtors opposed the motion asserting,

among other things, that Prudential's interest in the Hotel and Residences was more than

adequately protected by its collateral and by SW Boston's continued operation of the Hotel and

sales and leases of the Residences.  According to the Debtors, Prudential's interest in the Hotel

and Residences was being enhanced by the completion of the spa and theme bar using the

proceeds of the City Loan, and the Debtors' successful reorganization was in progress.

In November 2010, the bankruptcy court conducted a three-day evidentiary hearing on the Lift Stay Motion that involved multiple expert witnesses and extensive exhibits.  See Lift Stay Decision, 449 B.R. at 158-59.  At the hearing, the bankruptcy court heard expert testimony as to the value of the Hotel and Residences, and admitted into evidence competing appraisals of the Hotel and Residences, and stipulated values for other collateral.  See id.  On January 28, 2011, the bankruptcy court entered an order denying Prudential's Motion for Relief from the Automatic Stay.  In the bankruptcy court's extensive Lift Stay Decision, the bankruptcy court scrutinized the competing valuation evidence submitted by the parties, and ultimately found that the Hotel was worth $65,600,000 and the unsold Residences were worth $88,000,000.  Id. at 172-173.  The bankruptcy court also accepted the stipulated value of the other collateral as $14,754,000, for an aggregate collateral value of $168,354,000.  Id. at 171-73.  The bankruptcy court found the value of Prudential's claims to be $154,000.  Id. at 161-62.

In denying relief from stay, the bankruptcy court concluded that Prudential had not demonstrated cause for relief from stay due to lack of adequate protection under § 362(d)(1).  Noting that Prudential did not introduce evidence of lack of adequate protection at trial and did not address it in its brief, the bankruptcy court stated: "Given the total value of the collateral package, an equity cushion exists with respect to Prudential's claim in an amount in excess of $19 million."  Id. at 176.  The bankruptcy court also noted that the Debtors were reducing the amount of debt owed to Prudential from the proceeds of the Residence sales, and that the value of the collateral was not declining.  The bankruptcy court concluded, therefore, that Prudential did not lack adequate protection.  Id.

The bankruptcy court also held that Prudential was not entitled to relief from stay under § 362(d)(2). In its analysis, the bankruptcy court found that SW Boston lacked equity in the Hotel and Residences, even though the "total value of the collateral package" provided Prudential with an equity cushion. Id. at 176 and 178. However, the bankruptcy court also found that the Debtors had sustained their burden of demonstrating that a plan of reorganization was in prospect, and, therefore, that the Property was necessary for their reorganization.

### 3. The Hotel Sale

On March 28, 2011, the Debtors filed a motion requesting approval of a purchase and sale agreement to sell the Hotel and Residences and certain other related facilities to an unrelated third party for $89.5 million (the "Hotel Sale"). This amount was substantially more than the opinions expressed by both parties' appraisers and the value determined by the bankruptcy court when denying the Lift Stay Motion. See Lift Stay Decision, 449 B.R. at 162-173. The bankruptcy court entered an order approving the Hotel Sale on May 24, 2011. The Hotel Sale closed on June 8, 2011, and the $83,322,017 net proceeds of the Hotel Sale were paid to Prudential, thereby reducing the amount of outstanding principal balance of Prudential's claim.

### 4. The Plan

On March 31, 2011, prior to the closing on the Hotel Sale, the Debtors filed a Joint Plan of Reorganization and a Disclosure Statement. Prudential objected to the Disclosure Statement and, on May 5, 2011, the Debtors filed a First Amended Joint Plan of Reorganization, with an Amended Disclosure Statement. On May 24, 2011, the bankruptcy court approved the Amended Disclosure Statement and scheduled a confirmation hearing. On June 24, 2011, Prudential filed

7

an objection to the First Amended Plan, and, on June 27, 2011, the Debtors filed a Modified First Amended Joint Plan of Reorganization (the "Plan").

The Plan divided creditors and other interests into nine classes and proposed to pay in full all allowed claims filed by non-insiders, using income generated by the Debtors' operations, the sale of the remaining residences in the ordinary course of SW Boston's business, and the liquidation of certain assets of the Debtors. The Plan defined Prudential's allowed secured claim as "$180,803,186.86 less all payments made to, or received by, Prudential on account of its Claims against the Debtors from the Petition Date through the Effective Date . . ." or such other amount as determined by the bankruptcy court. According to the Plan, Prudential's allowed Class 2 claim would be paid in full prior to March 31, 2014, with post-confirmation interest at a rate of 4.25%, or such other rate as determined by the bankruptcy court. The Plan also proposed that Prudential would retain its prepetition liens on the Debtors' property and it would be paid the "Residence Net Sales Proceeds," the sales price of the condominiums, less 8% for closing costs and the amount necessary to pay outstanding real estate taxes and condominium fees, as well as budgeted operating expenses. Prudential also would receive, on a monthly basis, the aggregate of the Debtors' cash in excess of working capital amounts.

In its objection, Prudential asserted numerous flaws with the Plan, including that the Plan failed to satisfy multiple provisions of § 1129, such as §§ 1129(a)(3), (a)(7), (a)(11) and (b)(2). Prudential also argued that the Plan fixed its claim at an amount vastly below what the circumstances and the Bankruptcy Code require because it failed to calculate properly the postpetition interest to which Prudential was entitled, and because the Plan allowed payments on Prudential's claims to be made over time at a below-market rate of interest.

8

### 5. The 506(b) Motion

On April 15, 2011, Prudential filed a Motion of The Prudential Insurance Company of America for an Order Authorizing the Application of Payments Received During the Chapter 11 Cases to Payment of Postpetition Interest Pursuant to Section 506(b) of the Bankruptcy Code (the "506(b) Motion"). In the 506(b) Motion, Prudential sought a declaration that it was oversecured and, therefore, entitled under § 506(b) to recover postpetition interest from the petition date at the default rate set forth in loan documents executed by the parties, as well as attorneys' fees, costs, and charges. Prudential also sought to apply all postpetition payments received during the chapter 11 proceedings first to postpetition interest and then to the principal balance of its claim. The Debtors opposed the 506(b) Motion, asserting that Prudential's claim was undersecured as to SW Boston until the closing of the Hotel Sale on June 8, 2011, and as such, Prudential was not entitled to postpetition interest, fees and costs from the petition date. Furthermore, the Debtors asserted that the default rate of interest should not be allowed as it was an unreasonable penalty and would be inequitable under the circumstances. The Official Committee of Unsecured Creditors and the City of Boston also filed objections to the 506(b) Motion.

### D. The Combined Hearing

On June 27-29, 2011, the bankruptcy court held a combined evidentiary hearing (the "Combined Hearing") on Prudential's 506(b) Motion and confirmation of the Plan. At the Combined Hearing, Joanna Mulford ("Ms. Mulford"), a Vice President of Prudential, testified on behalf of Prudential. Her Declaration was introduced into evidence as her direct testimony, and she was cross-examined by Debtors' counsel pursuant to an agreement of the parties. Ms.

9

Mulford indicated that the principal amount of Prudential's loan had been reduced from $180.8 million to $163.5 million by application of $17.3 million attributable to the Letter of Credit proceeds. She also reported that the Debtors had paid Prudential approximately $22.2 million from the sale of Residences. She compared the amount due Prudential for postpetition interest, as of April 25, 2011, prior to the sale of the Hotel in June of 2011, using the non-default contract rate of interest and the default rate of interest. Using the 9.5% contract rate, Ms. Mulford calculated interest owed at $16,209,512.78. Using the 14.5% default rate of interest, she calculated interest owed at $24,740,835.30. Ms. Mulford, however, did not explain how she actually computed those figures.

Ms. Mulford testified that she was responsible for the loan after it was originated and that another group, "[o]n the portfolio side," actually originated the loan. She also testified that the rates of interest set forth in the Construction Loan Agreement were predicated on similar loans in the market at the time of the loan's origination, "whether it be a loan that we're originating or a loan that we're actually taking out on one of our properties." She added that she did not engage in any analysis with respect to the anticipated costs, or losses, that Prudential might sustain as a result of a default, or whether the 5% spread between the non-default and default rates reasonably anticipated Prudential's costs or expenses in the event of a default. In fact, she admitted that she made no inquiries to determine on what basis they established the default rate of interest. On redirect examination, Ms. Mulford re-emphasized that interest rates in the Construction Loan Agreement were similar to those in situations where Prudential had acted as either a lender or a borrower.

10

F.       The 506(b) Decision

On October 4, 2011, the bankruptcy court entered its 506(b) Order granting, in part, and

denying, in part, the 506(b) Motion.  In its accompanying 506(b) Decision, the bankruptcy found

that Prudential first became oversecured and entitled to accrue postpetition interest from June 8,

2011, the date of the closing of the Hotel Sale, through confirmation, at the default rate of

interest.  In so holding, the bankruptcy court, following precedent set forth by the Fifth Circuit in

T-H New Orleans, infra, applied a flexible approach as to the timing of the determination of

Prudential's secured status for § 506(b) purposes.  The bankruptcy court rejected Prudential's

argument that it was entitled to postpetition interest from the petition date, finding that

Prudential had not established that it was a fully secured creditor from the petition date forward.

Instead, the bankruptcy court found that the date of the closing of the Hotel Sale was the

appropriate time for fixing Prudential's oversecured status because, on that date, it was

unequivocally established and beyond dispute that Prudential was an oversecured creditor.

The bankruptcy court also determined that Prudential was entitled to postpetition interest

at the default rate of 14.5% and that such rate was not a penalty as contended by the Debtors.  In

ruling that Prudential was entitled to the default rate of interest, the bankruptcy court relied on

testimony at the Combined Hearing that the non-default and default rates of interest set forth in

the applicable loan documents were similar to and predicated upon those set forth in other loans

in the market at that time.

As to Prudential's request under § 506(b) for reasonable attorneys' fees, costs, and other

charges, the bankruptcy court determined that Prudential had not met its burden of establishing

that the fees and charges were authorized by the applicable loan documents, or that they were

necessary and reasonable.  In so holding, the bankruptcy court pointed out that Prudential had

not introduced into evidence the applicable promissory note or mortgage that allegedly entitled it

to recover fees, costs, and other charges, nor did it provide a statement or itemization of its fees

and costs.

Thereafter, on October 20, 2011, the bankruptcy court entered the Prudential Claim

Order determining, based on the 506(b) Decision, that Prudential had an allowed secured claim

as of October 4, 2011, in the amount of $51,835,721.  In determining the amount of Prudential's

allowed secured claim, the bankruptcy court determined that Prudential was not entitled to

postpetition interest computed on a compounded basis as the Construction Loan Agreement did

not provide for compound interest.

Prudential appealed both the 506(b) Decision and the Prudential Claim Order, and the

Debtors filed cross-appeals relating to both orders.  Neither party sought a stay of either order

pending appeal.

### G.    Plan Confirmation

On November 14, 2011, the bankruptcy court entered an order and accompanying

decision confirming the Plan (the "Confirmation Decision"), and an order overruling

Prudential's objection to confirmation of the Plan (the "Confirmation Order").[4]  Prudential

appealed the Confirmation Order and Decision, and that appeal is currently pending before the

Panel.[5]  Prudential sought a stay of the Confirmation Order pending appeal from both the

---

[4]  See In re SW Boston Hotel Venture, LLC, 460 B.R. 38 (Bankr. D. Mass. 2011).

[5]  See BAP No. MB 11-087.

bankruptcy court and the Panel, both of which were denied. Without a stay, the Plan became effective on December 1, 2011.

While these appeals were in briefing, the Debtors filed motions to dismiss, arguing that the appeals should be dismissed as moot as the Debtors' confirmed Plan has been substantially consummated and appellate relief cannot be granted without "eviscerating" the Debtors' reorganization, completely undoing multiple consummated transactions made in reliance on the confirmed Plan's finality, and causing harm to third parties not before the court. In orders dated March 12, 2012, the Panel denied the motions to dismiss, reasoning that although the Plan has been substantially consummated, Prudential is willing to accept alternative forms of relief that would not require an unraveling of the reorganization, and reversal of the Plan confirmation would not adversely affect any innocent third parties.

## JURISDICTION

Before addressing the merits of an appeal, the Panel must determine that it has jurisdiction, even if the issue is not raised by the litigants. See Boylan v. George E. Bumpus, Jr. Constr. Co. (In re George E. Bumpus, Jr. Constr. Co.), 226 B.R. 724 (B.A.P. 1st Cir. 1998). The Panel has jurisdiction to hear appeals from: (1) final judgments, orders, and decrees; or (2) with leave of court, from certain interlocutory orders. 28 U.S.C. § 158(a); Fleet Data Processing Corp. v. Branch (In re Bank of New England Corp.), 218 B.R. 643, 645 (B.A.P. 1st Cir. 1998). A decision is considered final if it "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment," id. at 646 (citations omitted), whereas an interlocutory order "'only decides some intervening matter pertaining to the cause, and . . . requires further

steps to be taken in order to enable the court to adjudicate the cause on the merits.'" <u>Id.</u> (quoting <u>In re American Colonial Broad. Corp.</u>, 758 F.2d 794, 801 (1st Cir. 1985)).

The underlying decisions and orders of the bankruptcy court determined whether and in what amount Prudential was entitled to postpetition interest pursuant to § 506(b).  Generally, a bankruptcy court order regarding a secured creditor's entitlement to postpetition interest pursuant to § 506(b) is a final, reviewable order.  <u>See, e.g.</u>, <u>Fin. Sec. Assur. Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)</u>, 116 F.3d 790 (5th Cir. 1997) (reviewing bankruptcy court's ruling that appellant was not entitled to postpetition interest from the petition date).

## **STANDARD OF REVIEW**

The Panel applies the clearly erroneous standard to findings of fact and *de novo* review to conclusions of law.  <u>See</u> <u>Lessard v. Wilton-Lyndeborough Coop. School Dist.</u>, 592 F.3d 267, 269 (1st Cir. 2010).

## **DISCUSSION**

Prudential argues that the bankruptcy court erred by awarding postpetition interest only from the date of the Hotel Sale, and that it was entitled to postpetition interest from the petition date because: (1) it was oversecured at confirmation; and/or (2) it was oversecured throughout the bankruptcy proceedings, as evidenced by the bankruptcy court's findings in the Lift Stay Decision.[6]  Prudential also argues that the bankruptcy court erred by concluding that it was not

---

[6]  Although Prudential argues generally that it is entitled to fees and expenses in addition to postpetition interest, it did not brief any issues relating to the bankruptcy court's ruling that Prudential had not proven that the claimed fees and expenses were authorized by the loan documents and that they were necessary and reasonable.  Therefore, any argument on the issue of postpetition fees and expenses is waived.  <u>See</u> <u>Tower v. Leslie-Brown</u>, 326 F.3d 290, 299 (1st Cir. 2003) ("[W]e have made it abundantly clear that failure to brief an argument does, in fact, constitute waiver for purposes of appeal."); <u>see also</u>

14

entitled to accrue postpetition interest on a compounded basis.  In their cross-appeals, the

Debtors argue that the bankruptcy court erred by awarding Prudential postpetition interest at the

default rate.

**I.    Whether Prudential Was Entitled to Accrue Postpetition Interest From the Petition Date.**

      **A.    Prudential's entitlement to postpetition interest**

Section 506(b) governs a creditor's entitlement to postpetition interest, and provides that:

> To the extent that an allowed secured claim is secured by property the
> value of which . . . is greater than the amount of such claim, there shall be
> allowed to the holder of such claim, interest on such claim, and any
> reasonable fees, costs, or charges provided for under the agreement or
> State statute under which such claim arose.

11 U.S.C. § 506(b).  As the U.S. Supreme Court has made clear, under § 506(b), a creditor is

unqualifiedly entitled to postpetition interest on its oversecured claim, whether or not the loan

documents upon which the claim is based provide for such interest.  See United States v. Ron

Pair Enters., Inc., 489 U.S. 235, 241 (1989); see also Rake v. Wade, 508 U.S. 464 (1993).

According to § 506(b)'s express terms, a secured creditor can only accrue postpetition

interest on its claim if it is oversecured and then only to the extent it is oversecured.  See United

Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 372-73 (1988).

Thus, the first inquiry under § 506(b) is usually a determination of whether the creditor is

oversecured.  In re T-H New Orleans, 116 F.3d at 797.  The creditor who claims entitlement to

postpetition interest bears the burden of proving, by a preponderance of evidence, that its claim

---

Furness v. Wright Med. Tech., Inc. (In re Mercurio), 402 F.3d 62, 64 n.1 (1st Cir. 2005) (holding that
failure to brief an argument constitutes waiver); García-Ayala v. Lederle Parenterals, Inc., 212 F.3d 638,
645 (1st Cir. 2000) (same); Blacksmith Invs., Inc. v. Woodford (In re Woodford), 418 B.R. 644, 646 n.1
(B.A.P. 1st Cir. 2009) (same).

is oversecured, "to what extent, and for what period of time." T-H New Orleans, 116 F.3d at 798

(citing Heritage Bank Tinley Park v. Steinberg (In re Grabill Corp.), 121 B.R. 983, 991-92

(Bankr. N.D. Ill. 1990)).

A creditor is considered to be oversecured when the value of its collateral exceeds the

amount of the creditor's allowed claim.  See Ron Pair Enters., 489 U.S. at 239; see also

Baybank-Middlesex v. Ralar Distribs., Inc., 69 F.3d 1200, 1202 (1st Cir. 1995).  Section 506(a)

establishes the extent to which an allowed claim is a secured claim.  "An allowed claim of a

creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to

the extent of the value of such creditor's interest in the estate's interest in such property. . . ."

11 U.S.C. § 506(a).  Valuations under § 506(a) are to be made "in light of the purpose of the

valuation and of the proposed disposition or use of" the collateral.  Id.

The parties do not dispute that Prudential is entitled to some amount of postpetition, pre-

confirmation interest on its claim.  They disagree, however, as to the appropriate time for the

valuation determination under § 506(a), and when Prudential's right to postpetition interest

accrued.  Prudential argues that it is entitled to postpetition interest from the petition date either

because it was oversecured *at confirmation*, or because the bankruptcy court's earlier findings

prove that it was oversecured throughout these proceedings.  The Debtors argue that Prudential

was not entitled to postpetition interest from the petition date because Prudential had not met its

burden of establishing that it was oversecured on that date.  Thus, the question here is when

should the valuation of the collateral and the claim occur for the purpose of determining a

secured creditor's entitlement to postpetition interest under § 506(b)?

16

## B.    The valuation determination

As the bankruptcy court remarked:

> The timing of the comparison between the amount of debt and the value of the collateral required by § 506(a) and (b) is crucial in determining the allowed amount of the secured claim and whether the secured creditor is oversecured.  The bankruptcy court must determine the appropriate date for assessing the value of collateral, as values may decrease, increase or fluctuate over time during the pendency of the case, as evidenced by what has transpired in the Debtors' cases where both the amount of debt and the value of the collateral have declined due to payments to Prudential and sales of the Hotel and Residences, respectively.  Thus, the application of § 506(a) and (b) often presents difficulties in the context of determining a secured creditor's entitlement to postpetition interest during the pendency of the [c]hapter 11 case (often referred to as "pendency interest") where a debtor has made significant payments to the secured creditor and substantially paid down the balance owed to the creditor during the case due to sales of assets or the appreciation of the value of the secured creditor's collateral during the case.

506(b) Decision, 460 B.R. at 26.

Neither the Bankruptcy Code nor the Bankruptcy Rules define or establish the appropriate point in a reorganization proceeding for the valuation determination under § 506(a), and, as a result, several approaches have emerged.  See Official Comm. of Unsecured Creditors v. Liberty Sav. Bank, FSB (In re Toy King Distribs., Inc.), 256 B.R. 1 (Bankr. M.D. Fla. 2000) (discussing different approaches).  Some courts have held that a creditor's secured claim is always determined on a specific date, i.e., either the petition date or the confirmation date.[7]  Courts applying this "single valuation approach" rely on the Supreme Court's ruling in Timbers,

---

[7]    See, e.g., Cmty. Bank of Homestead v. Torcise (In re Torcise), 187 B.R. 18, 23 (S.D. Fla. 1995) ("The amount by which a claim is oversecured must be determined as of the petition date"), rev'd on other grounds, 162 F.3d 1084 (11th Cir. 1998); NCNB Texas Nat'l Bank v. Hulen Park Place Ltd. (In re Hulen Park Place Ltd.), 130 B.R. 39, 43 (Bankr. N.D. Tex. 1991) (issue of whether creditor is oversecured is determined as of the petition date); In re Landing Assocs., Ltd., 122 B.R. 288, 293 (Bankr. W.D. Tex. 1990) (measurement date is confirmation date).

17

_supra_, that an undersecured creditor whose collateral is not declining during the pendency of a bankruptcy case is not entitled to postpetition interest. Accordingly, under this approach, if a secured claim is not fully secured on the specific date, the secured creditor will not be entitled to any postpetition interest under § 506(b).

Other courts utilize a "dual valuation approach," determining a creditor's secured status twice, once at the petition date and once at the hearing on plan confirmation.[8] Those courts reason that it is necessary to determine secured status through valuation at the outset of the case for adequate protection purposes, and at confirmation for the purpose of determining treatment under the plan and reducing the amount of the secured claim by any payments made by the debtor. "If the collateral package at the time of confirmation exceeds the amount of the creditor's total prepetition claim, the creditor is entitled to interest and costs under [§] 506(b) to the extent of the surplus." In re Addison Props., 185 B.R. at 784.

The majority of courts, however, use a more flexible approach, looking to the circumstances of each case and the purpose of the valuation. They do not pick a specific point in time for the debt/value comparison, focusing instead on the matter before the court. This flexible approach was adopted by the Fifth Circuit in T-H New Orleans, _supra_. In that case, the bankruptcy court made a finding early in the case that the secured creditor was substantially undersecured, but because of subsequent adequate protection payments and an increase in the value of the creditor's collateral, the creditor became oversecured prior to the effective date of the plan. 116 F.3d at 794-95. On appeal, the Fifth Circuit addressed the issue of whether courts

---

[8]  See, e.g., In re Addison Props. Ltd. P'ship, 185 B.R. 766, 784 (Bankr. N.D. Ill. 1995); In re Kennedy, 177 B.R. 967 (Bankr. S.D. Ala. 1995).

must utilize a fixed point in the reorganization proceeding, such as the petition date or the date of

plan confirmation, for the purposes of valuing secured collateral to determine whether a creditor

is entitled to postpetition interest under § 506(b).  Declining to follow the single point in time

approach, the Fifth Circuit stated:

> . . . [W]e conclude that for purposes of determining whether a creditor is
> entitled to accrue interest under § 506(b) in the circumstance where the
> collateral's value is increasing and/or the creditor's allowed claim has
> been or is being reduced by cash collateral payments, such that at some
> point in time prior to confirmation of the debtor's plan the creditor may
> become oversecured, valuation of the collateral and the creditor's claim
> should be flexible and not limited to a single point in time, such as the
> petition date or confirmation date.

Id. at 798.  Thus, the Fifth Circuit held that the secured creditor's entitlement to accrue

postpetition interest under § 506(b) begins at that point in time when it becomes oversecured.  Id.

at 799.

> The measuring date on which the status of a creditor's collateral and claim
> are compared is determinative of a creditor's right to accrue interest under
> § 506(b).  Thus, a secured creditor's entitlement to accrue interest under
> § 506(b) matures at that point in time where the creditor's claim becomes
> oversecured.

Id.

Citing T-H New Orleans with approval, the bankruptcy court in In re Urban

Communicators PCS Ltd. P'ship, 379 B.R. 232 (Bankr. S.D.N.Y. 2007), aff'd in part and rev'd

in part on other grounds, 394 B.R. 325 (S.D.N.Y. 2008), similarly held that bankruptcy courts

have flexibility in determining whether a secured creditor is entitled to postpetition interest under

§ 506(b).  As that court reasoned:

> Recognition of that flexibility is, after all, consistent with attention to the
> needs and concerns of junior creditors, and, more significantly, language
> in [§] 506(a) that bankruptcy courts engage in any analysis of collateral

19

value "in light of the purpose of the valuation and the proposed disposition or use of such property."  The statutory guidance appearing as part of [§] 506(a) is the antithesis of a hard-and-fast rule, and instead embodies a more functional approach.

Id. at 243.  As mandated by § 506(a), the Urban Communicators court considered both the "disposition or use of the property" (the eventual sale of the property) and the "purpose of the valuation" (the allowance of a secured creditor's claim – specifically, whether the extent to which the creditor should be able to collect its contractual entitlement from the proceeds of the collateral).  Id. at 242.  The court went on to say, however, that where collateral is actually sold during the pendency of the case, and the sale price was fair and the result of an arm's length transaction, courts should use the actual sale price, and not some earlier "hypothetical" valuation, to determine whether a creditor is oversecured and thus entitled to postpetition interest.  Id. (citing Ford Motor Credit Co. v. Dobbins, 35 F.3d 860, 870 (4th Cir. 1994)).  The court remarked:

> But acknowledging, as this Court does, that a bankruptcy court has flexibility in making a collateral valuation decision does not mean that the Court should disregard the best evidence of collateral value – what the collateral actually fetched.  Rather, that flexibility should permit this Court's resort to the best available evidence of collateral value except where the circumstances dictate a different approach . . . .  This flexible approach, the Fifth Circuit noted [in T-H New Orleans], ensures that "any increase over the judicially determined valuation during the bankruptcy rightly accrues to the benefit of the creditor, and not to the debtor."

> Importantly, in T-H New Orleans, there had not been an actual sale of the underlying secured asset.  In this case, . . . the secured asset has been sold in a good faith and arm's length transaction.  This distinction is critical.  It is settled law that the sale price in an arm's length transaction is the best evidence of an asset's market value.  T-H New Orleans does not disturb this conclusion.  While this Court endorses the "flexible approach" outlined in T-H New Orleans, the Court believes that in instances where an actual post-petition sale of a secured asset has occurred, the flexibility provided to bankruptcy courts is usually best employed by utilizing the

20

> sale price in a good faith transaction as the value of a secured asset – and
> that in any event, such an approach is the most sensible here.

Id. at 243-44(footnotes omitted).

We agree with the flexible approach espoused in T-H New Orleans and as applied by

Urban Communicators.  This case is similar to Urban Communicators in that the value of the

secured collateral (primarily the Hotel and Residences) fluctuated during the case and the debt

was reduced by adequate protection payments.  In addition, an actual postpetition sale of a

substantial portion of Prudential's collateral occurred in an arm's length transaction.  Although

the bankruptcy court cited both T-H New Orleans and In re Urban Communicators with approval

in holding that the Hotel Sale was evidence establishing Prudential's oversecured status, it did

not follow the reasoning of Urban Communicators in applying that evidence under a flexible

approach to determine the point in time to apply the evidentiary determination.  We find that the

bankruptcy court erred in not doing so.  Under the rationale set forth in Urban Communicators,

the Hotel Sale price is the best evidence of the value of the Hotel and establishes that Prudential

was oversecured throughout these bankruptcy proceedings.

In addition, whether the hypothetical stay relief value is used, or the actual later sale

value is used, it appears that Prudential was fully secured from the petition date under the

rationale in Urban Communicators, and by the statements of the bankruptcy court in the 506(b)

Decision.  See 460 B.R. at 26 ("all collateral . . . is considered"), 30-31 (adopting Urban

Communicators where a sale of the collateral has occurred).  Although the values used in the

stay relief hearing, other than the Hotel value, were stipulated by the parties solely for the

purpose of that hearing, the bankruptcy court adopted the stipulated values for purposes of the

§ 506(b) hearing without objection.  See 460 B.R. at 32-33.  The values found by the bankruptcy court at the § 506(b) hearing support Prudential being fully secured as of the petition date.

### C.   Prudential's argument

Prudential argues, that because the Plan provides for Prudential to receive deferred cash payments over time, § 1129(b)(2)(A)(i)(II) precludes the bankruptcy court from applying a flexible approach and requires that Prudential's collateral be valued at the confirmation date.  However, Prudential's argument has no support in the language of the Bankruptcy Code and is inconsistent with the holdings in T-H New Orleans, and other cases, that the right to accrue postpetition interest under § 506(b) begins at that point in time when a secured creditor becomes oversecured.  See T-H New Orleans, 116 F.3d at 799.

The bankruptcy court has flexibility regarding when the valuation is made.  Where there has been an arm's length sale of collateral during the course of the bankruptcy case, that sale value is the best evidence of the collateral's value.  See Urban Communicators, 379 B.R. at 243-44.  Thus, Prudential was fully secured and, for the reasons discussed above, is entitled to postpetition interest from the petition date.

## II.   Whether the Bankruptcy Court Erred in Concluding that Prudential Was Not Entitled to Postpetition Interest Computed on a Compounded Basis.

"Compound interest is the periodic calculation of additional interest on the interest that has already come due."  Aceta v. Robinson, 2000 Mass. App. Div. 155, 157 (Mass. App. Div. 2000).

Prejudgment interest rates are governed by state law.  See Loft v. Lapidus, 936 F.2d 633, 639 (1st Cir. 1991) (citations omitted).  The general rule in Massachusetts is that in the absence of statutory or express agreement by the parties, interest is presumed to be simple interest.  See,

e.g., Cherokee Nation v. United States, 270 U.S. 476, 490 (1926) ("The general rule, even as between private persons, is that, in the absence of a contract therefor or some statute, compound interest is not allowed to be computed upon a debt."); Berman v. B.C. Assocs., 219 F.3d 48, 50 (1st Cir. 2000); Coupounas v. Madden, 514 N.E.2d 1316, 1321 (Mass. 1987); Shapiro v. Bailen, 199 N.E. 315, 316 (Mass. 1936); D'Annolfo v. D'Annolfo Constr. Co., Inc., 654 N.E.2d 82, 85 (Mass. App. Ct. 1995) ("[C]ompounding cannot be done in the absence of express agreement"); Thomas's Case, 519 N.E.2d 786, 788 (Mass. App. Ct. 1988) (disallowing compound interest except in certain proceedings in equity or by express statutory language); Infolink Partners Ltd. P'ship v. Treasurer & Receiver Gen. of the Commonwealth of Massachusetts, 2002 Mass. Super. LEXIS 563 (Mass. Super. Ct. May 1, 2002); see also S.R. Fulton, "Interest On Money Damages For Periods Before And After Judgment: A Guide For The Massachusetts Practitioner," 85 Mass. L. Rev. 146, 152 and n. 46-50 (2001).  In Berman v. B.C. Assocs., the First Circuit stated:

> In Massachusetts, compound interest is generally disfavored.  See Ellis v. Sullivan, 241 Mass. 60, 134 N.E. 695, 697 (1922) (recognizing an "'ancient unwillingness to allow compound interest'" (quoting Lewin v. Folsom, 171 Mass. 188, 50 N.E. 523, 524 (1898))).  As early as 1906, the Supreme Judicial Court of Massachusetts decreed that interest is simple, "unless there is an express agreement to the contrary."  Inhabitants of Tisbury v. Vineyard Haven Water Co., 193 Mass. 196, 79 N.E. 256, 257 (1906); see also Coupounas v. Madden, 401 Mass. 125, 514 N.E.2d 1316, 1321 (1987); Von Hemert v. Porter, 52 Mass. 210, 218, 11 Metc. 210 (Mass. 1846); D'Annolfo v. D'Annolfo Constr. Co.[, Inc.], 39 Mass. App. Ct. 189, 654 N.E.2d 82, 85 (1995).  Consequently, compound interest is only permitted in certain proceedings in equity or by express statutory or contractual authority.  See Dunne v. City of Boston, 41 Mass. App. Ct. 922, 671 N.E.2d 518, 520 (1996); see also Shapiro v. Bailen, 293 Mass. 121, 199 N.E. 315, 316 (1936) (recognizing exception in equity); Ellis, 134 N.E. at 697 (same).

23

219 F.3d at 50.  It added that "the overwhelming majority of Massachusetts cases equate an interest rate 'per annum,' whether in a contract or a statute, with simple interest."  Id. (citations omitted).

In the Prudential Claim Order, the bankruptcy court, citing Berman, denied compound interest because it found that the Construction Loan Agreement, which is governed by Massachusetts law, does not provide for compound interest either at the default rate or the non-default rate of interest.  Prudential argues that the bankruptcy court erred because the Construction Loan Agreement expressly provides for compound interest in the definition of "Applicable Interest Rate," which is incorporated into the definition of "Default Rate."

Prudential did not introduce into evidence the applicable promissory note or mortgage, so the only loan document before the bankruptcy court was the Construction Loan Agreement. Section 1.1 of the Construction Loan Agreement is entitled "Definitions" and includes the following: **"Applicable Interest Rate"** shall mean 9.50% per annum, *compounding monthly.* (emphasis added).

Section 2.2 of the Construction Loan Agreement is entitled "Interest Rate" and provides, in relevant part, as follows:

> **2.2.1  Applicable Interest Rate.**  Except as herein provided with respect to interest accruing at the Default Rate, interest on the principal balance of the Loan outstanding from time to time shall accrue from the Closing Date up to and including the Maturity Date at the Applicable Interest Rate.
>
> **2.2.2   Interest Calculation.**  Interest on the outstanding principal balance of the Loan shall be calculated by multiplying (a) the actual number of days elapsed in the period for which the calculation is being made by (b) a daily rate based on a three hundred sixty (360) day year (that is, the Applicable Interest Rate or the Default Rate, as then applicable, expressed as an annual rate divided by 360) by (c) the outstanding principal balance.

24

Section 2.3 of the Construction Loan Agreement is entitled "Loan Payments" and the relevant subsection provides, in pertinent part:

> **2.3.3   Interest Rate and Payment After Default.**  In the event that, and for so long as, any Event of Default shall have occurred and be continuing, the outstanding principal balance of the Loan and, to the extent permitted by applicable Legal Requirements, overdue interest in respect of the Loan, shall accrue interest at the Default Rate, calculated from the date the Default occurred which led to such Event of Default; provided, however, if such Event of Default consists of a failure to pay interest due on the Loan in accordance with the Loan Documents, then interest at the Default Rate shall not begin to accrue on the Loan on account of such Default until such Default remains uncured for more than fifteen (15) days. . . .

The Debtors argue that these sections do not expressly provide that overdue interest shall be added to the outstanding principal balance at the default rate of interest, resulting in compond interest at the default rate.  Thus, the Debtors claim, the agreement is ambiguous as to compound interest, and, because that right is not expressly stated in the agreement, Prudential is not entitled to compound interest.  The Debtors are correct that neither of these sections uses the term "compound interest."  However, section 2.2.1 provides that interest shall accrue at the "Applicable Interest Rate," and "Applicable Interest Rate" is defined as "9.50% per annum, *compounding monthly*."  (emphasis added).  Furthermore, "Default Rate" is defined as "a rate per annum equal to the lesser of (i) the maximum rate permitted by applicable law, or (ii) five percent (5%) above the Applicable Interest Rate."  Clearly, the definition of "Default Rate" incorporates the definition of "Applicable Interest Rate."  Together, these definitions require that both non-default and default interest be computed on a compounded basis.  Section 1.1 of the Construction Loan Agreement defines the term "Loan Documents" to include "this Agreement, the Note," and other documents executed in connection with the loan.  Section 2.1.3 of the Construction Loan Agreement describes the Note as the document evidencing the loan to be

25

"repaid in accordance with the terms of this Agreement, the Note, and the other Loan Documents." Neither Prudential nor the Debtors submitted any further documentary evidence to support their arguments on the calculation of interest. Accordingly, the Construction Loan Agreement is the only evidence of the agreement between the parties regarding the calculation of interest and is sufficient evidence of an express agreement between the parties that compound interest would accrue on the Prudential Loan. The Debtors argue and cite authority that it is within a court's discretion to *allow* compound interest in the absence of an express agreement if warranted by equitable considerations. However, the Debtors cite no authority for the assertion that a court has the discretion to *deny* compound interest where, as in this case, it is expressly provided for in the applicable contract between the parties.

Consequently, we conclude that the bankruptcy court erred in finding that the Construction Loan Agreement did not expressly provide for compound interest and in holding that Prudential was not entitled to postpetition interest computed on a compounded basis.

### III.    Whether the Bankruptcy Court Erred in Awarding Prudential Postpetition Interest at the Default Rate.

In their cross-appeals, the Debtors argue that the bankruptcy court erred in granting Prudential postpetition interest at the default rate set forth in the Construction Loan Agreement because the default rate constituted an unenforceable penalty under applicable Massachusetts law.

Although § 506(b) entitles Prudential to recover postpetition interest on its claim, § 506(b) and the accompanying legislative history are silent as to the appropriate rate of interest. Bradford v. Crozier (In re Laymon), 958 F.2d 72, 74 (5th Cir. 1992). Thus, the appropriate rate of postpetition interest is within the limited discretion of the bankruptcy court. See Key Bank

26

Nat'l Ass'n v. Milham (In re Milham), 141 F.3d 420, 423 (2d Cir. 1998).[9] Most courts hold that

entitlement to default interest is a matter of federal law. See, e.g., In re Route One West

Windsor Ltd. P'ship, 225 B.R. 76, 86 (Bankr. D.N.J. 1998); see also Urban Communicators, 379

B.R. at 254 & n.76; In re Consol. Properties Ltd. P'ship, 152 B.R. 452, 456 (Bankr. D. Md.

1993). In Route One West, the court observed:

> The allowance of interest on claims in bankruptcy has long been
> determined by federal law. Vanston Bondholders Protective Committee v.
> Green, 329 U.S. 156, 162-63, 67 S. Ct. 237, 91 L. Ed. 162 (1947). The
> touchstone of such decisions "has been a balance of equities between
> creditor and creditor or between creditors and the debtor." Id. at 165, 67
> S. Ct. 237. The continuing validity of these principles under the Code was
> acknowledged in United States v. Ron Pair Enterprises, Inc., 489 U.S.
> 235, 248, 109 S. Ct. 1026, 103 L. Ed. 2d 290 (1989).

225 B.R. at 86.

Under federal bankruptcy law, there is a presumption that an oversecured creditor is

entitled to postpetition interest at the contractual default rate, provided that there are no equitable

---

[9] As the Second Circuit has explained:

> [S]ection 506(b) does not say that the oversecured creditor collects pendency
> interest at the contractual rate. In United States v. Ron Pair Enters., Inc., 489
> U.S. 235, 241, 109 S. Ct. 1026, 1030, 103 L. Ed. 2d 290 (1989), the Supreme
> Court held that the phrase "provided for under the agreement under which such
> claims arose" does not modify the phrase "interest on such claim." Unlike
> prepetition interest, pendency interest is not based upon contract. See Rake v.
> Wade, 508 U.S. 464, 468, 113 S. Ct. 2187, 2190, 124 L. Ed. 2d 424 (1993)
> ("[T]he right to postpetition interest under § 506(b) is unqualified and exists
> regardless of whether the agreement giving rise to the claim provides for
> interest.") (internal quotation marks omitted). The appropriate rate of pendency
> interest is therefore within the limited discretion of the court. See In re
> DeMaggio, 175 B.R. 144, 148 (Bankr. D.N.H. 1994). Most courts have awarded
> pendency interest at the contractual rate; but nevertheless, however widespread
> this practice may be, it does not reflect an entitlement to interest at the
> contractual rate.

In re Milham, 141 F.3d at 423.

considerations that would compel a different result.  See The Southland Corp. v. Toronto-Dominion (In re The Southland Corp.), 160 F.3d 1054, 1059-60 (5th Cir. 1998) (citing In re Terry Ltd. Partnership, 27 F.3d 241, 243-44 (7th Cir. 1994)); Hassen Imports P'ship v. KWP Fin. VI (In re Hassen Imports P'ship), 256 B.R. 916, 924 (B.A.P. 9th Cir. 2000); Florida Asset Fin. Corp. v. Dixon (In re Dixon), 228 B.R. 166, 172-73 (W.D. Va. 1998); Riley v. Tencara, LLC (In re Wolverine, Proctor & Schwartz), 449 B.R. 1, 5 (Bankr. D. Mass. 2011); In re South Canaan Cellular Invs., Inc., 427 B.R. 44, 77 (Bankr. E.D. Pa. 2010); Urban Communicators, 394 B.R. at 338; In re Route One West, 225 B.R. at 86.  We agree with those decisions.

"The effect of the rebuttable presumption in favor of the contract rate is to impose upon the debtor the burden of proving that the equities favor allowing interest at a different rate."  In re Route One West, 225 B.R. at 87 (citation omitted).  As set forth above, the Loan Construction Agreement establishes a non-default rate of 9.50% and a default rate of 5% above the non-default rate.  Section 2.3 of the Construction Loan Agreement provides that if an event of default (as defined in the agreement) has occurred, interest shall accrue at the default rate.  There is no dispute that an event of default occurred.  Therefore, there is a rebuttable presumption that Prudential is entitled to postpetition interest at the default rate, unless the Debtors can prove that there are equitable considerations that compel a different result.

Although there is "no clear, emerging, definite enumeration of [the] special circumstances or equitable considerations" which would justify an "equitable deviation" from the contractual default interest rate, see In re Dixon, 228 B.R. at 173, several courts have identified a list of factors which may be considered.  For example, in General Growth Properties, the court stated:

> 11 U.S.C. § 506(b) requires payment of post-petition interest to an oversecured creditor . . . and a rebuttable presumption exists favoring the payment of such interest at the contractual rate. Courts in this and other circuits have been reluctant to modify private contractual arrangements imposing default interest rates — particularly in cases involving a solvent debtor — except where: (i) there has been creditor misconduct; (ii) application of the contractual interest rate would cause harm to unsecured creditors; (iii) the contractual interest rate constitutes a penalty; or (iv) its application would impair the debtor's fresh start.

See In re General Growth Props., Inc., No. 09-11977, 2011 WL 2974305, *4 (Bankr. S.D.N.Y. July 20, 2011) (citations omitted); see also In re Jack Kline Co., Inc., 440 B.R. 712, 745 (Bankr. S.D. Tex. 2010) (identifying seven factors to be considered). "The power to modify the contract rate based on notions of equity should be exercised sparingly and limited to situations where the secured creditor is guilty of misconduct, the application of the contractual interest rate would harm the unsecured creditors or impair the debtor's fresh start or the contractual interest rate constitutes a penalty." In re 785 Partners LLC, 470 B.R. 126 (Bankr. S.D.N.Y. 2012) (citing Urban Communicators, 394 B.R. at 338; General Growth, 451 B.R. at 328; In re P.G. Realty Co., 220 B.R. 773, 780 (Bankr. E.D.N.Y. 1998)). The debtor bears the burden of rebutting the presumption that the contract rate applies postpetition. Id. (citing In re The Southland Corp., 160 F.3d at 1059-60; Urban Communicators, 394 B.R. at 338; In re Vest Assocs., 217 B.R. 696, 702 (Bankr. S.D.N.Y. 1998)).

The Debtors have not satisfied this burden. The bankruptcy court in this case employed the four equitable factors outlined in General Growth Properties, supra, and found that the contractual default interest rate of 14.5% was the appropriate rate for Prudential's postpetition interest. In making its determination, the bankruptcy court noted that SW Boston was in default under the Loan Construction Agreement as of the petition date. It also found that because the

Debtors proposed to pay all creditors in full, other creditors would not be harmed by the payment of postpetition interest at the default rate. Moreover, the bankruptcy court found that although Prudential was litigious during these cases, there was no evidence of misconduct by Prudential. In finding that the default rate was not a penalty, the bankruptcy court pointed to unrebutted evidence through the testimony of Ms. Mulford to the effect that the default interest rate in the Construction Loan Agreement was consistent with the default rates in other loans made and obtained by Prudential. Finally, the bankruptcy court found that allowance of interest at the default rate would not impair the Debtors' ability to reorganize because under the Plan, the Debtors are paying all creditors in full in a relativly short period of time. Thus, the bankruptcy court concluded that a default rate which is 5% higher than the non-default rate was neither a penalty nor inequitable.

Here, there is no cognizable basis in law to disturb the parties' bargain. The Debtors and Prudential were sophisticated parties that entered into a $192.2 million loan agreement. Each was represented by counsel, and there is no evidence of overreaching. They agreed to allocate the risk of default by, among other things, including an unambiguous provision that increased the non-default rate by 5% in the event of a default. The Debtors' appeal to equitable considerations has no merit.

Consequently, we conclude that the bankruptcy court did not err in awarding Prudential postpetition interest at the default rate set forth in the Construction Loan Agreement.

## <u>CONCLUSION</u>

For the reasons set forth above, we **AFFIRM** the Default Rate Calculation, **REVERSE** the 506(b) Order and the Prudential Claim Order, and **REMAND** both orders for further proceedings consistent with this opinion.

# UNITED STATES BANKRUPTCY APPELLATE PANEL
# FOR THE FIRST CIRCUIT

———————————————————

**BAP NOS. MB 11-079, MB 11-082, MB 11-085, MB 11-086**

———————————————————

**Bankruptcy Case No. 10-14535-JNF**
**(Jointly Administered)**

———————————————————

**SW BOSTON HOTEL VENTURE, LLC, et al.,[1]**
**Debtors.**

———————————————————

**THE PRUDENTIAL INSURANCE COMPANY OF AMERICA,**
**Appellant / Cross-Appellee,**

**v.**

**CITY OF BOSTON,**
**Appellee,**

**and**

**SW BOSTON HOTEL VENTURE, LLC, et al.,**
**Appellees / Cross-Appellants.**

———————————————————

## <u>JUDGMENT</u>

This cause came to be heard from the United States Bankruptcy Court for the District of

Massachusetts.  Upon consideration whereof, and in accordance with the Opinion entered of

even date, it is now **ORDERED AND ADJUDGED** that the October 4, 2011 order granting, in

part, and denying, in part, the Motion of The Prudential Insurance Company of America for an

———————————————————

[1]  The "Debtors" are SW Boston Hotel Venture LLC ("SW Boston") (Case No. 10-14535-JNF), Auto Sales & Service, Inc. (Case No. 10-14528-JNF), General Trading Company (Case No. 10-14532-JNF), Frank Sawyer Corporation (Case No. 10-14533-JNF), 100 Stuart Street LLC (Case No. 10-14534-JNF), 30-32 Oliver Street Corporation (Case No. 10-16173-JNF), General Land Corporation (Case No. 10-16174-JNF), and 131 Arlington Street Trust (Case No. 10-16177-JNF).

Order Authorizing the Application of Payments Received during the Chapter 11 Cases to

Payment of Postpetition Interest Pursuant to Section 506(b) of the Bankruptcy Code and the

Order Fixing Amount of Allowed Prudential Secured Claim as of October 4, 2011 entered by the

bankruptcy court on October 20, 2011, are hereby **AFFIRMED** in part, **REVERSED** in part,

and **REMANDED** for further proceedings consistent with this opinion.


                              FOR THE PANEL:


Dated: October 1, 2012                    By:   s/ Mary P. Sharon
                                          Mary P. Sharon, Clerk




[Hon. Joan N. Feeney, and Clerk, U.S. Bankruptcy Court for the District of Massachusetts
(Eastern Division); and Gina Martin, Esq., Emanuel Grillo, Esq., Meagan Costello, Esq.,
Charles Bennett, Esq., Harold Murphy, Esq., Christopher Condon, Esq., D. Ethan Jeffery, Esq.,
Natalie Sawyer, Esq., Brendan Recupero, Esq., Bruce Smith, Esq., E. Kate Buyuk, Esq.,
John Elstad, Esq., Joseph Ryan, Esq.]
                                                                              33

NOT FOR PUBLICATION

# UNITED STATES BANKRUPTCY APPELLATE PANEL
## FOR THE FIRST CIRCUIT

―――――――――――――――――――

### BAP NO. MB 11-087
―――――――――――――――――――

**Bankruptcy Case No. 10-14535-JNF
(Jointly Administered)**

―――――――――――――――――――

**SW BOSTON HOTEL VENTURE, LLC, et al.,[1]
Debtors.**

―――――――――――――――――――

**THE PRUDENTIAL INSURANCE COMPANY OF AMERICA,
Appellant,**

**v.**

**SW BOSTON HOTEL VENTURE, LLC, et al.,
Appellees.**

―――――――――――――――――――

**Appeal from the United States Bankruptcy Court
for the District of Massachusetts
(Hon. Joan N. Feeney, U.S. Bankruptcy Judge)**

―――――――――――――――――――

**Before Haines, Deasy, and Tester,
United States Bankruptcy Appellate Panel Judges.**

―――――――――――――――――――

**Gina L. Martin, Esq. and Emanuel C. Grillo, Esq., on brief for Appellant.
Harold B. Murphy, Esq., Charles R. Bennett, Jr., Esq., and John C. Elstad, Esq.,
on brief for Appellees SW Boston Hotel Venture, LLC, et al.**

―――――――――――――――――――

**October 1, 2012**

―――――――――――――――――――

―――――――――――――――――――

[1] The "Debtors" are SW Boston Hotel Venture, LLC (Case No. 10-14535-JNF) ("SW Boston"), Auto Sales & Service, Inc. (Case No. 10-14528-JNF), General Trading Company (Case No. 10-14532-JNF), Frank Sawyer Corporation (Case No. 10-14533-JNF), 100 Stuart Street LLC (Case No. 10-14534-JNF), 30-32 Oliver Street Corporation (Case No. 10-16173-JNF), General Land Corporation (Case No. 10-16174-JNF), and 131 Arlington Street Trust (Case No. 10-16177-JNF).

**Per Curiam.**

The Prudential Insurance Company of America ("Prudential") appeals from the bankruptcy court's decision and accompanying order confirming the Debtors' Modified First Amended Joint Plan of Reorganization (the "Plan") and the order overruling Prudential's objection to confirmation of the Plan.[2]  At issue on appeal is whether the bankruptcy court erred in holding that: (1) the Plan complied with the requirements of § 1129[3] for confirmation; (2) the consolidation of the Debtors' estates for distribution purposes was proper; and (3) the City of Boston's assignment of voting rights which sought to alter substantive rights of creditors under the Bankruptcy Code is unenforceable.

For the reasons set forth below, we **VACATE** and **REMAND** the Confirmation Orders for further proceedings consistent with this opinion.

<u>**BACKGROUND**</u>

On April 28, 2010, SW Boston and three of its affiliated debtors filed voluntary chapter 11 petitions.  The other debtors filed voluntary chapter 11 petitions on June 4, 2010.  Prudential has a first priority security interest in and lien on essentially all of the assets of the Debtors (with

---

[2]   Prudential identified three related but separate documents in its notice of appeal: (1) the "Memorandum" entered on November 14, 2011 regarding confirmation of the Debtors' Plan [Docket No. 867]; (2) the "Order" entered on November 14, 2011, overruling Prudential's objection to the Plan [Docket No. 868]; and (3) the "Findings of Fact, Conclusions of Law, and Order Confirming Modified First Amended Joint Plan of Reorganization of SW Boston Hotel Venture LLC, Auto Sales & Service, Inc., General Trading Company, Frank Sawyer Corporation, 100 Stuart Street, LLC, 30-32 Oliver Street Corporation, General Land Corporation and 131 Arlington Street Trust," entered on November 16, 2011 [Docket No. 869].  All three documents will be referred to collectively as the "Confirmation Orders."

[3]   Unless expressly stated otherwise, all references to "Bankruptcy Code" or to specific statutory sections shall be to the Bankruptcy Reform Act of 1978, as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. No. 109-8, 119 Stat. 23, 11 U.S.C. §§ 101, et seq.

2

a limited exception). The City of Boston (the "City") has a second priority lien on most (but not all) of the same assets on which Prudential has a lien. Prudential and the City are parties to an intercreditor agreement pursuant to which the City subordinated its liens against, and right to payment from, the collateral pledged to both of them. This subordination agreement also contemplates the assignment of voting rights from the City to Prudential.

The Debtors filed the Plan in June 2011. The Plan divided creditors and other interests into nine classes and proposed to pay, in full, all allowed claims held by non-insiders using income generated by the Debtors' operations and the sale of SW Boston's condominiums in the ordinary course of business. Prudential filed an objection in which it asserted numerous flaws with the Plan, including that the Plan failed to satisfy multiple provisions of 11 U.S.C. § 1129, such as §§ 1129(a)(3), (a)(7), (a)(11), and (b)(2). Prudential also argued that the bankruptcy court fixed its claim at an amount vastly below what the Bankruptcy Code requires because it failed to calculate properly the postpetition interest to which Prudential is entitled, and because the Plan allowed payments on Prudential's claims to be made over time at a below-market rate of interest. Prudential was the only party to object to and vote against the Plan.

The bankruptcy court conducted a three-day trial on confirmation of the Plan, combined with a hearing on the "Motion of The Prudential Insurance Company of America for an Order Authorizing the Application of Payments Received during the Chapter 11 Cases to Payment of Postpetition Interest Pursuant to Section 506(b) of the Bankruptcy Code" (the "506(b) Motion"). On October 4, 2011, the bankruptcy court entered an order and accompanying memorandum granting, in part, and denying, in part, the 506(b) Motion (the "506(b) Decision"). See In re SW Boston Hotel Venture, LLC, 460 B.R. 4 (Bankr. D. Mass. 2011). In the 506(b) Decision, the

3

bankruptcy court held that Prudential had failed to establish that it was oversecured at any time

prior to the date of SW Boston's sale of the "W" Hotel and, therefore, was entitled to

postpetition interest only from June 8, 2011.  Based on the 506(b) Decision, the bankruptcy court

entered an order (the "Prudential Claim Order") fixing Prudential's allowed secured claim as of

October 4, 2011, in the amount of $51,835,721.  Prudential appealed both the 506(b) Decision

and the Prudential Claim Order, and the Debtors filed cross-appeals relating to both orders.[4]

On November 14, 2011, the bankruptcy court entered the Confirmation Orders

confirming the Plan and overruling Prudential's objections to the Plan.  See In re SW Boston

Hotel Venture, LLC, 460 B.R. 38 (Bankr. D. Mass. 2011).  With respect to Prudential's secured

claim, the bankruptcy court determined that, pursuant to the 506(b) Decision and the Prudential

Claim Order, Prudential was owed around $52 million.  The Plan provided for payment of the

full amount of Prudential's allowed secured claim, by March 31, 2014.  Upon the evidence and

witness testimony accepted at trial, adopting the United States Supreme Court's "formula

approach" as set forth in Till v. SCS Credit Corp., 541 U.S. 465 (2004), the bankruptcy court

also found that the interest rate of 4.25% for the cramdown loan would compensate Prudential

for the risk attendant to the restructured loan.  Also, Prudential was to retain its lien and receive

payments with interest at an appropriate rate from the sale of the condominiums, until its allowed

secured claim is paid in full.  Finally, the Debtors intended to satisfy Prudential's lien in a

relatively short period of time, no later than March 31, 2014.  Consequently, the bankruptcy

court found that Debtors' proposed treatment of Prudential's allowed secured claim was fair and

equitable, did not unfairly discriminate, and met the requirements for a cramdown under

---

[4]  See BAP Nos. MB 11-079, MB 11-082, MB 11-085, and MB 11-086.

§ 1129(b)(2)(A).  Moreover, the bankruptcy court found that the Plan provided Prudential with the indubitable equivalent of its claim and that the treatment complied with the requirements of § 1129(b)(2)(A)(i) and (iii).

Prudential appealed the Confirmation Orders, and sought a stay pending appeal from both the bankruptcy court and the Panel.  Both of those requests were denied.  Without a stay, the Plan became effective on December 1, 2011.  The Debtors assert that the Plan became substantially consummated shortly thereafter.

On February 14, 2012, the Debtors filed with the Panel a motion to dismiss this appeal, arguing that the appeal is equitably moot because the Plan had been substantially consummated and no effective relief could be granted to Prudential that would not completely undo the Debtors' reorganization and require the unraveling of the consummated transactions.  They argued that because the 506(b) Decision and the Prudential Claim Order are "inextricably intertwined" with the Confirmation Orders and the implementation of the Debtors' reorganization, the decisions are "all part of a whole and one cannot be undone without undoing the others."  Prudential opposed the motion to dismiss, arguing that the appeal was not moot as the Plan had not been substantially consummated and because effective relief could still be granted to Prudential without unwinding the Plan.  In an order dated March 12, 2012, the Panel denied the motion to dismiss, concluding that the Debtors had failed to carry their burden of showing that the appeal is equitably moot, in part because Prudential is willing to accept alternative forms of relief that would not require an unraveling of the reorganization.

The motion to dismiss having been denied, both this appeal and the appeals relating to the 506(b) Decision and the Prudential Claim Order proceeded to oral argument.

## DISCUSSION

The Plan provided for payment in full of all allowed, non-insider claims, plus post-confirmation interest, and proposed to pay these claims using income generated from the Debtors' operations, the sale of the remaining condominiums in the ordinary course of SW Boston's business, and the liquidation of certain assets of the Debtors. As set forth above, the bankruptcy court's 506(b) Decision and the Prudential Claim Order fixing the amount of Prudential's secured claim played an integral part in the confirmation of the Plan. According to the bankruptcy court, allowance of Prudential's claim in the amount originally asserted by Prudential would have rendered the Plan unconfirmable as the stipulated value of the Debtors' assets was substantially less than the amount of Prudential's secured claim.

In a decision entered this date, we have affirmed in part, and reversed in part, the 506(b) Decision and the Prudential Claim Order, and remanded both orders for further proceedings. In our decision, we concluded that the bankruptcy court: (1) erred in holding that Prudential was entitled to accrue postpetition interest only from the date of the hotel sale, as the values found by the bankruptcy court at the hearing on the 506(b) Motion showed that Prudential was fully secured as of the petition date; (2) erred in holding that Prudential was not entitled to postpetition interest computed on a compounded basis; and (3) did not err in awarding Prudential postpetition interest at the default rate set forth in the applicable loan agreement. Such a reversal alters the landscape dramatically. Its practical result is a significant increase in the amount of Prudential's claim, which, in turn, impacts the evaluation of the Plan's terms under § 1129. Thus, we will vacate the Confirmation Orders, and afford the Debtors an opportunity to amend the Plan's terms to account for the increased amount of Prudential's claim and the

6

resulting pay out to Prudential and/or for the bankruptcy court to fashion alternative forms of relief for Prudential that would not unravel the reorganization.

## **CONCLUSION**

For the reasons set forth above, we **VACATE** the Confirmation Orders and **REMAND** to the bankruptcy court for proceedings consistent with this opinion.

40

# UNITED STATES BANKRUPTCY APPELLATE PANEL
# FOR THE FIRST CIRCUIT

————————————————

### BAP NO. MB 11-087

————————————————

### Bankruptcy Case No. 10-14535-JNF
### (Jointly Administered)

————————————————

### SW BOSTON HOTEL VENTURE, LLC, et al.,[1]
### Debtors.

————————————————

### THE PRUDENTIAL INSURANCE COMPANY OF AMERICA,
### Appellant,

### v.

### SW BOSTON HOTEL VENTURE, LLC, et al.,
### Appellees.

————————————————

### <u>JUDGMENT</u>

————————————————

This cause came to be heard from the United States Bankruptcy Court for the District of
Massachusetts.  Upon consideration whereof, and in accordance with the Opinion entered of
even date, it is now **ORDERED AND ADJUDGED** that the orders confirming the Debtors'
Modified First Amended Joint Plan of Reorganization and the order overruling Prudential's

————————————————

[1] The "Debtors" are SW Boston Hotel Venture, LLC (Case No. 10-14535-JNF) ("SW Boston"),
Auto Sales & Service, Inc. (Case No. 10-14528-JNF), General Trading Company (Case No.
10-14532-JNF), Frank Sawyer Corporation (Case No. 10-14533-JNF), 100 Stuart Street LLC (Case No.
10-14534-JNF), 30-32 Oliver Street Corporation (Case No. 10-16173-JNF), General Land Corporation
(Case No. 10-16174-JNF), and 131 Arlington Street Trust (Case No. 10-16177-JNF).

objection to confirmation of that plan are hereby **VACATED** and **REMANDED** for further

proceedings consistent with the opinion entered of even date.


FOR THE PANEL:


Dated: October 1, 2012                    By: ___s/ Mary P. Sharon_____
                                                            Mary P. Sharon, Clerk


[Hon. Joan N. Feeney, and Clerk, U.S. Bankruptcy Court for the District of Massachusetts
(Eastern Division); and Gina Martin, Esq., Emanuel Grillo, Esq., Meagan Costello, Esq.,
Charles Bennett, Esq., Harold Murphy, Esq., Christopher Condon, Esq., D. Ethan Jeffery, Esq.,
Natalie Sawyer, Esq., Brendan Recupero, Esq., Bruce Smith, Esq., E. Kate Buyuk, Esq.,
John Elstad, Esq., Joseph Ryan, Esq.]

# UNITED STATES BANKRUPTCY APPELLATE PANEL
# FOR THE FIRST CIRCUIT

_____

### BAP NOS. MB 11-079, MB 11-082, MB 11-085, MB 11-086

_____

### Bankruptcy Case No. 10-14535-JNF
### (Jointly Administered)

_____

### SW BOSTON HOTEL VENTURE, LLC, et al.,[1]
### Debtors.

_____

### THE PRUDENTIAL INSURANCE COMPANY OF AMERICA,
### Appellant / Cross-Appellee,

### v.

### CITY OF BOSTON,
### Appellee,

### and

### SW BOSTON HOTEL VENTURE, LLC, et al.,
### Appellees / Cross-Appellants.

_____

**Deasy, U.S. Bankruptcy Appellate Panel Judge.**

### <u>ORDER DENYING MOTION TO DISMISS APPEAL</u>

The Prudential Insurance Company of America ("Prudential") has appealed from the

following orders of the bankruptcy court: (1) the October 4, 2011 order granting, in part, and

denying, in part, the Motion of The Prudential Insurance Company of America for an Order

---

[1] The "Debtors" are SW Boston Hotel Venture LLC ("SW Boston") (Case No. 10-14535-JNF), Auto Sales & Service, Inc. (Case No. 10-14528-JNF), General Trading Company (Case No. 10-14532-JNF), Frank Sawyer Corporation (Case No. 10-14533-JNF), 100 Stuart Street, LLC (Case No. 10-14534-JNF), 30-32 Oliver Street Corporation (Case No. 10-16173-JNF), General Land Corporation (Case No. 10-16174-JNF), and 131 Arlington Street Trust (Case No. 10-16177-JNF).

Authorizing the Application of Payments Received during the Chapter 11 Cases to Payment of
Postpetition Interest Pursuant to Section 506(b) of the Bankruptcy Code (the "506(b) Decision");
and (2) the Order Fixing Amount of Allowed Prudential Secured Claim as of October 4, 2011,
entered by the bankruptcy court on October 20, 2011.[2]  On February 14, 2012, the Debtors filed
a motion to dismiss (the "Motion to Dismiss"), arguing that the appeals should be dismissed as
moot as the Debtors' confirmed plan has been substantially consummated and appellate relief
cannot be granted without "eviscerating" the Debtors' reorganization, completely undoing
multiple consummated transactions made in reliance on the confirmed plan's finality and causing
harm to third parties not before the court.  Prudential opposes the Motion to Dismiss, arguing
that the appeal is not moot as the confirmed plan has not been substantially consummated and
because effective relief can still be granted to Prudential without harm to third parties if the
Panel were to reverse the orders on appeal.

For the following reasons, the Motion to Dismiss is **DENIED**.

## BACKGROUND

Prior to the petition date, SW Boston was the developer, owner and operator of the "W"
Hotel and Residences, a mixed-use property located in Boston's downtown theater district
consisting of a hotel, 123 residential condominiums, a parking garage, restaurant, lobby bar,
retail store and spa.  See In re SW Boston Hotel Venture, LLC, 449 B.R. 156, 159 (Bankr. D.
Mass. 2011) (reciting stipulated facts in connection with Prudential's motion to lift stay).  After
financing with another lender fell through, Prudential agreed to finance the construction of the
project.  In January 2008, Prudential and SW Boston entered into a Construction Loan

---

[2]  The Debtors have filed cross-appeals with respect to both orders.

2

44

Agreement, whereby Prudential agreed to provide up to $192.2 million in financing to SW Boston (the "Prudential Loan"). Id. at 160. The Construction Loan Agreement provided for the payment of interest at the rate of 9.5% compounded monthly, and that after the occurrence of an event of default, the interest rate would increase to 14.5%. In addition to scheduled debt service payments, the Debtors were required to pay Prudential 92% of the proceeds of each residence sale as it occurred. To secure SW Boston's obligations under the Construction Loan Agreement, SW Boston granted Prudential, among other things, a security interest and mortgage on SW Boston's real and personal property, and all proceeds of the foregoing. In addition, the Debtors other than SW Boston (the "Affiliated Debtors") agreed to provide additional security in order to induce Prudential to enter into the loan. Id. at 160-61.

After construction of the project was underway, the City of Boston agreed to lend SW Boston an additional $10.5 million on a subordinated basis (the "City Loan") to complete construction of certain amenities and facilities. As security for the City Loan, SW Boston granted to the City of Boston a second priority security interest and mortgage on much of the same collateral on which Prudential had a first lien. Id. at 161. Prudential and the City of Boston entered into an Intercreditor and Subordination Agreement, under which the City of Boston agreed, among other things, to subordinate its liens against, and right to payment from, the collateral pledged to both of them. See In re SW Boston Hotel Venture, LLC, 460 B.R. 4, 17 (Bankr. D. Mass. 2011).

### A.    The Commencement of Bankruptcy Proceedings

On April 28, 2010, SW Boston and four of its Affiliated Debtors filed voluntary chapter 11 petitions. The other Affiliated Debtors filed voluntary chapter 11 petitions on June 4, 2010.

After evidentiary hearings held in November 2010, the bankruptcy court denied

Prudential's Motion for Relief from the Automatic Stay.  See In re SW Boston Hotel Venture,

LLC, 449 B.R. 156 (Bankr. D. Mass. 2011).  The bankruptcy court found that there was no cause

for relief from the automatic stay under § 362(d)(1) because Prudential did not lack adequate

protection for its security interest as the value of all of the collateral it had been pledged by all

the Debtors exceeded its loan balance, and, thus, it was adequately protected by an equity

cushion.  The bankruptcy court also found that even though the value of the assets of SW

Boston, principally the W Hotel and condominiums, was less than the amount owed to

Prudential, the Debtors had sustained their burden of demonstrating that a plan was in prospect,

and, therefore, Prudential was not entitled to relief from stay under § 362(d)(2).

One year into the bankruptcy cases, the bankruptcy court approved the sale of the W

Hotel and certain other related facilities to an unrelated third party for $89.5 million (the "Hotel

Sale"), an amount substantially more than the opinions expressed by both parties' appraisers and

the value determined by the bankruptcy court when denying relief from the automatic stay.  See

In re SW Boston Hotel Venture, LLC, 406 B.R. 5, 11 (Bankr. D. Mass. 2011).  Upon the closing

of the Hotel Sale on June 8, 2011, Prudential received $83,322,017 in net sales proceeds.  Id.

### B.    The 506(b) Motion

On April 15, 2011, Prudential filed a "Motion of The Prudential Insurance Company of

America for an Order Authorizing the Application of Payments Received During the Chapter 11

Cases to Payment of Postpetition Interest Pursuant to Section 506(b) of the Bankruptcy Code"

(the "506(b) Motion").  In the 506(b) Motion, Prudential sought a declaration that it was

oversecured and was entitled under § 506(b) to recover postpetition interest from the petition

date at the default rate set forth in loan documents executed by the parties, as well as attorneys'
fees, costs and charges.  Prudential also sought to apply all postpetition payments received
during the chapter 11 proceedings first to postpetition interest and then to the principal balance
of its claim.  The Debtors opposed the 506(b) Motion, asserting that Prudential's claim was
undersecured until the Hotel Sale on June 8, 2011, and as such, was not entitled to postpetition
interest at the default rate.  Furthermore, the Debtors asserted that the default rate of interest was
unreasonable and that Prudential had not itemized any fees or costs.  The Official Committee of
Unsecured Creditors and the City of Boston also filed objections to the 506(b) Motion.

  **C.**  **The Plan**

  The Debtors filed their Modified First Amended Joint Plan of Reorganization (the
"Plan") in June 2011.  The Plan divided creditors and other interests into nine classes and
proposed to pay in full all allowed claims filed by non-insiders, using income generated by the
Debtors' operations, the sale of the remaining residences in the ordinary course of SW Boston's
business, and the liquidation of certain assets of the Debtors.  The Plan defined Prudential's
allowed secured claim as "$180,803,187.86 less all payments made to, or received by, Prudential
on account of its Claims against the Debtors from the Petition Date through the Effective Date . .
." or such other amount as determined by the bankruptcy court.  According to the Plan,
Prudential's allowed Class 2 claim would be paid in full prior to March 31, 2014 with
post-confirmation interest at a rate of 4.25 %, or such other rate as determined by the bankruptcy
court.  The Plan also proposed that Prudential would retain its prepetition liens on the Debtors'
property and it would be paid the "Residence Net Sales Proceeds," the sales price of the
condominiums, less 8% for closing costs and the amount necessary to pay outstanding real estate

taxes and condominium fees, as well as budgeted operating expenses. Prudential also would receive, on a monthly basis, the aggregate of the Debtors' cash in excess of working capital amounts.

Prudential filed an objection in which it asserted numerous flaws with the Plan, including that the Plan failed to satisfy multiple provisions of § 1129, such as §§ 1129(a)(3), (a)(7), (a)(11) and (b)(2). Prudential also argued that the Plan fixed its claim at an amount vastly below what the circumstances and the Bankruptcy Code require because it failed to calculate properly the postpetition interest to which Prudential was entitled, and because the Plan allowed payments on Prudential's claims to be made over time at a below-market rate of interest. Prudential was the only party to object to and vote against the Plan.

### D.  The 506 Decision and Confirmation of the Plan

On June 27-29, 2011, the bankruptcy court held a combined evidentiary hearing on Prudential's 506(b) Motion, confirmation of the Debtors' Plan and Prudential's objections to the Plan.

On October 4, 2011, the bankruptcy court entered an order and accompanying memorandum granting, in part, and denying, in part, the 506(b) Motion (the "506(b) Decision").[3] In the 506(b) Decision, the bankruptcy court held that Prudential had failed to establish that it was oversecured at any time prior to the Hotel Sale on June 8, 2011, and had not provided any support for its claim for costs, charges and fees. The bankruptcy court concluded, however, that Prudential became oversecured as of the date of the Hotel Sale and, therefore, was entitled to postpetition interest from and after June 8, 2011. Thereafter, on October 20, 2011, the

---

[3]  See In re SW Boston Hotel Venture, LLC, 460 B.R. 4 (Bankr. D. Mass. 2011).

bankruptcy court entered an "Order Fixing Amount of Allowed Prudential Secured Claim as of October 4, 2011" (the "Prudential Claim Order") determining, based on the 506(b) Decision, that Prudential had an allowed secured claim as of October 4, 2011, in the amount of $51,835,721. Prudential appealed both the 506(b) Decision and the Prudential Claim Order, and the Debtors filed cross-appeals relating to both orders. Neither party sought a stay of either order pending appeal.

On November 14, 2011, the bankruptcy court entered an order and accompanying decision confirming the Plan (the "Confirmation Decision"), and an order overruling Prudential's objection to confirmation of the Plan (the "Confirmation Order").[4] The 506(b) Decision was integral to the bankruptcy court's decision to overrule Prudential's objections and determine that the Plan satisfied the requirements of § 1129. According to the bankruptcy court, allowance of Prudential's claim in the amount asserted by Prudential would have rendered the Plan unconfirmable as the stipulated value of the Debtors' assets was substantially less than the amount of Prudential's secured claim.

Prudential appealed the Confirmation Order and Decision, and that appeal is currently pending before the Panel.[5] Prudential also sought a stay pending appeal from the bankruptcy court, which was denied. Prudential then filed an emergency motion with the Panel for a stay of the Confirmation Order pending appeal. On November 30, 2011, the Panel issued an order denying the motion for a stay pending appeal, concluding that there was no reasonable likelihood

---

[4] See In re SW Boston Hotel Venture, LLC, 460 B.R. 38 (Bankr. D. Mass. 2011).

[5] See BAP No. MB 11-087.

of success on the merits. Without a stay, the Plan became effective on December 1, 2011, and

the Debtors assert that the Plan became substantially consummated shortly thereafter.

## DISCUSSION

**I.      The Standard**

Mootness in bankruptcy appellate proceedings is based "on jurisdictional and equitable

considerations stemming from the impracticability of fashioning fair and effective judicial

relief." Rochman v. Northeast Utils. Serv. Group (In re Public Serv. Co. of New Hampshire),

963 F.2d 469, 471 (1st Cir. 1992) (citations omitted); Kasperian v. Conley (In re Conley), 369

B.R. 67, 70-71 (B.A.P. 1st Cir. 2007). A bankruptcy appeal must be dismissed for mootness

where jurisdictional and equitable considerations render it impracticable for the appellate court

to provide an effective remedy. Deloitte & Touche L.L.P. v. Aquila Biopharmaceuticals, Inc. (In

re Cambridge Biotech Corp.), 214 B.R. 429, 431 (D. Mass. 1997).

The jurisdictional component relates to the constitutional restriction prohibiting the

judiciary from deciding cases in which no effective remedy can be provided. See Public Serv.

Co., 963 F.2d at 471. Constitutional mootness refers to Article III's requirement that a federal

court can only exercise jurisdiction over a "case or controversy." U.S. Const. art. III. If an

action is moot, however, there is no case or controversy. See In re Continental Airlines, 91 F.3d

553, 558 (3d Cir. 1996) (noting that mootness implicates the case or controversy requirement).

An appeal is moot in the constitutional sense only where events have taken place during the

pendency of the appeal that make it "impossible for the court to grant 'any effectual relief

whatever.'" Church of Scientology of Calif. v. United States, 506 U.S. 9, 12 (1992) (citations

omitted).

Although related to constitutional mootness, equitable mootness is a broader concept. The doctrine of equitable mootness applies chiefly in bankruptcy proceedings because of the equitable nature of bankruptcy judgments.  Essentially, "[t]he doctrine of equitable mootness represents a pragmatic recognition by courts that reviewing a judgment may, after time has passed and the judgment has been implemented, prove 'impractical, imprudent, and therefore inequitable.'"  Behrmann v. Nat'l Heritage Found., Inc., 663 F.3d 704, 713 (4th Cir. 2011).  In the bankruptcy context, equitable mootness is a prudential doctrine that is invoked to avoid disturbing a reorganization plan once implemented.  See, e.g., Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.), 416 F.3d 136, 144 (2d Cir. 2005); In re UNR Indus., Inc., 20 F.3d 766, 769 (7th Cir. 1994).  Thus, unlike the constitutional doctrine of mootness, which bars consideration of appeals because no Article III case or controversy exists, equitable mootness is often invoked when it would be unfair or impractical to grant the relief requested.  See Mac Panel Co. v. Virginia Panel Corp., 283 F.3d 622, 625 (4th Cir. 2002).  The question is not whether the court has the ability "to award some fashion of meaningful relief," Church of Scientology, 506 U.S. at 12 (test for Article III mootness); rather, the question is whether prudence counsels against upsetting the plan of reorganization.  See In re Metromedia Fiber, 416 F.3d at 144.

Here, the Debtors argue that these appeals are subject to dismissal on the grounds of equitable mootness because the Plan has been substantially consummated and no effective relief can be granted to Prudential that will not completely undo the Debtors' reorganization and require the unraveling of the consummated transactions.  They argue that because the 506(b) Decision and the Prudential Claim Order are "inextricably intertwined" with the Confirmation

Decision and the implementation of the Debtors' reorganization, the decisions are "all part of a whole and one cannot be undone without undoing the others." Prudential argues that the Plan has not been substantially consummated, and, even if it has been substantially consummated, relief does not require unwinding the Plan.

## II.    Equitable Mootness

Under the doctrine of equitable mootness, an appeal should be dismissed, even if the court has jurisdiction and could fashion relief, if the implementation of that relief would be inequitable. In re PWS Holding Corp., 228 F.3d 224, 235-236 (3d Cir. 2000); see also Behrmann, 663 F.3d at 713 ("The doctrine of equitable mootness represents a pragmatic recognition by courts that reviewing a judgment may, after time has passed and the judgment has been implemented, prove 'impractical, imprudent, and therefore inequitable.'"). In the bankruptcy context, the doctrine of equitable mootness is based upon the important public policy favoring orderly reorganizations and settlement of debtor's estates by affording finality to bankruptcy court judgments. In re Public Service Co., 963 F.2d at 471-72. In effect, the equitable mootness doctrine "prevents a court from unscrambling complex bankruptcy reorganizations when the appealing party should have acted before the plan became extremely difficult to retract." Nordhoff Invs., Inc. v. Zenith Elecs. Corp., 258 F.3d 180, 185 (3d Cir. 2001). Thus, a court may dismiss an appeal as equitably moot "when it becomes impractical and imprudent to upset the plan of reorganization at [a] late date." Behrmann, 663 F.3d at 713.

To that end, the Fourth Circuit has articulated four factors in determining whether dismissal for equitable mootness is warranted: (1) whether the appellant sought and obtained a stay; (2) whether the reorganization plan or other equitable relief ordered has been substantially

10

consummated; (3) the extent to which the relief requested on appeal would affect the success of the reorganization plan or other equitable relief granted; and (4) the extent to which the relief requested on appeal would affect the interests of third parties.  Id.

Appellate courts have the discretion to give varying weight to the relevant factors, although the doctrine of equitable mootness "is limited in scope and should be cautiously applied."  PWS Holding, 228 F.3d at 236 (applying a five-factor test similar to the test set forth by the Fourth Circuit in Behrmann).[6]  Consideration of the factors also will at times overlap, and the application of the equitable mootness doctrine employs balancing, practicality, and prudence, rather than rigid rules.  See, e.g., Mac Panel Co., 283 F.3d at 625; PWS Holding, 228 F.3d at 236.  "The question, then, is whether these factors, taken together, suggest that, irrespective of the merits of the appeal, it would be imprudent to disturb the Plan at this late date."  In re Anderson, 349 B.R. 448, 454 (E.D. Va. 2006).

### 1.      Whether appellant sought and obtained a stay

The Debtors argue that, because Prudential did not obtain a stay and the reorganization has gone forward, these appeals are equitably moot.  As a practical matter, acts completed in accordance with an unstayed order of the bankruptcy court must not thereafter be routinely vulnerable to nullification if a plan of reorganization is to succeed.  In re Stadium Mgmt. Corp., 895 F.2d 845, 848-49 (1st Cir. 1990).  Appellants are obligated, therefore, to diligently pursue all available remedies to obtain a stay of the objectionable order, even where a stay may be unlikely

---

[6]   The five factors considered by the Third Circuit in determining equitable mootness are: (1) whether the reorganization plan has been substantially consummated; (2) whether a stay has been obtained; (3) whether the relief requested would affect the rights of the parties not before the court; (4) whether the relief requested would affect the success of the plan; and (5) the public policy of affording finality to bankruptcy judgments.  See PWS Holding, 228 F.3d at 236.

to be granted.  See Metromedia Fiber, 416 F.3d at 144-45; Nordhoff Invs., 258 F.3d at 187; see

also In re Chateaugay Corp., 988 F.2d 322, 326 (2d Cir. 1993) ("The party who appeals without

seeking to avail himself of that [stay] protection does so at his own risk.").  Thus, the equitable

mootness test inquires whether an unwarranted or repeated failure to request a stay enabled

developments to evolve in reliance on the bankruptcy court order to the degree that their

remediation has become impracticable or impossible.  See Hicks, Muse & Co., Inc. v. Brandt (In

re Healthco Int'l, Inc.), 136 F.3d 45, 48 (1st Cir. 1998).

 Here, although Prudential sought a stay of the Confirmation Decision and Order from

both the bankruptcy court and this Panel, it did not seek a stay of the 506(b) Decision.  However,

in light of the combined evidentiary hearing, the close sequence of the 506(b) Decision, the

Prudential Claim Order and the Confirmation Decision, and the "integral nexus" of those

decisions, see In re Continental Airlines, 91 F.3d at 55-57 (holding that there was "integral

nexus" between plan confirmation and adjudication of secured creditors' claim motions),

Prudential's failure to seek a stay of the 506(b) Decision is not material.  The 506(b) Decision

has no significance and is incapable of being implemented in any meaningful way other than

through the confirmation of the Plan, and no party relied on the 506(b) Decision in formulating

or voting on the Plan.  The 506(b) Decision and the Confirmation Decision were considered by

the bankruptcy court simultaneously and the decisions were issued only weeks apart.  Therefore,

a stay of the 506(b) Decision would have had no practical effect.  I conclude, therefore, that this

factor does not weigh in favor of dismissal on equitable mootness grounds.

## 2.     Whether the Plan has been substantially consummated

To assess whether a plan has been substantially consummated, courts look first at the

Bankruptcy Code, which defines "substantial consummation" as:

> (A) transfer of all or substantially all of the property proposed by the plan
> to be transferred;
>
> (B) assumption by the debtor or by the successor to the debtor under the
> plan of the business or of the management of all or substantially all of the
> property dealt with by the plan; and
>
> (C) commencement of distribution under the plan.

11 U.S.C. § 1101(2).  It is undisputed that without a stay, the Plan became effective on

December 1, 2011.  The Debtors assert that on or after the effective date, they implemented and

consummated the Plan, including the transfer of all property proposed to be transferred under the

Plan (namely, the revesting of the Debtors' assets in the reorganized Debtors, the transfer of

certain equity interests, and the discharge and subordination of certain claims).  The Debtors also

assert that they have assumed the management of the property addressed in the Plan, and they

have commenced making distributions under the Plan (including the payment of all allowed

priority Class 1 claims, payment to Prudential of proceeds from the sales of residences, interest

payments to the City of Boston, and payment of the initial distribution owed to Bovis Land

Lease LMB, Inc. ("Bovis"), the general contractor for the project and the sole Class 6 creditor).

Thus, it appears that all the elements of § 1101(2) have been satisfied and the Plan has been

13

substantially consummated.[7]  Therefore, this factor weighs in favor of finding that Prudential's appeal is equitably moot.

The Debtors assert that the analysis should end here, as substantial consummation creates a rebuttable presumption of mootness that Prudential must overcome, and Prudential has failed to satisfy this burden.  I find no basis for any such presumption.  The Debtors rely on a footnote in Public Service Co., supra, where the First Circuit noted that substantial consummation can raise "a strong presumption that an appellate court will not be able to fashion *an equitable and effective remedy*."  963 F.2d at 473-74 n.13 (emphasis added).  This does not mean that substantial consummation creates a presumption *of equitable mootness*.  Thus, satisfaction of the statutory definition of substantial consummation, while a factor to be considered, alone is insufficient for finding equitable mootness.  See In re Zenith, 329 F.3d at 344.  Even more significant is the court's consideration of "the probability that granting the appeal would unravel the plan, upon which numerous parties were at that point in reliance."  Id.  This consideration is addressed by the third and fourth factors of the equitable mootness test.

**3.      The extent to which the relief requested would affect the success of the Plan**

As to the third factor, the Debtors argue that these appeals are equitably moot because the appeal, if successful, would "completely undo" the Debtors' reorganization and necessitate "the

---

[7]  Prudential maintains that the Plan has not been "substantially consummated" because the majority of the property proposed to be transferred under the Plan has not yet occurred as sixty of the residences, which is the primary source of distribution under the Plan, have not yet been sold, and because the Debtors have only made one-third of the payments due to unsecured creditors and one-half of the payments due to Bovis (who has an allowed claim of $1.9 million).  This argument is unpersuasive because § 1101(2) makes clear that "substantial consummation" requires only the "commencement of distribution," not completion of distribution.

14

unraveling of the consummated transactions." As noted by the Third Circuit, this factor asks whether granting the relief appellant seeks would "knock the props out from under the authorization for every transaction that has taken place and create an unmanageable, uncontrollable situation for the Bankruptcy Court." Nordhoff Invs., 258 F.3d at 189 (internal quotation marks omitted). If, however, some form of equitable relief is practicable, even if only partial relief or alternative relief, the appeal is not moot. See PWS Holding, 228 F.3d at 236 (denying equitable mootness where portions of the plan could be easily severed and undone without affecting the remainder of the plan).

As Prudential points out, success on appeal in this case does not necessarily mean the disruption of the entire reorganization plan. Prudential has indicated that it is willing to accept alternative or partial relief, such as allowing general unsecured creditors and the City of Boston to retain any distributions received thus far, or accepting an increased claim amount with the same rate of interest proposed under the Plan. As there are intermediate options available, I conclude that this factor weighs against dismissal on equitable mootness grounds.

### 4. The extent to which the relief requested would affect third parties

The fourth and final factor – the extent to which the relief requested would affect the rights of parties not before the court – also militates against finding equitable mootness. This factor requires the court to consider whether third parties, particularly investors, have relied on the finality of the transaction. See In re Continental, 91 F.3d at 560, 562. The Debtors assert that parties not before the court would be adversely affected by reversal of the plan confirmation. Specifically, the Debtors point to the City of Boston, Bovis, mechanics' lien holders, unsecured creditors and SW Berkeley and SE McClellan, who they claim have all changed their positions

in reliance on the confirmed Plan.  They also assert that reversal on appeal would adversely impact individuals who have bought or committed to buy condominiums from the Debtors since the effective date.

In assessing this factor, courts are generally not concerned with the temporary denial of benefits to those receiving treatment under the Plan.  Rather, what matters is whether any innocent third parties will be harmed.  Here, the Debtors do not point to any actual third parties that have a stake in the Plan.  Although they assert that the buyers of the residences may have relied on the finality of the Plan and will be harmed if the Plan is overturned on appeal, they have not shown that overturning the Plan will require that the sales of residences that have occurred since the effective date be disturbed.  Thus, the Debtors have not pointed to any third parties whose interests would be impacted if the Plan were invalidated on appeal.  As a result, I conclude that no third party interests are implicated and that this factor weighs against dismissal on equitable mootness grounds.

## III.    Weighing the Factors

In sum, then, there is only one factor – substantial consummation – that weighs in favor of equitable mootness and three factors weighing against it.  Depending on the circumstances, greater weight may be given to whether the plan has been substantially consummated, especially where the reorganization plan involves intricate transactions or has affected third parties.  See PWS Holding, 228 F.3d at 236.  On the other hand, where, as here, the reorganization plan does not involve intricate transactions or affect third party interests, greater weight may be given to the third and fourth factors – the extent to which the relief requested on appeal would affect the

16

success of the reorganization plan and the interests of third parties.[8]  In balancing the relevant

factors, I conclude that the equities here do not require dismissal.  The Plan has been

substantially consummated, but, as noted above, Prudential is willing to accept alternative forms

of relief that would not require an unraveling of the reorganization, and reversal of the plan

confirmation would not adversely affect any innocent third parties.  Given this, the Debtors have

failed to carry their burden and it is appropriate to deny their Motion to Dismiss these appeals on

equitable mootness grounds.

## CONCLUSION

For the reasons set forth above, the Motion to Dismiss is hereby **DENIED**.


FOR THE PANEL:


Dated: March 12, 2012                    By:  _s/ Mary P. Sharon_____
                                              Mary P. Sharon, Clerk



[Gina Martin, Esq., Emanuel Grillo, Esq., Meagan Costello, Esq., Charles Bennett, Esq.,
Harold Murphy, Esq., Christopher Condon, Esq., D. Ethan Jeffery, Esq., Natalie Sawyer, Esq.,
Brendan Recupero, Esq., Bruce Smith, Esq., E. Kate Buyuk, Esq., John Elstad, Esq.,
Joseph Ryan, Esq., Michael Fencer, Esq.]

---

[8]   This is in accord with a leading bankruptcy treatise's observation that "[w]hether a court can provide effective relief to a party appealing an order of confirmation should not depend on whether the plan has been substantially consummated." 7 Collier on Bankruptcy ¶ 1101.01[1][c] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. 2005).

# UNITED STATES BANKRUPTCY APPELLATE PANEL
# FOR THE FIRST CIRCUIT

---

### BAP NO. MB 11-087

---

### Bankruptcy Case No. 10-14535-JNF
### (Jointly Administered)

---

### SW BOSTON HOTEL VENTURE, LLC, et al.,[1]
### Debtors.

---

### THE PRUDENTIAL INSURANCE COMPANY OF AMERICA,
### Appellant,

### v.

### SW BOSTON HOTEL VENTURE, LLC, et al.,
### Appellees.

---

**Deasy, U.S. Bankruptcy Appellate Panel Judge.**

### ORDER DENYING MOTION TO DISMISS APPEAL

The Prudential Insurance Company of America ("Prudential") has appealed the

bankruptcy court's decision and accompanying order confirming the Debtors' Modified First

Amended Joint Plan of Reorganization (the "Plan") and the order overruling Prudential's

objection to confirmation of the Plan.[2] On February 14, 2012, the Debtors filed a motion to

---

[1]  The "Debtors" are SW Boston Hotel Venture, LLC ("SW Boston") (Case No. 10-14535-JNF) ("SW Boston"), Auto Sales & Service, Inc. (Case No. 10-14528-JNF), General Trading Company (Case No. 10-14532-JNF), Frank Sawyer Corporation (Case No. 10-14533-JNF), 100 Stuart Street, LLC (Case No. 10-14534-JNF), 30-32 Oliver Street Corporation (Case No. 10-16173-JNF), General Land Corporation (Case No. 10-16174-JNF), and 131 Arlington Street Trust (Case No. 10-16177-JNF).

[2]  Prudential identified three related but separate documents in its notice of appeal: (1) the "Memorandum" decision entered on November 14, 2011 regarding confirmation of the Debtors' Plan

dismiss (the "Motion to Dismiss"), arguing that the appeal should be dismissed as moot as the

Plan has been substantially consummated and appellate relief cannot be granted without

"eviscerating" the Debtors' reorganization, completely undoing multiple consummated

transactions made in reliance on the Plan's finality and causing harm to third parties not before

the court.  Prudential opposes the Motion to Dismiss, arguing that the appeal is not moot as the

Plan has not been substantially consummated and because effective relief can still be granted to

Prudential without harm to third parties if the Panel were to reverse the orders on appeal.

For the following reasons, the Motion to Dismiss is **DENIED.**

## BACKGROUND

Prior to the petition date, SW Boston was the developer, owner and operator of the "W"

Hotel and Residences, a mixed-use property located in Boston's downtown theater district

consisting of a hotel, 123 residential condominiums, a parking garage, restaurant, lobby bar,

retail store and spa.  See In re SW Boston Hotel Venture, LLC, 449 B.R. 156, 159 (Bankr. D.

Mass. 2011) (reciting stipulated facts in connection with Prudential's motion to lift stay).  After

financing with another lender fell through, Prudential agreed to finance the construction of the

project.  In January 2008, Prudential and SW Boston entered into a Construction Loan

Agreement, whereby Prudential agreed to provide up to $192.2 million in financing to SW

Boston (the "Prudential Loan").  Id. at 160.  The Construction Loan Agreement provided for the

payment of interest at the rate of 9.5% compounded monthly, and that after the occurrence of an

---

[Docket No. 867] (the "Confirmation Decision"); (2) the "Order" entered on November 14, 2011, overruling Prudential's objection to the Plan [Docket No. 868]; and (3) the "Findings of Fact, Conclusions of Law, and Order Confirming Modified First Amended Joint Plan of Reorganization of SW Boston Hotel Venture LLC, Auto Sales & Service, Inc., General Trading Company, Frank Sawyer Corporation, 100 Stuart Street, LLC, 30-32 Oliver Street Corporation, General Land Corporation and 131 Arlington Street Trust," entered on November 16, 2011 [Docket No. 869] (the "Confirmation Order").

event of default, the interest rate would increase to 14.5%. In addition to scheduled debt service payments, the Debtors were required to pay Prudential 92% of the proceeds of each residence sale as it occurred. To secure SW Boston's obligations under the Construction Loan Agreement, SW Boston granted Prudential, among other things, a security interest and mortgage on SW Boston's real and personal property, and all proceeds of the foregoing. In addition, the Debtors other than SW Boston (the "Affiliated Debtors") agreed to provide additional security in order to induce Prudential to enter into the loan. Id. at 160-61.

After construction of the project was underway, the City of Boston agreed to lend SW Boston an additional $10.5 million on a subordinated basis (the "City Loan") to complete construction of certain amenities and facilities. As security for the City Loan, SW Boston granted to the City of Boston a second priority security interest and mortgage on much of the same collateral on which Prudential had a first lien. Id. at 161. Prudential and the City of Boston entered into an Intercreditor and Subordination Agreement, under which the City of Boston agreed, among other things, to subordinate its liens against, and right to payment from, the collateral pledged to both of them. See In re SW Boston Hotel Venture, LLC, 460 B.R. 4, 17 (Bankr. D. Mass. 2011).

### A. The Commencement of Bankruptcy Proceedings

On April 28, 2010, SW Boston and four of its Affiliated Debtors filed voluntary chapter 11 petitions. The other Affiliated Debtors filed voluntary chapter 11 petitions on June 4, 2010.

After evidentiary hearings held in November 2010, the bankruptcy court denied Prudential's Motion for Relief from the Automatic Stay. See In re SW Boston Hotel Venture, LLC, 449 B.R. 156 (Bankr. D. Mass. 2011). The bankruptcy court found that there was no cause

for relief from the automatic stay under § 362(d)(1) because Prudential did not lack adequate

protection for its security interest as the value of all of the collateral it had been pledged by all

the Debtors exceeded its loan balance, and, thus, it was adequately protected by an equity

cushion.  The bankruptcy court also found that even though the value of the assets of SW

Boston, principally the W Hotel and condominiums, was less than the amount owed to

Prudential, the Debtors had sustained their burden of demonstrating that a plan was in prospect,

and, therefore, Prudential was not entitled to relief from stay under § 362(d)(2).

One year into the bankruptcy cases, the bankruptcy court approved the sale of the W

Hotel and certain other related facilities to an unrelated third party for $89.5 million (the "Hotel

Sale"), an amount substantially more than the opinions expressed by both parties' appraisers and

the value determined by the bankruptcy court when denying relief from the automatic stay.  See

In re SW Boston Hotel Venture, LLC, 406 B.R. 5, 11 (Bankr. D. Mass. 2011).  Upon the closing

of the Hotel Sale on June 8, 2011, Prudential received $83,322,017 in net sales proceeds.  Id.

### B.    The 506(b) Motion

On April 15, 2011, Prudential filed a "Motion of The Prudential Insurance Company of

America for an Order Authorizing the Application of Payments Received During the Chapter 11

Cases to Payment of Postpetition Interest Pursuant to Section 506(b) of the Bankruptcy Code"

(the "506(b) Motion").  In the 506(b) Motion, Prudential sought a declaration that it was

oversecured and was entitled under § 506(b) to recover postpetition interest from the petition

date at the default rate set forth in loan documents executed by the parties, as well as attorneys'

fees, costs and charges.  Prudential also sought to apply all postpetition payments received

during the chapter 11 proceedings first to postpetition interest and then to the principal balance

of its claim.  The Debtors opposed the 506(b) Motion, asserting that Prudential's claim was undersecured until the Hotel Sale on June 8, 2011, and as such, was not entitled to postpetition interest at the default rate.  Furthermore, the Debtors asserted that the default rate of interest was unreasonable and that Prudential had not itemized any fees or costs.  The Official Committee of Unsecured Creditors and the City of Boston also filed objections to the 506(b) Motion.

### C.      The Plan

The Debtors filed the Plan in June 2011.  The Plan divided creditors and other interests into nine classes and proposed to pay in full all allowed claims filed by non-insiders, using income generated by the Debtors' operations, the sale of the remaining residences in the ordinary course of SW Boston's business, and the liquidation of certain assets of the Debtors.  The Plan defined Prudential's allowed secured claim as "$180,803,187.86 less all payments made to, or received by, Prudential on account of its Claims against the Debtors from the Petition Date through the Effective Date . . ." or such other amount as determined by the bankruptcy court.  According to the Plan, Prudential's allowed Class 2 claim would be paid in full prior to March 31, 2014 with post-confirmation interest at a rate of 4.25 %, or such other rate as determined by the bankruptcy court.  The Plan also proposed that Prudential would retain its prepetition liens on the Debtors' property and it would be paid the "Residence Net Sales Proceeds," the sales price of the condominiums, less 8% for closing costs and the amount necessary to pay outstanding real estate taxes and condominium fees, as well as budgeted operating expenses.  Prudential also would receive, on a monthly basis, the aggregate of the Debtors' cash in excess of working capital amounts.

Prudential filed an objection in which it asserted numerous flaws with the Plan, including that the Plan failed to satisfy multiple provisions of § 1129, such as §§ 1129(a)(3), (a)(7), (a)(11) and (b)(2). Prudential also argued that the Plan fixed its claim at an amount vastly below what the circumstances and the Bankruptcy Code require because it failed to calculate properly the postpetition interest to which Prudential was entitled, and because the Plan allowed payments on Prudential's claims to be made over time at a below-market rate of interest. Prudential was the only party to object to and vote against the Plan.

**D.      The 506 Decision and Confirmation of the Plan**

On June 27-29, 2011, the bankruptcy court held a combined evidentiary hearing on Prudential's 506(b) Motion, confirmation of the Debtors' Plan and Prudential's objections to the Plan.

On October 4, 2011, the bankruptcy court entered an order and accompanying memorandum granting, in part, and denying, in part, the 506(b) Motion (the "506(b) Decision").[3] In the 506(b) Decision, the bankruptcy court held that Prudential had failed to establish that it was oversecured at any time prior to the Hotel Sale on June 8, 2011, and had not provided any support for its claim for costs, charges and fees. The bankruptcy court concluded, however, that Prudential became oversecured as of the date of the Hotel Sale and, therefore, was entitled to postpetition interest from and after June 8, 2011. Thereafter, on October 20, 2011, the bankruptcy court entered an "Order Fixing Amount of Allowed Prudential Secured Claim as of October 4, 2011" (the "Prudential Claim Order") determining, based on the 506(b) Decision, that Prudential had an allowed secured claim as of October 4, 2011, in the amount of $51,835,721.

---

[3]   See In re SW Boston Hotel Venture, LLC, 460 B.R. 4 (Bankr. D. Mass. 2011).

Prudential appealed both the 506(b) Decision and the Prudential Claim Order, and the Debtors filed cross-appeals relating to both orders. Neither party sought a stay of either order pending appeal, and the appeals are currently pending before the Panel.[4]

On November 14, 2011, the bankruptcy court entered the Confirmation Decision confirming the Plan and overruling Prudential's objections to the Plan.[5] The 506(b) Decision was integral to the bankruptcy court's decision to overrule Prudential's objections and determine that the Plan satisfied the requirements of § 1129. According to the bankruptcy court, allowance of Prudential's claim in the amount asserted by Prudential would have rendered the Plan unconfirmable as the stipulated value of the Debtors' assets was substantially less than the amount of Prudential's secured claim.

Prudential appealed the Confirmation Order and Decision. Prudential also sought a stay pending appeal from the bankruptcy court, which was denied. Prudential then filed an emergency motion with the Panel for a stay of the Confirmation Order pending appeal. On November 30, 2011, the Panel issued an order denying the motion for a stay pending appeal, concluding that there was no reasonable likelihood of success on the merits. Without a stay, the Plan became effective on December 1, 2011, and the Debtors assert that the Plan became substantially consummated shortly thereafter.

---

[4]  See BAP Nos. MB 11-079, MB 11-082, MB 11-085, and MB 11-086.

[5]  See In re SW Boston Hotel Venture, LLC, 460 B.R. 38 (Bankr. D. Mass. 2011).

## DISCUSSION

### I.     The Standard

Mootness in bankruptcy appellate proceedings is based "on jurisdictional and equitable considerations stemming from the impracticability of fashioning fair and effective judicial relief." Rochman v. Northeast Utils. Serv. Group (In re Public Serv. Co. of New Hampshire), 963 F.2d 469, 471 (1st Cir. 1992) (citations omitted); Kasperian v. Conley (In re Conley), 369 B.R. 67, 70-71 (B.A.P. 1st Cir. 2007).  A bankruptcy appeal must be dismissed for mootness where jurisdictional and equitable considerations render it impracticable for the appellate court to provide an effective remedy.  Deloitte & Touche L.L.P. v. Aquila Biopharmaceuticals, Inc. (In re Cambridge Biotech Corp.), 214 B.R. 429, 431 (D. Mass. 1997).

The jurisdictional component relates to the constitutional restriction prohibiting the judiciary from deciding cases in which no effective remedy can be provided.  See Public Serv. Co., 963 F.2d at 471.  Constitutional mootness refers to Article III's requirement that a federal court can only exercise jurisdiction over a "case or controversy."  U.S. Const. art. III.  If an action is moot, however, there is no case or controversy.  See In re Continental Airlines, 91 F.3d 553, 558 (3d Cir. 1996) (noting that mootness implicates the case or controversy requirement). An appeal is moot in the constitutional sense only where events have taken place during the pendency of the appeal that make it "impossible for the court to grant 'any effectual relief whatever.'"  Church of Scientology of Calif. v. United States, 506 U.S. 9, 12 (1992) (citations omitted).

Although related to constitutional mootness, equitable mootness is a broader concept. The doctrine of equitable mootness applies chiefly in bankruptcy proceedings because of the

8

equitable nature of bankruptcy judgments. Essentially, "[t]he doctrine of equitable mootness represents a pragmatic recognition by courts that reviewing a judgment may, after time has passed and the judgment has been implemented, prove 'impractical, imprudent, and therefore inequitable.'" Behrmann v. Nat'l Heritage Found., Inc., 663 F.3d 704, 713 (4th Cir. 2011). In the bankruptcy context, equitable mootness is a prudential doctrine that is invoked to avoid disturbing a reorganization plan once implemented. See, e.g., Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.), 416 F.3d 136, 144 (2d Cir. 2005); In re UNR Indus., Inc., 20 F.3d 766, 769 (7th Cir. 1994). Thus, unlike the constitutional doctrine of mootness, which bars consideration of appeals because no Article III case or controversy exists, equitable mootness is often invoked when it would be unfair or impractical to grant the relief requested. See Mac Panel Co. v. Virginia Panel Corp., 283 F.3d 622, 625 (4th Cir. 2002). The question is not whether the court has the ability "to award some fashion of meaningful relief," Church of Scientology, 506 U.S. at 12 (test for Article III mootness); rather, the question is whether prudence counsels against upsetting the plan of reorganization. See In re Metromedia Fiber, 416 F.3d at 144.

Here, the Debtors argue that these appeals are subject to dismissal on the grounds of equitable mootness because the Plan has been substantially consummated and no effective relief can be granted to Prudential that will not completely undo the Debtors' reorganization and require the unraveling of the consummated transactions. They argue that because the 506(b) Decision and the Prudential Claim Order are "inextricably intertwined" with the Confirmation Decision and the implementation of the Debtors' reorganization, the decisions are "all part of a whole and one cannot be undone without undoing the others." Prudential argues that the Plan

9

has not been substantially consummated, and, even if it has been substantially consummated,

relief does not require unwinding the Plan.

## II.    Equitable Mootness

Under the doctrine of equitable mootness, an appeal should be dismissed, even if the

court has jurisdiction and could fashion relief, if the implementation of that relief would be

inequitable.  In re PWS Holding Corp., 228 F.3d 224, 235-236 (3d Cir. 2000); see also

Behrmann, 663 F.3d at 713 ("The doctrine of equitable mootness represents a pragmatic

recognition by courts that reviewing a judgment may, after time has passed and the judgment has

been implemented, prove 'impractical, imprudent, and therefore inequitable.'").  In the

bankruptcy context, the doctrine of equitable mootness is based upon the important public policy

favoring orderly reorganizations and settlement of debtor's estates by affording finality to

bankruptcy court judgments.  In re Public Service Co., 963 F.2d at 471-72.  In effect, the

equitable mootness doctrine "prevents a court from unscrambling complex bankruptcy

reorganizations when the appealing party should have acted before the plan became extremely

difficult to retract."  Nordhoff Invs., Inc. v. Zenith Elecs. Corp., 258 F.3d 180, 185 (3d Cir.

2001).  Thus, a court may dismiss an appeal as equitably moot "when it becomes impractical and

imprudent to upset the plan of reorganization at [a] late date."  Behrmann, 663 F.3d at 713.

To that end, the Fourth Circuit has articulated four factors in determining whether

dismissal for equitable mootness is warranted: (1) whether the appellant sought and obtained a

stay; (2) whether the reorganization plan or other equitable relief ordered has been substantially

consummated; (3) the extent to which the relief requested on appeal would affect the success of

the reorganization plan or other equitable relief granted; and (4) the extent to which the relief requested on appeal would affect the interests of third parties.  Id.

Appellate courts have the discretion to give varying weight to the relevant factors, although the doctrine of equitable mootness "is limited in scope and should be cautiously applied."  PWS Holding, 228 F.3d at 236 (applying a five-factor test similar to the test set forth by the Fourth Circuit in Behrmann).[6]  Consideration of the factors also will at times overlap, and the application of the equitable mootness doctrine employs balancing, practicality, and prudence, rather than rigid rules.  See, e.g., Mac Panel Co., 283 F.3d at 625; PWS Holding, 228 F.3d at 236.  "The question, then, is whether these factors, taken together, suggest that, irrespective of the merits of the appeal, it would be imprudent to disturb the Plan at this late date."  In re Anderson, 349 B.R. 448, 454 (E.D. Va. 2006).

### 1.    Whether appellant sought and obtained a stay

The Debtors argue that, because Prudential did not obtain a stay and the reorganization has gone forward, this appeal is equitably moot.  As a practical matter, acts completed in accordance with an unstayed order of the bankruptcy court must not thereafter be routinely vulnerable to nullification if a plan of reorganization is to succeed.  In re Stadium Mgmt. Corp., 895 F.2d 845, 848-49 (1st Cir. 1990).  Appellants are obligated, therefore, to diligently pursue all available remedies to obtain a stay of the objectionable order, even where a stay may be unlikely to be granted.  See Metromedia Fiber, 416 F.3d at 144-45; Nordhoff Invs., 258 F.3d at 187; see

---

[6]   The five factors considered by the Third Circuit in determining equitable mootness are: (1) whether the reorganization plan has been substantially consummated; (2) whether a stay has been obtained; (3) whether the relief requested would affect the rights of the parties not before the court; (4) whether the relief requested would affect the success of the plan; and (5) the public policy of affording  finality to bankruptcy judgments.  See PWS Holding, 228 F.3d at 236.

also In re Chateaugay Corp., 988 F.2d 322, 326 (2d Cir. 1993) ("The party who appeals without seeking to avail himself of that [stay] protection does so at his own risk."). Thus, the equitable mootness test inquires whether an unwarranted or repeated failure to request a stay enabled developments to evolve in reliance on the bankruptcy court order to the degree that their remediation has become impracticable or impossible. See Hicks, Muse & Co., Inc. v. Brandt (In re Healthco Int'l, Inc.), 136 F.3d 45, 48 (1st Cir. 1998).

This is not a case where the appellant sat back and ignored its obligation to pursue a stay. Rather, Prudential promptly appealed the Confirmation Decision and diligently sought a stay of the Confirmation Decision pending appeal from the bankruptcy court. When the bankruptcy court denied the request, Prudential sought a stay pending appeal from the Panel on an emergency basis in light of the approaching effective date of the Plan. Thus, Prudential did not sit back and watch the reorganization proceed, but rather actively contested the legal points. I conclude, therefore, that this factor weighs against dismissal on equitable mootness grounds.

### 2. Whether the Plan has been substantially consummated

To assess whether a plan has been substantially consummated, courts look first at the Bankruptcy Code, which defines "substantial consummation" as:

> (A) transfer of all or substantially all of the property proposed by the plan to be transferred;
>
> (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and
>
> (C) commencement of distribution under the plan.

11 U.S.C. § 1101(2). It is undisputed that without a stay, the Plan became effective on December 1, 2011. The Debtors assert that on or after the effective date, they implemented and

12

consummated the Plan, including the transfer of all property proposed to be transferred under the Plan (namely, the revesting of the Debtors' assets in the reorganized Debtors, the transfer of certain equity interests, and the discharge and subordination of certain claims). The Debtors also assert that they have assumed the management of the property addressed in the Plan, and they have commenced making distributions under the Plan (including the payment of all allowed priority Class 1 claims, payment to Prudential of proceeds from the sales of residences, interest payments to the City of Boston, and payment of the initial distribution owed to Bovis Land Lease LMB, Inc. ("Bovis"), the general contractor for the project and the sole Class 6 creditor). Thus, it appears that all the elements of § 1101(2) have been satisfied and the Plan has been substantially consummated.[7]  Therefore, this factor weighs in favor of finding that Prudential's appeal is equitably moot.

The Debtors assert that the analysis should end here, as substantial consummation creates a rebuttable presumption of mootness that Prudential must overcome, and Prudential has failed to satisfy this burden. I find no basis for any such presumption. The Debtors rely on a footnote in Public Service Company, supra, where the First Circuit noted that substantial consummation can raise "a strong presumption that an appellate court will not be able to fashion *an equitable and effective remedy*." 963 F.2d at 473-74 n.13 (emphasis added). This does not mean that

---

[7]  Prudential maintains that the Plan has not been "substantially consummated" because the majority of the property proposed to be transferred under the Plan has not yet occurred as sixty of the residences, which is the primary source of distribution under the Plan, have not yet been sold, and because the Debtors have only made one-third of the payments due to unsecured creditors and one-half of the payments due to Bovis (who has an allowed claim of $1.9 million). This argument is unpersuasive because § 1101(2) makes clear that "substantial consummation" requires only the "commencement of distribution," not completion of distribution.

substantial consummation creates a presumption *of equitable mootness*. Thus, satisfaction of the statutory definition of substantial consummation, while a factor to be considered, alone is insufficient for finding equitable mootness. See In re Zenith, 329 F.3d at 344. Even more significant is the court's consideration of "the probability that granting the appeal would unravel the plan, upon which numerous parties were at that point in reliance." Id. This consideration is addressed by the third and fourth factors of the equitable mootness test.

### 3. The extent to which the relief requested would affect the success of the Plan

As to the third factor, the Debtors argue that the appeal is equitably moot because the appeal, if successful, would "completely undo" the Debtors' reorganization and necessitate "the unraveling of the consummated transactions." As noted by the Third Circuit, this factor asks whether granting the relief appellant seeks would "knock the props out from under the authorization for every transaction that has taken place and create an unmanageable, uncontrollable situation for the Bankruptcy Court." Nordhoff Invs., 258 F.3d at 189 (internal quotation marks omitted). If, however, some form of equitable relief is practicable, even if only partial relief or alternative relief, the appeal is not moot. See PWS Holding, 228 F.3d at 236 (denying equitable mootness where portions of the plan could be easily severed and undone without affecting the remainder of the plan).

As Prudential points out, success on appeal in this case does not necessarily mean the disruption of the entire reorganization plan. Prudential has indicated that it is willing to accept alternative or partial relief, such as allowing general unsecured creditors and the City of Boston to retain any distributions received thus far, or accepting an increased claim amount with the

14

same rate of interest proposed under the Plan. As there are intermediate options available, I conclude that this factor weighs against dismissal on equitable mootness grounds.

### 4. The extent to which the relief requested would affect third parties

The fourth and final factor -- the extent to which the relief requested would affect the rights of parties not before the court – also militates against finding equitable mootness. This factor requires the court to consider whether third parties, particularly investors, have relied on the finality of the transaction. See In re Continental, 91 F.3d at 560, 562. The Debtors assert that parties not before the court would be adversely affected by reversal of the plan confirmation. Specifically, the Debtors point to the City of Boston, Bovis, mechanics' lien holders, unsecured creditors and SW Berkeley and SE McClellan, who they claim have all changed their positions in reliance on the confirmed Plan. They also assert that reversal on appeal would adversely impact individuals who have bought or committed to buy condominiums from the Debtors since the effective date.

In assessing this factor, courts are generally not concerned with the temporary denial of benefits to those receiving treatment under the Plan. Rather, what matters is whether any innocent third parties will be harmed. Here, the Debtors do not point to any actual third parties that have a stake in the Plan. Although they assert that the buyers of the residences may have relied on the finality of the Plan and will be harmed if the Plan is overturned on appeal, they have not shown that overturning the Plan will require that the sales of residences that have occurred since the effective date be disturbed. Thus, the Debtors have not pointed to any third parties whose interests would be impacted if the Plan were invalidated on appeal. As a result, I

15

74

conclude that no third party interests are implicated and that this factor weighs against dismissal on equitable mootness grounds.

## III.     Weighing the Factors

In sum, then, there is only one factor – substantial consummation – that weighs in favor of equitable mootness and three factors weighing against it.  Depending on the circumstances, greater weight may be given to whether the plan has been substantially consummated, especially where the reorganization plan involves intricate transactions or has affected third parties.  See PWS Holding, 228 F.3d at 236.  On the other hand, where, as here, the reorganization plan does not involve intricate transactions or affect third party interests, greater weight may be given to the third and fourth factors – the extent to which the relief requested on appeal would affect the success of the reorganization plan and the interests of third parties.[8]  In balancing the relevant factors, I conclude that the equities here do not require dismissal.  The Plan has been substantially consummated, but, as noted above, Prudential is willing to accept alternative forms of relief that would not require an unraveling of the reorganization, and reversal of the plan confirmation would not adversely affect any innocent third parties.  Given this, the Debtors have failed to carry their burden and it is appropriate to deny their Motion to Dismiss this appeal on equitable mootness grounds.

---

[8]   This is in accord with a leading bankruptcy treatise's observation that "[w]hether a court can provide effective relief to a party appealing an order of confirmation should not depend on whether the plan has been substantially consummated." 7 Collier on Bankruptcy ¶ 1101.01[1][c] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. 2005).

16

## **CONCLUSION**

For the reasons set forth above, the Motion to Dismiss is hereby **DENIED**.


FOR THE PANEL:


Dated:  March 12, 2012                    By:  _s/ Mary P. Sharon_____
                                                    Mary P. Sharon, Clerk




[Gina Martin, Esq., Emanuel Grillo, Esq., Meagan Costello, Esq., Charles Bennett, Esq.,
Harold Murphy, Esq., Christopher Condon, Esq., D. Ethan Jeffery, Esq., Natalie Sawyer, Esq.,
Brendan Recupero, Esq., Bruce Smith, Esq., E. Kate Buyuk, Esq., John Elstad, Esq.,
Joseph Ryan, Esq., Michael Fencer, Esq.]

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**(Eastern Division)**

In re:

SW BOSTON HOTEL VENTURE, LLC, *et al.*, [1]

Debtors.

Chapter 11
Case No. 10-14635-JNF
(Jointly Administered)

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND**
**ORDER CONFIRMING MODIFIED FIRST AMENDED**
**JOINT PLAN OF REORGANIZATION OF**
**SW BOSTON HOTEL VENTURE LLC, AUTO SALES &**
**SERVICE, INC., GENERAL TRADING COMPANY, FRANK**
**SAWYER CORPORATION, 100 STUART STREET, LLC,**
**30-32 OLIVER STREET CORPORATION, GENERAL**
**LAND CORPORATION AND 131 ARLINGTON STREET TRUST**
**(Modification Dated June 23, 2011)**

SW Boston, Auto Sales, General Trading, Sawyer Corporation, 100 Stuart Street, General

Land, 131 Arlington Street and 30-32 Oliver Street (collectively the "Debtors"), the debtors and

debtors-in-possession in the above captioned jointly administered proceedings, having filed the

*Modified First Amended Joint Plan of Reorganization of SW Boston Hotel Venture LLC, Auto*

*Sales & Service, Inc., General Trading Company, Frank Sawyer Corporation, 100 Stuart Street,*

*LLC, 30-32 Oliver Street Corporation, General Land Corporation And 131 Arlington Street*

*Trust (Modification Dated June 23, 2011)* (the "Plan") [docket no. 722], and their *Amended*

*Disclosure Statement With Respect to First Amended Joint Plan of Reorganization Of SW Boston*

---

[1] The debtors in these jointly administered cases besides SW Boston Hotel Venture, LLC ("SW Boston") are Auto Sales & Service, Inc. ("Auto Sales"), General Trading Company ("General Trading"), Frank Sawyer Corporation ("Sawyer Corporation"), 100 Stuart Street, LLC ("Stuart Street"), General Land Corporation ("General Land"), 131 Arlington Street Trust ("Arlington Street") and 30-32 Oliver Street Corporation ("Oliver Street").

*Hotel Venture LLC, Auto Sales & Service, Inc., General Trading Company, Frank Sawyer Corporation, 100 Stuart Street, LLC, 30-32 Oliver Street Corporation, General Land Corporation And 131 Arlington Street Trust* (the "Disclosure Statement") [docket no. 587]; and the Court having entered an Order dated May 24, 2011 [docket no. 632] approving the Disclosure Statement (the "Disclosure Statement Order"); and upon the certificates of service reflecting compliance with the notice requirements of the order approving the Disclosure Statement (the "Certificates of Service"); and a hearing having been held on confirmation of the Plan on June 27th and June 28th, 2011 (the "Confirmation Hearing"); and upon the evidence submitted and the arguments of counsel made at the Confirmation Hearing; and the Court having reviewed all documents in connection with confirmation of the Plan and having heard all parties desiring to be heard; and the Debtors having agreed to modify the Plan as provided in this Order; and upon the record compiled in the Bankruptcy Cases, and after due deliberation and consideration of all of the foregoing; and sufficient cause appearing therefor; the Court hereby makes the following findings of fact, conclusions of law and order (the "Confirmation Order"):

## I.     FINDINGS OF FACT AND CONCLUSIONS OF LAW.

A.     Capitalized terms used herein, but not defined herein, shall have the respective meanings attributed to such terms in the Plan and Disclosure Statement.

B.     This Court has jurisdiction over the Bankruptcy Cases pursuant to 28 U.S.C. §§ 1334(a) and 157(b)(1). Venue of these proceedings and the Bankruptcy Cases in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

78

C. As established through the Certificates of Service, the Debtors provided good and sufficient notice of the Confirmation Hearing and the deadline for filing and serving objections to the Plan.

D. The findings of fact and conclusions of law set forth in the Court's Memorandum dated November 14, 2011 [docket no. 867] are incorporated herein by reference.

## II. ORDER.

### A. <u>Confirmation of the Plan and Notice of Confirmation Hearing</u>.

1. The Plan (including all exhibits thereto) is hereby approved and confirmed in all respects pursuant to section 1129 of the Bankruptcy Code.

2. The Plan is hereby modified to prohibit the Reorganized Debtors from issuing any nonvoting equity securities. The power to vote any existing equity securities shall be governed by the Reorganized Debtors documents of formation.

3. The Plan is hereby modified to require that: (a) such of the Reorganized Debtors who executed an environment indemnity agreement in favor of the Prudential prior to the Petition Date, shall execute a new environmental indemnity agreement in favor of Prudential in form and substance reasonably acceptable to each such Reorganized Debtor and Prudential; and (b) such of the Reorganized Debtors who executed an environment indemnity agreement in favor of the City of Boston prior to the Petition Date, shall execute a new environmental indemnity agreement in favor of the City of Boston in form and substance reasonably acceptable to each such Reorganized Debtor and the City of Boston.

4. The Plan is hereby modified to provide that, notwithstanding Section 5.8 of the Plan, all of the Reorganized Debtors shall be liable for the satisfaction of the Allowed Prudential

-3-

Claim and the Allowed City Claim, and that payment of those Allowed Claims shall be made in accordance with the Plan.

5. The modifications to the Plan described above do not materially or adversely affect or change the treatment of the holder of any Claim against the Debtors. In accordance with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, these modifications do not require additional disclosure under section 1125 of the Bankruptcy Code. Disclosure of any such modifications on the record at the Confirmation Hearing constitutes due and sufficient notice of such modifications.

6. If there is any direct conflict between the terms of the Plan and the terms of this Confirmation Order, the terms of this Confirmation Order shall control. The provisions of the Confirmation Order are integrated with each other and are non-severable and mutually dependent unless expressly stated by further order of this Court.

7. All objections and responses to, and statements and comments regarding, the Plan, to the extent they have not been withdrawn prior to entry of this Confirmation Order, are hereby expressly overruled.

8. In accordance with section 1142(b) of the Bankruptcy Code, the Debtors, Reorganized Debtors and each other appropriate party are hereby authorized and directed to take all actions necessary or appropriate to: (a) enter into, implement and consummate any contracts, instruments, releases, leases, indentures and other agreements necessary to effectuate the Plan, and (b) take such other steps and perform such other acts as may be necessary to effectuate the Plan.

-4-

9.     This Confirmation Order shall be effective upon the date of its entry and the requirement that this Confirmation Order be stayed for a period of fourteen (14) days under Bankruptcy Rule 3020(e) shall not apply.

**B.     Effects of Confirmation.**

10.     <u>Injunctions and Stays Remain in Effect Until the Effective Date</u>. All injunctions and stays in effect on the Confirmation Date pursuant to sections 105 and 362 of the Bankruptcy Code or otherwise shall remain in full force and effect until the Effective Date of the Plan, except that nothing in this Confirmation Order shall bar the taking of such actions as are necessary to effectuate the Plan and/or this Confirmation Order.

**C.     Matters Relating to Implementation of the Plan.**

11.     <u>Binding Effect</u>. Immediately upon the entry of this Confirmation Order, the terms of the Plan hereby are deemed binding upon the Debtors, Reorganized Debtors, any and all holders of Claims or Equity Interests (irrespective of whether such Claims or Equity Interests are impaired under the Plan or whether the holders of such Claims or Equity Interests accepted or are deemed to have accepted the Plan), any and all nondebtor parties to executory contracts and unexpired leases with the Debtor and the respective heirs, executors, administrators, successors or assigns, if any, of any of the foregoing.

12.     <u>Continued Existence</u>. The Reorganized Debtors shall continue to exist after the Effective Date as separate entities, with all of the powers attributable to them, as they may be reorganized, reconstituted and/or converted pursuant to the Plan and the Plan Documents, under the laws of the applicable jurisdiction of organization, and, except with respect to 100 Stuart Street, without prejudice to any right to alter or terminate such existence (whether by merger or otherwise). Except as otherwise provided in the Plan or this Confirmation Order, on the

-5-

Effective Date, all property of the Debtors' estates shall vest in the Reorganized Debtors, free and clear of all Claims, Liens, encumbrances and interests of holders of Claims and Equity Interests.

13. On and after the Effective Date and subject only to the terms and conditions of the Plan, the Reorganized Debtors may operate their businesses and may use, acquire and dispose of property and compromise or settle any Claims or Equity Interests without supervision or approval by this Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

14. <u>Cancellation of Existing Indebtedness and Liens</u>. In accordance with section 1141 of the Bankruptcy Code, except as may otherwise be provided in the Plan, on the Effective Date: (a) all credit agreements, promissory notes, mortgages, security agreements, invoices, contracts, agreements and any other documents or instruments evidencing Claims against the Debtors, together with any and all Liens securing same, shall be canceled, discharged and released without further act or action by any Person under any applicable agreement, law, regulation, order or rule; (b) the obligations of the Debtors thereunder shall be deemed cancelled, discharged and released; and (c) all of the right, title and interest of any holder of such mortgages, deeds of trust, liens or other security interests, including any rights to any collateral thereunder, will revert to the Reorganized Debtors. To the extent deemed necessary or advisable by the Reorganized Debtors, any holder of a Claim shall promptly provide the Reorganized Debtors with an appropriate instrument of cancellation, discharge or release, as the case may be, in suitable form for recording wherever necessary to evidence such cancellation, discharge or release, including the cancellation, discharge or release of any Lien securing such Claim.

15. <u>Governance: Organization Documents</u>. As of the Effective Date, the Debtors Organization Documents shall be deemed modified to the extent necessary to effectuate the Plan.

-6-

To the extent not prohibited by the Plan or this Confirmation Order, after the Effective Date, the Reorganized Debtors and all other parties to the Organization Documents may amend and restate the Organization Documents as permitted by the Plan Documents and applicable law.

**D.    Discharge, Release, Injunction and Related Provisions.**

16.    Discharge of Debtors.  Except as otherwise expressly provided in section 1141 of the Bankruptcy Code or the Plan, the distributions made pursuant to and in accordance with the applicable terms and conditions of the Plan are in full and final satisfaction, settlement, release and discharge as against the Debtors and the Reorganized Debtors of any debt or obligation of the Debtors that arose before the Effective Date, and any debt of the Debtors of a kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code, and all Claims against the Debtors or their Estates of any nature, including, without limitation, any interest accrued thereon from and after the Petition Date, whether or not (i) a proof of claim based on such debt, obligation or Equity Interest is filed or deemed filed under section 501 of the Bankruptcy Code, (ii) such Claim is Allowed under section 502 of the Bankruptcy Code, or (iii) the holder of such Claim has accepted the Plan.

17.    Injunction.  As of the Effective Date, all Persons are hereby permanently enjoined from commencing, continuing or enforcing in any manner or in any place, any action or other proceeding, whether directly, indirectly, derivatively or otherwise against the Debtors, their Estates or the Reorganized Debtors, on account of, or respecting any Claims, debts, rights, obligations, Causes of Action or liabilities discharged pursuant to the Plan, except to the extent expressly permitted under the Plan.

18.    Releases.  Except as otherwise set forth in the Plan, as of the Effective Date, in consideration for, among other things, the obligations of the Debtors under the Plan and other

-7-

contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, (a) each holder of a Claim or Interest that votes in favor of the Plan and (b) to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, each Person that has held, holds or may hold a Claim or Equity Interest or at any time was a creditor or equity holder of any of the Debtors and that does not vote on the Plan or votes against the Plan, in each case will be deemed to forever release, waive and discharge all claims (including any derivative claims), obligations, suits, judgments, damages, demands, rights, causes of action and liabilities (other than the right to enforce the Reorganized Debtors' obligations under the Plan and the contracts, instruments, releases, agreements and documents delivered under the Plan), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction or other occurrence taking place on or prior to the Effective Date in any way relating to a Debtor, the Bankruptcy Cases or the Plan that such entity has, had or may have against any Debtor, the Estates, the Estate's Assets, the Reorganized Debtors and/or the Reorganized Debtors' Assets.

19. _Exculpation._ Except as otherwise set forth in the Plan, neither the Debtors, the Reorganized Debtors, the Committee nor any of their respective present or former members, managers, officers, directors, employees, general or limited partners, advisors, attorneys, agents, successors or assigns, shall have or incur any liability to any holder of a Claim or an Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the administration of these Chapter 11 bankruptcy

-8-

proceedings, the pursuit of confirmation of the Plan, the Disclosure Statement, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan occurring prior to the Effective Date, provided that the terms of Section 9.5 shall not apply to any liability for willful misconduct or ultra vires acts.

20.    <u>Cancellation of Existing Indebtedness and Liens</u>.  Except as may otherwise be provided in the Plan, on the Effective Date: (a) all credit agreements, promissory notes, mortgages, security agreements, invoices, contracts, agreements and any other documents or instruments evidencing Claims against the Debtors, together with any and all Liens securing same, shall be canceled, discharged and released without further act or action by any Person under any applicable agreement, law, regulation, order or rule, (b) the obligations of the Debtors thereunder shall be deemed cancelled, discharged and released, and (c) all of the right, title and interest of any holder of such mortgages, deeds of trust, liens or other security interests, including any rights to any collateral thereunder, will revert to the Reorganized Debtors.  To the extent deemed necessary or advisable by the Reorganized Debtors, any holder of a Claim shall promptly provide the Reorganized Debtors with an appropriate instrument of cancellation, discharge or release, as the case may be, in suitable form for recording wherever necessary to evidence such cancellation, discharge or release, including the cancellation, discharge or release of any Lien securing such Claim.

**E.    <u>Miscellaneous Provisions</u>.**

21.    <u>Substantial Consummation</u>.  The substantial consummation of the Plan, within the meaning of section 1127 of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

-9-

22.    <u>Payment of Statutory Fees</u>. On or prior to the Effective Date, the Debtors shall

pay all fees payable pursuant to 28 U.S.C. § 1930, if any. After the Effective Date, the

Reorganized Debtors shall continue to pay such fees until a final decree is entered in the

Bankruptcy Cases.

23.    <u>Reference to and Validity and Enforceability of Plan Provisions</u>. The failure to

reference any particular provision of the Plan in this Confirmation Order shall have no effect on

the binding effect, enforceability or legality of such provisions and such provisions shall have the

same binding effect, enforceability or legality as every other provision of the Plan. Each term

and provision of the Plan, as it may have been altered or modified by this Court, is valid and

enforceable pursuant to its terms.

24.    <u>Creditors' Committee</u>. On the Effective Date, the Committee shall dissolve, the

members of the Committee shall be released and discharged from all rights and duties arising

from or related to these Bankruptcy Cases, and the professionals retained by the Committee in

accordance with section 1103 of the Bankruptcy Code (including, without limitation, attorneys,

investment advisors, accountants and other professionals) shall be released and discharged from

their respective fiduciary obligations, duties and responsibilities.

25.    <u>Solicitation of the Plan</u>. The Debtors, the Reorganized Debtors and any other

person that participated in the solicitation of the Plan acted in good faith. Pursuant to section

1125(e) of the Bankruptcy Code, neither the Debtors, the Reorganized Debtors nor any other

person that participated in the Debtors' transmittal of Plan solicitation materials, as described

above, their solicitation of acceptances of the Plan, or the offer, issuance, sale or purchase of any

security offered or sold under or in connection with the Plan shall be liable, on account of such

actions or such participation, for any violation of any applicable law, rule or regulation

-10-

governing the solicitation of acceptance or rejection of the Plan or the offer, issuance, sale, purchase or distribution of securities.

26.    <u>Retention of Jurisdiction</u>.  From and after the occurrence of the Effective Date, this Court shall have jurisdiction over the matters arising out of, and related to, the Bankruptcy Cases and the Plan as provided for in Article XI of the Plan.

27.    <u>Professional Fee Claim Deadline; Post-Effective Date Fees</u>.  Within thirty-five (35) days after the Effective Date, each Professional shall file a final application for the allowance of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date.  Any such application granted by the Bankruptcy Court shall be paid: (i) within ten days of the entry of the order of the Bankruptcy Court approving such application, unless a stay of the order approving the application is obtained; or (ii) upon such other terms as may be mutually agreed upon between the Professional and the Reorganized Debtors.  All fees and expenses of Professionals for services rendered after the Effective Date shall be paid by the Reorganized Debtors upon receipt of reasonably detailed invoices in such amounts and on such terms as such Professional and the Reorganized Debtors may agree.  No further order or authorization from the Bankruptcy Court shall be necessary to permit the Reorganized Debtors to pay the fees and expenses of Professionals for services rendered after the Effective Date.

28.    <u>Administrative Claims Bar Date</u>.  Any party seeking payment of an Administrative Expense Claim (except for Professionals) must file with the Bankruptcy Court and serve upon the Debtors and their counsel a request for payment of such Administrative Expense Claim not later than thirty-five (35) days after the Effective Date (the "Administrative Expense Claim Bar Date").  Any party that fails to file an Administrative Expense Claim by the

-11-

Administrative Expense Claim Bar Date shall be forever barred from asserting such

Administrative Expense Claim against the Debtors, their estate, the Reorganized Debtors or their

respective properties, successors or assigns, and any such Administrative Expense Claim will be

deemed discharged.

29. <u>Notice of Entry of Confirmation Order</u>. Within five (5) business days of the

Effective Date, the Reorganized Debtors shall serve notice of the occurrence of the Effective

Date on all creditors and parties in interest. The notice of the occurrence of the Effective Date

shall include notice of the deadlines described in paragraphs 27 and 28 of this Confirmation

Order.

30. The Debtors hereby are directed to serve copies of this Confirmation Order on

each party that has filed a notice of appearance in the Bankruptcy Cases and on each party who

filed an objection or response to, or statement or comment regarding, the Plan, no later than

fifteen (15) days after the Confirmation Date.

31. <u>Exemption from Certain Taxes</u>. In accordance with section 1146(c) of the

Bankruptcy Code: (a) the issuance, transfer or exchange of any security under the Plan or the

making or delivery of any instrument of transfer pursuant to, in implementation of, or as

contemplated by the Plan, including any merger agreements or agreements of consolidation,

deeds, bills or sale or assignments executed in connection with any of the transactions

contemplated under the Plan, or the vesting, re-vesting, transfer or sale of any real or personal

property of the Debtors pursuant to, in implementation of, of as contemplated by the Plan; (b) the

making, delivery, creation, assignment, amendment or recording or any note or other obligation

for the payment of money or any mortgage, deed of trust or other security interest under, in

furtherance of, or in connection with the Plan, the issuance, renewal, modification or securing of

-12-

indebtedness by such means; and (c) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, this Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment. Each recorder of deeds or similar official for any county, city or governmental unit in which any instrument under the Plan is hereby ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, transfer tax, intangible tax or similar tax.

32.     <u>Non-occurrence of Effective Date</u>. In the event that the Effective Date does not occur, then (a) the Plan, (b) the assumption or rejection of executory contracts or unexpired leases pursuant to the Plan, (c) any document or agreement executed pursuant to the Plan, (d) any actions, releases, waivers, or injunctions authorized by this Confirmation Order or any order in aid of the consummation of the Plan, and (e) this Confirmation Order shall be deemed null and void. In such event, nothing contained in this Confirmation Order, any order in aid of consummation of the Plan, or the Plan, and no acts taken in preparation for consummation of the Plan, (y) shall be deemed to constitute a waiver or release of any Claims or Equity Interests by or against the Debtors or any other persons or entities, to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors or otherwise, or to constitute an admission of any sort by the Debtors or any other persons as to any issue, or (z) shall be construed as a finding of fact or conclusion of law in respect thereof.

33.     <u>Post-Confirmation Fees and Reporting Requirements</u>. The Reorganized Debtors will be responsible for timely payment of fees incurred pursuant to 28 U.S.C. § 1930(a)(6) until the cases are closed. After confirmation the Debtor will serve the United States Trustee with a

-13-

monthly final report for each month (or portion thereof) the cases remain open. The monthly

financial report shall include the following:

    (a)    A statement of all disbursements made during the course of the month, whether or not pursuant to the plan;

    (b)    A summary, by class, of amounts distributed or property transferred to each recipient under the plan, and an explanation of the failure to make any distributions or transfers of property under the plan;

    (c)    The Reorganized Debtors' projections as to its continuing ability to comply with the terms of the plan;

    (d)    A description of any other factors which may materially affect the Reorganized Debtors' ability to complete its obligations under the plan; and

    (e)    An estimated date when an application for final decree will be filed with the court (in the case of the final monthly report, the date the decree was filed).

IT IS SO ORDERED.

Dated: Boston, Massachusetts,

_November 16_, 2011

_HONORABLE JOAN N. FEENEY_
_UNITED STATES BANKRUPTCY JUDGE_

611952

-14-

90

# UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re:
**SW BOSTON HOTEL VENTURE, LLC, et al.,[1]**          Chapter 11
     Debtors                                           Case No. 10-14535-JNF
                                  (Jointly Administered)

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~


## MEMORANDUM


## I. INTRODUCTION

The matters before the Court for determination are the Debtors' Modified First Amended Joint Plan of Reorganization (the "Plan") and the Objection to Confirmation of the Plan filed by Prudential Insurance Company of America ("Prudential").[2] Interested party, the City of Boston (the "City"), supports confirmation of the Plan. The Debtors are SW Boston Hotel Venture, LLC ("SW"), Auto Sales & Service, Inc. ("Auto Sales"), General

---

[1] The other Debtors in these jointly administered cases are Auto Sales & Service, Inc. (Case No. 10-14528-JNF), General Trading Company (Case No. 10-14532-JNF), Frank Sawyer Corporation (Case No. 10-14533-JNF), 100 Stuart Street, LLC (Case No. 10-14534-JNF), 30-32 Oliver Street Corporation (Case No. 10-16173-JNF), General Land Corporation (Case No. 10-16174-JNF), and 131 Arlington Street Trust (Case No. 10-16177-JNF) (the "Affiliated Debtors").

[2] The Prudential Insurance Company of America appears in this case as follows: "on behalf and solely for the benefit of, and with its liability limited to the assets of, its insurance company separate account PRISA." In its Proposed Findings of Fact and Conclusions of Law, it states that "Prudential (PRISA) is a private real estate investment fund, not a commercial bank or an insurance company."

91

Trading Company ("General Trading"), Frank Sawyer Corporation, 100 Stuart Street, LLC ("100 Stuart Street"), 30-32 Oliver Street Corporation ("Oliver Street"), General Land Corporation ("General Land"), and 131 Arlington Street Trust ("Arlington Street") (collectively, the "Debtors").

The Court conducted a three-day evidentiary hearing on June 27, 28, and 29, 2011 with respect to this contested matter, as well as the contested matter relating to Prudential's Motion for an Order Authorizing the Application of Payments Received during the Chapter 11 Cases to Payment of Postpetition Interest pursuant to Section 506(b) of the Bankruptcy Code (the "506(b) Motion"). Nine witnesses testified and 28 exhibits were introduced into evidence. On October 4, 2011, this Court issued a decision with respect to the 506(b) Motion, which is incorporated herein by reference. *See* In re SW [Boston] Hotel Venture, LLC, __ B.R. __, 2011 WL 4704215 (Bankr. D. Mass. Oct. 4, 2011). On October 20, 2011, the Court entered an "Order Fixing Amount of Allowed Prudential Secured Claim as of October 4, 2011."

The parties submitted Proposed Findings of Fact and Conclusions of Law and briefs on August 1, 2011, at which time the Court took these matters under advisement. The Court now makes the following findings of fact and conclusions of law in accordance with Fed. R. Bankr. P. 7052.

## II. BACKGROUND

### A. Procedural Posture of the Debtors' Cases

On April 28, 2010, SW, Auto Sales, General Trading, Frank Sawyer Corporation, and

100 Stuart Street filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in this Court.  On June 4, 2010, General Land, Arlington Street and Oliver Street filed Chapter 11 petitions.  The Debtors' cases are the subject of an order for joint administration. All of the Chapter 11 Debtors have continued as debtors-in-possession since the commencement of the cases.  The United States trustee appointed an Official Committee of Unsecured Creditors (the "Committee") which serves in all of the cases.  The Committee supports confirmation of the Debtors' Plan.

After evidentiary hearings held in November of 2010, the Court denied Prudential's Motion for Relief from the Automatic Stay.  *See* In re SW Boston Hotel Venture, LLC, 449 B.R. 156 (Bankr. D. Mass. 2011).  The Court found that there was no cause for relief from the automatic stay under 11 U.S.C. § 362(d)(1) because Prudential did not lack adequate protection for its security interest as the value of all of the collateral it had been pledged by all the Debtors exceeded its loan balance, and, thus, it was adequately protected by an equity cushion.  The Court also found that even though the value of the assets of SW, principally the W Hotel and condominiums, was less than the amount owed to Prudential, the Debtors had sustained their burden of demonstrating that a plan was in prospect, and, therefore, Prudential was not entitled to relief from stay under 11 U.S.C. § 362(d)(2).

As the Court observed in the Memorandum issued in conjunction with Prudential's 506(b) Motion, in light of events that transpired after the Memorandum issued on January 28, 2011, neither the parties nor the Court accurately valued the W Hotel as it sold for substantially more than the opinions expressed by both parties' appraisers and the value

-3-

determined by the Court.  In March of 2011, the Debtors entered into a purchase and sale agreement for the sale of the W Hotel to Razorbacks Owner LLC, an affiliate of Pebblebrook Hotel Trust, for the sum of $89.5 million. The sale required resolution of several contingencies, including the assent of the manager of the W Hotel, an affiliate of Starwood Worldwide Hotels and Resorts, Inc. ("Starwood"), and the assignment of warranties by the building's contractor, Bovis Lend Lease LMB, Inc. ("Bovis").  The contingencies were favorably resolved by agreements among the Debtors, Starwood and Bovis, and the sale of the W Hotel closed on June 8, 2011.  As a result of the sale closing, Prudential was paid the total net proceeds of the sale, namely $83,322,017.

The Debtors filed their Joint Plan of Reorganization and Disclosure Statement on March 31, 2011.  Thereafter, the Debtors amended their  plan and subsequently filed a further modification.  On June 27, 2011, the Debtors filed their Modified First Amended Joint Plan of Reorganization  which is the subject of the Debtors' request for confirmation and  Prudential's Objection.  In summary, the Plan provides for payment in full of all allowed claims held by non-insiders from the income generated by the Debtors' operations and the sale of the Debtors' assets.  The Debtors propose to sell the condominiums in the ordinary course of SW's business and the proceeds of the sales of the condominiums, and the assets and income of the affiliated Debtors will be used as necessary to pay allowed claims in full with interest.

### B. Class 2 - Prudential's Secured Claim

The treatment of Prudential's allowed secured claim is set forth in Sections 1.10 and

4.2 of the Plan. The Allowed Prudential claim is defined in the Plan as "$180,803,187.86 less all payments made to, or received by, Prudential on account of its Claims against the Debtors from the Petition Date through the Effective Date . . ." or such other amount as determined by the Court. According to the Plan, Prudential's allowed Class 2 claim will be paid in full prior to March 31, 2014 with post-confirmation interest at a rate of 4.25 %, or such other rate as determined by the Court. Additionally, through the Plan, the Debtors propose that Prudential shall retain its prepetition liens on the Debtors' property and it will be paid the "Residence Net Sales Proceeds," specifically defined at Section 1.98, but generally the sales price of the condominiums, less 8 % for closing costs and the amount necessary to pay outstanding real estate taxes and condominium fees, as well as budgeted operating expenses. Prudential also will receive, on a monthly basis, the aggregate of the Debtors' cash in excess of working capital amounts.

In addition, the Plan establishes both affirmative and negative covenants for the benefit of Prudential, as well as the City of Boston's Class 3 claim. The covenants are set forth in Exhibit A to the Plan. Generally, the Plan restricts the Debtors' ability to exceed budgeted expenses, to grant liens, to change management, to buy assets other than in the ordinary course of business, or to make any distribution to the holders of the equity interests in the Debtors. The affirmative covenants require the Debtors to file all post-confirmation tax returns, pay all condominium fees promptly, and maintain appropriate insurance policies. In addition, the Plan requires the Debtors to submit monthly financial reports to Prudential, including accountings of excess cash, financial statements, copies of

leases and purchase and sale agreements for the condominiums, and bank account statements. The Debtors also must provide Prudential with quarterly reconciliations of actual and budgeted expenses, as well as annual unaudited financial statements and tax returns.

The Plan also established minimum prices for the sale of the condominiums which are approximately 2.5 % lower than the contractual release prices in the prepetition Prudential loan documents. Finally, the Plan provides for Prudential to receive such additional treatment as the Court determines is necessary to provide Prudential with the indubitable equivalent of Prudential's allowed claim.

### C. Class 3 - City of Boston's Secured Claim

The Plan provides that the allowed secured claim of the City will be paid in full including interest at the contract rate of 8 %. The City's allowed secured claim is defined at "$10,704,247 less all payments made to, or received by the City" on account of its claim during the pendency of the case. According to the Plan, the City will only be paid interest on account of its secured claim pending payment in full of Prudential's claim. The City will retain its liens on the Debtors' property.

### D. Class 6 - The Bovis Claim

The Plan provides for treatment of Bovis's claim in Class 6. Bovis was the construction manager for the SW project. The Plan incorporates a compromise between the Debtors and Bovis with respect to alleged breaches of contract pertaining to construction, payment, and contractual warranties. SW and Bovis agreed to a compromise,

which the Court approved on March 30, 2011, after notice and a hearing and without

objection from any creditors, including Prudential. Under the Plan, Bovis is a separately

classified, impaired class. It will have an allowed claim in the approximate amount of $1.9

million to be paid in two equal installments, the first on the effective date of the Plan and

the second in one year from the effective date. Bovis accepted and supports the Plan.

E.  Classes 4 and 5 - Miscellaneous Secured Claims and Mechanics Lien Claims

The Plan, in Class 5, provides that all creditors with mechanics liens against the

Debtors' property will receive full payment of their claims from Bovis in accordance with

the Court-approved compromise. Class 4 pertains to Miscellaneous Secured Claims, which

shall be allowed or disallowed through the claims objection process.

F.  Classes 7 and 8 - General Unsecured Claims

In Class 7 of their Plan, the Debtors provide for treatment of general unsecured

claims in two separate classes. Class 7 consists of allowed, nonpriority, unsecured claims

who do not elect treatment in Class 8. Class 8 is a convenience class consisting of allowed,

nonpriority, unsecured creditors with claims of $5,000 or less who elect to participate in

that class. They will receive cash on the effective date equal to the lesser of their allowed

claim or $5,000.

Class 7 claimants will receive payment in full of their allowed claims, with interest

after the effective date of 4.25 % in three equal payments, the first of which will be on the

effective date, and then on the first and second anniversaries of the effective date. Class

7 also contains the Debtors' proposed treatment of the claims of insiders. Except for the

claims of affiliates of the Debtors, SE Berkeley Street, LLC ("SE Berkeley") and SE McClellan Highway LLC ("SE McClellan"), who are non-debtor, insider entities that are wholly owned by another non-debtor, the Frank Sawyer Trust, the general unsecured claims of non-debtor, insiders are preserved, but they are not entitled to receive any payment until the claims of other creditors are paid in full. The claims of SE McClellan and SE Berkeley, arise in large part out of the purchase of a Letter of Credit in favor of Prudential in the amount of $17.3 million which was drawn upon shortly after the petition date and reduced Prudential's allowed secured claim in that amount. The claims of SE Berkeley and SE McClellan are being satisfied by issuance of equity interests in a new entity, denominated 110 Stuart Street, LLC, a Delaware limited liability company to be formed prior to the effective date to hold the new equity interests in reorganized SW.

Inter-company claims of the Debtors against one another are cancelled and are entitled to no payment. In addition, the Plan, except with respect to the claims of SE Berkeley and SE McClellan against SW, provides that non-debtor insiders of the Debtors shall not receive any distributions on account of their claims until the claims of all non-insider creditors have been paid in full.

G. Class 9 - Equity Interests

Under the Plan, equity interests in SW and 100 Stuart Street are cancelled and new equity interests in SW shall be issued to 110 Stuart Street, LLC ("110 Stuart"). 100 Stuart Street shall be deemed dissolved. Equity interests in 110 Stuart will be issued to SE Berkeley and SE McClellan on account of, and in proportion to, their respective claims

against and monetary contributions and advances to or on behalf of SW. Equity interests

in Oliver Street, Arlington Street, Auto Sales, Frank Sawyer Corporation, General Land and

General Trading are being retained by the current equity holders.

H.  Plan Implementation: Consolidation

The Plan provides that the payment of claims will be made from sales and income

from the Debtors' properties. In addition, according to the Plan, as provided in Section 5.8,

the Debtors "shall continue to maintain their separate existence for all purposes other than

the treatment of Claims under the Plan."  Notwithstanding that provision, the Debtors

propose that they shall be "substantively consolidated under the Plan on the Effective Date

pursuant to 11 U.S.C. § 1123(a)(5)(C) of the Bankruptcy Code and the Confirmation Order."

According to the Debtors, the effect of such consolidation would be  1) the merger of all

their assets and liabilities, except with respect to the insider claims of SE Berkeley and SE

McClellan against SW;  and 2) the elimination of all inter-company claims and guarantees,

such that the payment of all claims will be the joint and several liability of all of the

Debtors.

At the conclusion of the confirmation hearing, the Debtors' attorney stated on the

record a clarification of the Debtors' intention with respect to Section 5.8.  He indicated that

all of the Debtors are liable for payment to all creditors and inter-company claims among

all of the Debtors are eliminated.  Prudential did not object to the clarification and the

Court deems counsel's statement on the record to be a further modification of the Plan.

I. <u>Report of Plan Voting</u>

The Debtors submitted a Report of Plan Voting. Prudential is the only creditor and class which voted against the Plan. All other classes of creditors accepted or are deemed to have accepted the Plan. The City cast its own vote in favor of the Plan.

Prudential submitted a ballot rejecting the Plan on behalf of the City. Prudential is seeking to strike the City's vote and cast its own vote against the Plan on behalf of the City pursuant to an Intercreditor and Subordination Agreement (the "Intercreditor Agreement"). The Intercreditor Agreement between the City as Junior Lender and Prudential as Senior Lender is dated January 2009 and was executed in connection with the City's $10 million loan to SW to assist it in completing construction of the project. Prudential contends that the City agreed to assign its voting rights to Prudential based upon Section 8(c) of the Intercreditor Agreement.

Three impaired classes, Classes 5, 7, and 8 voted to accept the plan. Class 6, Bovis, also voted to accept the Plan, although its vote was filed late.

At the hearing on confirmation, the Debtors proposed to resolve three of Prudential's objections to their Plan by agreeing to include in a confirmation order the following provisions: 1) a representation that they would not issue any non-voting securities; 2) a representation that they would indemnify Prudential for any environmental liabilities; and 3) a representation that they would remain liable for the claims of Prudential and the City, notwithstanding Section 5.8 of the Plan, which provides for consolidated treatment of the Debtors' liabilities. Prudential did not oppose the statement on the record

-10-

by Debtors' counsel further amending the Plan to comply with the stated objections of Prudential.

## III. POSITIONS OF THE PARTIES

### A. Prudential's Objections

Prudential argues that the Plan does not satisfy multiple provisions of 11 U.S.C. § 1129 and cannot be confirmed for a number of reasons. In the first place, Prudential asserts that the Plan does not comply with the requirements of the Bankruptcy Code because it does not provide a fair and equitable treatment of its secured claim in violation of 11 U.S.C. 1129(b)(2). It argues that the Plan does not provide specifically for payment of postpetition interest to which it is entitled as a fully secured creditor and does not provide fair and equitable treatment of its claim due to the inadequate rate of interest to be paid to it on its restructured obligation.

Secondly, Prudential maintains that the Plan is premised on the improper substantive consolidation of the Debtors which it asserts prejudices it.

Thirdly, Prudential argues that the Plan violates the absolute priority rule which requires that, absent full satisfaction of a creditor's allowed claim, no member of a class junior in priority to the class of that creditor, may receive any distributions on account of their claim or interest.

Prudential also argues that the Debtors' Plan is not feasible as it is based on projections that exceed historical performance and, accordingly, does not satisfy the requirement of 11 U.S.C. § 1129(a)(11). Additionally, Prudential asserts that the Plan does

not pay to creditors at least the amount they would receive in a Chapter 7 case and, thus, does not satisfy the "best interests of creditors" test set forth in 11 U.S.C. § 1129(a)(7).

Prudential adds to its list of objections the assertion that the Plan improperly classifies certain creditors' claims, in particular the Bovis claim provided for in Class 6.

Prudential also asserts that the Debtors have not proposed the Plan in good faith in violation of 11 U.S.C. § 1129(a)(3). In support of that assertion, it maintains that the Plan improperly benefits the Debtors' insiders and that the new value being provided is artificial. It also asserts that the Plan gives preferential treatment to the City.

Prudential further faults the Plan on the ground that it does not enforce the subordination agreement between Prudential and the City required by 11 U.S.C. §510(a). According to Prudential, the City may not receive any payments until Prudential is paid in full. Moreover, because the Intercreditor Agreement required the City to assign its voting rights in any bankruptcy case involving SW to Prudential, Prudential maintains that it may vote the City's claim and has cast a vote rejecting the Plan on the City's behalf. According to Prudential, the City's own vote should be disregarded as invalid, and the Court should rule that the City has rejected the Plan due to Prudential's rejection on its behalf.

B. The City's Arguments

The City opposes Prudential's exercise of its voting rights with respect to the Plan. It cast its own vote to accept the Plan and maintains that its vote in favor of the Plan is determinative of Class 3's acceptance, not Prudential's surrogate vote. The City argues that

-12-

the purported assignment of voting rights in the Intercreditor Agreement is unenforceable as parties cannot contractually annul provisions of the Bankruptcy Code.  Furthermore, the City argues that it has other collateral subject to security interests and liens, namely, its second mortgages and assignments of rents on properties at 142 Berkeley Street and McClellan Highway, as well as the so-called "City Account," namely a bank account at Boston Private Bank and Trust Company with a balance of approximately $4 million.  According to the City, that account specifically is excluded from, and is  not subject to, the Intercreditor Agreement.  Accordingly, the City maintains that Prudential has no right to insist that it be paid in full before the City receives interest payment on account of those secured claims.  The City supports confirmation of the Plan in all respects.

C.  The Debtors' Arguments

The Debtors request that the Plan  be confirmed over the objection of Prudential.  They point out that the Plan has been accepted by all creditors other than Prudential and it satisfies the requirements of 11 U.S.C. § 1129 for a "cramdown," that is confirmation over the objection of the sole dissenting class, Prudential.  The Debtors emphasize that the Plan provides for payment in full of all allowed, non-insider claims, plus post-confirmation interest, which amounts are to be paid from the Debtors' income from operations and sales of assets.  The Debtors maintain that the treatment of its largest secured creditors, Prudential and the City, satisfy 11 U.S.C. § 1129(b) because they are retaining their liens and receiving deferred cash payments which total their allowed claims and have a present value equal to their claims or the indubitable equivalent of their claims.  They add that the

-13-

Plan can be confirmed over the objection of either creditor, under the so-called "cramdown" method because the Plan complies with that subsection's requirements for treatment of the claim:  either deferred cash payments with retention of liens until the claims are paid in full with interest, fair and equitable treatment, or the indubitable equivalent of the claim.

As to the treatment of the City's claim, the Debtors argue that they have provided for the appropriate treatment of the claim as the Plan does not alter the debt service payments or the maturity date of the City's loan set forth in the loan documents and provides for payment by December 9, 2019.  They state that principal and interest payments to the City as provided in the City loan documents will only begin after the Prudential claim has been paid in full, although the City will receive accrued interest and receive interest payments from the $4 million of cash collateral in the City Account subject to its lien.  The Debtors also agree with the position of the City with respect to its voting rights, and request that the Court determine that the purported assignment of the City's voting rights is unenforceable and that Prudential is not entitled to vote the City's claim.

As to the treatment of Prudential's claim, the Debtors submit that because Prudential's allowed claim will be paid in full by March 31, 2014 with post-confirmation interest at the rate of 4.25 % per year, which sums shall be payable from sales in the ordinary course of business of the condominium units that constitute Prudential's collateral, as well as the covenants attached as Exhibit A to the Plan, all of which reasonably protect Prudential's interest as mortgagee, the Plan provides for a proper treatment of

Prudential's claim under all of the subsections of 11 U.S.C. § 1129(b)(2). The Debtors argue that 4.25% is an appropriate and adequate rate of post-confirmation interest. They point to evidence they presented through credible expert opinions that there is no efficient market for comparable loans and that the amount of interest was formulated using the guidelines established by the Supreme Court in Till v. SCS Credit Corp., 541 U.S. 465 (2004). The Debtors criticize the opinion of Prudential's expert as being based on a number of  erroneous assumptions.  In particular, they point to the testimony that there is an efficient market for a loan with similar characteristics to Prudential's loan, the use of an inaccurate loan to value ratio, and the  failure to recognize that the Plan is feasible.

The Debtors maintain that the substantial and persuasive evidence they presented in support of the Plan establish that the Plan is feasible.  They argue that their projections for the sale of condominiums over a three year period are reasonable and are supported by the record of sales during the pendency of their cases.

The Debtors also assert that the separate classification of the Bovis claim is proper. Due to the creditor's unique construction lien and claims relating to warranties, which had to be delivered to Starwood,  SW and Bovis entered into an agreement, approved by the Court, which provided for completion of the project's Theme Bar and delivery of construction warranties, in addition to a consensual treatment of the Bovis claim in the Plan. The Debtors emphasize that Prudential did not object to the compromise with Bovis, which was the subject of notice and a hearing and which included a provision for the separate classification of its claim. The Debtors request that the Court overrule Prudential's

-15-

objection to confirmation based on the separate classification of the Bovis claim.

The Debtors report that the Plan has been accepted by the affirmative votes of several impaired classes of creditors: the City, Bovis, the secured creditors in Class 5, pertaining to Mechanics Lien Claims, and the general unsecured creditor classes in Classes 7 and 8.

The Debtors maintain that Prudential's Objection to the Plan based on an alleged violation of the absolute priority rule, which is an element of confirmation under 11 U.S.C. § 1129(b)(2)(B), is without merit. First, the Debtors emphasize that secured creditors such as Prudential do not have standing to assert a violation of the absolute priority rule where, as here, the rights of junior creditors do not affect the treatment of Prudential's allowed secured claim, and where Prudential is being paid in full. Moreover, the Debtors assert that the Plan satisfies the absolute priority rule as all creditors, including unsecured creditors, are being paid in full with interest.

The Debtors further argue that the Plan does not contain improper provisions relating to the consolidation of the Debtors. They emphasize, in lieu of guarantees, all Debtors will be jointly and severally liable to Prudential with respect to its allowed claim. According to the Debtors, Prudential has no standing to raise that argument, as it will suffer no harm or prejudice from the consolidation provision set forth in Section 5.8.

The Debtors maintain that the Plan satisfies the best interest of creditors test as Prudential and other creditors are being paid in full and it cannot receive more than its legal entitlement.

-16-

The Debtors counter Prudential's contention that the Plan has not been filed in good faith with their assertion that the Plan proposes to pay all creditors in full with interest. They emphasize that certain claims of non-debtor affiliates, namely SE Berkeley and SE McClellan against them, are to be converted to equity and all other non-debtor insider claims are being subordinated to the payment in full of all allowed claims of non-insider creditors. Moreover, they add that inter-company claims are being extinguished and no distribution will be made on account of insider claims or equity interests until all non-insider claims have been paid in full. Accordingly, the Debtors submit that the Plan complies with all of the requirements of 11 U.S.C. § 1129.

D. <u>The United States Trustee's Position</u>

The United States trustee submitted a Statement requesting that any order confirming the plan include provisions requiring post-confirmation financial reporting to the United States trustee.

## IV. FINDINGS OF FACT AND CONCLUSIONS OF LAW

Rather than summarizing the evidence adduced at the evidentiary hearing followed by an explication of the law and a discussion of the evidence in relation to the provisions of § 1129, the Court elects to discuss the evidence and the law pertinent to each subsection of § 1129 which is the subject of dispute.

A. <u>Confirmation Standards</u>

A plan proponent has the burden of proving by a preponderance of the evidence, that the plan satisfies the 14 applicable requirements for confirmation of a plan as set forth

-17-

in § 1129(a) of the Bankruptcy Code. *See* <u>In re Salem Suede, Inc.</u>, 219 B.R. 922, 932 (Bankr. D. Mass. 1998). This Court has an independent obligation to review the Plan to make sure that it satisfies the requirements for plan confirmation set forth in § 1129. <u>Id</u>. For the following reasons, this Court finds that the Plan satisfies the applicable confirmation requirements including those contested by the sole objecting party, Prudential.

### B. Acceptance of the Plan

Prudential rejected the Plan as a Class 2 claimant. Class 4, consisting of the claims of impaired miscellaneous secured creditors, did not vote. Thus, Class 4 is deemed to have accepted the Plan. *See* <u>Heins v. Ruti-Sweetwater, Inc. (In re Ruti-Sweetwater, Inc.)</u>, 836 F.2d 1263, 1267-68 (10th Cir. 1988). Class 5, consisting of impaired mechanics lien claims, voted to accept the Plan, as did Bovis, the sole creditor in Class 6, although its vote was untimely. Assuming this Court were to disregard the late filed vote, it still can be deemed to have accepted the Plan, having failed to vote against it. Eight claimants in Class 7, consisting of impaired general unsecured claims, voted to accept the Plan. In Class 8, the convenience class, one creditor voted to accept the Plan.

### C. The Voting Dispute between Prudential and City of Boston

Two sets of ballots were submitted with respect to Class 3, the impaired class representing the claim of the City. The City voted to accept the Plan; Prudential cast a ballot on behalf of the City rejecting the Plan. Resolution of the dispute requires an examination of the provisions of the Intercreditor Agreement. It provides in pertinent part the following:

-18-

7. Payment Subordination

(a) . . . all of Junior Lender's rights to payment of the Junior Loan and the obligations evidenced by the Junior Loan Documents are hereby subordinated to all of Senior Lender's rights to payment of the Senior Loan and the obligations secured by the Senior Loan Documents , and Junior Lender shall not accept or receive payments (including without limitation, whether in cash or other property and whether received directly, indirectly or by set-off, counterclaim or otherwise) from Borrower, the Premises or any other source prior to the date that all obligations under the Senior Loan Documents Are paid, except only insofar as the payments relate to Junior Lender's rights as a municipal corporation to require payment of amounts otherwise due Junior Lender unrelated to the Junior Loan (including, by way of example and without limitation, real property taxes) and except for payments realized under Junior Lender's documents which are not part of the Junior Loan Documents from the 142 Berkeley Property or the McClellan Property or from the $4,000,000 Pledge Amount.

8.  Rights of Subrogation: Bankruptcy

(c) In the event of . . . a bankruptcy . . . reorganization . . . whether or not pursuant to bankruptcy laws . . . Junior Lender will assign to Senior Lender the voting rights of Junior Lender in such proceeding, and will hold in trust for Lender and pay over to Lender, in the form received (together with any necessary endorsement), to be applied to the Senior Loan, any and all monies, dividends, or other assets received in any such proceedings on account of the Junior Loan, unless and until the Senior Loan is unconditionally and irrevocably paid in full, except that the foregoing provisions in this subsection (c) shall not apply to Junior Lender's claims, interests, benefits, proceeds, rights and remedies with respect to the 142 Berkeley Property and the McClellan Property and the $4,000,000 Pledge Amount subject to the $4,000,000 Pledge and Security Agreement. . . .

The Court finds that the assignment of voting rights by the City to Prudential is not

enforceable.  Although 11 U.S.C. § 510(b) provides for the enforceability of subordination

agreements, such agreements cannot nullify provisions of the Bankruptcy Code.  To the

extent a provision in a subordination agreement purports to alter substantive rights under

the Bankruptcy Code, it is invalid.  This Court follows and adopts the reasoning of Judge

-19-

Wedoff in <u>Bank of Amer. v. N. LaSalle Street Ltd. P'ship (In re 203 N. LaSalle Street P'ship)</u>, 246 B.R. 325, 331 (Bankr. N.D. Ill. 2000), in which he ruled that a provision in a subordination agreement in which the subordinated creditor purported to agree to assign its voting rights in a future Chapter 11 case to a senior secured creditor was contrary to 11 U.S.C. § 1126(a) ("The holder of a claim or interest allowed under section 502 of this title may accept or reject a plan. . . .") and  was unenforceable.  The court reasoned that a creditor cannot waive plan voting rights, relying on <u>Beatrice Foods Co. v. Hart Ski Mfg. Co. (In re Hart Ski Mfg. Co.)</u>, 5 B.R. 734 (Bankr. D. Minn. 1980), because Congress did not intend to permit creditors to alter substantive provisions of bankruptcy law.  Although the Court recognizes that there exists contrary authority, <i>see</i> <u>Blue Ridge Investors, II, LP v. Wachovia Bank (In re Aerosol Packaging, LLC)</u>, 362 B.R. 43 (Bankr. N.D. Ga. 2006), the Court finds that the decision of the courts in <u>LaSalle</u> and <u>Hart</u> are more persuasive.

In the present case,  the Court finds that the City's vote accepting the Plan was valid and that Prudential cannot be permitted to reject the Plan on behalf of the City.  Moreover, because three other impaired classes voted to accept the Plan, the voting dispute between Prudential and the City is irrelevant.  Nevertheless, assuming the Court were to deem the vote of Prudential on behalf of the City to be the controlling vote, the treatment of the City's secured claim under the Plan is appropriate and complies with the provisions of § 1129 (b)(2)(A)(i) and (iii).  The Debtors' proposed treatment of the City's claim, in essence, provides for maintenance of their contractual obligations to the City.  In other words, the obligations are not being modified under the Plan.  Prudential's argument that the City is

-20-

receiving amounts contrary to the Intercreditor Agreement is without merit.  As the City correctly points out, its interest in the City Account with a balance of approximately $4 million is not subject to Prudential's liens, and it is only receiving interest payments from that account until Prudential is paid in full.

As noted, three impaired classes affirmatively voted to accept the plan, Class 5, Class 7 and Class 8.  Without regard to the dispute between the City and Prudential or the late Bovis vote, the Court finds that the Plan has been accepted by at least one class of impaired claims.  Thus, the Plan complies with the requirements of 11 U.S.C. § 1129(a)(10) that at least one class of impaired claims accepts the Plan.

D.  Separate Classification of the Bovis Claim

The Court rules that separate classification of the Bovis claim under the Plan is legally permissible under the standards articulated by the United States Court of Appeals for the First Circuit in Granada Wines, Inc. v. New England Teamsters and Trucking Indus. Pension Fund, 748 F. 2d 42, 46-47 (1st Cir. 1984).  Bovis's claim is legally distinguishable from general unsecured claims because of its entitlement to assert lien rights as a contractor under applicable Massachusetts law. Thus, its claim is of a different legal character than those of other secured and unsecured creditors, and separate classification of the Bovis claim is proper.  Moreover, the compromise with Bovis providing for separate classification is binding on all creditors, including Prudential, as the order approving the settlement was the subject of notice and a hearing and is a final order.

E.  Treatment of Secured Claims

With respect to Prudential's secured claim, the Court made findings of fact and conclusions of law in its Memorandum dated October 4, 2011.  *See* In re SW [Boston] Hotel Venture, LLC, __ B.R. , __, 2011 WL 4704215 (Bankr. D. Mass. Oct. 4, 2011).  Pursuant to that decision, and this Court's October 20, 2011 "Order Fixing Amount of Allowed Prudential Secured Claim as of October 4, 2011," Prudential is owed the approximate sum of $52 million on account of its secured claim as a result of the Court's October 20, 2011 Order. The Plan provides that the Debtors will pay the restructured loan with interest at the rate of 4.25 % until the loan is paid in full by March 31, 2014.

A Chapter 11 plan may be confirmed over the objection of a class of secured claims if the plan treatment is fair and equitable and does not discriminate unfairly.  11 U.S.C. § 1129(b)(1).  The requirement of fair and equitable treatment can be satisfied if under the plan the secured creditor retains its lien on its collateral and receives deferred cash payments which total the allowed amount of its secured claim "of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estates's interest" in the property.  11 U.S.C. § 1129(b)(2)(A)(i).  A plan proponent also can satisfy the fair and equitable requirement by providing the secured party with the "indubitable equivalent" of its claim.  11 U.S.C. § 1129 (b)(2)(A)(iii).  Payment of the value of the secured creditor's claim on the effective date of the plan requires a determination of the amount of post-confirmation interest that will compensate the secured creditor for the risk attendant to the restructured loan.  In Till v. SCS Credit Corp., 541 U.S. 465 (2004), a plurality of the

-22-

Justices of the United States Supreme Court directed that the so-called "formula approach" be utilized in determining the appropriate rate of interest rate for a restructured "cramddown" loan in Chapter 13 cases. It stated:

> The formula approach has . . . begins by looking to the national prime rate, reported daily in the press, which reflects the financial market's estimate of the amount a commercial bank should charge a creditworthy commercial borrower to compensate for the opportunity costs of the loan, the risk of inflation, and the relatively slight risk of default. Because bankrupt debtors typically pose a greater risk of nonpayment than solvent commercial borrowers, the approach then requires a bankruptcy court to adjust the prime rate accordingly. The appropriate size of that risk adjustment depends, of course, on such factors as the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan. The court must therefore hold a hearing at which the debtor and any creditors may present evidence about the appropriate risk adjustment. Some of this evidence will be included in the debtor's bankruptcy filings, however, so the debtor and creditors may not incur significant additional expense. Moreover, starting from a concededly low estimate and adjusting upward places the evidentiary burden squarely on the creditors, who are likely to have readier access to any information absent from the debtor's filing (such as evidence about the "liquidity of the collateral market" . . . .

541 U.S. at 478-49 (footnote omitted). The Supreme Court also observed that in Chapter 11 cases there may be an efficient market for restructured loans. Id. at 476 n.14. Thus many courts attempting to determine the appropriate rate for post-confirmation interest of a restructured loan in Chapter 11 cases follow a two-step process. Courts first inquire whether there exists an efficient market for cramdown financing; if so, the market rate will apply. If there is no efficient market for the restructured loan, courts should follow the formula approach adopted in Till. See infra, pages 25-26.

In determining whether there is an efficient market for a cramdown loan, a court

must analyze the terms of the restructured debt, the type of collateral, the duration of the loan, and the amount of the loan.  *See* Gen. Elec. Credit Equities, Inc. v. Brice Road Devs., LLC (In re Brice Road Devs., LLC), 392 B.R. 274, 280-81 (B.A.P. 6th Cir. 2008).  A market analysis by experts should be performed to ascertain whether the type of loan that the debtor is proposing in a plan can be obtained or whether an efficient market is lacking.  A debtor, however, is not required to show that it was unsuccessful in attempting to obtain postpetition financing in order for the court to find that an efficient market does not exist. *See* SPCP Group, LLC v. Cypress Creek Assisted Living Residence, Inc., 434 B.R. 650, 658 (M.D. Fla. 2010).  To determine whether there is an efficient market for the loan at issue, most courts look to expert evidence and evidence of actual loan offers. *See, e.g.*, In re Deep River Warehouse, Inc., No. 04-52749, 2005 WL 2319201 at *12 (Bankr. M.D. N.C. Sept. 22, 2005).  As one court observed before Till, consideration should be given to the "current market rate for loans that are similar in term, quality of security, and risk of repayment or financial condition of the borrower." In re One Times Square Assocs. Ltd. P'ship, 159 B.R. 695, 706 (Bankr. S.D.N.Y. 1993), *aff'd*, 165 B.R. 773 (S.D.N.Y. 1994), *aff'd*, 41 F.3d 1502 (2nd Cir. 1994), *cert. denied*, 513 U.S. 1153 (1995).  As another court noted:  "The interest rate under an original loan agreement is informative as to a proposed cramdown interest rate's merits to the extent that the original rate was set near in time to a debtor's chapter 11 proceeding and in a period in which market conditions were substantially similar to present conditions." In re Cellular Info. Sys. Inc., 171 B.R. 926, 938 (Bankr. S.D.N.Y. 1994) (citations omitted).  Other courts have looked to tiered financing to determine whether a

-24-

market interest rate exists. The tiered financing or band of investment approach calls for the court to consider whether the debtor can obtain a loan through a combination of different tranches of financing. The interest rates of these tranches are then blended to determine the appropriate rate.  *See, e.g.*, Pac. First Bank v. Boulders on the River, Inc. (In re Boulders on the River, Inc.), 164 B.R. 99, 102–03, 107 (B.A.P. 9th Cir. 1994) (affirming the bankruptcy court decision applying a blended interest rate of 9%); In re N. Valley Mall, LLC, 432 B.R. 825, 832–36 (Bankr. C.D. Cal. 2010) (applying a blended interest rate of 8.5 %); In re Cellular Info. Sys., Inc., 171 B.R. at 944 (applying the band of investment approach and denying confirmation because the plan's cramdown interest rate was lower than the blended rate).

Where an efficient market for a Chapter 11 cramdown loan is absent, the overwhelming majority of courts applies the "formula" approach articulated by the plurality of the United States Supreme Court in Till to determine whether an appropriate cramdown rate of interest is being paid to a secured creditor under a Chapter 11 plan  to comply with § 1129(b)(2)(A).  *See, e.g.*, Bank of Montreal v. Off. Comm. of Unsecured Creditors (In re Am. Homepatient, Inc.), 420 F. 3d 559, 568 (6th Cir. 2006), *cert. denied,* 549 U.S. 942 (2006)  (" . . . the market rate should be applied in Chapter 11 cases where there exists an efficient market.  But where no efficient market exists for a Chapter 11 debtor, then the bankruptcy court should employ the formula approach endorsed by the Till plurality.");  In re Brice Road Devs, L.L.C., 392 B.R. at 280 ("in a chapter 11 case where an 'efficient market' exists, the market rate should be applied, and where no 'efficient market'

exists, the formula approach endorsed by the Supreme Court in <u>Till</u> . . . should be employed"); <u>In re N. Valley Mall, LLC</u>, 432 B.R at 831-2 (" . . . it is necessary to adopt some kind of a formula approach in order to approximate as nearly as is possible compensation for the risks that proposed to be imposed upon the [secured creditor]."); <u>In re Prussia Assocs.</u>, 322 B.R. 572, 589-90 (Bankr. E.D. Pa. 2005) (where there was insufficient evidence of market rate for cramdown loan, court applied formula approach to determine appropriate cramdown rate of interest).

In applying the formula approach, the Supreme Court in <u>Till</u> directed that the first step is to determine a risk free rate, such as the national prime rate, and make additional adjustments to it to account for risk factors, including the risk of nonpayment, the debtor's circumstances, the nature and value of the collateral, the loan to value ratio, the term of the proposed loan, and the feasibility of the plan, that is the likelihood of the plan's success. *See, e.g.*, <u>SPCP Group, LLC v. Cypress Creek Assisted Living Residence, Inc</u>., 434 B.R. at 660; <u>In re Village at Camp Bowie I, L.P.</u>, 454 B.R. 702 (Bankr. N.D. Tex. 2011); <u>In re 20 Bayard Views, LLC</u>, 445 B.R. 83 (Bankr. E.D.N.Y. 2011).

Applying these standards to the facts of the present case, the Court finds that the credible evidence supports a finding that a market for exit financing of the type of loan proposed by the Debtors does not exist. On the issue of whether an efficient market exists and an appropriate rate, the Debtors offered the expert testimony of Freddie Reiss ("Mr. Reiss"), who has over 30 years experience in the restructuring industry, has written and lectured extensively in his field, and has testified as an expert in numerous contested

Chapter 11 cases. Mr. Reiss expressed the opinion that there is currently no efficient market for a loan such as the one proposed by the Debtors in their Plan. He based his opinion on his knowledge and involvement of his firm's real estate loan transactions, his review of publications and research materials, his communications with a number of large commercial lenders whose responses to the opportunity to make a loan to the Debtors on terms set forth in the Plan he described as "less than tepid," as well as current poor market conditions. In reaching his opinion, Mr. Reiss reviewed the unprecedented negative market conditions for financing in the present economy, the nature and type of the cramdown loan proposed under the Plan, the amount due to Prudential, the characteristics of the loan, in particular, the rapid amortization which has occurred during these cases and which is projected to continue, and the proposed loan terms, especially the quarterly minimum payments. He and his company surveyed a number of commercial mortgage lenders, and he reviewed a number of other real estate Chapter 11 cases in which his company had been involved, and he found that there was no interest in this type of loan. Mr. Reiss's opinion was credible and substantiated by substantial evidence.

On the efficient market issue, Prudential proffered the opinion of Ms. Marti Murray. ("Ms. Murray"). Ms. Murray is a hedge fund and distressed debt specialist. She expressed the opinion that an efficient market exists for the restructured loan proposed in the Debtors' Plan. In reaching that conclusion, she relied on discussions with a mortgage broker, an investment banker, a loan officer, and her own review of web sites and emails to potential lenders. She indicated that she received information from a potential lender

-27-

who makes loans to owners of apartment buildings at a rate of 4.9 %. In her testimony, Ms.

Murray described the Plan's cramdown loan as a "fractured condo loan," a term which

refers to an unfinished condo project. The Court finds that Ms. Murray inaccurately

described the characteristics of the Debtors' property which serves as Prudential's collateral

in reaching her conclusion. The restructured loan under the Debtors' plan is not a

fractured condo loan as the Debtors' condominiums are fully completed, numerous units

are occupied by residents, and the W Hotel, where the condominiums are located, is fully

operational with significant amenities available to condominium residents. In her report,

Ms. Murray relied on the existence of a number of loans to distressed borrowers, identified

as Sheffield 57 and Comstock. The Court finds that the transactions considered by Ms.

Murray are different from, and not comparable to, the cramdown loan in the Debtors' Plan.

The Sheffield property contained unfinished condominiums and lacked amenities, while

the Comstock loan was for less than $12 million. Moreover, those properties were being

financed in bundles and did not have records of sales comparable to what SW has achieved

since the commencement of this case. Accordingly, those loans are not reliable indicators

to support a finding that an efficient market for a loan such as the Debtors' cramdown loan

exists.

With respect to the efficient market issue, the Court finds that Mr. Reiss's opinion

is entitled to more weight than the opinion of Ms. Murray. Ms Murray's background as

a manager of a financial firm which purchases distressed debt is not as relevant to, or

reliable as, the background and experience as Mr. Reiss for the purpose of an opinion on

the efficient market for a Chapter 11 cramdown loan. Moreover, prior to her testimony in this case, Ms. Murray had never been retained as an expert and never qualified as an expert witness and her qualifications and experience are inferior to those of Mr. Reiss.

Here, the evidence shows that there is not a market for the type of loan proposed in the Plan. The Court rejects Ms. Murray's conclusion that there is an efficient market for this loan and accepts the opinion of the Debtors' expert who stated that an efficient market does not exist for a loan of the size required by the Debtors' Plan and secured by existing collateral. His testimony was grounded in his years of experience in real estate finance as well as his inquiries to prospective lenders. Those inquiries led him to conclude that financiers in the business of making loans were not likely or willing to make a loan of the nature proposed in the Plan. Prudential introduced no credible or reliable evidence that other financing is available to the Debtors. Based upon the evidence presented, the Court finds that, in the absence of an efficient market, the formula approach must be utilized.

Ms. Murray opined that the appropriate interest rate for a cramdown loan in this case would be 9.8 %, although she did not conduct a <u>Till</u> analysis or apply the formula approach. Her opinion was based on a loan to value ratio. One of her critical assumptions was that Prudential would be owed approximately $82 million at confirmation. That assumption proved to be flawed. At the present time, due to payments by the Debtors generated from condominium sales, Prudential is owed approximately $52 million, which includes interest at the default rate from the date the Court found it to be warranted. Ms. Murray also assumed that the risk of nonpayment by the Debtors was substantial. That

assumption is inconsistent with the Debtors' rapid amortization of the Prudential loan during the pendency of their cases. Moreover, Ms. Murray expressed the view that the Debtors' Plan is not feasible due to what she considered excessive pricing of the condominium units. Ms. Murray, however, is neither an experienced real estate broker nor a licensed appraiser. She merely based her opinion that the Debtors' Plan lacked feasibility on discussions with unnamed local brokers. Even though Ms. Murray conceded that the projected payout period for the Prudential loan over a three to four year period is reasonable, she did not give that factor appropriate weight in reaching her opinion for a post-confirmation loan rate.

Unlike Ms. Murray, Mr. Reiss conducted a <u>Till</u> analysis using the formula approach. He opined that under that approach the appropriate cramdown interest rate should be 4.25%. Mr. Reiss started with application of the national prime rate of 3.25 %. The Debtors' Exhibit 11 indicates that the treasury rate for loans of up to 7 years is less than 3%. Mr. Reiss opined that one percentage point must be added to the cramdown loan for risk, considering the circumstances of the estates, the nature and value of the collateral, the term of the Plan, and the feasibility of the Plan. Mr. Reiss credited the Debtors' principals and management for their commitment to the project, their development of another project, and, most importantly, the accomplishments of the Debtors' broker in selling units during the pendency of the SW case and substantially meeting projections. Mr. Reiss evaluated the collateral available to satisfy Prudential's claim and concluded that the loan to value ratio would be 66 % as of the proposed effective date of the Plan. Noting that the

-30-

Prudential debt was expected to fully amortize in approximately two years, he concluded that the loan to value ratio was 33 %. Based upon those facts, Mr. Reiss concluded that the Debtors did not pose a substantial risk of nonpayment following their emergence from bankruptcy.

Mr. Reiss specifically found that an upward adjustment of one half of one percent was necessary to compensate for a feasibility risk. He also opined that a one half of one percent adjustment was appropriate due to the duration of the loan, which is expected to be from two to four years. As to the nature of the collateral securing the cramdown loan, Mr. Reiss noted that the payments to Prudential over time are secured by a first mortgage on the condominium units that they are part of the W Hotel, a luxury chain, and that the loan to value ratio (an approximate $52 million loan balance compared to a $61.5 million value and $14 million in additional assets available to secure the loan) required no further risk adjustment to the 4.25 % interest rate. Mr. Reiss observed that when Prudential made the original $180 million loan, the interest rate was 2.25 % more than the prime rate. If that differential were applied today, the interest rate for the cramdown loan would be 5.5 %.

The Court credits Mr Reiss's opinion for a variety of reasons, including his qualifications, wealth of experience, excellent reputation as a restructuring advisor, and the detailed and legally appropriate approach he followed in applying the Till formula. Accordingly, the Court finds that the interest rate of 4.25 % for the cramdown loan will provide Prudential with deferred cash payments equal to the allowed amount of its claim as of the effective date with retention of its liens and the indubitable equivalent of its claim.

-31-

121

This interest rate will result in a stream of payments to Prudential under the Debtors' Plan with a present value equal to its allowed secured claim. The Court accepts the only evidence on the issue of an appropriate risk adjustment point, namely the opinion of Mr. Reiss. The Court emphasizes that Prudential did not introduce any evidence of the appropriate interest rate based on the <u>Till</u> formula approach, preferring to rely exclusively on its contention that there is an efficient market for the cramdown loan.

The Court finds that the Debtors' proposed treatment of Prudential's allowed secured claim over its objection meets the requirements for a cramdown under 11 U.S.C. § 1129(b)(2)(A). Prudential will retain its lien and receive payments with interest at an appropriate rate from the sale of the condominiums, a lien it will retain until its claim its allowed secured claim is paid in full. The Debtors intend to satisfy Prudential's lien in a relatively short period of time, rapidly amortizing the loan no later than March 31, 2014. The Debtors' treatment of Prudential's secured claim is fair and equitable and does not unfairly discriminate. Moreover, the Plan provides Prudential with the indubitable equivalent of its claim and the treatment complies with the requirements of 11 U.S.C. § 1129(b)(2)(A)(i) and (iii).

F. <u>Feasibility</u>

Section 1129(a)(11) of the Bankruptcy Code provides that a plan may only be confirmed if confirmation is not likely to be followed by liquidation, or the need for further financial reorganization. 11 U.S.C. § 1129(a)(11). Commonly referred to as the feasibility requirement, the purpose of this test is to ensure that the plan is not a "visionary scheme."

See In re Merrimack Valley Oil Co., Inc., 32 B.R. 485, 488 (Bankr. D. Mass. 1983).  Stated

another way, "[t]he purpose of the feasibility test is to determine whether there is a

reasonable probability that creditors will receive the payments provided for in the plan."

In re Trenton Ridge Investors, LLC, __ B.R. __, 2011 WL 4442270 at *25 (Bankr. S.D. Ohio

Jun. 23, 2011) (citations omitted).  A plan proponent need not guarantee the success of the

plan, but rather must introduce evidence that its plan is realistic.   In re Brice Road Devs.

LLC., 392 B.R. at 283.   Courts consider the following factors in assessing feasibility:

> (1) the adequacy of the capital structure; (2) the earning power of the
> business; (3) economic conditions; (4) the ability of management; (5) the
> probability of the continuation of the same management; and (6) any other
> related matter which determines the prospects of a sufficiently successful
> operation to enable performance of the provisions of the plan.

In re Trenton Ridge Investors, LLC, 2011 WL 4442270  at * 25 (footnote omitted) (citing In

re U.S. Truck Co., Inc., 800 F.2d 581, 589 (6th Cir. 1986)).  See also In re Orfa Cop. of Phil.,

129 B.R. 404, 411 (Bankr. E.D. Pa. 1991).

The primary funding source for the Debtors' Plan is the sale of condominiums which

are integrated with the W Hotel, located at 100 Stuart Street.  SW owned the W Hotel and

operated it through Starwood until the hotel was sold on June 8, 2011 for $89.5 million to

a third party buyer, resulting in a payment to Prudential in excess of $83 million.

Prudential was owed approximately $180,000, 000 as of the commencement of these cases

in March of 2010 and due to the sale of the W Hotel, the draw on the letter of credit, and

sales of condominiums during the pendency of these cases, it now is owed approximately

$52 million, which includes postpetition interest, as a result of the Court's rulings as set

forth in the 506(b) Memorandum.

The Debtors' projections for sales of condominiums over the next three years, which were attached to their Disclosure Statement and referenced in the affidavit and testimony of Paul Griesmer ("Mr. Griesmer"), a designated Counselor of Real Estate, a Fellow in the Royal Institute of Chartered Surveyors, a state certified general real estate appraiser, and a licensed real estate broker, as well as the testimony of the Debtors' turnaround consultant, Derrick Flanagan ("Mr. Flanagan"). The Debtors project that condominium sales will occur at the approximate rate of three per month, which will generate cash flow of approximately $80 million over the Plan period. In addition to cash flow from which the Debtors intend to make Plan payments, the Debtors have approximately $14 million in cash and other assets to support the Plan.

The Debtors' real estate broker in charge of marketing and selling the condominiums, Kevin Ahearn ("Mr. Ahearn"), one of the premier real estate brokers in Boston, Massachusetts, expressed the opinion that the three-year sell out period projected by the Debtors is reasonable based upon his knowledge of the market and familiarity with similar projects. Mr. Griesmer confirmed that the three-year sell out period was feasible. Indeed Ms. Murray, Prudential's expert, agreed that the projected sales rate was reasonable.

During the bankruptcy cases, Mr. Ahearn has been responsible for the sales and marketing of the condominiums. The Debtors have substantially met the sales projections and have sold condominiums at an average rate of three per month for prices within the

range of their projections. During the pendency of the bankruptcy cases, the Debtors have been fairly successful in selling the condominiums, notwithstanding the stigma and uncertainties of bankruptcy and the economic difficulties of the past several years. During the 14 months prior to the hearing on confirmation, the Debtors generated net sales proceeds of $33.7 million compared to their projection of $34.3 million. SW sold 22 condominiums between November 1, 2010 and June 30, 2011, netting proceeds of $25.2 million compared to projected net proceeds of $25,582,000.

Mr. Ahearn testified that SW's bankruptcy case had a negative effect on sales. He explained that the inventory of luxury condominium units in Boston is decreasing and that the overall prices for luxury condominiums have maintained stability. Thus, in his view, condominium sales will be positively affected by existing market conditions.

Mr. Ahearn also testified that the Debtors will be able to achieve the number of sales and the price per square foot set forth in the projections. The Debtors projected an average price per square foot of $950, which represents an increase over the average price obtained during bankruptcy proceedings of approximately $898 per square foot. He explained that when SW exits bankruptcy, sales will improve. He indicated that overall prices in the Boston condominium market will increase, especially for luxury units like SW's units. Accordingly, in his view, the Debtors' projections are not overly optimistic. Even if SW were to realize only $898 per square foot, the average price obtained during the pendency of the Chapter 11 case, the Debtors would still generate cash flow of approximately $77.5 million for the term of the Plan. In other words, even if the Debtors are unable to realize

their projections, they still will have the ability to fund the Plan if they maintain their existing track record of sales.

The credible evidence submitted at the confirmation hearing compels a finding that the Plan is feasible. The Debtors have shown that it is likely they will be able to pay creditors the amounts required under the Plan and the Court's orders within the time contemplated under the Plan. The projections for the sales of condominiums are realistic and workable and are supported by SW's track record of sales. SW has accomplished, on average, sales of three units per month and the prices obtained are within the range of reasonableness compared to the projected prices. During these cases, SW has been able to realize an average price of $ 898 per square foot which is within 5 % of the projections. It has substantially met its projections during the pendency of the bankruptcy cases, despite the stigma of and uncertainty resulting from the pendency of a Chapter 11 case and market conditions. Mr. Ahearn acknowledged that the pendency of these Chapter 11 cases has hurt sales, but once SW emerges from bankruptcy and that stigma is removed, there will be a more positive sales climate. His opinion was credible and well supported by the data he referenced in his testimony.

The Debtors' track record during this case strongly supports a finding of feasibility. The Court finds that the anticipated sales prices for the condominiums and the rate of sales are obtainable and that the Debtors likely will generate sufficient cash flow to make Plan payments. Even if the Debtors are unable to meet the projections and realize only the average amount per square foot they have obtained during these cases, they will still be

able to fund the Plan from net cash flow.  Moreover, the additional assets which Debtors

own, totaling approximately $14 million, provide additional support for  finding that the

Plan is feasible.

The Court rejects Prudential's assertion that the Plan is no more than a "visionary

scheme."  It argues that the Debtors have attempted to decrease leverage by failing to

include postpetition interest to which it is entitled.  The Court, however, has determined

the rate of postpetition interest to which Prudential is entitled using the <u>Till</u> factors, which

Prudential did not address through the submission of evidence.  The Debtors have the

ability to satisfy the Prudential claim at the interest rate provided in the Plan and there is

a sufficient cushion from additional assets in the event they do not meet their  projections.

Prudential also challenges the Debtors' sales and pricing projections as "unrealistic,"

extrapolating that they lack significant reserves to cover unexpected costs and putting their

collateral at risk.  SW's track record, however, speaks to the Debtors' abilities to meet their

projections.  Prudential also points to Mr. Ahearn's admission that the overall health of the

real estate market is depressed and the continuation of the Debtors' existing management

team, emphasizing the lack of a budgeted line item of financial professionals.  Prudential's

attempt to impugn the Debtors' success at selling the condominiums is based on snapshots,

and not an overall view of the actual postpetition events.  Prudential also criticized the

abilities of the Debtors' management team, in particular Ms. Carol Parks.  Prudential,

however, ignores Ms. Parks's substantial business and  management experience with other

ventures and her successful development of the so-called Niketown project on Newbury

Street in Boston.

Prudential further maintains that the Debtors will have inadequate capital if their Plan is confirmed and they exit Chapter 11. This argument ignores the unrebutted evidence of a favorable loan to value ratio and adequate capital structure. As supported by the affidavit and testimony of Mr. Reiss, when a comparison is made of the amount Prudential is owed (which is $ 51,740,786 as a result of the Court's Order dated October 20, 2011) to the stipulated value of the condominiums projected as of the date of confirmation, approximately $61 million, plus the stipulated value of the $14 million dollars in additional assets owned by the Debtors, it is clear that the Debtors have a favorable loan to value ratio with respect to the Prudential loan. Mr. Reiss also analyzed the Debtors' cash position and other Plan obligations and concluded their capital was adequate. He noted that the Debtors will have unrestricted cash on hand of approximately $250,000 as of the effective date of the Plan and additional collateral which can be liquidated in the sum of $3.1 million. Considering the Debtors' effective date obligations of approximately $2.1 million, the Debtors will have a cash balance of $1.25 million as of the effective date of the Plan. He also observed that the Debtors' additional assets could be available to enhance the Debtors' cash position. In light of the unrebutted evidence, the Court finds that the Debtors' capital structure upon confirmation is likely to be adequate to support the Plan payments.

Although Prudential correctly points out that market conditions are uncertain, the Court finds that it failed to undermine the weight of the evidence submitted by the Debtors. As many bankruptcy courts recognize, debtors are not required to guarantee the

success of their plans.  *See* <u>In re Brice Road Devs., LLC</u>, 392 B.R. at 283.  The Debtors have

sustained their burden on feasibility and have produced sufficient evidence from which

this Court can find that their Plan satisfies the requirement of 11 U.S.C. § 1129(a)(11).

G.  <u>Absolute Priority Rule</u>

The provisions of 11 U.S.C. § 1129(b)(2)(B) and (C) require that for a plan to be

confirmed with respect to an impaired, dissenting class of unsecured claims or interests,

a Chapter 11 plan must provide that each holder of a claim must receive property of a

value as of the effective date of the plan equal to the allowed amount of its claim or the

holder of a claim or interest that is junior to the claims of such class will not receive or

retain under the plan any property on account of such junior  claim.  *See* 11 U.S.C. §

1129(b)(2)(B)(i), (ii) and (C).  Commonly referred to as the absolute priority rule, the

statute's requirements prevent a lower class of unsecured creditors or equity interests from

receiving money or property where senior classes and senior interests are not being paid

in full.

The Court rejects Prudential's argument that the Debtors' Plan violates the

provisions of § 1129(b)(2) (B)(i) and (ii), for a number of reasons.  First, the absolute priority

rule is not implicated in this case as no class of unsecured claims has rejected or objected

to the Plan.  Secondly, the Plan provides for payment to unsecured creditors in full over

time with interest and, thus, the Plan satisfies the absolute priority rule.  Thirdly,

Prudential has not asserted an unsecured claim and, in any event, the proposed treatment

of its secured claim requires payment in full with interest.  Finally, Prudential does not

have standing to assert the absolute priority rule as a secured creditor, and it has not shown that it will sustain any harm from the Plan's provisions respecting treatment of unsecured creditors. *See* <u>In re Wabash Valley Power Ass'n</u>, 72 F.3d 1305, 1314 (7th Cir. 1995), *cert. denied,* 519 U.S. 965 (1996) ("In its origins, the absolute priority rule was a judicial invention designed to preclude the practice in railroad reorganizations of 'squeezing out' intermediate unsecured creditors through collusion between secured creditors and stockholders (who were often the same people.")); <u>Corestates Bank, N.A. v. United Chemical Techs., Inc.</u>, 202 B.R. 33, 54-55 (E.D. Pa. 1996) (courts limit the application of the absolute priority rule to unsecured creditors); <u>In re Cypresswood Land Partners, I</u>, 409 B.R. 396, 419 (Bankr. S.D. Tex. 2009); (same); <u>In re New Midland Plaza Assocs.</u>, 247 B.R. 877, 893 (Bankr. S.D. Fla. 2000) ("As a fully secured creditor . . . [the objecting party] . . . does not have standing to assert the absolute priority rule of § 1129(b)(2)(B)(ii)).

In footnote 11 to its Proposed Findings of Fact and Conclusions of Law, Prudential makes a somewhat oblique assertion that it has an unsecured claim against the Debtor, Frank Sawyer Corporation, due to a deficiency in the value of that Debtor's assets compared to Prudential's claim against that Debtor. Prudential, however, has not filed an unsecured claim in that case and is not treated as an unsecured creditor in the Debtors' Plan. In the Court's October 4, 2011 Memorandum, Prudential vehemently argued, and the Court ruled, that it was a creditor with an allowed secured claim and that it held no unsecured deficiency claim. The basis for Prudential's assertion that it has an unsecured claim in the case of Frank Sawyer Corporation is unclear. The Court finds that Prudential

-40-

failed to sustain its burden of proof as to its status as the holder of an unsecured claim. Moreover, even if it had such a claim, a dissenting unsecured creditor in an accepting class cannot assert the absolute priority rule. In re United Marine, Inc., 197 B.R. 942, 948 (Bankr. S.D. Fla. 1996). Two classes of unsecured creditors, Class 7 and Class 8 accepted the Plan.

In the same vein, Prudential complains that the unsecured claims asserted by insider affiliates of the Debtors, SE Berkeley and SE McClellan, must be disallowed prior to the Court's consideration of the Plan and that the Debtors' treatment of those claims violates the absolute priority rule. Prudential states that the participation of those insider creditors in the Plan and their receipt of membership interests issued by 110 Stuart Street, LLC is tantamount to the current equity interest of the Debtors being paid ahead of other creditors.

Steven Kravetz ("Mr. Kravetz"), the Debtors' chief financial officer, testified that the non-debtor, insider claimants contributed $17.3 million dollars towards the purchase of the letter of credit from Sovereign Bank which was used to pay Prudential after SW defaulted under the Construction Loan Agreement. In addition, he testified that SW agreed to repay the claims arising from the letter of credit, although that agreement was not reduced to a writing. In the proofs of claim filed by SE Berkeley and SE McClellan, which were filed in the case of SW, the claims are described as claims for contribution and reimbursement by affiliates of the Debtors by virtue of their having obtained the $17.3 million letter of credit from Sovereign Bank for the benefit of Prudential.

Under the Plan, the claims of SE Berkeley and SE McClellan will receive equity

interests in a newly formed entity whose capital structure is unknown.  They will not receive any cash payments.  The treatment of those claims does not violate the absolute priority rule.  As in the case of <u>In re Ion Media Networks, Inc</u>. 419 B.R. 585 (Bankr. S.D. N.Y. 2009), the  issuance of equity through the creation of memberships in a new, limited liability company does not enable any creditor or interest holder to retain or recover any value under the Plan.  The Plan provisions do not harm Prudential or any other creditors who are being paid 100 % of their allowed claims plus interest.  The provision of Section 4.7(e)(1) of the Plan is a device to allow the Debtors to satisfy the claims of SE Berkeley and SE McClellan and to effectuate a new corporate structure;  it is not an allocation of value to interest holders to the detriment of other creditors who are all being paid in full with interest under the Plan.  SE Berkeley and SE McClellan have valid claims against the Debtors arising from the draw on the $17.3 million letter of credit issued by Sovereign Bank and from the $10.5 million guarantees of the City loan.  Regardless of how those claims are characterized, and, in particular, how the letter of credit claims are characterized, whether as claims for  contribution, reimbursement, subrogation, unjust enrichment or quantum meruit, SE Berkeley and SE McClellan have claims of at least $17.3 million because they paid  a debt incurred by SW.  Moreover, the issuance of new equity to claimants SE Berkeley and SE McClellan is not the functional equivalent of old equity retaining their interests. The evidence introduced at trial mandates the conclusion that those entities have the right to assert claims against the Debtors for whose benefit they advanced funds which were ultimately paid to Prudential.  Under the Plan, the Debtors are obligated to repay SE

Berkeley and SE McClellan for their purchase of the letter of credit through the issuance of equity interests.  Regardless of the legal theories of contribution, reimbursement, subrogation or quantum meruit, Prudential has failed to establish that SE Berkeley did not advance funds for the purchase of the letter of credit for the benefit of Prudential in conjunction with SW's Construction Loan Agreement, that the equity interests in the newly formed entity either harm it in any way or that the value of the equity interests in 110 Stuart Street, LLC is grossly disproportionate in value to the sums advanced.  In summary, the Court finds and rules that the absence of documentation does not negate the validity of their claims, as urged by Prudential, and that the Plan does not violate the absolute priority rule.

### H.  The Plan's Consolidation Provision

 The Court finds that the consolidation provision of the Plan is an appropriate method for implementing the Plan under 11 U.S.C. § 1123(a)(5)(C) under the circumstances of these cases.  In Section 5.8 of the Plan, the Debtors reference substantive consolidation. The  actual language and intent of the Section 5.8 appears to be different than the typical instances where debtors seek substantive consolidation as a remedy to address disregard of the corporate form.

Numerous courts acknowledge that under appropriate circumstances substantive consolidation is an appropriate remedy for failure to adhere to corporate formalities. *See, e.g.* Union Savs. Bank v. Augie/Restivo Baking Co., Ltd. (In re Augie/Restivo Baking Co., Ltd., 860 F.2d 515 (2d Cir. 1988); Drabkin v. Midland-Ross Corp. (In re Auto-Train Corp.),

810 F.2d 270 (D.C. Cir. 1987). As the court observed in In re Owens Corning, 419 F.3d 195

(3d Cir. 2005), *cert. denied,* 547 U.S. 1123 (2005):

> Ultimately most courts slipstreamed behind two rationales-those of the
> Second Circuit in Augie/Restivo and the D.C. Circuit in Auto-Train. The
> former found that the competing "considerations are merely variants on two
> critical factors: (i) whether creditors dealt with the entities as a single
> economic unit and did not rely on their separate identity in extending credit,
> . . . or (ii) whether the affairs of the debtors are so entangled that
> consolidation will benefit all creditors. . . ." In re Augie/Restivo, 860 F.2d at
> 518 (internal quotation marks and citations omitted). Auto-Train touched
> many of the same analytical bases as the prior Second Circuit cases, but in the
> end chose as its overarching test the "substantial identity" of the entities and
> made allowance for consolidation in spite of creditor reliance on separateness
> when "the demonstrated benefits of consolidation 'heavily' outweigh the
> harm." In re Auto-Train, 810 F.2d at 276 (citation omitted).

Owens Corning, 419 F.3d at 207-08. In Owens Corning, the court fashioned the following

test, absent consent, regarding entities for whom substantive consolidation is sought: " (1)

prepetition they disregarded separateness so significantly their creditors relied on the

breakdown of entity borders and treated them as one legal entity, or (2) postpetition their

assets and liabilities are so scrambled that separating them is prohibitive and hurts all

creditors." Id. at 212 (footnote omitted). The Third Circuit recognized that substantive

consolidation can be "bad news for certain creditors, [because] instead of looking to assets

of the subsidiary with whom they dealt, they now must share those assets with all creditors

of all consolidated entities, raising the specter for some of a significant distribution

diminution." Id. at 206.

Although courts have approved plans that provide for substantive consolidation,

other courts have ruled that provisions in Chapter 11 plans resulting in "deemed"

consolidation or "partial" consolidation of joint debtors are legally impermissible.  In those cases, the plan implementation provisions do not constitute substantive consolidation in the usual bankruptcy sense recognized by the Third Circuit.  Thus, in Owens Corning, the Third Circuit held that the "deemed" consolidation of a corporate debtor and related entities that had guaranteed their borrowing was impermissible as it deprived the lender of the guarantees for which it had bargained.  See also Genesis Health Ventures, Inc. v. Stapleton (In re Genesis Health Ventures Inc.), 402 F.3d 195 (3d Cir. 2005) (court disapproved deemed consolidation provision in a plan which had as its purpose the avoidance of quarterly fees payable to the office of the United States trustee for each joint debtor).  See also In re New Century TRS Holdings, Inc., 407 B.R. 576 (D. Del. 2009).  In Owens Corning, the Third Circuit Court of Appeals set forth a number of principles for the purpose of assessing whether to order substantive consolidation, one of which was that "[w]hile substantive consolidation may be used defensively to remedy the identifiable harms cause by entangled affairs, it may not be used offensively (for example, having a primary purpose to disadvantage tactically a group of creditors in the plan process or to alter creditor rights)."  419 F.3d at 211.  Thus, when substantive consolidation is used offensively for an improper purpose which is detrimental to creditors, a court should not permit its use.

In the present case, the consolidation set forth in the Debtors' Plan is legally permissible for several reasons.  Unlike the provisions in the Third Circuit decisions, the consolidation provision does not affect the distributions to the Debtors' creditors and does

not result in discrimination against certain creditors or result in disenfranchisement of certain classes of claimants. Section 5.8 of the Plan does not impact the rights of creditors as all creditors are being paid 100 % of their claims and no creditor is sustaining a loss by virtue of this Plan provision. Moreover, no interested party other than Prudential raised an issue or objected to the substantive consolidation provision of the Plan that provides for consolidation of the Debtors for Plan distribution purposes. The consolidation provisions do not affect Prudential's secured claim or its treatment, and Prudential has not shown that it will suffer any harm from the consolidation provision, particularly where the Debtors clarified at the hearings on confirmation that they will all remain jointly and severally liable to Prudential for payment of its allowed secured claim, as well as the claims of other creditors. Contrary to Prudential's assertion, Section 5.8 does not destroy Prudential's claims against the various Debtors. In fact, the Plan provides that Prudential's claims against the various Debtors are preserved and are being modified only with regard to amount owed and the interest rate.

In addition, the decisions which have criticized limited consolidation, which are not from this circuit, have done so where creditors were being prejudiced by such the consolidation provisions. Here, creditors are not being harmed by virtue of the limited consolidation provision. In contrast, in <u>In re New Century TRS Holdings, Inc.</u>, the plan provided for the aggregation of multiple debtors into debtor groups to resolve claims and effected an impermissible substantive consolidation because it called for a merger of a number of entities into three groups, and continuation of inter-entity liabilities, whereas

-46-

under the typical scenario multiple separate entities are merged into a single entity and

inter-entity liabilities are erased. 407 B.R. at 591. As the court observed:

> Typical or not, however, the many-into-three framework still presents the same potential inequities for creditors as would be presented in the many-into-one framework, namely that creditors face increased competition for a consolidated pool of assets and a re-valued claim that is less precise than if the creditors were dealing with debtors individually. This is the 'rough justice' against which <u>Owens Corning</u> warns and, because it is effected by aggregating multiple debtors into one or more debtor groups, it falls within the definition of substantive consolidation.

<u>Id.</u> Section 5.8 of the Plan does not consolidate different Debtors into different groups,

while ignoring the relative rights of creditors against different Debtors, a circumstance

which the court in <u>New CenturyTRS Holdings, Inc.</u> found impermissible.

I. <u>Best Interests of Creditors</u>

In order for a Chapter 11 plan to be confirmed, 11 U.S.C. § 1129(a)(7) requires that

each nonaccepting holder of an impaired class of claims or interests will retain or receive

property of a value as of the effective date in an amount that is not less than the amount

such holder would receive or retain if the debtor were liquidated under Chapter 7 of the

Bankruptcy Code. Prudential complains that the Plan does not pass the best interests of

creditors test.  In doing so, it misconstrues this requirement of § 1129(a)(7).  First, the test

only applies to nonaccepting creditors, as accepting creditors can waive the requirement.

Prudential's interpretation of the test is that if liquidation of collateral in a Chapter 7 case

would result in a secured creditor being paid quicker than through a Chapter 11 plan, the

plan fails the best interests test.

-47-

Section 1129(a)(7) requires only that the present value of the distribution under the plan, which must account for the time value of money, must be no less than a dividend upon liquidation. *See* N. Dreher and J. Feeney, *Bankruptcy Law Manual* § 11:63 (West 2011). "The best interests valuation is to be based on evidence not assumptions, but it is not an exact science." In re Multiut Corp. 449 B.R. 323, 344 (Bankr. N.D. Ill. 2011) (citations omitted).

The treatment of Prudential's claim that postpones payment in full for the life of the Plan is not a violation of the best interests test as long as Prudential is receiving payment in full and an appropriate rate of interest to compensate it for the time it must wait to be paid. The Plan provides that Prudential will be paid in full on its allowed secured claim by March 31, 2014 with interest as determined by the Court. Prudential cannot be paid more than its allowed secured claim, and payment in full of its allowed secured claim, with interest at the proper post-confirmation rate, is the amount to which Prudential is entitled, not the amount Prudential claims it would be entitled under its prepetition loan documents. The best interests test does not require accelerated payment to Prudential where its treatment is legally permissible under § 1129(b)(2)(A)(i) and (iii).

J. Good Faith

In order for a plan to be confirmed, 11 U.S.C. § 1129(a)(3) requires proof that the plan was proposed in good faith and not by any means forbidden by law. The term "good faith" is not defined in the Bankruptcy Code, but has been construed to mean honesty in purpose and full disclosure of relevant facts. *See* J. Feeney and N. Dreher, *Bankruptcy Law*

*Manual* at § 11:63. "[T]he term is generally interpreted to mean that there exists a reasonable likelihood that the plan will achieve a result consistent with the objective and purposes of the Bankruptcy Code." In re Weber, 209 B.R. 793, 797 (Bankr. D. Mass. 1997) (citations omitted). An unwarranted and discriminatory treatment of insiders' claims that favors those claims over those of creditors may preclude a finding of good faith. *See* In re Future Energy Corp., 83 B.R. 470, 487 (Bankr. S. D Ohio 1988). For purposes of confirming a Chapter 11 plan, "the Court must determine whether the Plans, given the totality of the Debtors' circumstances, satisfy the purposes underlying Chapter 11 . . .[namely] . . . 'the preservation of businesses as going concerns, and the maximization of the assets recoverable to satisfy unsecured claims.'" In re Trenton Ridge Investors, LLC, 2011 WL 4442270 at *16.

Prudential maintains that the Debtors have not sustained their burden of establishing good faith. Under the Plan, the Debtors are being reorganized, new equity is being issued, and all creditors are being paid in full with interest. Although new equity interests are being issued by a new company to SE Berkeley and SE McClellan, those entities made valuable contributions through their agreement to convert their $17.3 million claim to equity. The purpose of the Plan is not to impermissibly favor insiders. In fact, other than the distribution of equity interests in a newly formed entity to SE Berkeley and SE McClellan, insider claims are subordinated to the claims of non-insider creditors under the Plan. The Plan provides for cancellation of all inter-company claims. Thus, insider claimants are treated less favorably than other creditors, a result that is not necessarily

-49-

mandated under the Bankruptcy Code. There is no discrimination against any non-insider creditors in this Plan. Creditors, including Prudential, are receiving full payment and all except Prudential agree, either affirmatively or by their silence, to such treatment. Under the test articulated by the courts in cases such as <u>Weber</u> and <u>Trenton Ridge</u>, the Court finds that the Debtors have satisfied the good faith requirement set forth in § 1129(a)(3).

> K. <u>Additional Requirements of Confirmation</u>

Through the testimony of their chief financial officer, Mr. Kravetz, the Debtors have established that the Plan satisfies all of the other requirements of 11 U.S.C. § 1129(a) of the Bankruptcy Code, namely that the Plan complies with the provisions of the Bankruptcy Code, that all payments have been disclosed, that professional fees have been or shall be subject to Court approval, that the Debtors have disclosed the identity of officers, directors and managers, and that all U.S trustee fees that have accrued have been paid and the Debtors agree that they will be paid as they become due pending a final decree.

## V. CONCLUSION

For the foregoing reasons the Court shall enter an order confirming the Debtors' Modified First Amended Joint Plan of Reorganization in accordance with this decision.

By the Court,

*Joan N. Feeney*

Joan N. Feeney
United States Bankruptcy Judge

Dated: November 14, 2011

# UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re:

**SW BOSTON HOTEL VENTURE, LLC, et al.,[1]**          Chapter 11

    Debtors          Case No. 10-14535-JNF

(Jointly Administered)

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## ORDER

In accordance with the Memorandum dated November 14, 2011, the Debtors forthwith shall submit a proposed order confirming the Debtors' Modified First Amended Joint Plan of Reorganization (the "Plan"), which shall include the clarifications made by counsel to the Debtors on the record at the confirmation hearing. The Court overrules the Objection to Confirmation of the Plan filed by Prudential Insurance Company of America ("Prudential").

By the Court,

*Joan N. Feeney*

Joan N. Feeney
United States Bankruptcy Judge

Dated:  November 14, 2011

---

[1] The other Debtors in these jointly administered cases are Auto Sales & Service, Inc. (Case No. 10-14528-JNF), General Trading Company (Case No. 10-14532-JNF), Frank Sawyer Corporation (Case No. 10-14533-JNF), 100 Stuart Street, LLC (Case No. 10-14534-JNF), 30-32 Oliver Street Corporation (Case No. 10-16173-JNF), General Land Corporation (Case No. 10-16174-JNF), and 131 Arlington Street Trust (Case No. 10-16177-JNF) (the "Affiliated Debtors").

-1-

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
### (Eastern Division)

|  |  |  |
|---|---|---|
| **In re:** | ) |  |
|  | ) |  |
| **SW BOSTON HOTEL VENTURE, LLC,** *et al.,* [1] | ) | **Chapter 11** |
|  | ) | **Case No. 10-14535 (JNF)** |
| **Debtors.** | ) |  |
|  | ) | **(Jointly Administered)** |

## ORDER FIXING AMOUNT OF
## ALLOWED PRUDENTIAL SECURED CLAIM AS OF OCTOBER 4, 2011

The Prudential Insurance Company of America ("Prudential") having filed the *Motion of The Prudential Insurance Company of America for an Order Authorizing the Application of Payments Received during the Chapter 11 Cases to Payment of Postpetition Interest pursuant to Section 506(b) of the Bankruptcy Code* on April 15, 2011 (the "506(b) Motion"); and SW Boston Hotel Venture, LLC and the Affiliated Debtors (the "Debtors"), debtors and debtors-in-possession in the above captioned jointly administered proceedings, having objected to the 506(b) Motion on June 21, 2011; and the Court having conducted a hearing on the 506(b) Motion in conjunction with the hearing on confirmation of the Debtors' Modified First Amended Joint Plan of Reorganization (the "Debtors' Plan") commencing on June 27, 2011; and the Debtors and Prudential having submitted proposed findings of fact and conclusions of law with regard to, *inter alia*, the 506(b) Motion and objections to confirmation of the Debtors' Plan on

---

[1] The other Debtors in these jointly administered cases besides SW Boston Hotel Venture, LLC are Auto Sales & Service, Inc., General Trading Company, Frank Sawyer Corporation, 100 Stuart Street, LLC, General Land Corporation, 131 Arlington Street Trust and 30-32 Oliver Street Corporation (the "Affiliated Debtors").

August 1, 2011; and the Court having issued its order (the "506(b) Order") and memorandum of law (the "506(b) Memorandum") on October 4, 2011[2], granting in part and denying in part the 506(b) Motion and directing the Debtors and Prudential to submit an agreed order or separate proposed orders in the event the parties could not agree as to the amount of Prudential's claim (the "Prudential Claim"), itemizing the amount of default interest from June 8 to the date of issuance of the 506(b) Order; and the Debtors and Prudential having submitted separate orders differing only on the issue of whether the loan should accrue compound interest; and sufficient cause appearing therefor;

**THE COURT FINDS AS FOLLOWS:**

A.     On January 15, 2008, Prudential and SW Boston Hotel Venture, LLC ("SW Boston") and the other Debtors entered into that certain Construction Loan Agreement (the "Prudential Loan Agreement") pursuant to which SW Boston borrowed approximately $180,800,000 to finance the construction of the W Hotel and Residences (the "Prudential Loan").

B.     In accordance with the 506(b) Order, post-petition interest shall not begin to accrue under the Prudential Loan until the date of the closing of the sale of the W Hotel on June 8, 2011. Applying all proceeds received by Prudential in respect of the Prudential Loan from the Petition Date to the date of the sale of the W Hotel on June 8, 2011, the outstanding principal balance of the Prudential Loan as of June 8, 2011 was $56,509,725.

C.     Pursuant to the 506(b) Order, postpetition interest shall begin to accrue at 14.5%, the default rate set forth in the Prudential Loan Agreement, as of June 8, 2011.

D.     The Debtors closed ten (10) sales of condominium units between June 8, 2011 and October 4, 2011, distributing $7,043,655 of net proceeds to Prudential.

---

[2] On October 12, 2011, Prudential filed a Notice of Appeal to the Bankruptcy Appellate Panel of the First Circuit with respect to the 506(b) Order and 506(b) Memorandum.

E.      In accordance with the 506(b) Order, Prudential and the Debtors have calculated the amount outstanding under the Prudential Loan Agreement by applying the proceeds received from June 8, 2011 to October 4, 2011 first to outstanding postpetition interest and second to reduce the outstanding principal balance of the Prudential Loan.

F.      Applying the payments to the Prudential Loan balance as outlined herein, as of October 4, 2011, Prudential was owed accrued but unpaid postpetition, preconfirmation interest of $94,935.

G.      Applying the payments to the Prudential Loan balance as outlined herein, as of October 4, 2011, the outstanding principal balance of the Prudential Loan was $51,740,786.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED AS FOLLOWS:**

1.      Pursuant to the 506(b) Order and 506(b) Memorandum, Prudential has an allowed secured claim (inclusive of outstanding principal and accrued interest) as of October 4, 2011, of $51,835,721.

2.      The Construction Loan Agreement, which is governed by Massachusetts law, and the only agreement introduced into evidence by Prudential that contains applicable provisions for calculation of interest, at paragraphs 2.2.1, 2.2.2, 2.2.3, 2.3.1, 2.2.3 2.3.3, does not provide for compound interest either at the default rate or the non-default rate of interest. Moreover, as stated by the court in Berman v. B.C. Assocs., 219 F.3d 48, 50 (1st Cir. 2000):

> In Massachusetts, compound interest is generally disfavored. *See* Ellis v. Sullivan, 241 Mass. 60, 134 N.E. 695, 697 (1922) (recognizing an "'ancient unwillingness to allow compound interest'" (quoting Lewin v. Folsom, 171 Mass. 188, 50 N.E. 523, 524 (1898))). As early as 1906, the Supreme Judicial Court of Massachusetts decreed that interest is simple, "unless there is an express agreement to the

-3-

144

contrary." <u>Inhabitants of Tisbury v. Vineyard Haven Water Co.</u>, 193 Mass. 196, 79 N.E. 256, 257 (1906); *see also* <u>Coupounas v. Madden</u>, 401 Mass. 125, 514 N.E.2d 1316, 1321 (1987); <u>Von Hemert v. Porter</u>, 52 Mass. 210, 218 (Mass.1846); <u>D'Annolfo v. D'Annolfo Constr. Co.</u>, 39 Mass.App.Ct. 189, 654 N.E.2d 82, 85 (1995). Consequently, compound interest is only permitted in certain proceedings in equity or by express statutory or contractual authority. *See* <u>Dunne v. City of Boston</u>, 41 Mass.App.Ct. 922, 671 N.E.2d 518, 520 (1996); *see also* <u>Shapiro v. Bailen</u>, 293 Mass. 121, 199 N.E. 315, 316 (1936) (recognizing exception in equity); Ellis, 134 N.E. at 697 (same).

Accordingly, based upon the terms of the Construction Loan Agreement, and applicable

Massachusetts law, the Court rules that Prudential is not entitled to compound interest as a matter

of law.

JOAN N. FEENEY
UNITED STATES BANKRUPTCY JUDGE

Dated: October 28, 2011

609362

-4-

# UNITED STATES BANKRUPTCY COURT
## FOR THE
### DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re:
**SW HOTEL VENTURE, LLC, et al.,**[1]          Chapter 11
      Debtors          Case No. 10-14535-JNF
          (Jointly Administered)

~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

## I.  INTRODUCTION

The matter before the Court for determination is the "Motion of The Prudential Insurance Company of America for an Order Authorizing the Application of Payments Received during the Chapter 11 Cases to Payment of Postpetition Interest pursuant to Section 506(b) of the Bankruptcy Code" (the "506(b) Motion").[2] Through its 506(b) Motion,

---

[1] The other Debtors in these jointly administered cases are Auto Sales & Service, Inc. (Case No. 10-14528-JNF), General Trading Company (Case No. 10-14532-JNF), Frank Sawyer Corporation (Case No. 10-14533-JNF), 100 Stuart Street, LLC (Case No. 10-14534-JNF), 30-32 Oliver Street Corporation (Case No. 10-16173-JNF), General Land Corporation (Case No. 10-16174-JNF), and 131 Arlington Street Trust (Case No. 10-16177-JNF) (the "Affiliated Debtors").

[2] The Prudential Insurance Company of America appears in this case as follows: "on behalf and solely for the benefit of, and with its liability limited to the assets of, its insurance company separate account PRISA."  In its Proposed Findings of Fact and Conclusions of Law, it states that "Prudential (PRISA) is a private real estate investment fund, not a commercial bank or an insurance company."

-1-

The Prudential Insurance Company of America ("Prudential" or the "Secured Claimant"), which purportedly holds a first mortgage on real property owned by SW Hotel Venture, LLC ("SW" or the "Debtor"), as well as other collateral owned by SW and the Affiliated Debtors (together with SW, the "Debtors"), seeks a determination that it is an oversecured creditor entitled to accrued interest under 11 U.S.C. § 506(b) from the petition date[3] at the default rate of interest set forth in loan documents executed by the parties.  It also seeks an order authorizing the application of postpetition payments made to it by the Debtors first to postpetition interest, fees and costs, and then to the principal balance of its loan.  The Debtors, as well as the City of Boston (the "City"), object  to the 506(b) Motion.  The Debtors contend that  Prudential was undersecured as to SW until June 8, 2011 following the closing of the sale of the W Hotel (the "Hotel") and is an undersecured creditor as to the remaining Affiliated Debtors and as such is not entitled to default interest as Prudential requests.  Furthermore, the Debtors and the City maintain that the default rate of interest

---

[3] On September 15, 2011, SW and the Affiliated Debtors commenced an adversary proceeding against Prudential, captioned "Complaint to Avoid Liens and Claims Asserted by the Prudential Insurance Company of America."  Specifically, in Count I, SW asserted that Prudential's liens against certain accounts granted on or around April 20, 2010 with respect to two Collateral Pledge and Security Agreements and two Limited Access Service Agreements at Sovereign Bank are avoidable preferential transfers under 11 U.S.C. §§ 547 and 551.  Additionally, in the remaining twelve counts, certain of the Affiliated Debtors sought to avoid liens on their respective assets, namely those of Auto Sales & Service, Inc., Frank Sawyer Corporation, 30-32 Oliver Street Corporation, General Trading Company, General Corporation, and 131 Arlington Street Trust pursuant to 11 U.S.C. §544 and Mass. Gen. Laws ch. 109A, §§ 5 and 6.  Because the adversary proceeding has been pending for less than three weeks, the Court finds that, although it would appear to be predicated upon causes of action which the Debtors knew or should have known about early in their respective cases, the Complaint can have no effect on the Court's rulings at this time.

-2-

sought by Prudential is unreasonable and inequitable; that it should not be allowed to accrue any interest; that Prudential should not be able to recover interest at the default rate set forth in the Loan Documents; and that Prudential has not itemized any fees or costs.

The Court held an evidentiary hearing on the 506(b) Motion in conjunction with the hearing on confirmation of the Debtors' Modified First Amended Joint Plan of Reorganization, and Prudential's Objection to that plan. After a three day trial beginning on June 27, 2011 and extensive briefing by the parties, the Court took the 506(b) Motion under advisement. As the Court observed in note 3, the Debtors commenced an action against Prudential on September 15, 2011 seeking to avoid various liens under 11 U.S.C. §§ 544 and 547.

The issues presented include whether Prudential is an oversecured creditor entitled to accrue and be paid postpetition interest after the commencement of the Debtors' Chapter 11 cases, and, if so, whether it is entitled to interest at the default rate. Resolution of those issues requires the Court to decide at what point in time a creditor's secured status is determined during the pendency of a Chapter 11 case for the purpose of determining whether a secured claimant is entitled to postpetition interest and other charges as an oversecured creditor pursuant to 11 U.S.C. § 506(b).

## II. PROCEDURAL AND FACTUAL BACKGROUND

### A. Procedural Background

On April 28, 2010 (the "Petition Date"), SW, General Trading Company ("General Trading"), Frank Sawyer Corporation ("FSC"), 100 Stuart Street, LLC ("Stuart Street"), and

Auto Sales & Service, Inc. ("Auto Sales") filed voluntary Chapter 11 petitions. Subsequently, on June 4, 2010, General Land Corporation ("General Land"), 30-32 Oliver Street Corporation ("Oliver Street"), and Arlington Street Trust ("Arlington Street Trust") also filed voluntary Chapter 11 petitions.[4] Approximately one year after the commencement of the Debtors' cases, Prudential, on April 15, 2011, filed its 506(b) Motion, asserting that it is entitled to default interest from April 28, 2010 in the amount of $24,740,835.30. The Debtors and the City filed Objections to the 506(b) Motion on June 21, 2011.

On November 1, 2010, Prudential filed proofs of claim in the Debtors' cases,

---

[4] In their Amended Disclosure Statement, the Debtors disclosed, and evidence submitted at trial established, the relationship among the Debtors and non-debtor affiliates. The Debtors consist of eight related companies, which are part of a larger corporate group that is owned directly or indirectly by the Frank Sawyer Revocable Trust (the "Trust"), a non-debtor entity. The Trust owns 100% of FSC, Auto Sales, General Trading, General Land and Oliver Street, as well as two non-debtors, SE Berkley Street LLC and SE McClellan Highway LLC. FSC, in turn, owns approximately 65% of the membership interests in 100 Stuart Street, LLC, as well as some cash and an investment account. The remaining interests in 100 Stuart Street are owned by non-debtor affiliates, namely William Sawyer Corporation (in turn owned by the William Sawyer Revocable Trust), and Terminal Taxi Company (in turn owned by the Trust). The limited liability company known as 100 Stuart Street was formed to own 100% of the membership interests in SW. SW was formed to own and develop the real estate associated with the W Hotel and Residences. Oliver Street owns two improved pieces of real estate, which it leases to tenants and which generate approximately $3,700 in net income per month. Arlington Trust holds a piece of real property located at 131 Arlington Street. The property is used by the Debtors to store the records of the Debtors and their affiliates. General Trading is the entity that employs all of the Debtors' personnel and performs the administrative functions for the consolidated group of Debtors and non-debtor affiliates. General Land operates four parking lots located in Boston, three of which it owns directly. Carol Sawyer Parks is the president or manager of each of the Debtors and the sole manager of two non-debtor affiliates: SE Berkeley Street, LLC and SE McClellan Highway LLC.

identifying itself as the holder of a secured claim in an amount of "[n]ot less than $180,803,185.93 (plus all interest, costs, and fees)." Prudential attached to its proofs of claim an Addendum containing a narrative description of its claim and a schedule - - Schedule 1 - - in which it referenced "Construction Loan Documents," including a Construction Loan Agreement dated January 15, 2008, a Promissory Note dated January 15, 2008, a First Priority Mortgage, Security Agreement, Fixture Filing, and Assignment of Sales Contracts and Deposits dated as of January 15, 2008 (the "Mortgage") on the land, improvements and personal property located on 100 Stuart Street, Boston, Massachusetts, and various other guaranties, assignments, pledge agreements, and mortgages affecting property of the Affiliated Debtors (the "Construction Loan Documents"). Despite the instruction on the proof of claim form (Official Form 10) to "attach copies of lien documentation," none of the documents were attached to the proofs of claim, and, except for the Construction Loan Agreement, none of the loan documents, including amendments to the Construction Loan Agreement, the Promissory Note and the Mortgage on 100 Stuart Street, were introduced into evidence at the trial.

Prudential specifically asserted in paragraph 3(a) of the Addendum that, in addition to the aggregate principal amount of $180,803,185.93, it was owed "all interest accrued and unpaid both prior and subsequent to the Petition Date [April 28, 2010], calculated in accordance with the Construction Loan Documents, plus all fees, expenses and other amounts owed to Prudential pursuant to the Construction Loan Documents. . . . ." Moreover, in paragraph 3(b) of the Addendum, Prudential asserted the following:

In addition to the principal balance of the Construction Loan, both prior and subsequent to the Petition Date, the Debtors are obligated and liable to the Claimant for all other amounts under the Construction Loan Documents including, but not limited to, (i) costs and expenses of counsel relating thereto including, without limitation, fees and expenses of counsel, experts, consultants, and witnesses; (ii) indemnification costs; (iii) all costs incurred in the payment, performance, cure or remedy of any defaults, failed payments, or failure to act of any of the Debtors, (iv) accrued and unpaid Net Sales Proceeds (as defined in the Construction Loan Agreement); (v) costs incurred in connection with any filing and recording fees and expenses, title insurance and other similar expenses incurred in creating and perfecting the Liens and Guaranty Obligations . . ., (vi) costs incurred in connection with enforcing or preserving any rights in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation or otherwise affecting any of the Debtors, (vii) costs incurred in enforcing any obligations of or collecting any payments due from any of the Debtors . . . , (viii) contract damages arising from misrepresentations, defaults and breaches of representations, warranties, and covenants under the Construction Loan Documents, (ix) fees, costs and additional interest; (x) accrued and unpaid interest, including default rate interest; and (xi) any and all other fees, expenses, charges or amounts, whether arising under federal or state law or under principles of equity or otherwise.

Prudential did not attach to its proofs of claim any accounting of any amounts owed for prepetition interest, postpetition interest, or any of the fees, costs or charges it now seeks. As noted above, it did not attach to its proofs of claim any of the Construction Loan Documents to which it referred in the Addendum, including the Construction Loan Agreement, Promissory Note or Mortgage.

On August 3, 2010, Prudential filed a Motion for Relief from the Automatic Stay pursuant to 11 U.S.C. § 362(d) (the "Lift Stay Motion") with respect to the real property located at 100 Stuart Street, comprised of the Hotel and over 120 condominium units (the "Residences" or the "Condominiums"). On January 28, 2011, after briefing and a three-day

-6-

evidentiary hearing, the Court denied the relief sought by Prudential.  In the Court's

Memorandum (the "Lift Stay Memorandum"), *see* <u>In re SW Boston Hotel Venture LLC</u>, 449

B.R. 156 (Bankr. D. Mass. 2011),  the Court denied Prudential's request for relief from the

automatic stay after finding that when the total value of its collateral package was

evaluated an equity cushion in excess of $19 million existed as to the amount of

Prudential's claim.

Approximately two months after the Court issued the Lift Stay Memorandum and

Order with respect to the Lift Stay Motion, the Debtors, on March 28, 2011, filed a motion

seeking Court approval of the sale of the Hotel located at 100 Stuart Street owned by SW,

along with approval of sales procedures for the Residences, specifically "Debtor's Motion

for Order (I) Authorizing the Sale of the Debtor's Commercial Unit, Parking Garage Unit

and Related Assets Free and Clear of All Liens, Claims, Interests and Encumbrances, (II)

Authorizing the Assumption and Assignment of Certain Executory Contracts and

Unexpired Leases in Connection Therewith and (III) Granting Related Relief" (the "Sale

Motion").

The Sale Motion evidenced that the Debtors had entered into a purchase and sale

agreement with Razorbacks Owner LLC (the "Purchaser"), an affiliate of Pebblebrook

Hotel Trust, pursuant to which the Purchaser agreed to acquire the Hotel for $89.5 million,

subject to higher and better offers.  On May 24, 2011, the Court approved the sale of the

Hotel pursuant to 11 U.S.C. § 363 to the Purchaser.  The closing occurred on June 8, 2011.

After the closing, the Debtors caused net sale proceeds in the sum of $83,322,017 to be paid

to Prudential.

Prior to the closing of the sale of the Hotel and other assets, the Debtors, on March 31, 2011, filed a Joint Plan of Reorganization and a Disclosure Statement. Prudential filed an Objection to the original Disclosure Statement on April 29, 2011. On May 5, 2011, the Debtors filed a First Amended Joint Plan of Reorganization, together with an Amended Disclosure Statement. On May 24, 2011, the Court approved the Amended Disclosure Statement, and scheduled a confirmation hearing for June 27, 2011. On June 24, 2011, Prudential filed an Objection to the Amended Plan; on June 27, 2011, the Debtors filed a Modified First Amended Joint Plan of Reorganization (the "Plan").

Through their Plan, the Debtors propose to pay, in full, the "Allowed Prudential Claim," adjusted for amounts paid during the pendency of the Chapter 11 cases and to pay that claim by March 31, 2014 with interest accruing at 4.25% per year or another rate determined by the Court. The Plan in paragraph 1.10 contains a definition of the term "Allowed Prudential Claim" as follows:

> (a) $180,803,186.86 [sic] less all payments made to, or received by, Prudential on account of its Claims against the Debtors from the Petition Date through the Effective Date including, without limitation, (i) the Letter of Credit Draw, and (ii) payments made to Prudential from the proceeds of the sale of Residences and/or Real Estate, or (b) such other amount that is determined by the Bankruptcy Court."[5]

In paragraph 4.2(k), the Debtors provide that Prudential "shall receive such additional or other treatment as may be necessary, as agreed to between the Debtors and . . . Prudential

---

[5] In its proofs of claim, Prudential set forth a principal amount due of $180,803,185.<u>93</u>, not $180,803,185.<u>86</u>.

. . . or as determined by the Bankruptcy Court, to permit . . . Prudential . . . to realize the indubitable equivalent of its Allowed Claim."

Under the Plan, the Debtors propose to pay Prudential, monthly, the aggregate of the Debtors' cash in excess of fixed working capital amounts;[6] proceeds from the sale of Residences, less 8% for closing costs, any amounts, if necessary, to pay outstanding real estate taxes or condominium fees, and the amount, if necessary, to pay SW Boston's budgeted expenses;[7] and the proceeds of the sale of real estate other than the Residences, including property not subject to Prudential's liens, less costs and expenses of sale.[8]

The Debtors in paragraph 4.7(e)(iv) of their Plan agreed that no insiders would receive cash distributions on account of their allowed claims until the allowed claims of all non-insider creditors have been paid in full. In paragraph 4.2(h), the Debtors also agreed to provide Prudential with monthly, quarterly, and yearly financial reports. Specifically, on a monthly basis, they agreed to provide Prudential with

---

[6] Excess Cash" is defined at paragraph 1.54 of the Plan as "such Debtor's cash on a book basis, excluding amounts in Investment Accounts held by such Debtor in excess of the Working Capital Minimum." "Working Capital Minimum" is defined at paragraph 1.114 for each Debtor. By way of example, the Working Capital Minimum for SW is the sum of not more than $1,250,000, while the Working Capital Minimum for General Trading is the sum of not more than $100,000..

[7] *See* the definition of "Residence Net Sales Proceeds" at paragraph 1.98 of the Plan.

[8]"Real Estate Net Sales Proceeds are defined at paragraph 1.90 as "the proceeds of such sale less the costs and expenses of selling the Real Estate, including, without limitation, applicable taxes, municipal charges, professional fees, broker's fees and costs, and other customary closing costs."

(i) an accounting of the Excess Cash, (ii) the Debtors' financial statements for the previous month, (iii) copies of all leases executed since the prior monthly report, (iv) copies of all new purchase and sale agreements with respect to the Residences or the other Real Estate executed since the prior monthly report, and (v) copies of account statements for accounts that contain Cash Collateral.

Additionally, on a quarterly basis, Debtors agreed, at paragraph 4.2(h)(iii), to provide Prudential with a comparison of their actual expenses and their budgeted expenses and to annually provide Prudential with unaudited financial statements and tax returns within 10 days of filing.

The Debtors, at paragraph 4.2(d)(iii), of their Plan agreed that payments made on account of the Allowed Prudential Claim would be applied first to accrued interest and second to the principal balance of the claim. The Debtors did not expressly provide that Prudential is entitled to postpetition interest on its secured claim. Indeed, in their Amended Disclosure Statement, the Debtors state that "because Prudential is undersecured as to each Debtor," it is not entitled to postpetition interest, cost or attorneys' fees. *See* Amended Disclosure Statement at 11 (Docket Entry # 587). In addition, the Debtors did not provide for payments to Prudential using the default rate of interest, although the parties stipulated that, at the Petition Date, the Prudential loan was in default.

In paragraph 5.8, the Debtors provided the following:

Except as expressly provided in the Plan, the Reorganized Debtors shall continue to maintain their separate corporate existence for all purposes other than the treatment of Claims under the Plan. The Debtors are proposing that the Debtors be substantively consolidated under the Plan on the Effective Date pursuant to Section 1123(a)(5)(C) of the Bankruptcy Code and the Confirmation Order. The effect of such substantive consolidation would be

that: (i) all assets (and all proceeds thereof) and liabilities of each Debtor shall be deemed merged or treated as though they were merged into and with the assets and liabilities of all other Debtors, (ii) except as set forth in Section 4.7(e)(i) of the Plan, no cash distributions shall be made under the Plan on account of intercompany Claims among the Debtors and all such Claims shall be eliminated, (iii) all guarantees of any Debtor of the obligations of any other Debtor shall be deemed eliminated and extinguished so that any Claim against any Debtor and any guarantee thereof executed by the other and any joint and several liability of any Debtor shall be deemed to be one obligation of the consolidated cases, (iv) each and every Claim filed or to be filed in the Chapter 11 Case of any Debtor shall be deemed filed against the consolidated Debtors, and (v) for purposes of determining the availability of the right of setoff under Section 553 of the Bankruptcy Code, the Debtors shall be treated as one entity so that, subject to the other provisions of Section 553 of the Bankruptcy Code, debts due to any Debtor may be set off against the debts of any other Debtor. Such substantive consolidation shall not (other than for purposes related to the Plan) affect the legal and corporate structures of the Reorganized Debtors.

The Debtors in Exhibit A to their Plan also established negative covenants to limit or prohibit their ability to exceed budgeted expenses; to permit any additional liens on collateral, subject to Prudential's Mortgage or that of the City of Boston, unless the lien secures financing allowing payment of the Allowed Prudential Claim in full; to change their management structure; to guaranty or become liable for any indebtedness or obligation of a non-Debtor insider; to be a party to a merger or reorganization, unless the Debtor is the surviving entity; to purchase or acquire stock in another organization, other than in the ordinary course of business; or to make any distribution to equity.

In Exhibit A to the Plan, the Debtors also established 20 affirmative covenants for the benefit of Prudential and other creditors, which include requirements to (i) file all post-Effective Date tax returns; (ii) pay all post-Effective Date Residence fees promptly

when due; (iii) make cumulative payments to the holder of the Allowed Prudential Claim in accordance with a Schedule attached to the Plan, until such time as the Allowed Prudential Claim is paid in full; (iv) maintain insurance for each of the Debtors and their respective properties; and (v) perform and/or observe all of the material covenants and agreements required to be performed and observed under the existing agreements with Starwood Hotels & Resorts Worldwide, Inc. ("Starwood"), the manger of the Hotel, as well as the Bliss Spa, Culinary Concepts (Boston) LLC, Ultimate Parking, LLC, and Wink Retail Group, Inc.

### B. Prudential Loan Documents and Collateral

#### 1. The Construction Loan Agreement and the Guarantees

The Debtors initially approached Prudential about financing the development of the W Hotel and Residences after a loan from a German commercial bank lender, HSH Nordbank, failed to close. On January 15, 2008, Prudential and SW entered into an agreement, captioned, "Construction Loan Agreement," whereby Prudential provided up to approximately $190 million in construction financing for the construction of a hotel and residence complex.[9]  SW ostensibly issued a Promissory Note to Prudential for the full

---

[9] Although the Borrower is identified as SW, the Construction Loan Agreement was executed on its behalf by Carol Parks as president of FSC, the manager of 100 Stuart Street LLC, which, in turn, is the manager of SW. Carol Parks also signed the Construction Loan Agreement as president of FSC on behalf of 100 Stuart Street as an SPC Party. The Construction Loan Agreement was also executed by Stuart Street as the "SPC Party." FSC, by its president executed and guaranteed the contract. Auto Sales, General Trading and Oliver Street also were parties to the contract as guarantors and Carol Parks signed the contract on their behalf as president of each of those three entities.

amount of the loan, i.e., $190,225,000.00. Although the Construction Loan Agreement references a Promissory Note in the sum of $190,255,000.00, as noted above, Prudential did not attache it to its proofs of claim, and Prudential did not offer it into evidence in conjunction with the Lift Stay Motion or the 506(b) Motion. Under the Construction Loan Agreement, the amounts borrowed from Prudential were due on the loan maturity date of January 15, 2011.

Under the Construction Loan Agreement, the loan balance accrued interest at the rate of 9.5% per year. In the event of a default, the outstanding principal balance of the loan and any overdue interest were to accrue interest at the default rate of interest of 14.5% per annum. *See* Prudential's Exhibit 3, Construction Loan Agreement, at paragraph 2.3.3. In addition, the Construction Loan Agreement provided for a Late Payment Charge in paragraph 2.3.4. That section provided:

> If any principal, interest or any other sum due under the Loan Documents, other than a payment of principal due on the Maturity Date, is not paid by Borrower on the date on which it is due, Borrower shall pay to Lender upon demand an amount equal to $2,500 in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment. Any such amount shall constitute a portion of the outstanding principal balance of the Loan unless and until repaid and shall be secured by the Mortgage and the other Loan Documents.

Under paragraph 4.1.13 of the Construction Loan Agreement, the Borrowers agreed as follows:

> In the event (a) that Lender consults with an attorney in connection with the

-13-

Loan, (b) any enforcement action is considered or brought under any Loan Document, including, without limitation, foreclosure of the Mortgage or placement of the Note or any other Loan Document into the hands of an attorney for collection, suit, action or foreclosure, (b) [sic] of the foreclosure of any Lien or mortgage prior to or subsequent to the Mortgage in which proceeding Lender is made a party, (c) of the bankruptcy, insolvency, rehabilitation or other similar proceeding in respect of Borrower or an assignment by Borrower or any other Loan Party for the benefit of its creditors, or (d) Lender shall remedy or attempt to remedy any default or Event of Default, Borrower shall be chargeable with and agrees to pay all Costs incurred by Lender as a result thereof, including, without limitation, costs of collection and defense (including, without limitation, reasonable attorneys', experts', consultants' and witnesses' fees and disbursements) in connection therewith and in connection with any appellate proceeding or post-judgment action involved therein, which shall be due and payable on demand, together with interest thereon from the date incurred by Lender at the Default Rate, and together with all required service or use taxes Borrower agrees to pay all other Costs of Lender promptly following demand. All Costs due from Borrower shall constitute a portion of the outstanding principal balance of the Loan and shall be secured by the Loan Documents.

According to Prudential, as noted above, the Debtor executed a Promissory Note evidencing the loan obligation and a Mortgage to secure the Note and Construction Loan Agreement. The parties appear to agree that to secure the Debtors' obligations to Prudential, SW Boston entered into a First Priority Mortgage, Security Agreement, Fixture Filing, and Assignment of Sales Contracts and Deposits, previously identified as the "Mortgage," with Prudential which granted Prudential a first priority mortgage and security interest on SW Boston's real and personal property and the proceeds from the sale of real and personal property. SW Boston also executed pledge and control agreements with respect to two accounts at Sovereign Bank, which were not submitted into evidence, and certain of the Affiliated Debtors, including FSC, Arlington Street Trust, General Land,

-14-

General Trading, Oliver Street, and Auto Sales, executed guarantees of SW's obligations to Prudential, which are discussed in more detail below.

FSC executed its "Payment Guaranty" on January 15, 2008, as did Oliver Street, Auto Sales, and General Trading. General Land and Arlington Street Trust executed their guaranties on December 22, 2008 at the time the Construction Loan Agreement, according to those guaranties, "was amended by that certain First Amendment to Construction Loan Agreement dated as the date hereof." Prudential did not submit into evidence that or any other amendments to the Construction Loan Agreement. Additionally, like the Promissory Note, it did not introduce the Mortgage into evidence at the trial concerning the 506(b) Motion, or at any stage of this case. To date, neither the Debtors nor the Official Committee of Unsecured Creditors (the "Creditors' Committee") has claimed that the Mortgage was not recorded, although the Debtors recently commenced an adversary proceeding against Prudential, captioned "Complaint to Avoid Liens and Claims Asserted by the Prudential Insurance Company of America."

In addition to the collateral provided by SW Boston, the Affiliated Debtors provided guarantees to Prudential and pledged additional collateral as security for repayment of the Construction Loan. FSC issued what Prudential describes as "a Payment Guaranty, a Carveout Guaranty, and a Completion Guaranty" (the "FSC Guarantees"), although only the Payment Guaranty was introduced into evidence. FSC also executed pledge and control agreements with respect to a securities account and, according to Prudential, assigned its interest in the subscription agreement of Frank Sawyer Trust. The FSC

-15-

Payment Guaranty defined "Guaranteed Obligations" as follows:

> (a) the full, complete, and prompt payment of any and all Mandatory Principal Payments under the Loan, (b) all Operating Deficits . . . (c) prompt reimbursement to Lender of the LD Payment to the extent paid by Lender, and (d) the full prompt payment of all amounts due or arising out of the obligations, duties and agreements referred to this definition, [sic] including without limitation, Enforcement Costs as set forth in <u>Section 2(g)</u> below.[10]

Oliver Street granted Prudential a first priority mortgage on, and an assignment of leases and rents from, real property located at 25 and 27 Pinckney Street, Boston, Massachusetts and guaranteed FSC's obligations under the FSC Guarantees. Auto Sales guaranteed FSC's obligations under the FSC Guarantees and executed pledge and control agreements for a securities account. General Trading guaranteed FSC's obligations under the FSC guarantees and executed pledge and control agreements for a securities account. Arlington Street Trust guaranteed FSC's obligations under the FSC Guarantees and granted Prudential a first priority mortgage on real property located at 131 Arlington Street, Boston, Massachusetts. Stuart Street pledged 100% of its membership interests in SW Boston. General Land guaranteed FSC's obligations under the FSC Guarantees and granted Prudential a first priority mortgage on real property located at 109 and 121-127 Arlington Street, Boston, Massachusetts

Except for the Payment Guaranty executed by FSC, the various guarantees executed by the Affiliated Debtors define "Guaranteed Obligations" in paragraph 1, captioned "Defined Terms," as follows:

---

[10] The LD Payment is a reference to "Starwood Liquidated Damages," which is defined in the Construction Loan Agreement at paragraph 4.1.4.

"Guaranteed obligations" shall mean (a) the full, complete and prompt payment and performance of the "Guaranteed Obligations" under and as defined in each of the FSC Guaranties, (b) the full, complete and prompt payment by FSC of any and all Mandatory Principal Payments under the Loan, (c) the full, complete and prompt payment by FSC of any Operating Deficits, (d) the full, complete and prompt reimbursement by FSC to Lender of the LD Payments to the extent paid by Lender, (e) the full, complete and punctual observance, performance, and satisfaction by FSC of all of the obligations, duties, and agreements of Borrower under the Loan Agreement and the other Loan Documents relating to the Final Completion of the Improvements in accordance with the terms and conditions of the Loan Agreement, . . .(f) the full, complete and prompt payment by FSC of all amounts required to be deposited or paid by Borrower to keep the Loan In-Balance at all times, (g) the full, complete and prompt payment by FSC of any and all Losses arising out of any Recourse Event other than the Recourse Events identified in subparagraphs (a), (b), (c) and (d) of the definition of Recourse Events . . .,(h) the full, complete and prompt payment by FSC of all obligations of Borrower under the Loan Documents in the event of a Recourse Event . . ., (i) the full, complete and prompt payment of all amounts due or arising out of the obligations, duties and agreements referred to this definition, [sic] including, without limitation, Enforcement Costs as set forth in <u>Section 3(g)</u> below.

(emphasis in original). The definition of Guaranteed Obligations referenced the payment of Enforcement Costs as set forth in Section 3(g) of the guarantees, and in Section 2(g) of the FSC Payment Guaranty. That section of the guarantees set forth the following intentions:

to indemnify, protect, hold harmless and defend Lender . . . from and against any and all Losses incurred by any of them arising out of or by reason of entering into this Guaranty or the consummation of the transactions contemplated by this Guaranty and to pay or reimburse Lender for the fees and disbursements of counsel reasonably incurred in connection with any investigation, litigation or other proceedings (whether or not Lender is a party thereto) arising out of or by reason of any of the aforesaid (collectively, **"Enforcement Costs"**).

(emphasis in original). In summary, the Construction Loan Documents entitle Prudential

to seek or collect attorneys' fees from SW, as well as interest and late charges,  and they entitle Prudential to seek such enforcement costs from the Affiliated Debtors who executed Guarantees of FSC's obligations.

### 2. Prudential Letter of Credit

Two of the Debtors' non-debtor affiliates, SE Berkeley Street, LLC ("SE Berkeley") and SE McClellan Highway, LLC ("SE McClellan"), are parties to a creditor agreement with Sovereign Bank.  Pursuant to their agreement, Sovereign Bank issued a letter of credit in favor of Prudential for approximately $17.3 million (the "Letter of Credit").  Shortly after the Debtors' filings, Prudential drew the full amount of the Letter of Credit and applied the funds to the principal balance due on the Construction Loan.

### 3. Subordination Agreement between Prudential and the City of Boston

The City has a secured claim in the amount of $10.5 million arising from a loan agreement dated December 9, 2009 between SW and the City.  At the time it executed its agreement with SW, the City entered into an Intercreditor and Subordination Agreement (the "Subordination Agreement") with Prudential pursuant to which it subordinated certain payment rights to those of Prudential.  The Intercreditor and Subordination Agreement also prohibited the City from receiving certain payments from the Debtors while the Debtors' obligations to Prudential remain outstanding, and required the City to surrender any payments received from the Debtors to Prudential.  The agreement also provided that the City must assign to Prudential, upon Prudential's request, its voting rights concerning the Debtors' Plan.

-18-

163

C. Prudential Collateral Values

   Putting aside Prudential's failure to submit complete proof of its secured status, and the challenge to its liens raised in the Debtors' recently filed adversary proceeding, the Court observes that the positions of Prudential and the Debtors with respect to the value of the Prudential collateral and its concomitant status as an undersecured or oversecured creditor, have vacillated during the course of the Debtors' Chapter 11 cases in response to pending motions pertinent to the use of cash collateral, relief from the automatic stay, plan confirmation and the instant 506(b) Motion.

   As of the Petition Date, the Debtors, in their schedules, stated, under the penalty of perjury, that the property owned by SW at 100 Stuart Street had a value of $223,287,214.10 *See* Schedule A-Real Property filed in the SW case (Docket Entry # 94). In the parties' Joint Pretrial Memorandum filed in conjunction with the Lift Stay Motion, the parties stipulated that the value of all real estate securing Prudential's claim, other than 100 Stuart Street, and excluding marketable securities and cash, was $7,075,000 in the Fall of 2010. *See* Joint Pretrial Memorandum (Docket Entry #338). Therefore, as of the Petition Date, using Debtors' valuation of 100 Stuart Street and the agreed values set forth in the Joint Pretrial Memorandum, the aggregate value of the collateral securing Prudential's claim was approximately $231,000,000.00, whereas the amount owed Prudential was approximately $180,000,000. Adding the value of marketable securities referenced by the Debtors in their Opposition to the Lift Stay of approximately $8.5 million, the collateral package far exceeded the amount of the debt. *See* Opposition by Debtors to Prudential's Lift Stay

-19-

Motion (Docket Entry # 227).[11] Thus, at the outset of this case, the Debtors maintained that Prudential was oversecured, whereas they now claim that Prudential was not oversecured until after closing of the sale of the Hotel on June 8, 2011.

Prudential claimed it was undersecured throughout much of the Debtors' cases. In its Lift Stay Motion, dated August 3, 2010, Prudential asserted that the value of 100 Stuart Street was $141,000,000 in relation to its debt at that time which it asserted was approximately $162.4 million. *See* Prudential's Lift Stay Motion (Docket Entry # 201).

On January 28, 2011, the Court, in denying Prudential's Lift Stay Motion, found that the value of the Hotel and Residences was $153,600,000.00 and that the parties had stipulated that the value of other collateral, including securities, was $14,754,000.00 (the stipulated values of real property other than Stuart Street was $7,715,000 plus securities of approximately $7 million). Thus, the Court determined that Prudential was oversecured if its debt was compared to the total value of all its collateral. Adding the stipulated value of all collateral other than 100 Stuart Street with the value of 100 Stuart Street resulted in a total collateral package of $168,354,000.00 to secure an obligation of $154,000,000. When SW's cash collateral was added, the Court concluded: "[g]iven the total value of the collateral package, an equity cushion exists with respect to Prudential's claim in an amount

---

[11] As of June 23, 2011, the parties stipulated that the Arlington Street Trust held property worth $1.85 million, General Land held property worth $2.4 million, Oliver Street held property worth $2.18 million, that Auto Sales held securities worth $230,308, General Trading held securities worth $1,399,242, and FSC held securities worth $6,141,870 for a total of $14,201,420, plus cash in the amount of $354,049 held by SW for a grand total of $14,555,468.

in excess of $19 million." In re SW Boston Hotel Venture, LLC, 449 B.R. at 176.

On March 28, 2011, SW filed the Sale Motion to which it attached a Purchase and Sale Agreement with Razorbacks Owner LLC, dated the same day, with a stated purchase price of $89.5 million. The Court entered an order granting the Sale Motion on May 24, 2011, and, on June 8, 2011, Prudential received net proceeds of $83,322,017 from the sale of the Hotel and other assets.

As of May 31, 2011, the parties stipulated to the aggregate value of Prudential's collateral, other than the Hotel at $82,781,809. If the offer price for the Hotel is added to that sum, the total collateral package could be valued at $172,172,809 ($15,891,744 + $66,781,065 + $89.5 million). See Stipulation and Amended Stipulation Regarding (I) Discovery Schedule in Connection with Hearings on June 27, 2011 and (II) for Purposes of Such Hearings, the Value of the Remaining Condominium Units (Docket Entries #667 and #716); and the Sale Motion (Docket Entry #495).

As of June 23, 2011, the aggregate value of Prudential's collateral was $78,327,688, which sum is determined by adding the stipulated value of the remaining Residences ($63,772,219) and the stipulated value of all collateral other than 100 Stuart Street ($14,555,469). As of August 12, 2011, the aggregate value of Prudential's collateral was $76,624,688, which sum is determined by subtracting from the last stipulated value for the remaining Residences the net proceeds of the sales of Residences in July 2011 ($63,772,219 - $1,676,000), and then adding to that result the last stipulated value of all collateral, other than 100 Stuart Street ($62,096,219 + $14,528,469).

-21-

D. <u>Prudential Payments</u>

In addition to the Letter of Credit ($17.3 million) and the net proceeds from the sale

of the Hotel ($83,322,017 on June 8, 2011), the Debtors have reduced Prudential's secured

claim by payments of net proceeds from the sale of Residences.  Between April 28, 2010 and

November 3, 2010, the Debtors paid Prudential $9,153,883 in proceeds from the sales of

Condominiums.   Between November 4, 2010 and May 31, 2011, they paid Prudential

$15,775,673 in proceeds from the sales of  the Residences.  Between June 1, 2011 and June

23, 2011, they paid Prudential $3,320,000 in proceeds from the sales of Condominiums, plus

$83,322017 from the sale of the Hotel, resulting in a debt to Prudential of $55,834,959,

excluding interest, fees and charges. (Debtors' Exhibit 6).  According to Debtors' Status

Report filed on August 12, 2011, they paid Prudential $1,676,000 in proceeds from the sales

of Residences in July and that, as of the date of the Report, they had paid Prudential

approximately $29.6 million in proceeds from the sales of Residences, and owe Prudential

between $52 and $53 million, exclusive of postpetition interest, fees and charges.

E. <u>Trial Testimony</u>

At the hearing on the 506(b) Motion, Joanna Mulford ("Ms. Mulford"), a Vice

President of The Prudential Insurance Company of America, testified on behalf of

Prudential.  Her Declaration was introduced into evidence as her direct testimony, and she

was cross-examined by Debtors' counsel pursuant to an agreement of the partes.  Ms.

Mulford indicated that the principal amount of Prudential's loan had been  reduced from

$180.8 million to $163.5 million by application of $17.3 million attributable to the Letter of

Credit proceeds.  She also reported that the Debtors have paid Prudential approximately $22.2 million from the sale of Residences.  She compared the amount due Prudential for postpetition interest, as of April 25, 2011, prior to the sale of the Hotel in June of 2011, using the non-default contract rate of interest and the default rate of interest.  Using the 9.5% contract rate, Ms. Mulford calculated interest owed at  $16,209,512.78.  Using the 14.5% default rate of interest, she calculated interest owed at $24,740,835.30.  Ms. Mulford, however, did not explain how she actually computed those figures.

Ms. Mulford testified that she was responsible for the loan after it was originated and that another group, "[o]n the portfolio side," actually originated the loan.  She also testified that the rates of interest set forth in the Construction Loan Agreement were predicated on similar loans in the market at the time of the loan's origination, "whether it be a loan that we're originating or a loan that we're actually taking out on one of our properties."  She added that she did not engage in any analysis with respect to the anticipated costs, or losses, that Prudential might sustain as a result of a default.  Ms. Mulford conceded that she did not engage in any analysis with respect to whether the default rate of interest, which is 5% higher than the non-default contract rate, reasonably anticipated Prudential's costs and expenses in the event of a default.  Indeed, she admitted that she made no inquiries to determine on what basis they established the default rate of interest.

On redirect examination, Ms. Mulford described PRISA as a private investment fund, similar to a hedge fund.  She emphasized that interest rates in the Construction Loan

Agreement were similar to those in situations where Prudential is both a lender and a borrower.

## III.  POSITIONS OF THE PARTIES

### A. Prudential

Prudential seeks postpetition interest, fees and costs under 11 U.S.C. § 506(b) on the ground that it has an allowed, secured claim which exceeds the value of its collateral. Maintaining that it is an oversecured creditor entitled to postpetition interest and reasonable fees, costs and charges, Prudential seeks to recover postpetition interest  from the date of the filing of the petition.  It relies upon the Lift Stay Memorandum in which this Court determined for purposes of 11 U.S.C. § 362(d)(1) that "[g]iven the total value of the collateral package, an equity cushion exists with respect to Prudential's claim in an amount in excess of $19 million." 449 B.R. at 176.  Prudential estimates that  its collateral, consisting of the Hotel, the Residences, plus additional collateral in the form of cash, securities and real estate of the Affiliated Debtors, had a value of approximately $200,000,000 at the commencement of these cases when it was owed approximately $180,800,000.

Prudential further argues, however, that, for purposes of confirmation of the Debtors' plan, it is owed $90,432,714.  It asserts that its claim as of May 31, 2011 was $171,212,200 to which it adds both estimated additional fees and expenses of $750,000 using a  Plan Effective Date of July 14, 2011 and estimated default interest of $1,792,531 from June 1, 2011 to  July 14, 2011 [sic], and from which it subtracts the proceeds from the sale of the Hotel in the sum of $83,322,017.  Using a total collateral package valued at $73,327,688, it

-24-

states: "taking into account the value of the Prudential Collateral as of Confirmation, Prudential's secured claims as of Confirmation are equal to the value of the Prudential Collateral, or $78,300,688."[12]  It also asserts that "*the parties agree that, as of the confirmation date, Prudential is oversecured*." (emphasis in original).[13]

Prudential argues that it has been an oversecured creditor of the Debtors in the aggregate and that it has been oversecured throughout the Debtors' Chapter 11 cases.  It emphasizes that the Hotel sold for a sum well in excess of the value this Court determined in its  Lift Stay Memorandum dated January 28, 2011.

In connection with the confirmation hearing, the Debtors and Prudential agreed that the value of the collateral held by Prudential as of the confirmation hearing was $14,555,469 in cash, securities and mortgages on properties owned by Arlington Street Trust, General Land and Oliver Street, and that the value of the remaining unsold Residences was $63,772,219, totaling $78,327,688. Prudential argues that it is entitled to the benefit of any

---

[12] Prudential mistakenly uses the sum of $78,300,688 in its Proposed Findings, the result of a transposed number with respect to the value of securities owned by Auto Sales.  The parties stipulated to a value of $230,308.  Prudential used a figure of $203,308, thereby unintentionally reducing the value of its collateral.

Additionally, in its proposed findings, it indicated that its prepetition claim was $182,892,659, reduced by $17.3 million, resulting in a claim of $165,592,659.  There is no explanation for the $5.6 million dollar difference between its asserted claim as of May 31, 2011 and its claim at the outset of the Debtors' cases, i.e, the difference between $171,212,200 and $165,592,659.

[13] Prudential did not attempt to reconcile the inconsistency of its positions, namely that its claim of $90  million is secured by collateral worth $78.3 million and that it  has been oversecured since the commencement of the case and at the time of the confirmation hearing.

-25-

increase in values during the bankruptcy proceeding through allowance of the 506(b) Motion.

As noted above, Prudential seeks default interest from the petition date, and, specifically, default interest in the sum of $1,792,531 from June 1, 2011 through July 14, 2011 (the conclusion of the confirmation hearing and the hearing on the 506(b) Motion). It also seeks estimated additional fees and expenses in the sum of $750,000. Prudential, however, did not submit an itemization of those fees and expenses, the Promissory Note or Mortgage, and the documentation in the form of Guarantees to support its entitlement to attorneys' fees raises a number of issues, including whether its claim to attorneys' fees is secured.

In sum, Prudential argues that it is entitled to the default rate of interest provided in the Construction Loan Agreement, adding that application of the default rate of interest is enforceable under state law. It asserts that the default rate of interest is within the range typically charged by commercial lenders, is not inequitable, and will not negatively affect the dividend to junior creditors.

B. The Debtors

The Debtors seek denial of Prudential's 506(b) Motion, except as to postpetition interest at the non-default rate of 9.5% per annum accruing beginning June 8, 2011, the date SW conveyed the proceeds from the sale of the Hotel and other assets pursuant to the Court's allowance of the Sale Motion on May 24, 2011. According to the Debtors, Prudential's loan balance was approximately $56 million at that time. They argue that

Prudential should only be allowed postpetition, preconfirmation interest at the rate of 9.5% per annum from June 8, 2011 to the Effective Date, while accounting for payments made after that date.

The Debtors maintain that they have paid Prudential $83,322,017 in net sale proceeds from the sale of the Hotel and related assets approved by the Court on May 24, 2011, as well as $17.3 million from the Letter of Credit and proceeds from the sales of Residences since the commencement of Debtor' cases and have reduced its claim on the petition date from $182,078,243[14] to $53,537,825 as of June 24, 2011, excluding postpetition interest.

The Debtors object to Prudential aggregating the value of all its collateral for purposes of its 506(b) Motion. They maintain that, on the petition date, Prudential was undersecured as to SW and to each Affiliated Debtor and remained so when this Court issued its Lift Stay Memorandum on January 28, 2011. The Debtors also argue that not only was Prudential undersecured as to SW until June 8, 2011, it is undersecured as to each Affiliated Debtor, adding that the determination, in the context of the Lift Stay Motion that Prudential was undersecured as to SW is res judicata on the issue.

The Debtors observe that Prudential has not submitted evidence with respect to the

---

[14] The Debtors' Exhibit 6 sets forth the above figure, beginning with a debt balance of $181,359,970 as of March 31, 2010. The Court notes that Prudential's witness, Marti P. Murray, in her Expert Report, indicated that Prudential held a prepetition claim in the sum of $182,892,659, calculated by adding prepetition accrued interest of $2,042,646 and prepetition fees and expenses of $46,827 to the balance of $180,803,186. The Court is unable to reconcile the $814,416 difference.

reasonableness of its fees and costs. They also contend that Prudential should not be allowed the default rate of interest in the sum of 14.5% per annum because, in their view, that rate is an unreasonable penalty, particularly as allowance of postpetition, preconfirmation interest at the contract rate of 9.5% could add as much as $16,209,512.78 to the principal balance, if the Court were to allow interest from the petition date.

The Debtors assert that as of the petition date the amount owed to Prudential for principal and interest was $182,078,243, and that at the time of the hearings on the Lift Stay Motion, Prudential was owed $155,644,359, largely due to the payment of $17.3 million from the Letter of Credit. In the context of the Lift Stay Motion, the Court determined that the value of the Hotel was $65,600,000. In the context of the 506(b) Motion and confirmation of the Debtors' Plan, the parties have stipulated that the value of the Residences was $63,772,219, although in November of 2010 at the time of the trial on the Lift Stay Motion, the value of the Residences was $82,556,736.

Although the Debtors sold the Hotel, they assert that the amount set forth in the Asset Purchase Agreement filed with the Sale Motion on March 28, 2011, should not be determinative of the Hotel's value because there were material risks associated with closing the sale, as well as hold backs and adjustments. Prudential was paid $83,322,017 in net sale proceeds on June 8, 2011, the date the sale of the Hotel and other assets closed, reducing the balance of Prudential's loan to $55,834,959, exclusive of postpetition interest. The Debtors maintain that as of the date of the confirmation hearing on June 24, 2011, Prudential was owed $53,537,825 excluding postpetition, preconfirmation interest and

-28-

costs.

The Debtors object to consideration of the value of Prudential's collateral in the aggregate and assert that given the stipulated value of the collateral of each individual Debtor, Prudential was undersecured until June 8, 2011, the date when the Hotel sale closed and the stipulated value of the Residences was $66,069,053 with respect to SW and is still undersecured with respect to remaining Debtors. They argue that Prudential cannot aggregate the value of all of the Debtors' assets to establish an entitlement to postpetition interest. Emphasizing that SW is the primary obligor and the Affiliated Debtors are guarantors who have secured their guarantees with mortgages or other pledged assets, the Debtors argue that Prudential was undersecured prior to the Hotel sale on June 8, 2011 and should be bound by its earlier contention that it was undersecured. The Debtors also maintain that Prudential was undersecured with respect to the Affiliated Debtors whose assets on an individual basis were and are worth less than the total amount due to Prudential.[15]

_____

[15] The Debtors utilize the following table:

| Affiliated Debtor | Collateral Value (6/23/11) | Source |
|---|---|---|
| General Trading | $1,399,242 | Trial Stipulation |
| Sawyer Corp. [FSC] | $6,141,870 | Trial Stipulation |
| Auto Sales | $230,308 | Trial Stipulation |
| General Land | $2,400,000 | Trial Stipulation |
| 131 Arlington | $1,850,000 | Trial Stipulation |
| 30-32 Oliver | $1,160,000 | Trial Stipulation |

The Debtors object to the 14.5% default rate of interest claimed by Prudential because it is five points above the non-default rate set forth in the Construction Loan Agreement and because Prudential failed to submit any "evidence that the default rate of interest was reasonably related to the anticipated costs and damages expected to be incurred by Prudential in the event that the Debtors defaulted under the Prudential Loan Documents," adding that it did not submit "any evidence that it has incurred $8.5 million in damages, the difference between Prudential's asserted claim for interest at the contract rate [i.e., $16,209,512.78] and its asserted claim for interest at the default rate [i.e., $24,740,835.30] as a result of any default under the Prudential Loan Documents."

Not only do the Debtors contend that the default interest rate is unreasonable, they contend that payment of default interest is inequitable because Prudential received enhancement of its collateral and received substantial proceeds from the sales of the Hotel and Residences during the pendency of the Chapter 11 cases. In short, they maintain that payment of default interest would be a windfall to Prudential, particularly as Prudential has opposed virtually every motion made by the Debtors, creating market uncertainty, adversely affecting sales and making their reorganization efforts more difficult and expensive. In the Debtors' view, Prudential's allowed secured claim always has been adequately protected, and the Debtors have reduced its claim substantially during the pending Chapter 11 cases. The Debtors emphasize that because Prudential has not

---

| 100 Stuart | $-0- | *See* Kravetz Affidavit ¶ 11 |

documented or itemized its fees and has not filed a fee application for attorneys' fees, it cannot obtain an award of fees.

C.  City of Boston

The City opposes Prudential's request for accrual and payment of interest under U.S.C. § 506(b) to the extent that Prudential seeks interest prior to the date of the closing of the sale of the Hotel.  Moreover, the City objects to payment of any interest at the default rate, arguing that the default rate will penalize the City and severely compromise its ability to recover money lent to SW under a program to stimulate local real estate development.  Noting that it pledged its present and future affordable housing and economic development revenue to fund the loan it made, it states that "[i]f Prudential is permitted to recover postpetition interest at the default rate of 14.5%, the City's standing to recover its affordable housing and economic development money will be severely compromised," adding that it would be particularly inequitable to allow interest at the default rate where the City's funds have been used and continue to be used to increase the value of Prudential's collateral.

**IV.  DISCUSSION**

A.  Entitlement to Postpetition Interest

1. Applicable Law

Section 502(b) of the Bankruptcy Code sets forth the general rule applicable to bankruptcy cases that, subject to certain exceptions, "the court shall determine the amount of [a] claim . . . as of the date of the filing of  the petition, and shall allow such claim in such

amount , except to the extent that . . . such claim is for unmatured interest." 11 U.S.C. §

502(b)(2).  The rule, as noted, is subject  to an important exception applicable to secured

creditors.  Section 506(b) provides:

> To the extent that an allowed secured claim is secured by property the value
> of which, after any recovery under subsection (c) of this section, is greater
> than the amount of such claim, there shall be allowed to the holder of such
> claim, interest on such claim, and any reasonable fees, costs, or charges
> provided for under the agreement or State statute under which such claim
> arose.

11 U.S.C. § 506(b).  The United States Supreme Court has made clear that an oversecured

creditor is unqualifiedly entitled to postpetition interest on its oversecured claim. United

States v. Ron Pair Enters., Inc., 489 U.S. 235 (1989).[16]  Section 506(b) applies only from the

petition date through the date of confirmation of any plan.  See Rake v. Wade, 508 U.S. 464,

468 (1993), *superseded by statute on other grounds*, ("It is generally recognized that the interest

---

[16] The Court stated:

> The relevant phrase in § 506(b) is: "[T]here shall be allowed to the holder
> of such claim, interest on such claim, and any reasonable fees, costs, or
> charges provided for under the agreement under which such claim arose."
> "Such claim" refers to an oversecured claim. The natural reading of the
> phrase entitles the holder of an oversecured claim to postpetition interest
> and, in addition, gives one having a secured claim created pursuant to an
> agreement the right to reasonable fees, costs, and charges provided for in
> that agreement. Recovery of postpetition interest is unqualified. Recovery
> of fees, costs, and charges, however, is allowed only if they are reasonable
> and provided for in the agreement under which the claim arose.
> Therefore, in the absence of an agreement, postpetition interest is the only
> added recovery available.

489 U.S. at 241.

allowed by § 506(b) will accrue until payment of the secured claim or until the effective

date of the plan.").   It is the burden of a secured creditor who claims entitlement to post-

petition interest to prove, by a preponderance of the evidence, that it is oversecured "to

what extent, and for what period of time." In re Jack Kline Co., Inc., 440 B.R. 712, 732

(Bankrs. S.D. Tex. 2010); In re Grabill Corp., 121 B.R. 983, 992 (Bankr. N.D. Ill. 1990)

(citations omitted).

    The starting point for determining whether a secured creditor is entitled to interest

is § 506(a), which governs the determination of secured status.  Section  506(a)  provides:

in pertinent part:

> (a)(1) An allowed claim of a creditor secured by a lien on property in which
> the estate has an interest . . .  is a secured claim to the extent of the value of
> such creditor's interest in the estate's interest in such property . . . is an
> unsecured claim to the extent that the value of such creditor's interest . . . is
> less than the amount of such allowed claim. *Such value shall be determined in*
> *light of the purpose of the valuation and of the proposed disposition or use of such*
> *property, and in conjunction with any hearing on such disposition or use or on a*
> *plan affecting such creditor's interest.*

11 U.S.C. § 506(a) (emphasis supplied).

    A creditor is considered to be oversecured when the value of its collateral exceeds

the amount of the creditor's allowed claim. *See* United States. v. Ron Pair Enters., Inc., 489

U.S. at 239.  Undersecured creditors are not entitled to accrual or payment of postpetition

interest. *See* United Savs. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd., 484

U.S. 365 (1988).  In Timbers, the Court stated:

> Even more important for our purposes than § 506's use of terminology is its
> substantive effect of denying undersecured creditors postpetition interest on

their claims-just as it denies *over* secured creditors postpetition interest to the extent that such interest, when added to the principal amount of the claim, will exceed the value of the collateral. . . . Since this provision permits postpetition interest to be paid only out of the "security cushion," the undersecured creditor, who has no such cushion, falls within the general rule disallowing postpetition interest. *See* 11 U.S.C. § 502(b)(2). If the Code had meant to give the undersecured creditor, who is thus denied interest on his *claim,* interest on the value of his *collateral,* surely this is where that disposition would have been set forth, and not obscured within the "adequate protection" provision of § 362(d)(1). Instead of the intricate phraseology set forth above, § 506(b) would simply have said that the secured creditor is entitled to interest "on his allowed claim, or on the value of the property securing his allowed claim, whichever is lesser."

Id. at 372-73 (emphasis in original).

Section 506(a) further provides that the secured status of a creditor's claim must be determined in light of the purpose of the valuation and the proposed disposition or use of the property that is collateral. *See* In re Winthrop Old Farm Nurseries, Inc. v. New Bedford Inst. for Savs. (In re Winthrop Old Farm Nurseries, Inc.), 50 F. 3d 72, 75-76 (1st Cir. 1995) ("a court remains faithful to the dictates of § 506(a) by valuing the creditor's interest in the collateral in light of the proposed post-bankruptcy reality: no foreclosure sale and economic benefit for the debtor derived from the collateral equal to or greater than its fair market value. Our approach allows the bankruptcy court, using its informed discretion and applying historic principles of equity, to adopt in each case the valuation method that is fairest given the prevailing circumstances."). Consistent with the conclusions of the First Circuit in Winthrop Old Farm, and contrary to the Debtors' arguments, a finding that collateral has a certain value at the inception of a case is not binding on the court when it is conducting a valuation for another purpose later in the case. *See* Baybank-Middlesex v.

Ralar Distribs., Inc., 69 F.3d 1200, 1203 (1st Cir. 1995); In re Richardson, 97 B.R. 161, 162

(Bankr. W.D.N.Y. 1989).

In order to determine secured status, the amount due to the secured creditor is

compared to the value of its collateral. *See* Assocs. Commercial Corp. v. Rash, 520 U.S. 953,

961 (1997). Moreover, the application of § 506(a) is a multi-step process.[17] First, the court

analyzes the estate's interest in the collateral. Next, the court must determine the interest

of the secured creditor in the estate's property. *See* Fin. Security Assurance Inc. v. T-H

Orleans Ltd. P'ship (Matter of T-H Orleans Ltd. P'ship), 116 F. 3d 790, 797 (5th Cir. 1997).

The reference in the statute to "the creditor's interest in property" is to the creditor's

security interest without taking into account the secured creditor's right to possession of

the collateral on default. United Savs. Ass'n of Texas v. Timbers of Inwood Forest Assocs.,

Ltd., 484 U.S. at 372. Third, the court must determine the value of the secured creditor's

---

[17] According to the Supreme Court,

> To separate the secured from the unsecured portion of a claim, a court
> must compare the creditor's claim to the value of "such property," i.e., the
> collateral. That comparison is sometimes complicated. A debtor may own
> only a part interest in the property pledged as collateral, in which case the
> court will be required to ascertain the "estate's interest" in the collateral.
> Or, a creditor may hold a junior or subordinate lien, which would require
> the court to ascertain the creditor's interest in the collateral. The § 506(a)
> phrase referring to the "creditor's interest in the estate's interest in such
> property" thus recognizes that a court may encounter, and in such
> instances must evaluate, limited or partial interests in collateral. The full
> first sentence of § 506(a), in short, tells a court what it must evaluate, but it
> does not say more; it is not enlightening on how to value collateral.

520 U.S. at 961.

collateral or setoff rights.  *See* McDonald v. Master Fin., Inc. (In re McDonald), 205 F.3d 606,

609 (3d Cir. 2000), *cert. denied,* 531 U.S. 822 (2000).

For the purpose of making the comparison of the debt owed to the secured creditor

and the value of collateral, all of the collateral pledged by affiliated debtors who have

commenced Chapter 11 cases is considered in determining whether a creditor has a fully

secured claim. *See* In re Urban Communicators PCS L.P., 379 B.R. 232, 244 (Bankr. S.D. N.Y.

2008), *rev'd on other grounds*,  394 B.R. 325 (S.D. N.Y. 2008);[18] In re Fiberglass Indus., Inc., 74

B.R. 738, 740 (Bankr. N.D.N.Y. 1987) (aggregating collateral of debtors who operated as an

"integrated entity," but excluding collateral pledge by non-debtors).  *But see* In re Toy King

Distribs., Inc., 256 B.R. 1, 187  (Bankr. M.D. Fla. 2001) (observing that although the collateral

subject to the creditor's loan included the property of the individual guarantors and

property of the debtor, only the debtor's property is relevant to the court's determination

of the secured status of the creditor's claim against the debtor under § 506, noting that the

debtor has no legal or beneficial interest in cash, cash equivalents or real estate collateral

pledged by individual, non-debtor guarantors to secure the loan).

The provisions of both § 506(a) and (b)  raise temporal issues.  The timing of the

comparison between the amount of debt and the value of the collateral required by § 506(a)

and (b) is crucial in determining the allowed amount of the secured claim and whether the

---

[18] The bankruptcy court did not expressly state that it was considering a total
collateral package available to the secured creditor. Nevertheless, the court valued all
the collateral of the affiliated debtors in determining that the lender, Gabriel, was
oversecured.

secured creditor is oversecured.   The bankruptcy court must determine the appropriate

date for assessing the value of collateral, as values may decrease, increase or fluctuate over

time during the pendency of the case, as evidenced by what has transpired in the Debtors'

cases where both the amount of debt and the value of the collateral have declined due to

payments to Prudential and sales of the Hotel and Residences, respectively. Thus, the

application of  § 506(a) and (b) often presents difficulties in the context of determining a

secured creditor's entitlement to postpetition interest during the pendency of the  Chapter

11 case (often referred to as "pendency interest") where a debtor has made significant

payments to the secured creditor and substantially paid down the balance owed to the

creditor during the case due to sales of assets or the appreciation of the value of the secured

creditor's collateral during the case.

The first issue that must be determined is when should a valuation occur for the

purpose of determining a secured creditor's entitlement to postpetition interest and fees.

Although in Chapter 7 and 13 cases, § 506 (a) mandates that the amount of a claim secured

by a security interest in personal property be determined as of the petition date, *see* 11

U.S.C. § 506(a)(2), the Bankruptcy Code does not reference any particular date for such

determinations in Chapter 11 cases.  The timing inquiry under § 506(b) in a Chapter 11 case

is to be contrasted with the determination of the amount of a secured claim for the

purposes of determining the propriety of a proposed treatment of a secured party's claim

in a plan of reorganization under 11 U.S.C. § 1129(b)(2)(A)(i).  Under the latter provision

relating to approval of a cramdown plan, courts agree that the appropriate time for

valuation of a secured claim is the date of the hearing on confirmation of a plan.  *See* <u>In re</u>

<u>Blake</u>, No. 07-12445-FJB, 2009 WL 4349787 at *5 (Bankr. D. Mass.  Nov. 30, 2009); <u>In re</u>

<u>Landing Assocs., Ltd.</u>, 122 B.R. 288, 293 (Bankr. W.D. Tex. 1990) (for plan confirmation, the

date of determination of secured claim is date of confirmation hearing).  The <u>Blake</u> court

reasoned that because § 506(b) contemplates postpetition interest and charges, the date of

the filing is not the appropriate date for quantification of the secured portion of a secured

claim for plan treatment purposes.  Moreover, § 506(b) does not apply to a secured

creditor's entitlement to postconfirmation interest which is governed by § 1129 and the

guidelines articulated by the Supreme Court in <u>Till v SCS Credit Corp.</u>, 541 U.S. 465 (2004).

There is considerable disagreement among courts on the issue of what is the

appropriate date for determining entitlement to postpetition, preconfirmation interest and

charges under § 506(b).  Courts have adopted a variety of approaches.  As noted by the

Court in <u>Toy King</u>,

> Some courts have held that a creditor's secured claim is always determined
> on a specific date. *See, e.g.*, <u>Community Bank of Homestead v. Torcise (In re</u>
> <u>Torcise)</u>, 187 B.R. 18, 23 (S.D. Fla.1995) ("The amount by which a claim is
> oversecured must be determined as of the petition date."), *rev'd on other*
> *grounds*, 162 F.3d 1084, 1087 (11th Cir.1998); <u>NCNB Texas National Bank v.</u>
> <u>Hulen Park Place, Ltd. (In re Hulen Park Place, Ltd.)</u>, 130 B.R. 39, 43 (N.D.
> Tex. 1991) (issue of whether creditor is oversecured is determined as of the
> petition date); <u>Landing Associates</u>, 122 B.R. at 293 (measurement date is
> confirmation date).

<u>Toy King</u>, 256 B.R. at 190.  A number of courts fix the secured creditor's interest in property

of the estate, namely the amount of its secured claim, at the petition date.  *See, e.g.*,

<u>Empresas Inabon, Inc.v. Hotay (In re Empresas Inabon, Inc.)</u>, 358 B.R. 487, 526 (Bankr. D.

P.R. 2006) ("A secured claim is 'oversecured' to the extent that the value of the creditor's interest in the estate's interest in property is greater than the amount of the creditor's allowed prepetition claim."); In re Kalian, 169 B.R. 503 (Bankr. D. R. I. 1994) (claim of undersecured creditor in Chapter 11 case does not increase by virtue of rental income); In re Reddington/Sunarrow Ltd. P'ship, 119 B.R. 809 (Bankr. D. N.M. 1990) (secured claim was fixed as of petition date for purpose of determining adequate protection). Those courts rely on the Supreme Court's ruling in Timbers that an undersecured creditor whose collateral is not declining during the pendency of a bankruptcy case is not entitled to postpetition interest. "Any portion of postpetition interest and allowed fees, costs or charges that exceed the oversecured amount would not be allowed as part of the secured claim under § 506(b) but, rather, excess postpetition fees, costs and charges constitute an unsecured claim against the estate, and excess postpetition interest is subject to disallowance under § 502(b)(2)." See In re Empresas Inabon, Inc., 358 B.R. at 526 (citing Baybank-Middlesex v. Ralar Distrbs., Inc., 69 F.3d 1200, 1202 (1st Cir. 1995). Accordingly, under this approach if a secured claim is not fully secured on the petition date, the secured creditor will not be entitled to postepetition interest or fees under § 506(b).

The single valuation approach has been criticized as creating an incentive on the part of debtors to delay the case as long as possible. See In re Vermont Inv. Ltd. P'ship, 142 B.R. 571, 574 (Bankr. D. D. C. 1992). Other courts have commented that the single valuation approach is inconsistent with the Supreme Court's statement in Dewsnup that any increase in valuation during bankruptcy should accrue to the benefit of the mortgagee, not the

debtor or unsecured creditors. *See, e.g.*, In re Union Meeting Partners, 178 B.R. 664, 675 (Bankr. E.D. Pa. 1995) (citing Dewsnup, 502 U.S. at 417). The most compelling criticism of the single valuation, filing date approach is that it is contradictory to the express language in § 506(a) and its legislative history that valuations under § 506 are to be made in light of the purpose of the valuation and that valuations are not binding in later proceedings.

Utilizing another approach, referred to as the "dual valuation" approach, several courts have determined secured status twice, once at the petition date and once at the hearing on confirmation of a plan of reorganization. *See, e.g.*, In re Addison Props. Ltd. P'ship, 185 B.R. 766, 784 (Bankr. N.D. Ill. 1995); In re Kennedy, 177 B.R. 967 (Bankr. S.D. Ala. 1995). Those courts recognize that it is necessary to determine secured status through valuation at the outset for adequate protection purposes, and at confirmation for the purpose of determining treatment under the plan and reducing the amount of the secured claim by any payments made by the debtor. "If the collateral package at the time of confirmation exceeds the amount of the creditor's total prepetition claim, the creditor is entitled to interest and costs under Section 506(b) to the extent of the surplus." In re Addison Props. Ltd. P'ship, 185 B.R at 784. Under the dual valuation approach an oversecured creditor's claim for postpetition interest, which is determined near the conclusion of the case, "must be denied to the extent that, together with the principal amount of the claim, it exceeds the value of the collateral . . . [o]r put another way, the oversecured creditor's allowed secured claim for postpetition interest is limited to the amount that a creditor was oversecured at the time of filing." *See* Orix Credit Alliance, Inc.

-40-

v. Delta Resources, Inc. ( In re Delta Resources, Inc.), 54 F. 3d 722, 729 (11th Cir. 1995), *cert.*

*denied,* 516 U.S. 980 (1995). The Eleventh Circuit in Delta Resources, recognized that it is

not possible to determine postpetition interest until a time near the conclusion of the

Chapter 11 case. Id.

Where collateral is sold during the pendency of a Chapter 11 case, a number of

courts use the date of approval of a sale to determine when a claim is secured for § 506(b)

purposes. *See, e.g.,* Ford Motor Credit Co. v. Dobbins, 35 F. 3d 860, 870 (4th Cir. 1994). *See*

*also* Takisaki v. Alpine Group, Inc. (In re Alpine Group, Inc.), 151 B.R. 931, 935-36 (B.A.P.

9th Cir. 1993). The Fourth Circuit in Dobbins, explained the approach, stating:

> When determining if and to what extent the value of secured collateral
> exceeds the value of a secured creditor's claim for purposes of § 506(b), if the
> collateral has been sold, should the value of the collateral be the sale price or,
> alternatively, some other valuation made earlier in the Chapter 11
> proceedings? We hold that when secured collateral has been sold, so long as
> the sale price is fair and is the result of an arm's-length transaction, courts
> should use the sale price, not some earlier hypothetical valuation, to
> determine whether a creditor is oversecured and thus entitled to postpetition
> interest under § 506(b).").

Dobbins, 35 F.3d at 870. Courts using the price obtained at an arm's-length sale to

determine the amount of the allowed secured claim conclude that, if the secured party is

undersecured at the time of the sale, it is not entitled to postpetition interest, even if it were

oversecured at the time the case was commenced. They reason that payment of

postpetition interest under those circumstances would be unfair to unsecured creditors.

*See* In re Toy King Distribs., Inc., 256 B.R. at 191.

The majority of courts utilize more flexible approaches than the courts in the

decisions referenced above in determining secured status. Based upon the language of §

506(b) they look to the circumstances of the case and purpose of the valuation. Toy King,

at 190.   Adopting a "continuous valuation approach," a number of courts determine

secured status at various times throughout the case, causing a fluctuation depending on

payments or changing values. *See* In re Addison Props. Ltd. P'ship, 185 B.R. at 776 (citing

In re Union Meeting Partners, 178 B.R. 664 (Bankr. E.D. Pa. 1995); In re Columbia Office

Assocs. Ltd P'ship, 175 B.R. 199 (Bankr. D. Md. 1994)).   Other courts, the majority, have

endorsed a similar, case by case approach, but refuse to pick a specific point in time for the

debt/value comparison, focusing instead on the matter before the court. *See, e.g.*, In re T-H

New Orleans Ltd. P'ship, 116 F.3d at 798; In re Southeastern Steel Co., No. 00-09225-W,

2001 WL 1804303 at *2 (Bankr D. S.C. Dec. 7, 2001).   Those courts reason that because of the

various issues posed by a request for a determination of a secured claim, it is inappropriate

to limit valuation to a particular point in time. Thus, for the purpose of determining the

amount of  adequate protection to which a secured creditor may be entitled, it may be

appropriate to value collateral as of the petition date, although for the purposes of

determining the amount of the secured claim for treatment under a plan of reorganization,

the appropriate time for valuation may be the hearing on confirmation. *See* In re Delta

Resources, Inc., 54 F.3d at 729-30.

The leading decision in which the court adopted the flexible approach is T-H New

Orleans Ltd. P'ship, 116 F.3d at 798.  In a thorough and well-reasoned opinion, the court

of appeals rejected the single valuation approach, and stated the following:

We decline to follow such a narrow path. Therefore, we conclude that for purposes of determining whether a creditor is entitled to accrue interest under § 506(b) in the circumstance where the collateral's value is increasing and/or the creditor's allowed claim has been or is being reduced by cash collateral payments, such that at some point in time prior to confirmation of the debtor's plan the creditor may become oversecured, valuation of the collateral and the creditor's claim should be flexible and not limited to a single point in time, such as the petition date or confirmation date. We further hold that, notwithstanding the bankruptcy court's determination of a creditor's secured status as of the petition date (if such a finding is made), the party who contends that there is a dispute as to whether a creditor is entitled to interest under § 506(b) must motion the bankruptcy court to make such a determination. The creditor though bears the ultimate burden to prove by a preponderance of evidence its entitlement to postpetition interest, that is, that its claim was oversecured, to what extent, and for what period of time. . . .

A flexible approach recognizes the fact that a creditor's allowed claim, which is being reduced over time, may become entitled to accrue postpetition interest, and that under the plain language of § 506(b) there is nothing limiting that right. . . . A flexible approach also recognizes that any increase over the judicially determined valuation during bankruptcy rightly accrues to the benefit of the creditor, and not to the debtor. . . .

Id. (citations omitted).

In T-H New Orleans, the Fifth Circuit took specific note of the change in the secured party's status during the pendency of the case as the secured creditor's claim was being reduced by payments made postpetition, the debtor's hotel was appreciating in value from the petition date to the confirmation hearing, and the creditor's claim went from being undersecured to oversecured. The bankruptcy court made a factual finding, which the United States Court of Appeals for the Fifth Circuit determined was supported by the evidence, as to the particular point in time when the creditor became oversecured. With respect to the accrual of postpetition interest and the extent to which the secured creditor

-43-

was entitled to such interest, the Fifth Circuit ruled:

> The measuring date on which the status of a creditor's collateral and claim are compared is determinative of a creditor's right to accrue interest under § 506(b). Thus, a secured creditor's entitlement to accrue interest under § 506(b) matures at that point in time where the creditor's claim becomes oversecured. However, as <u>Timbers</u> dictates, accrued interest under § 506(b) is not paid to an oversecured creditor until the plan's confirmation or its effective date, whichever is later. <u>United Sav. Ass'n. of Texas v. Timbers of Inwood Forest Assoc., Ltd. (In re Timbers of Inwood Forest Assoc., Ltd.)</u>, 793 F.2d 1380, 1381, 1407 (5th Cir.1986), <em>on reh'g</em>, 808 F.2d 363 (5th Cir.1987 (en banc court reinstating panel opinion)), <em>aff'd</em>, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988).

116 F.3d at 799. Finally, the Fifth Circuit rejected the secured creditor's argument that it was entitled to the postpetition interest that would have accrued during the entire postpetition, preconfirmation period on its claim since the petition date. <u>Id.</u> The court ruled that the amount of interest allowed under § 506(b), as explicated by the Supreme Court in <u>Timbers,</u> is limited to the amount of interest which, when added to the allowed claim, will not exceed the value of the collateral. In other words, an oversecured creditor's claim may include interest up to the value of the collateral. <u>Id.</u>

Following the reasoning of the Fifth Circuit in <u>T-H New Orleans</u>, the United States Bankruptcy Court for the Southern District of New York in <u>In re Urban Communicators PCS, Ltd. P'ship.</u>, 379 B.R. 232 (Bankr. S.D.N.Y. 2008), <em>aff'd in part, rev'd in part on other grounds,</em> 394 B.R. 325 (S.D.N.Y. 2008), considered whether a secured creditor was entitled to § 506(b) pendency interest where its secured claim was oversecured on the petition date, became undersecured thereafter due to depreciation during the case, and finally became oversecured again due to a sale of the collateral for a price sufficient to pay the secured

claim in full.  Adopting the flexible approach to fixing the date for determining a secured

claim for § 506(b) purposes, the court was persuaded that, where a sale of collateral has

occurred, the sale price is the value of the collateral.  The court determined that despite the

temporary decrease in value, the ultimate increase in collateral value entitled the secured

creditor to earn postpetition interest on its oversecured claim.  379 B.R. at 245.  The court

reasoned:

> This Court agrees that bankruptcy courts have flexibility in determining
> entitlements to post-petition interest, including in situations like this one
> where the entitlements turn on determinations as to collateral value.
> Recognition of that flexibility is, after all, consistent with attention to the
> needs and concerns of junior creditors, and, more significantly, language in
> section 506(a) that bankruptcy courts engage in any analysis of collateral
> value "in light of the purpose of the valuation and the proposed disposition
> or use of such property." The statutory guidance appearing as part of section
> 506(a) is the antithesis of a hard-and-fast rule, and instead embodies a more
> functional approach. But acknowledging, as this Court does, that a
> bankruptcy court has flexibility in making a collateral valuation decision
> does not mean that the Court should disregard the best evidence of collateral
> value—what the collateral actually fetched. Rather, that flexibility should
> permit this Court's resort to the best available evidence of collateral value
> except where the circumstances dictate a different approach. And the Court
> must also note the context in which the Fifth Circuit in T–H New Orleans
> made the observations upon which the Debtors rely. This flexible approach,
> the Fifth Circuit noted, ensures that "any increase over the judicially
> determined valuation during the bankruptcy rightly accrues to the benefit of
> the creditor, and not to the debtor."

Id. at 243 (footnote omitted).  The court found that the creditor was entitled to pendency

interest from the petition date based upon its determination that the creditor was

oversecured as of the date of the sale of collateral, which it viewed as conclusive on the

issue of valuation. Id. at 244.

Although the bankruptcy court's decision was reversed in part based upon its ruling with respect to its computation of the default interest rate, the court's decision was affirmed with respect to that part of its decision relating to the time for determining the creditor's secured status. The district court determined that, although there was a substantial period of time during the Chapter 11 case in which the secured creditor's collateral was worth less than its claim, based upon the sale price obtained for the collateral in good faith and at arm's length, the secured creditor had an oversecured claim and was entitled to receive postpetition interest. *See* <u>Urban Communicators PCS Ltd. P'ship v. Gabriel Capital, L.P.</u>, 394 B.R. 325, 336-37 (S.D.N.Y. 2008).

The decision of the the United States Court of Appeals for the First Circuit in <u>Baybank-Middlesex v. Ralar Distribs., Inc.</u>, 69 F. 3d 1200 (1st Cir. 1995), does not compel this Court to accept the argument made by the Debtors that this Court's prior finding with respect to collateral values and its ruling that Prudential was undersecured in the context of the Debtors' request to use cash collateral and adequate protection is binding in a later dispute. In <u>Ralar Distribs., Inc.</u>, the secured creditor did not argue that collateral valuations made at an adequate protection hearing had no binding effect in the context of a valuation made for another purpose at a later time. The First Circuit refused to consider the valuation issue resulting in a change in values and payments as not squarely presented by the secured creditor. 69 F.3d at 1203 n. 5.

As referenced above, the creditor bears the burden of proving, by a preponderance of the evidence, that its claim is oversecured. *See* <u>In re Jack Kline Co., Inc.</u>, 440 B.R. at 712.

-46-

In short, it has the ultimate burden of proof of showing entitlement to postpetition interest and fees, including "proving a referenced agreement with the debtor or a state statute which allows the over-secured creditor to collect post-petition attorneys' fees." Id. at 732-33 (footnote omitted).

### 2. Analysis

This Court adopts the view espoused by the majority of courts, in particular the decisions of the courts in T-H New Orleans and Urban Communicators, which have adopted the flexible approach as to the timing of the determination of secured status. This Court rejects the single valuation approach as unfair to the secured creditor and inconsistent with the plain language of § 506(a) and the Supreme Court's directives in Timbers and Dewsnup that the debtor should not reap the benefit of postpetition appreciation. The flexible approach has the advantage of fairness, in that it does not favor debtors over secured creditors or vice-versa. Moreover, the flexible approach is faithful to the statute's language and history that determinations of value are to be performed in light of their purpose and the disposition of collateral.

Applying the principles set forth in decisions adopting the majority view to the facts of the present case, there are several options for the choice of dates that the Court could use to fix the secured status of Prudential's claim: 1) the petition date; 2) the date the Court determined Prudential's Lift Stay Motion, namely January 28, 2011; 3) the date that SW signed the Purchase and Sale Agreement with Razorbacks Owner LLC and filed its

-47-

Sale Motion, namely March 28, 2011; 4) the date the Court granted the Sale Motion, namely

May 24, 2011; 5) the date the sale to Razorbacks Owner LLC closed, namely June 8, 2011

or 6) the date of the confirmation hearing. Prudential argues that it is entitled to

postpetition interest from the petition date, but it did not establish that it was a fully

secured creditor at that time. Indeed, in litigating the Lift Stay Motion, it maintained that

it was not fully secured.

The Court finds that June 8, 2011, the date of the closing of the sale, is the

appropriate time for fixing Prudential's oversecured status. On that date, it was

unequivocally established and beyond dispute that Prudential was an oversecured

creditor. Prudential did not submit evidence of oversecured status at the commencement

of the Debtors' cases, and there was no evidence substantiating the values utilized by the

Debtors in their Schedules of Assets. The Court's decision with respect to the Lift Stay

Motion was based upon expert testimony, not the operation of the market place in which

a willing seller and willing buyer agreed to a purchase price. The filing of the Sale Motion

and the Purchase and Sale Agreement with Razorbacks Owner LLC setting forth a sale

price of $89.5 million on March 28, 2011 provided strong evidence that the appraised values

ascribed to the Hotel by the expert appraisers engaged by the parties were conservative

and that Prudential was oversecured by the assets of SW alone. Nevertheless, as the

Debtors and the City argue, there were a variety of contingencies associated with the sale

to Razorbacks Owner LLC which could have derailed the sale even after the Court

approved the Sale Motion on May 24, 2011. Accordingly, the Court adopts the flexible

approach and shall utilize the price obtained at an arm's length sale of the Debtors' Hotel

as the best indicator of value for purposes of determining secured status, in conjunction

with the stipulated value of the remaining Residences and other collateral. *See* Urban

Communicators PCS Ltd. P'ship v. Gabriel Capital, L.P., 394 B.R. at 337; and Debtors'

Exhibit 6.[19]  Although in Urban Communicators, the secured creditor was oversecured at

the inception of the case, this Court finds that Prudential failed to submit sufficient

evidence to warrant the conclusion that it was oversecured in April of 2010.

     As noted, subsequent events, including the Sale of the Hotel, which brought a price

far in excess of the values ascribed to it by expert witnesses engaged by Prudential and the

Debtors, and the ongoing sales of Residences, establish Prudential's oversecured status as

of June 8, 2011.  In view of the evidence and the decisions recognizing that the actual sale

price is the best indicator of value, the Court finds that Prudential is entitled to postpetition

interest during the pendency of this case, commencing on June 8, 2011.

     The Court unequivocally rejects the argument made by the Debtors that each

Affiliated Debtor's assets and liabilities, including the debt owed to Prudential, must be

compared on a piecemeal basis for the purpose of determining whether Prudential has a

fully secured claim, particularly in view of the provisions of its Plan.

---

[19] As of March 18, 2011, the Debtors calculated that they owed Prudential approximately $149.3 million; on March 30, 2011 that amount had been reduced to $148.3 million  The value of the Residences were agreed to be approximately $76.2 million on March 18th, and $75.2 million on March 30th, respectively.  When the value of the cash, securities and real estate of the Affiliated Debtors (approximately $78 million)  is added to the value of Residences, it is evident that Prudential was oversecured.

"For purposes of determining the value of [a creditor's] security . . . under Code §

506(a), . . . the Court is solely concerned with property in which the debtors have an

interest." In re Fiberglass Indus., Inc., 74 B.R. 738, 740 (Bankr. N.D.N.Y. 1987) (aggregating

collateral of debtors who operated as an "integrated entity," but excluding collateral pledge

by non-debtors). This follows because § 506(a) refers to "a lien on property in which the

estate has an interest." *See* Assocs. Commercial Corp. v. Rash, 520 U.S. at 961. Thus, the

determination of Prudential's status as an oversecured (or undersecured) creditor must be

made aggregating the collateral of all the Debtors - - SW and the Affiliated Debtors. Such

a determination is consistent with the Debtors' merger for purposes of Plan payments on

the Effective Date "pursuant to Section 1123(a)(5)(C) of the Bankruptcy Code and the

Confirmation Order" set forth in paragraph 5.8 of the Plan.

B. Interest Rate

1. Applicable Law

Section 506(b) provides that a fully secured creditor may be allowed "interest on

such claim, and *any reasonable fees, costs or charges provided for under the agreement or State*

*Statute under which such claim arose.*" 11 U.S.C. § 506(b) (emphasis added). Recovery of

postpetition interest is unqualified if a secured creditor is oversecured. The United States

Court of Appeals for the Second Circuit in Key Bank Nat'l Assoc. v. Milham (In re

Milham), 141 F.3d 420 (2d Cir. 1998), *cert. denied,* 525 U.S. 872 (1998), explained:

> [S]ection 506(b) does not say that the oversecured creditor collects pendency
> interest at the contractual rate. In United States v. Ron Pair Enters., Inc., 489
> U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989), the Supreme Court

held that the phrase "provided for under the agreement under which such claims arose" does not modify the phrase "interest on such claim." Unlike prepetition interest, pendency interest is not based upon contract. *See* Rake v. Wade, 508 U.S. 464, 468, 113 S.Ct. 2187, 2190, 124 L.Ed.2d 424 (1993) ("[T]he right to postpetition interest under § 506(b) is unqualified and exists regardless of whether the agreement giving rise to the claim provides for interest.") (internal quotation marks omitted). The appropriate rate of pendency interest is therefore within the limited discretion of the court. *See* In re DeMaggio, 175 B.R. 144, 148 (Bankr. D. N.H. 1994). Most courts have awarded pendency interest at the contractual rate; but nevertheless, however widespread this practice may be, it does not reflect an entitlement to interest at the contractual rate.

Id. at 423.  Recovery of fees, costs, and charges, however, is allowed only if they are reasonable, and provided for in the agreement under which the claim arose.  U.S. v. Ron Pair Enterprises, 489 U.S. at 241.

Most courts hold that entitlement to default interest is a matter of federal law.  *See* In re Route One West Windsor Ltd. P'ship, 225 B.R. 76, 86 (Bankr. D. N.J. 1998*)*; In re Consol. Properties Ltd. P'ship, 152 B.R. 452, 456 (Bankr. D. Md. 1993); *but see* 201 Forest Street LLC v. LBM Fin. LLC (In re 201 Forest Street LLC), 409 B.R. 543, 565 (Bankr. D. Mass. 2009).  In Forest Street, the court, citing Massachusetts cases, stated "Massachusetts law examines a default interest rate to ascertain whether it is a permissible liquidated damages clause or an unenforceable penalty." 409 B.R. at 565 (citing TAL Fin. Corp. v. CSC Consulting, Inc., 446 Mass. 422, 430, 844 N.E.2d 1085, 1092 (Mass.2006), and De Cordova v. Weeks, 246 Mass. 100, 104–05, 140 N.E. 269, 270–71 (1923)).  This Court disagrees with the decision in Forest Street, which also placed the burden on the debtors to prove the unenforceability of default interest rates of 20% and 25% in two notes executed by the

debtors. Id. This Court agrees with the decision in Route One West, in which the court observed:

> The allowance of interest on claims in bankruptcy has long been determined by federal law. Vanston Bondholders Protective Committee v. Green, 329 U.S. 156, 162–63, 67 S.Ct. 237, 91 L.Ed. 162 (1947). The touchstone of such decisions "has been a balance of equities between creditor and creditor or between creditors and the debtor." Id. at 165, 67 S.Ct. 237. The continuing validity of these principles under the Code was acknowledged in United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 248, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989).

225 B.R. at 86.

Although courts disagree on whether a creditor is entitled to interest at the default rate provided for in a loan agreement, the majority of courts has concluded that where a debtor is in default in the payment of a loan owed to an oversecured creditor, there is a presumption that postpetiiton interest should be computed at the default rate provided for in the applicable agreement. *See* The Southland Corp. v. Toronto-Dominion (In re Southland Corp.), 160 F.3d 1054, 1059-60 (5th Cir. 1998) (citing In re Terry, Ltd. P'ship, 27 F.3d 241, 243-44 (7th Cir. 1994), *cert. denied,* Invex Holdings, N.V. v. Equitable Life Ins. Co. of Iowa, 513 U.S. 948 (1994)); *see also* Riley v. Tencara, LLC (In re Wolverine Proctor & Schwartz), 449 B.R. 1, 5 (Bankr. D. Mass. 2011).[20]  Nevertheless, courts have ruled that

---

[20] In In re Wolverine Proctor & Schwartz, this Court, citing In re AE Hotel Venture, stated:

> Generally speaking, interest compensates for the delay in receiving money owed: "the loss of the time value of money." In re Continental Ill. Sec. Litig., 962 F.2d 566, 571 (7th Cir.1992); *see also* Art Press Ltd. v. Western Printing Mach. Co., 852 F.2d 276, 278 (7th Cir.1988). GMACCM

default interest is not an entitlement, but is essentially a charge, and that it must be

reasonably related to a lender's costs to be allowed.  *See, e.g.*, <u>In re Market Center East

Retail Prop., Inc.</u>, 433 B.R. 335, 357-58 (Bankr. D. N.M. 2010); <u>In re AE Hotel Venture</u>, 321

---

> arrived at the interest rate it believed would compensate for
> that loss in the Note: a rate of 9.72%. That being so, the
> difference between the original rate and the 14.72% default
> rate — a difference of 5% — could not have been meant to
> perform the usual function of interest. The time value of
> GMACCM's money, after all, did not magically increase by
> 5% once AE Hotel defaulted.
>
> Default interest is instead designed to reimburse creditors
> for "extra costs incurred after default." <u>In re Consol. Props.
> Ltd. P'ship</u>, 152 B.R. 452, 455 (Bankr.D.Md.1993); *see also* <u>In
> re Vest Assocs.</u>, 217 B.R. 696, 701 (Bankr.S.D.N.Y.1998).
> Default interest, then, is not true interest at all. It is a form of
> late charge and thus is a "charge" for purposes of section
> 506(b). *See* <u>Fischer Enters., Inc. v. Geremia (In re Kalian)</u>, 178
> B.R. 308, 316–17 (Bankr.D.R.I.1995) (deeming default interest
> to be a "charge"); *see also* <u>Consol. Props.</u>, 152 B.R. at 455
> (noting that default interest is "more in the nature" of a
> charge); *but see* 4 A. Resnick & H. Sommer, Collier on
> Bankruptcy ¶ 506.04[2][b][ii] at 506–112 (15th rev. ed. 2004)
> (stating that "[i]n general, a default rate of interest is
> properly a form of interest").

> <u>In re AE Hotel Venture</u>, 321 B.R. at 215–16 (footnote omitted). The court
> concluded: "[b]ecause GMACCM's default interest is actually a charge, it
> must be 'reasonable' to be allowed." <u>Id.</u> at 216 (citing 11 U.S.C. § 506(b),
> and <u>Consol. Props.</u>, 152 B.R. at 456), adding "[d]efault interest is not a
> 'reasonable' charge, however, if it compensates for an injury that has
> already been compensated in some other way under the parties'
> agreement." <u>Id.</u> (citing <u>In re 1095 Commonwealth Ave. Corp.</u>, 204 B.R. 284,
> 305 (Bankr.D.Mass.1997), and <u>Consol. Props.</u>, 152 B.R. at 458).

<u>In re Wolverine Proctor & Schwartz</u>, 499 B.R. at 5-6( footnote omitted).

B.R. 209, 215-16 (Bankr. N.D. Ill. 2005); Fischer Enters., Inc. v. Geremia (In re Kalian), 178

B.R. 308, 316-17 (Bankr. D. R.I. 1995). Those courts recognize that use of the default rate is

presumed, but the presumption is rebuttable. *See* In re General Growth Props., Inc., No.

09-11977, 2011 WL 2974305 (Bankr. S.D. N.Y. July 20, 2011). In General Growth Properties,

the court stated:

> 11 U.S.C. § 506(b) requires payment of post-petition interest to an
> oversecured creditor . . . and a rebuttable presumption exists favoring the
> payment of such interest at the contractual rate. Courts in this and other
> circuits have been reluctant to modify private contractual arrangements
> imposing default interest rates — particularly in cases involving a solvent
> debtor — except where: (i) there has been creditor misconduct; (ii) application
> of the contractual interest rate would cause harm to unsecured creditors; (iii)
> the contractual interest rate constitutes a penalty; or (iv) its application
> would impair the debtor's fresh start.

General Growth Props., Inc., 2011 WL 2974305 at * 4 (citations omitted). *See also* In re Jack

Kline Co., Inc., 440 B.R. 712, 745 (Bankr. S.D. Tex. 2010);[21] In General Growth Properties,

---

[21] In Jack Kline Co., Inc., the court fashioned as seven part, balancing the equities
test that weigh against a presumptively valid default rate of postpetition interest as
follows:

> They exercise discretion in fixing the § 506(b) interest rate and consider a
> number of equitable factors in determining whether an oversecured
> creditor is entitled to the contractual default rate of interest, including:
> 1) the effect of the interest rate on other junior creditors; 2) whether
> imposition of the default rate would impede the debtor's fresh start; 3)
> whether the oversecured creditor obstructed the bankruptcy process; 4)
> the level of the requested interest; 5) whether the secured creditor had a
> realistic risk of nonpayment of its debt; 6) whether there is any
> justification for an increased rate to compensate for an assumed increased
> risk following default; and (7) whether liquidation of assets will benefit
> parties in interest.

Id. at 745 (citations omitted).

the bankruptcy court imposed the default rate where the commencement of the bankruptcy case was the default and the debtor was solvent.

2. Analysis

In the present case, the Court finds that the contractual default interest rate of 14.5% should be the rate accruing on Prudential's secured claim after June 8, 2011. Unquestionably, there was a payment default by SW under the Construction Loan Agreement prior to the commencement of the Chapter 11 cases. It also is undisputed that SW was in default on the petition date. Because the Debtors propose to pay all creditors in full, other creditors will not be harmed by the payment of pendency interest at the default rate. While the Court is sympathetic to the City's arguments, the Debtors' Plan provides for its payment in full. Moreover, although Prudential was litigious during the Debtors' cases, raising multiple objections to virtually every motion made by the Debtors, its pursuit of its legal rights and remedies did not rise to the level of obstruction of the bankruptcy process. There has been no suggestion or evidence presented of misconduct by Prudential in connection with the Construction Loan Agreement or the Debtors' cases.

Prudential introduced unrebutted evidence through the testimony of Ms. Mulford, that default rates of interest in loans of the type made and received by Prudential contain default rates of interest that are consistent with the default rate set forth in the Construction Loan Agreement. Thus, the Court concludes that a default rate which is 5% higher than the non-default contract rate is neither a penalty nor inequitable as the Debtors and the City assert. Moreover, the Court rejects the Debtors' argument that the 5% spread between

the non-default and the default rates of interest is more than twice the spread that courts

typically find reasonable.  For example, in <u>Urban Communicators PCS Ltd. P'ship v.

Gabriel Capital, L.P.</u>, 394 B.R. 325 (S.D.N.Y. 2008), the district court reversed the

bankruptcy court's decision to reduce an award of interest to a twenty-five percent simple

interest equivalent (from thirty-eight percent) in order to compensate the debtors for their

efforts to protect their interests in licenses.  The district court stated: "it is not inequitable

to cut down the interest of Debtors' shareholders by interest payments at a default rate to

which Debtors contractually agreed." 394 B.R. at 340.  The court, citing <u>Ruskin v. Griffiths</u>,

269 F.2d 827 (2nd Cir. 1959), and <u>In re Int'l Hydro-Electric Sys.</u>, 101 F.Supp. 222 (D. Mass.

1951), added:

> "A variable interest rate provision in the event of a stated default . . . . can be
> beneficial to a debtor in that it may enable him to obtain money at a lower
> rate of interest than he could otherwise obtain it, for if a creditor had to
> anticipate a possible loss in the value of the loan due to his debtor's
> bankruptcy or reorganization, he would need to exact a higher uniform
> interest rate for the full life of the loan."

<u>Urban Communicators PCS</u>, 394 B.R. at 340 (quoting <u>Ruskin</u>, 269 F.2d. at 832).

The Debtors have not shown any reason for avoiding the contractual default rate

of interest.  Based on Ms. Mulford's testimony, the Court finds that the default rate of

interest is not a penalty as loans made and obtained by Prudential had similar rates.

Allowance of interest at the default rate will not impair the Debtors' fresh start because

under their Plan the Debtors are paying all creditors in full in a relatively short period of

time.  Although the Debtors have rapidly paid down the principal amount owed to

-56-

Prudential and introduced evidence at the confirmation hearing that they will have in excess of $20,000,000 in cash, plus $15,000,000 in other assets upon completion of their Plan, those factors are not relevant to a decision on whether the default rate of interest is appropriate, but rather are more relevant to the amount to be paid on account of postconfirmation interest for a restructured loan. The present case has none of the factors that have justified imposition of an interest rate lower than the default rate. The Debtors failed to rebut the presumption that the contract default rate of interest should apply.

     C.   Fees and Other Charges

     In its 506(b) Motion, Prudential seeks a determination that it is entitled to apply the postpetition payments it has received from the Debtors (in the approximate sum of $100,000,000) first to interest and next to its fees and costs. Prudential references $750,000 in estimated fees in its Proposed Findings of Fact, but it is unclear whether those are attorneys' fees that were incurred prepetition or postpetition. Prudential's proofs of claim are deficient in that they have no accounting of the amount due for any attorneys' fees or other fees and charges. Prudential has not submitted an application for fees under Fed. R. Bankr. P. 2016 and MLBR 2016-1(a).

     Section 506(b) provides that an oversecured creditor may recover its reasonable fees as provided for in the applicable agreement or state statute under which the claim arose. In order for fees, costs, or charges to be recoverable under § 506(b), the secured creditor must show that those charges arose under the agreement giving rise to the claim and that the fees, costs, or charges are reasonable. *See* In re 1095 Commonwealth Corp., 236 B.R. 530

(D. Mass. 1999) (adding that "[t]he weight of authority is that only federal law governs the enforcement of attorneys' fees provisions in connection with secured claims in bankruptcy, without regard to potentially contrary state law"). A creditor seeking fees, costs or charges under § 506(b) has the burden of proof on each of the requirements for recovery, and with respect to attorneys' fees, it must provide supporting documentation that the fees are authorized by the agreement and were necessary and reasonable. *See* In re Woods Auto Gallery, Inc., 379 B.R. 875, 885 (Bankr. W.D. Mo. 2007).

The United States Court of Appeals for the First Circuit, in Gencarelli v. UPS Capital Business Credit (In re Gencarelli), 501 F.3d 1 (1st Cir. 2007), explained the relationship between § 506(b) and § 502. It stated:

> There is universal agreement that whereas section 506 furnishes a series of useful rules for determining whether and to what extent a claim is secured (and, therefore, entitled to priority), it does not answer the materially different question of whether the claim itself should be allowed or disallowed. *See* 4 Lawrence P. King et al., *Collier on Bankruptcy* § 506.01, at 506-6 (15th ed. 2007). Rather, the general rules that govern the allowance or disallowance of claims are set out in section 502. *See* id. It follows that:
>
> > If a creditor is generally entitled to add postpetition . . . fees to its secured claim because of the existence of an oversecurity, and the claim for . . . fees is valid under the agreement and applicable state law, but is disallowed by the bankruptcy court for want of reasonableness, the amount so disallowed should be treated as an unsecured claim against the estate.
>
> Id. § 506.04[3][a], at 506-120 to 506-121; *see* Daniel R. Cowans, *Bankruptcy Law & Practice* § 17.22, at 305 (7th ed.1999) (noting that the "limits of § 506(b) are applicable to the secured nature of the claim and any excess under the contract may be filed as an unsecured claim").

Gencarelli, 501 F.3d at 5-6. The First Circuit added: "once a claim for fees is found to be

-58-

allowable under section 502, it then must be assessed for reasonableness under section 506 in order to determine its priority . . . [and] . . . [t]o the extent that the contract between the parties calls for unreasonable fees, the fees should be bifurcated and the unreasonable portion should be treated as an unsecured claim. Id. at 6 (citing Welzel v. Advocate Realty Inv., LLC (In re Welzel), 275 F.3d 1308, 1318 (11th Cir.2001)).

In its post-filing brief, Prudential has not indicated the specific provision(s) in the Note and Mortgage that give rise to entitlement to attorneys' fees and other fees and charges. The Court's review of the Construction Loan Agreement provides for the payment of reasonable attorneys' fees, but Prudential did not introduce the Promissory Note or Mortgage into evidence. The Guarantees also provide that the Affiliated Debtors, with the exceptions of SW and FSC, guarantee payment of Prudential's attorneys' fees and expenses for services in enforcing FSC's Guaranty. Because the Debtors have proposed to pay Prudential's Allowed Secured Claim and all unsecured claims in full, it would appear that Prudential is entitled to its attorneys' fee as part of its claim if those fees are provided for in the Note and Mortgage and had they been itemized in conjunction with the hearing on its 506(b) Motion.

Prudential has not provided any statement or itemization of its fees or costs, other than a reference in its Proposed Findings to "$750,000 of additional fees and expenses after May 31, 2011." As noted, Prudential has not filed an application for compensation in accordance with Fed. R. Bankr. P. 2016 (a) as required by M.L.B.R. 2016-1 as a predicate for allowance of attorneys' fees under § 506(b). In the absence of compliance with this rule,

this Court does not have sufficient information to award or allocate fees among the Affiliated Debtors according to the Guarantees.

The Construction Loan Agreement contains a provision for the payment of late charges. Prudential's submissions are also deficient with respect to late charges as it has not provided any accounting or itemization of any late charges. Thus, the Court cannot determine the reasonableness of those charges, particularly in view of the allowance of interest at the default rate from June 28, 2011.

## V. CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Prudential's 506(b) motion. The Court shall allow postpetition interest on Prudential's secured claim at the default rate from June 8, 2011, pending a further order liquidating the amount of Prudential's claim. The Court denies Prudential's request for fees, costs and other charges.

By the Court,

*Joan N. Feeney*

Joan N. Feeney
United States Bankruptcy Judge

Dated: October 4, 2011

-60-

# UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re:
**SW HOTEL VENTURE, LLC, et al.,[1]**                    Chapter 11
     Debtors                                     Case No. 10-14535-JNF
                                       (Jointly Administered)

~~~~~~~~~~~~~~~~~~~~~~~~~~~

## ORDER

In accordance with the Memorandum dated October 4, 2011, the Court hereby grants in part and denies in part the Motion of The Prudential Insurance Company of America for an Order Authorizing the Application of Payments Received during the Chapter 11 Cases to Payment of Postpetition Interest pursuant to Section 506(b) of the Bankruptcy Code. The Court authorizes the payment of pendency interest at the default rate of interest set forth in the Construction Loan Agreement. The Court denies any request for attorneys' fees or other fees, costs, or charges.

The Court directs the parties to submit an agreed order as to the amount of Prudential's claim, itemizing the amount of default interest from June 8, 2011 to the date

---

[1] The other Debtors in these jointly administered cases are Auto Sales & Service, Inc. (Case No. 10-14528-JNF), General Trading Company (Case No. 10-14532-JNF), Frank Sawyer Corporation (Case No. 10-14533-JNF), 100 Stuart Street, LLC (Case No. 10-14534-JNF), 30-32 Oliver Street Corporation (Case No. 10-16173-JNF), General Land Corporation (Case No. 10-16174-JNF), and 131 Arlington Street Trust (Case No. 10-16177-JNF) (the "Affiliated Debtors").

1

of this order.[2]  In the event the parties are unable to agree to a form of order, the Court shall

accept proposed orders from the parties, in which event the Court shall resolve any

disputes.  The Court directs the parties to submit the order(s) on or before October 18, 2011.

By the Court,

Joan N. Feeney
United States Bankruptcy Court

Dated:  October 4, 2011

---

[2] The Court recognizes that the amount of interest and the amount of
Prudential's claim will have to be adjusted as the Debtors' Modified First Amended
Joint Plan of Reorganization has not been confirmed and sales of Residences will affect
the balance of the loan.

Westlaw.

11 U.S.C.A. § 506

Page 1

United States Code Annotated Currentness
 Title 11. Bankruptcy (Refs & Annos)
  ▪ Chapter 5. Creditors, the Debtor, and the Estate (Refs & Annos)
   ▪ Subchapter I. Creditors and Claims
    → → § 506. Determination of secured status

**(a)(1)** An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

**(2)** If the debtor is an individual in a case under chapter 7 or 13, such value with respect to personal property securing an allowed claim shall be determined based on the replacement value of such property as of the date of the filing of the petition without deduction for costs of sale or marketing. With respect to property acquired for personal, family, or household purposes, replacement value shall mean the price a retail merchant would charge for property of that kind considering the age and condition of the property at the time value is determined.

**(b)** To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Add. 208

**(c)** The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim, including the payment of all ad valorem property taxes with respect to the property.

**(d)** To the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void, unless--

  **(1)** such claim was disallowed only under section 502(b)(5) or 502(e) of this title; or

  **(2)** such claim is not an allowed secured claim due only to the failure of any entity to file a proof of such claim under section 501 of this title.

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Add. 209

Westlaw.

11 U.S.C.A. § 1129

11 U.S.C.A. § 1129

United States Code Annotated <u>Currentness</u>
Title 11. Bankruptcy <u>(Refs & Annos)</u>
<u>Chapter 11</u>. Reorganization <u>(Refs & Annos)</u>
<u>Subchapter II</u>. The Plan <u>(Refs & Annos)</u>
➡**§ 1129. Confirmation of plan**

(a) The court shall confirm a plan only if all of the following requirements are met:

(1) The plan complies with the applicable provisions of this title.

(2) The proponent of the plan complies with the applicable provisions of this title.

(3) The plan has been proposed in good faith and not by any means forbidden by law.

(4) Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

(5)(A)(i) The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and

(ii) the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and

(B) the proponent of the plan has disclosed the identity of any insider that will be  such insider.

(6) Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval.

(7) With respect to each impaired class of claims or interests--

    (A) each holder of a claim or interest of such class--

        (i) has accepted the plan; or

        (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date; or

    (B) if section 1111(b)(2) of this title applies to the claims of such class, each holder of a claim of such class will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.

(8) With respect to each class of claims or interests--

    (A) such class has accepted the plan; or

    (B) such class is not impaired under the plan.

(9) Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that--

    (A) with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of this title, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

11 U.S.C.A. § 1129

Page 3

**(B)** with respect to a class of claims of a kind specified in section 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of this title, each holder of a claim of such class will receive--

    **(i)** if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

    **(ii)** if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim;

**(C)** with respect to a claim of a kind specified in section 507(a)(8) of this title, the holder of such claim will receive on account of such claim regular installment payments in cash--

    **(i)** of a total value, as of the effective date of the plan, equal to the allowed amount of such claim;

    **(ii)** over a period ending not later than 5 years after the date of the order for relief under section 301, 302, or 303; and

    **(iii)** in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under section 1122(b)); and

**(D)** with respect to a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under section 507(a)(8), but for the secured status of that claim, the holder of that claim will receive on account of that claim, cash payments, in the same manner and over the same period, as prescribed in subparagraph (C).

**(10)** If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

**(11)** Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any

successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

**(12)** All fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan.

**(13)** The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of this title, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of this title, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

**(14)** If the debtor is required by a judicial or administrative order, or by statute, to pay a domestic support obligation, the debtor has paid all amounts payable under such order or such statute for such obligation that first become payable after the date of the filing of the petition.

**(15)** In a case in which the debtor is an individual and in which the holder of an allowed unsecured claim objects to the confirmation of the plan--

> **(A)** the value, as of the effective date of the plan, of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or

> **(B)** the value of the property to be distributed under the plan is not less than the projected disposable income of the debtor (as defined in section 1325(b)(2)) to be received during the 5-year period beginning on the date that the first payment is due under the plan, or during the period for which the plan provides payments, whichever is longer.

**(16)** All transfers of property under the plan shall be made in accordance with any applicable provisions of nonbankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.

**(b)(1)** Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm

the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(A) With respect to a class of secured claims, the plan provides--

(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

(iii) for the realization by such holders of the indubitable equivalent of such claims.

(B) With respect to a class of unsecured claims--

(i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the

debtor is an individual, the debtor may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14) of this section.

**(C)** With respect to a class of interests--

**(i)** the plan provides that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or

**(ii)** the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.

**(c)** Notwithstanding subsections (a) and (b) of this section and except as provided in section 1127(b) of this title, the court may confirm only one plan, unless the order of confirmation in the case has been revoked under section 1144 of this title. If the requirements of subsections (a) and (b) of this section are met with respect to more than one plan, the court shall consider the preferences of creditors and equity security holders in determining which plan to confirm.

**(d)** Notwithstanding any other provision of this section, on request of a party in interest that is a governmental unit, the court may not confirm a plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933. In any hearing under this subsection, the governmental unit has the burden of proof on the issue of avoidance.

**(e)** In a small business case, the court shall confirm a plan that complies with the applicable provisions of this title and that is filed in accordance with section 1121(e) not later than 45 days after the plan is filed unless the time for confirmation is extended in accordance with section 1121(e)(3).

END OF DOCUMENT

INTERCREDITOR AND SUBORDINATION AGREEMENT

by and between

THE PRUDENTIAL INSURANCE COMPANY OF AMERICA,
on behalf of and solely for the benefit of, and with its liability limited to the assets of, its
insurance company separate account, PRISA, together with its successors and assigns

as Senior Lender,

THE CITY OF BOSTON
A MUNICIPAL CORPORATION IN THE COMMONWEALTH OF MASSACHUSETTS,
ACTING BY AND THROUGH ITS PUBLIC FACILITIES COMMISSION
BY THE DIRECTOR OF THE DEPARTMENT OF NEIGHBORHOOD DEVELOPMENT

as Junior Lender,

Dated as of December $\overline{\underline{2}}$/2009

Premises:    THE W HOTEL
             Boston, Massachusetts

LIBD/2238985.13

## INTERCREDITOR AND SUBORDINATION AGREEMENT

This INTERCREDITOR AND SUBORDINATION AGREEMENT (this "Agreement") is made and entered as of the ☐ ☐ day of December, 2009, between THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, a New Jersey corporation, on behalf of and solely for the benefit of, and with its liability limited to the assets of, its insurance company separate account, PRISA (together with its successors and assigns, "Senior Lender") whose address is c/o Prudential Real Estate Investors, 8 Campus Drive, Parsippany, NJ 07054, and THE CITY OF BOSTON A MUNICIPAL CORPORATION IN THE COMMONWEALTH OF MASSACHUSETTS, ACTING BY AND THROUGH ITS PUBLIC FACILITIES COMMISSION BY THE DIRECTOR OF THE DEPARTMENT OF NEIGHBORHOOD DEVELOPMENT (together with its successors and assigns, "Junior Lender") whose address is 26 Court Street, Boston, MA 02108.

### RECITALS

WHEREAS, SW BOSTON HOTEL VENTURE LLC, a Delaware limited liability company, whose address is c/o Sawyer Enterprises, 200 Newbury Street, 4th Floor, Boston, Massachusetts 02116 ("Borrower"), Senior Lender and others entered into that certain Construction Loan Agreement, dated as of January 15, 2008, as amended by that certain First Amendment to Construction Loan Agreement dated as of December 22, 2008 and by that certain Second Amendment to Construction Loan Agreement dated as of the date hereof (as it may be further amended, restated, modified or supplemented from time to time in accordance with the terms of this Agreement, the "Loan Agreement"), whereby Senior Lender agreed to make a secured construction loan (the "Senior Loan") available to Borrower in the original principal amount of One Hundred Ninety Million Two Hundred Twenty-Five Thousand and No 100 Dollars ($190,225,000) to finance the development and construction of a full service 235-room hotel with approximately 123 residential units and an underground parking garage (the "Project") on certain real property in Boston, Massachusetts (the "Premises"). Capitalized terms used and not otherwise defined herein shall have the meanings given to them in the Loan Agreement; and

WHEREAS, in connection with the Senior Loan, Borrower has executed and delivered a promissory note (as amended, restated, modified or supplemented from time to time, the "Senior Note") in favor of Senior Lender, dated as of January 15, 2008, the payment of which is secured, among other things, by (i) the first-priority Mortgage, Security Agreement, Fixture, Filing and Assignment of Sales and Contract Deposits made by Borrower in favor of Senior Lender on the Premises and other collateral, dated as of January 15, 2008 and recorded with the Suffolk County Registry of Deeds in Book 42972, Page 126 (as amended, restated, modified or supplemented from time to time in accordance with the terms of this Agreement, the "Senior W Mortgage"), (ii) the first-priority Mortgage and Security Agreement recorded with the Suffolk County Registry of Deeds in Book 42973, Page 52 made by 30-32 Oliver Street Corporation, a Massachusetts corporation, ("Oliver Corp.") in favor of Senior Lender on premises located at 25-27 Pinckney Street, Boston, Massachusetts (the "Pinckney Property") as security for the guaranty of Oliver Corp. of certain guaranties of Frank Sawyer Corporation, a Massachusetts corporation ("Sawyer"), whose address is c/o Sawyer Enterprises, 200 Newbury Street, 4th Floor, Boston, Massachusetts 02116 given to Senior Lender (as amended, restated, modified or supplemented from time to time in accordance with the terms of this Agreement, the "Pinckney Mortgage"),

(iii) the first-priority Mortgage and Security Agreement recorded with the Suffolk County Registry of Deeds in Book 44346, Page 107 and filed with the Suffolk County Registry District of the Land Court as Document No. 759804 made by General Land Corporation, a Massachusetts corporation ("General Land") in favor of Senior Lender on premises located at 109, 121-127 Arlington Street, Boston, Massachusetts (the "109 Arlington Property") as security for the guaranty of General Land of certain guaranties of Sawyer given to Senior Lender (as amended, restated, modified or supplemented from time to time in accordance with the terms of this Agreement, the "109 Arlington Mortgage"), and (iv) the first-priority Mortgage and Security Agreement filed with the Suffolk County Registry of District of the Land Court as Document No. 759812 made by Carol S. Parks and Hana D. Parks, as Trustees of the 131 Arlington Street Trust u/d/t dated August 22, 1963 and filed with the Suffolk County Registry of District of the Land Court as Document No. 262034 as amended (the "Arlington Trust') in favor of Senior Lender on premises located at 131 Arlington Street, Boston, Massachusetts (the "131 Arlington Property", as security for the guaranty of Arlington Trust of certain guaranties of Sawyer given to Senior Lender (as amended, restated, modified or supplemented from time to time in accordance with the terms of this Agreement, the "Arlington Mortgage"). The Pinckney Property, the 131 Arlington Property and the 109 Arlington Property are collectively hereinafter referred to as the "Additional Premises". The 131 Arlington Mortgage, the Pinckney Mortgage and the109 Arlington Mortgage are collectively hereinafter referred to as the "Additional Senior Mortgages". Oliver Corp., General Land and Arlington Trust are collectively hereinafter referred to as "Additional Mortgagor." The Loan Agreement, the Senior Note, the Senior W Mortgage, the Additional Senior Mortgages, and the other instruments and documents evidencing or securing the Senior Loan, all as set forth on **Exhibit A** hereto, as they may be modified, amended, extended, supplemented, restated or replaced from time to time in accordance with the terms of this Agreement, are collectively hereinafter referred to as the "Senior Loan Documents"); and

WHEREAS, on and as of the date hereof, Borrower and Junior Lender entered into that certain Loan Agreement of even date herewith (as amended, restated, modified or supplemented from time to time in accordance with this Agreement, the "Junior Loan Agreement"), whereby Junior Lender agreed to make a secured construction loan (the "Junior Loan") available to Borrower in the original principal amount of Ten Million Five Hundred Thousand Dollars ($10,500,000), to finance the build-out of the restaurant, spa and bar spaces in the Project, such funds to be loaned pursuant to Section 108 of the United States Department of Housing and Urban Development ("HUD") Community Development Block Grant Program; and

WHEREAS, in connection with the Junior Loan, Borrower has executed and delivered a Promissory Note in the amount of $10,500,000 (as amended, restated, modified or supplemented from time to time in accordance with the terms of this Agreement, the "Junior Note") in favor of Junior Lender of even date herewith, the payment of which is secured by (i) the second-priority Second Mortgage Security Agreement, Assignment of Leases, Rents and Hotel Revenues, Fixture Financing Statement, and Assignment of Sales Contracts and Deposits made by Borrower in favor of Junior Lender of even date herewith (as amended, restated, modified or supplemented from time to time in accordance with the terms of this Agreement, the "Junior W Mortgage"), which Junior W Mortgage encumbers the Premises, (ii) the second-priority Second Mortgage, Security Agreement, Assignment of Leases and Rents, and Fixture Financing Statement and a Second Assignment of Leases and Rents made by Oliver Corp. in favor of

2

Junior Lender on the Pinckney Property as security for that certain guaranty executed by Oliver Corp. in favor of Junior Lender of guaranties of Sawyer given to Junior Lender (as amended, restated, modified or supplemented from time to time in accordance with the terms of this Agreement, the "Junior Pinckney Mortgage"), (iii) the second-priority Second Mortgage and Security Agreement, Assignment of Leases and Rents and Fixture Financing Statement and a Second Assignment of Lease and Rents made by General Land in favor of Junior Lender on the 109 Arlington Property, as security for that certain guaranty by General Land in favor of Junior Lender of guaranties of Sawyer given to Junior Lender (as amended, restated, modified or supplemented from time to time in accordance with the terms of this Agreement, the "Junior 109 Arlington Mortgage"), (iv) the second-priority Second Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Financing Statement and a Second Assignment of Leases and Rents made by Arlington Trust in favor of Junior Lender on the 131 Arlington Property, as security for that certain Guaranty by 131 Arlington Trust in favor of Junior Lender of Guaranties of Sawyer given to Junior Lender (as amended, restated, modified or supplemented from time to time in accordance with the terms of this Agreement, the "Junior 131 Arlington Mortgage"). The Junior Pinckney Mortgage, the Junior 109 Arlington Mortgage, and the Junior 131 Arlington Mortgage are hereinafter collectively referred to as the "Additional Junior Mortgages"). Collectively, the Junior Loan Agreement, the Junior Note, the Junior W Mortgage, the Additional Junior Mortgages and the other instruments and documents evidencing or securing the Junior Loan, all as set forth on **Exhibit B** hereto, as they may be modified, amended, extended, supplemented, restated or replaced from time to time in accordance with this Agreement are hereinafter referred to as the "Junior Loan Documents"); and

WHEREAS, Junior Lender has agreed that the Junior Loan and all of the Junior Loan Documents shall be subject and subordinate in all respects to the Senior Loan and the Senior Loan Documents; and

WHEREAS, Senior Lender and Junior Lender desire to enter into this Agreement to provide for the subordination of the Junior Loan and the Junior Loan Documents to the Senior Loan and the Senior Loan Documents on the terms and conditions hereinbelow set forth, and to evidence certain agreements with respect to the relationship between the Junior Loan and the Junior Loan Documents, on the one hand, and the Senior Loan and the Senior Loan Documents, on the other hand.

NOW, THEREFORE, in consideration of the foregoing recitals and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Senior Lender and Junior Lender hereby agree as follows:

## AGREEMENT

1.    Acknowledgment of Loans and Loan Documents.

(a)    Junior Lender hereby acknowledges that (i) it has received copies of the Senior Loan Documents, (ii) the execution, delivery and performance of the Senior Loan Documents do not and will not constitute a default or an event which, with the giving of notice or the lapse of time, or both, would constitute a default under the Junior Loan Documents, (iii) Senior

3

and Rents and Fixture Financing Statement and a Second Assignment of Leases and Rents, respectively, on each of the properties at 142 Berkeley Street, Boston, Massachusetts as described therein (the "142 Berkeley Property") and 415 McClellan Highway, Boston, Massachusetts as described therein (the "McClellan Property"). Senior Lender further acknowledges that it holds no direct or indirect interest in or lien on the $4,000,000.00 Pledge Amount or on the 142 Berkeley Property or on the McClellan Property and agrees that it shall not at any time acquire any such interest or lien. The above-referenced second mortgages and second assignments of leases and rents on the 142 Berkeley Property and the McClellan Property, respectively, and the obligations which are secured thereby and the $4,000,000 Pledge and Security Agreement are not Junior Loan Documents which are the subject of or which are subject to this Agreement. Notwithstanding anything to the contrary, Junior Lender acknowledges and agrees that it shall have no right to take additional collateral, security or guaranties for the Junior Loan other than as exist as of the date hereof under the Junior Loan Documents or consisting of the Additional Junior Loan Collateral.

2.    Representations and Warranties.

(a)    Junior Lender hereby represents and warrants as follows:

(i)    **Exhibit B** attached hereto and made a part hereof is a true, correct and complete listing of all of the Junior Loan Documents as of the date hereof. To Junior Lender's knowledge, there currently exists no default or event, circumstance or condition which, with the giving of notice or the lapse of time, or both, would constitute a default under any of the Junior Loan Documents.

(ii)    Junior Lender is the legal and beneficial owner of the entire Junior Loan free and clear of any lien, security interest, option or other charge or encumbrance.

(iii)    There are no conditions precedent for the benefit of Junior Lender to the effectiveness of this Agreement that have not been satisfied or waived by Junior Lender.

(iv)    Junior Lender has, independently and without reliance upon Senior Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.

(v)    Junior Lender is a duly organized and validly existing municipal corporation under the laws of the Commonwealth of Massachusetts with full power to execute, deliver, and perform this Agreement and consummate the transactions contemplated hereby.

(vi)    All actions necessary to authorize the execution, delivery, and performance of this Agreement on behalf of Junior Lender have been duly taken, and all such actions continue in full force and effect as of the date hereof.

(vii)    Junior Lender has duly executed and delivered this Agreement and this Agreement constitutes the legal, valid, and binding agreement of Junior Lender enforceable against Junior Lender in accordance with its terms subject to (A) applicable bankruptcy, reorganization, insolvency and moratorium laws, and (B) general principles

5

LIBD/2238985.13

of equity which may apply regardless of whether a proceeding is brought in law or in equity.

(viii)    To Junior Lender's knowledge, no consent of any other Person and no consent, license, approval, or authorization of, or exemption by, or registration or declaration or filing with, any governmental authority, bureau or agency is required in connection with the execution, delivery or performance by Junior Lender of this Agreement or the consummation by Junior Lender of the transactions contemplated by this Agreement.

(ix)    None of the execution, delivery and performance of this Agreement nor the consummation of the transactions contemplated by this Agreement will (A) violate or conflict with any provision of the organizational or governing documents of Junior Lender, (B) violate any judgment, order, injunction, decree, or award of any court, arbitrator, administrative agency or governmental or regulatory body of which Junior Lender has knowledge against, or binding upon, Junior Lender, or (C) to Junior Lender's knowledge, constitute a violation by Junior Lender of any statute, law or regulation that is applicable to Junior Lender.

(x)    The Junior Loan is not cross-defaulted with any loan except the Senior Loan. The Premises do not secure any loan (other than the Junior Loan) from Junior Lender to Borrower. The Additional Premises which are the subject of the Additional Junior Mortgages do not secure any obligations of the Additional Mortgagor not set forth in the Additional Junior Mortgages.

(b)    Senior Lender hereby represents and warrants as follows:

(i)    **Exhibit A** attached hereto and made a part hereof is a true, correct and complete listing of the Senior Loan Documents as of the date hereof. To Senior Lender's knowledge, there currently exists no default or event which, with the giving of notice or the lapse of time, or both, would constitute a default under any of the Senior Loan Documents. The present outstanding principal balance of the Senior Loan is $179,837,326.39 and interest on the Senior Loan has been paid through November 30, 2009.

(ii)    Except as described below, Senior Lender is the legal and beneficial owner of the Senior Loan free and clear of any lien, security interest, option or other charge or encumbrance. Sovereign Bank, N.A. holds a $50,000,000 participation interest in the Senior Loan.

(iii)    There are no conditions precedent for the benefit of Senior Lender to the effectiveness of this Agreement that have not been satisfied or waived by Senior Lender.

(iv)    Senior Lender has, independently and without reliance upon Junior Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.

6

LIBD/2238985.13

221

(v)    Senior Lender is duly organized and is validly existing under the laws of the jurisdiction under which it was organized with full power to execute, deliver, and perform this Agreement and consummate the transactions contemplated hereby.

(vi)    All actions necessary to authorize the execution, delivery, and performance of this Agreement on behalf of Senior Lender have been duly taken, and all such actions continue in full force and effect as of the date hereof.

(vii)    Senior Lender has duly executed and delivered this Agreement and this Agreement constitutes the legal, valid, and binding agreement of Senior Lender enforceable against Senior Lender in accordance with its terms subject to (x) applicable bankruptcy, reorganization, insolvency and moratorium laws and (y) general principles of equity which may apply regardless of whether a proceeding is brought in law or in equity.

(viii)    To Senior Lender's knowledge, no consent of any other Person that has not been obtained and no consent, license, approval, or authorization of, or exemption by, or registration or declaration or filing with, any governmental authority, bureau or agency is required in connection with the execution, delivery or performance by Senior Lender of this Agreement or consummation by Senior Lender of the transactions contemplated by this Agreement.

(ix)    None of the execution, delivery and performance of this Agreement nor the consummation of the transactions contemplated by this Agreement will (A) violate or conflict with any provision of the organizational or governing documents of Senior Lender, (B) violate any judgment, order, injunction, decree or award of any court, arbitrator, administrative agency or governmental or regulatory body of which Senior Lender has knowledge against, or binding upon, Senior Lender or (C) to Senior Lender's knowledge, constitute a violation by Senior Lender of any statute, law or regulation that is applicable to Senior Lender.

(x)    The Premises do not secure any loan (other than the Senior Loan) from Senior Lender to Borrower. The Additional Premises which are the subject of the Additional Senior Mortgages do not secure any obligations of the Additional Mortgagor which are not set forth in the Additional Senior Mortgages.

3.    Transfer of Junior Loan or Senior Loan.

(a)    Except only as expressly set forth below, Junior Lender shall not assign, transfer, pledge, sell or convey, directly or indirectly (each, a "Transfer"), all or any portion of its interest in the Junior Loan and/or the Junior Loan Documents. Subject to the terms of this Section below, Junior Lender may, from time to time, in its sole discretion, Transfer all or any portion of the Junior Loan and its interest in the Junior Loan Documents to HUD in connection with Section 108 of HUD's Community Development Block Grant Program, provided that the following conditions are satisfied: (i) Junior Lender shall provide Senior Lender with not less than ten (10) days prior written notice of such Transfer and contact person at HUD, (ii) Junior Lender shall provide all documentation executed in connection with such Transfer to Senior Lender within five (5) days following such Transfer, and (iii) Junior Lender shall remain

7

necessary endorsement) to be applied (in the case of cash) to, or held as collateral (in the case of non-cash property or securities) for, the payment or performance of the Senior Loan in accordance with the terms of the Senior Loan Documents.

(b)    Notwithstanding the foregoing, provided that Senior Lender shall not then have delivered to Junior Lender a notice, in writing, of a Default under the Loan Agreement, Junior Lender shall be entitled to receive and retain from (or on behalf of) Borrower current monthly debt service payments consisting of interest only on the principal amount of the Junior Loan to the extent not deferred in accordance with the terms and provisions of the Junior Note.

(c)    In the event of a casualty to the buildings or improvements constructed on any portion of the Premises or Additional Premises or a condemnation or taking under a power of eminent domain of all or any portion of the Premises or Additional Premises, Senior Lender shall have a first and prior interest in and to any payments, awards, proceeds, distributions, or consideration arising from any such event (an "Award") and all adjustments and settlements related to the foregoing shall be determined by Senior Lender in its sole but reasonable discretion in accordance with the Senior Loan Documents. If the amount of an Award is in excess of all amounts owed to Senior Lender under the Senior Loan Documents, however, and either the Senior Loan has been paid in full or Borrower is entitled to a remittance of the balance of an Award under the Senior Loan Documents other than to restore the Premises, such excess Award or portion to be so remitted to Borrower shall be paid to or at the direction of Junior Lender to the extent Junior Lender has the right to so require or direct payment, unless other Persons have claimed the right to such awards or proceeds, in which case Senior Lender shall only be required to provide notice to Junior Lender of such excess Award and of any other claims thereto. In the event of any competing claims for any such excess Award, Senior Lender shall continue to hold such excess Award until Senior Lender receives an agreement signed by all Persons making a claim to the excess Award or a final order of a court of competent jurisdiction directing Senior Lender as to how and to which Person(s) the excess Award is to be distributed. Notwithstanding the foregoing, in the event of a casualty or condemnation, Senior Lender shall release the Award from any such event to Borrower if and to the extent required by the terms and conditions of the Senior Loan Documents in order to repair and restore the Premises or Additional Premises in accordance with the terms and provisions of the Senior Loan Documents. Any portion of the Award made available to Borrower for the repair or restoration of the Premises or Additional Premises shall not be subject to attachment by Junior Lender.

(d)    Senior Lender agrees to apply proceeds from the Additional Collateral (as defined in the Senior Loan Agreement) received following an Event of Default (as defined in the Senior Loan Agreement) in repayment of amounts owing under the Senior Loan or as otherwise permitted hereunder or under the Senior Loan Documents.

8.    Rights of Subrogation; Bankruptcy.

(a)    Each of Junior Lender and Senior Lender hereby waives any requirement for marshaling of assets thereby in connection with any foreclosure of any security interest or any other realization upon collateral in respect of the Senior Loan Documents or the Junior Loan Documents, as applicable, or any exercise of any rights of set-off or otherwise. Each of Junior Lender and Senior Lender assumes all responsibility for keeping itself informed as to the

11

condition (financial or otherwise) of Borrower, the condition of the Premises and all other collateral and other circumstances and, neither Senior Lender nor Junior Lender shall have any duty whatsoever to obtain, advise or deliver information or documents to the other relative to such condition, business, assets and/or operations. Junior Lender agrees that Senior Lender owes no fiduciary duty to Junior Lender in connection with the administration of the Senior Loan and the Senior Loan Documents and Junior Lender agrees not to assert any such claim. Senior Lender agrees that Junior Lender owes no fiduciary duty to Senior Lender in connection with the administration of the Junior Loan and the Junior Loan Documents and Senior Lender agrees not to assert any such claim.

(b)     No payment or distribution to Senior Lender pursuant to the provisions of this Agreement shall entitle Junior Lender to exercise any right of subrogation in respect thereof prior to the unconditional and irrevocable payment in full of the Senior Loan, and Junior Lender agrees that, prior to the unconditional and irrevocable payment in full of the Senior Loan, it shall not acquire, by subrogation or otherwise, any lien, estate, right or other interest in any portion of the Premises or any other collateral now securing the Senior Loan or the proceeds therefrom that is or may be prior to, or of equal priority to, any of the Senior Loan Documents or the liens, rights, estates and interests created thereby, except only for such liens, rights, estates and interests as are unrelated to the Junior Loan and/or the Junior Loan Documents and only as and to the extent the same relate to the Junior Lender's rights as a municipal corporation (including, by way of example and without limitation, real property taxes).

(c)     In the event of any receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization or arrangement with creditors, adjustment of debt, whether or not pursuant to bankruptcy laws, the sale of all or substantially all of the assets, dissolution, liquidation, or any other marshalling of the assets and liabilities of Borrower, Junior Lender will at Senior Lender's request file any claim, proof of claim, proof of interest or other instrument of similar character necessary to enforce the obligations of Borrower in respect of the Junior Loan, assign to Senior Lender the voting rights of Junior Lender in such proceeding, and will hold in trust for Lender and pay over to Lender, in the form received (together with any necessary endorsement), to be applied to the Senior Loan, any and all monies, dividends or other assets received in any such proceedings on account of the Junior Loan, unless and until the Senior Loan is unconditionally and irrevocably paid in full, except that the foregoing provisions in this subsection (c) shall not apply to Junior Lender's claims, interests, benefits, proceeds, rights and remedies with respect to the 142 Berkeley Property and the McClellan Property and the $4,000,000 Pledge Amount subject of the $4,000,000 Pledge and Security Agreement. In the event that the Junior Lender fails to take any such action requested by Senior Lender, Junior Lender shall promptly reimburse, indemnify and hold harmless Senior Lender from and against any and all loss, cost, damage and expense, of any kind or nature, which may be incurred by Senior Lender as a result of Junior Lender's failure to take such action.

9.     Lenders' Right to Notice; Cure.

(a)     Senior Lender shall deliver to Junior Lender contemporaneously with the delivery of such notice under the Senior Loan Documents, a copy of any notice of Default delivered in writing by Senior Lender to Borrower or any other applicable Person under the Senior Loan Documents or that Senior Lender receives from Borrower or any other applicable Person

12

LIBD/2238985.13

24.    <u>No Release</u>. Nothing herein contained shall operate to release Borrower from (a) its obligation to keep and perform all of the terms, conditions, obligations, covenants and agreements contained in the Senior Loan Documents or any liability of Borrower under the Senior Loan Documents, or (b) its obligation to keep and perform all of the terms, conditions, obligations, covenants and agreements contained in the Junior Loan Documents or any liability of Borrower under the Junior Loan Documents,

25.    <u>Continuing Agreement</u>. This Agreement is a continuing agreement and shall remain in full force and effect until the earliest of (a) the unconditional and irrevocable payment in full of the Senior Loan, or (b) transfer of the Premises by foreclosure of the Senior W Mortgage or the exercise of the power of sale contained therein or by deed-in-lieu of foreclosure; <u>provided</u>, <u>however</u>, that any rights or remedies of either party hereto arising out of any breach of any provision hereof occurring prior to such date of termination shall survive such termination.

26.    <u>Severability</u>. In the event that any provision of this Agreement or the application hereof to any party hereto shall, to any extent, be invalid or unenforceable under any applicable statute, regulation, or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform to such statute, regulation or rule of law, and the remainder of this Agreement and the application of any such invalid or unenforceable provisions to parties, jurisdictions or circumstances other than to whom or to which it is held invalid or unenforceable, shall not be affected thereby nor shall same affect the validity or enforceability of any other provision of this Agreement.

27.    <u>Expenses</u>.

(a)    To the extent not paid by Borrower or out of or from any collateral securing the Senior Loan which is realized by Senior Lender, Junior Lender agrees upon demand to pay to Senior Lender the amount of any and all reasonable expenses, including, without limitation, the reasonable fees and expenses of its counsel and of any experts or agents, which Senior Lender may incur in connection with the failure by Junior Lender to perform or observe any of the provisions hereof.

(b)    To the extent not paid by Borrower or out of or from any collateral securing the Junior Loan which is realized by Junior Lender, Senior Lender agrees upon demand to pay to Junior Lender the amount of any and all reasonable expenses, including, without limitation, the reasonable fees and expenses of its counsel and of any experts or agents, which Junior Lender may incur in connection with the failure by Senior Lender to perform or observe any of the provisions hereof.

28.    <u>Injunction</u>. Senior Lender and Junior Lender each acknowledge (and waive any defense based on a claim) that monetary damages are not an adequate remedy to redress a breach by the other hereunder and that a breach by either Senior Lender or Junior Lender hereunder would cause irreparable harm to the other. Accordingly, Senior Lender and Junior Lender agree that upon a breach of this Agreement by the other, the remedies of injunction, declaratory judgment and specific performance shall be available to such non-breaching party.

29.    <u>Mutual Disclaimer</u>.

18

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed under seal, each by an official thereunto duly authorized, as of the day and year first above set forth.

**SENIOR LENDER:**

THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, on behalf of and solely for the benefit of, and with its liability limited to the assets of, its insurance company separate account, PRISA

By: _____
    Name:  Meghan C. McGray
    Title: Vice President

**JUNIOR LENDER:**

THE CITY OF BOSTON A MUNICIPAL CORPORATION IN THE COMMONWEALTH OF MASSACHUSETTS, ACTING BY AND THROUGH ITS PUBLIC FACILITIES COMMISSION BY THE DIRECTOR OF THE DEPARTMENT OF NEIGHBORHOOD DEVELOPMENT

Approved as to Form:

By: _____

William F. Sinnott, Esq.
City of Boston
Corporation Counsel

Name:  Evelyn Friedman
Title:  Chief and Director

226

20

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **In re** | ) | |
| | ) | **Chapter 11** |
| **SW BOSTON HOTEL VENTURE LLC,** *et al,* | ) | **Case No. 10-14535 (JNF)** |
| | ) | |
| **Debtor.** | ) | |
| | ) | **(Jointly Administered)** |

**DECLARATION OF KEITH A. HUNT IN SUPPORT OF**
**THE CITY OF BOSTON'S MEMORANDUM CONCERNING**
**NON-ASSIGNABILITY OF VOTING RIGHTS**

Keith A. Hunt, pursuant to 28 U.S.C. §1746, hereby declares under penalty of perjury as

follows:

1.    I am the Assistant Director of the Office of Business Development with the City of

Boston's Department of Neighborhood Development ("DND"), and have held that

position since 1999.

2.    I am familiar with the contents of the City Loan Documents and the Intercreditor and

Subordination Agreement between Prudential and the City of Boston dated as of

December 29, 2009 ("Intercreditor Agreement")(a true copy of which is attached hereto

as **Exhibit A**) and the portions of the First Amended Plan that relate to the City of

Boston. All capitalized terms herein have the meanings ascribed to them in the First

Amended Plan unless otherwise indicated.

3.    My responsibilities at DND include evaluating and developing loans under the *Boston*

*Invests in Growth Loan Pool* ("Loan Pool") which is structured under the United States

Department of Housing and Urban Development ("HUD") Section 108 Loan Guaranty

program ("HUD 108 Loan") to stimulate local real estate development. The City Loan is one of those loans.

4.      I was personally involved with the development and funding of the City Loan, including without limitation the development and execution of the Intercreditor Agreement.

5.      In order to prevent a shut-down of the entire project and to allow the Hotel to open under the W Flag, on December 9, 2009, SW Boston and the City of Boston entered into the City Loan Documents, whereby the City of Boston agreed to provide $10.5 million to finance the completion of the Restaurant, Spa and Theme Bar. The Debtors previously had asked Prudential to provide this additional financing, but Prudential refused. Prudential informed the City of Boston that it did not have an additional $10.5 million to lend on the project. The Debtors approached the City of Boston as a lender of last resort.

6.      The developments assisted by the Loan Pool have helped the City of Boston meet a number of important economic development goals, including the promotion of tourism, which remains a crucial aspect of Boston's economy, and the generation of additional retail activity. Furthermore, such developments are important generators of jobs and tax revenues for the City of Boston and have a variety of secondary economic impacts.

7.      One of the purposes of the Loan Pool is to provide economic assistance to projects which are having difficulty obtaining conventional commercial financing, such as the W Hotel and Residences. Due to the economic downturn in 2009, the need was especially acute. The City of Boston determined that the proposed funding for the Restaurant, Spa and Theme Bar met the criteria of the Loan Pool. The City of Boston was very aware that the Project needed to be finished quickly, and that there would be an immediate positive

2

economic impact. If finished, the Project would create new jobs and provide significant economic development in Boston's Theatre District.

8.    The City Loan enabled the project to open under the W Flag in a timely manner, and resulted in the hiring of over 250 persons, the majority of whom were low and moderate income people and residents of the City of Boston.

9.    The City of Boston borrowed the $10,500,000 from HUD, pursuant to the HUD 108 Loan program in order to fund the City Loan. As security for the HUD 108 Loan the City of Boston provided to HUD a note secured by a pledge of future Community Development Block Grant ("CDBG") revenues. CDBG funding is critically important to the City of Boston because it provides dollars for the City of Boston's affordable housing and economic development programs.

10.    In order to make the City Loan, the City of Boston was required to obtain Prudential's consent. To give its consent, Prudential required the City of Boston to enter into the Intercreditor Agreement.

11.    The Intercreditor Agreement provides at Sections 2(a)(vii) and 2(b)(vii) that Prudential and the City of Boston both represent and warrant that the Intercreditor Agreement is "subject to (A) applicable bankruptcy, reorganization, insolvency and moratorium laws, and (B) general principals of equity which may apply regardless of whether a proceeding is brought in law or in equity".

12.    At Prudential's insistence, the Intercreditor Agreement provides that in the event of bankruptcy, the City of Boston will "assign to [Prudential] the voting rights of [the City of Boston] in such proceeding." Intercreditor Agreement at §8(c).

3

13. The City of Boston made the City Loan and entered into the Intercreditor Agreement out of necessity to avoid a catastrophic shut-down of a large-scale project in the middle of the Theatre District. The City of Boston was not motivated to make the City Loan in order to turn a profit. Prior to executing the Intercreditor Agreement, the City of Boston made clear to Prudential that it objected to the voting assignment provision and that it did not consider a provision purporting to give a creditor the rights belonging to the citizens of the City of Boston, enforceable.

14. By letters dated December 15, 2010 and May 10, 2011 (attached hereto as **Exhibits B and C**, respectively). Prudential, by and through its attorneys, demanded the City of Boston assign its voting rights to Prudential. The City of Boston has declined to do so, indicating that the voting rights provision of the Intercreditor Agreement is unenforceable.

*[Signature block appears on following page]*

230

4

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS $23$ DAY OF JUNE,
2011.

Keith A. Hunt

231