Nos. 12-9008, 12-9009, 12-9011, and 12-9012

# UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

SW BOSTON HOTEL VENTURE, LLC; AUTO SALES & SERVICE, INC.;
GENERAL TRADING COMPANY; FRANK SAWYER CORPORATION; 100
STUART STREET, LLC; 30-32 OLIVER STREET CORPORATION;
GENERAL LAND CORPORATION; 131 ARLINGTON STREET TRUST,

Debtors.

THE PRUDENTIAL INSURANCE COMPANY OF AMERICA,

Appellee,

v.

SW BOSTON HOTEL VENTURE, LLC; AUTO SALES & SERVICE, INC.;
GENERAL TRADING COMPANY; FRANK SAWYER CORPORATION; 100
STUART STREET, LLC; 30-32 OLIVER STREET CORPORATION;
GENERAL LAND CORPORATION; 131 ARLINGTON STREET TRUST,

Appellants,

CITY OF BOSTON,

Appellant.

Appeals from the Bankruptcy Appellate Panel for the First Circuit

## BRIEF FOR THE APPELLEE
## THE PRUDENTIAL INSURANCE COMPANY OF AMERICA

Emanuel C. Grillo (1st Cir. #1155059)        William M. Jay (1st Cir. # 111872)
GOODWIN PROCTER LLP                          GOODWIN PROCTER LLP
The New York Times Building                  901 New York Avenue, N.W.
620 Eighth Avenue                            Washington, DC 20001-4432
New York, NY 10018                           Tel.:  (202) 346-4190
Tel.:  (212) 813-8800                        Fax:  (202) 204-7169
Fax:  (212) 355-3333

*Counsel for The Prudential Insurance Company of America, on behalf and solely
for the benefit of, and with its liability limited to the assets of, its insurance
company separate account, PRISA*

Dated: July 25, 2013

## **CORPORATE DISCLOSURE**

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned attorneys for Appellee The Prudential Insurance Company of America, on behalf and solely for the benefit of, and with its liability limited to the assets of, its insurance company separate account, PRISA ("Prudential") state the following:

Prudential's parent corporation is Prudential Financial Inc. ("PFI"), a publicly traded corporation.  Prudential is a wholly-owned subsidiary of Prudential Holdings, LLC.  Prudential Holdings, LLC is a wholly-owned subsidiary of PFI. No other publicly traded corporation owns 10% or more of the stock of Prudential.

.

# **TABLE OF CONTENTS**

PAGES

TABLE OF AUTHORITIES ................................................................ vii

JURISDICTION.............................................................................1

COUNTER-STATEMENT OF THE ISSUES PRESENTED ................................3

STATEMENT OF FACTS .................................................................5

    A.    Prudential Provides up to $192,200,000 in Financing to SW Boston and Its Affiliate Debtors for the W Hotel and Residences. ............................................................5

    B.    After Defaulting, the Debtors Commence the Chapter 11 Cases. ........8

    C.    The Bankruptcy Court Finds and Determines that Prudential Is Oversecured by More than $19 Million in the Lift Stay Litigation. ............................................................9

    D.    The Hotel Sale Confirms the Findings in the Lift Stay Decision Regarding the Value of Prudential's Collateral. ..................................12

    E.    The Debtors File the Liquidating Plan Refusing to Pay Post-Petition Interest to Prudential and Terminating Certain of Its Liens. ..............................................................12

    F.    Prudential Files the Post-Petition Interest Motion and the Parties Stipulate to the Value of the Collateral for the Joint Hearing on Confirmation and the Post-Petition Interest Motion. .......16

    G.    The Bankruptcy Court Confirms the Liquidating Plan by Cramdown over Prudential's Objections and Denies a Substantial Portion of the Post-Petition Interest Claim. .....................18

    H.    The BAP Reverses, Vacates and Remands the Bankruptcy Court's Decisions. ............................................................22

ii

SUMMARY OF ARGUMENT ..............................................................25

ARGUMENT ..................................................................................29

I.   The BAP Correctly Awarded Post-Petition Interest at the Default Rate to Prudential Based Upon the Totality of the Evidence and Multiple Determinations of the Bankruptcy Court that the Value of Prudential's Collateral Exceeded the Amount of Its Claims Throughout the Chapter 11 Cases. .................................................................29

    A.   Every Oversecured Creditor Is Entitled to Recover Post-Interest. ..........................................................................30

    B.   Under Any Approach, the Hotel Sale Price, the Debtors' Schedules, and the Lift Stay Decision All Established an Equity Cushion that Entitled Prudential to Post-Petition Interest from the Petition Date. ................................................................33

    C.   Prudential Remained Oversecured at Confirmation of the Debtors' Cramdown Liquidating Plan, the Date Recognized to be of Paramount Importance for the Determination of a Secured Creditor's Right to Post-Petition Interest. ................................39

    D.   The Bankruptcy Court and the BAP Correctly Aggregated the Value of Prudential's Collateral to Establish Prudential's Right to Post-Petition Interest. ..................................................43

    E.   The Prudential Loan Agreement Expressly Provided for Compounding of Interest as Permitted under Massachusetts Law. ............................................................................49

    F.   Federal Law Favors, and Massachusetts Law Permits, the Award of Post-Petition Interest at the Contractual Default Rate to Prudential in the Absence of Contrary Equitable Considerations. ..................................................................51

        1.   Federal Law Favors Application of a Negotiated and Agreed Contractual Default Rate. ...................................52

        2.   Interest at the Contractually Agreed Default Rate Does Not Violate Massachusetts Law. ....................................53

iii

3.      Equitable Considerations in the Chapter 11 Cases Did Not Weigh Against Application of the Contractually Agreed Default Rate. ...............................................54

II.      Upon the Allowance of Post-Petition Interest to Prudential at the Default Rate Resulting in a Vastly Higher Claim, the Liquidating Plan Could Not Stand. ............................................56

III.      Regardless of the Post-Petition Interest Payable to Prudential, the Liquidating Plan Improperly Disenfranchised Prudential and Did Not Satisfy the Requirements of Sections 1129 or 1126......................................59

A.      The Liquidating Plan's Treatment of Prudential's Impaired Senior Secured Claims Was Not Fair and Equitable by its Terms or on its Face. ..........................................60

1.      The Liquidating Plan Did Not Satisfy the Express "Fair and Equitable" Requirements of Section 1129(b)(2)(A)(i). ........................................61

i.      Prudential Did Not Retain Its Liens on the Equity of SW Boston and All Proceeds of Its Collateral Under the Liquidating Plan..............................62

ii.      Prudential Did Not Receive Deferred Cash Payments of a Value Equal to Its Interest in Its Collateral as of the Effective Date of the Liquidating Plan..............................65

2.      The Debtors Cannot Use the Indubitable Equivalence Test to End-Run the Requirements of Section 1129(b)(2)(A)(i). ........................................65

3.      The Liquidating Plan Was Not Fair and Equitable on Its Face. ........................................66

B.      The Debtors Improperly Consolidated Their Estates Solely to Deprive Prudential of Its Contractual and Statutory Rights Against Each Debtor. ..........................................69

iv

1.      "Deemed" Consolidation of the Debtors' Estates Stripped Prudential of Its Separate Debtor Guarantees and Their Attendant Remedies. ...............................................................74

2.      "Deemed Consolidation" of the Debtors' Estates and the Disregard of Other Voting Requirements Diminished Prudential's Voting Rights and Prejudiced Prudential. ...........76

i.      The Bankruptcy Court's Failure to Require an Impaired Accepting Class for Each Debtor Violated § 1129(a)(10) and Thus, Deprived Prudential of the Voting Rights Arising from its Guarantees. ...................................................................77

ii.     The Assignment of the City of Boston's Voting Rights to Prudential Constituted an Enforceable Obligation that Did Not Violate Federal Bankruptcy Policy. ........................................................79

iii.    The Bankruptcy Court's Determination that Non-Voting Classes Accepted the Liquidating Plan Violated Section 1126. ..................................................81

C.      The Payment of Junior Unsecured Creditors Before Payment of Senior Secured Creditors and the Debtors' Failure to Provide a Liquidation Analysis Means that the Liquidating Plan Did Not Satisfy the Best Interests of Creditors Test under Section 1129(a)(7). ............................................................82

D.      The Liquidating Plan Was Not Proposed in Good Faith, But To Benefit Insiders By Depriving Prudential of Its Rights to Full Recovery and to Vote. ........................................................84

IV.     The BAP Correctly Found that Equitable Mootness Did Not Preclude It from Correcting the Bankruptcy Court's Errors On Appeal......................88

A.      The BAP Correctly Weighed All Relevant Factors Rather Than Apply A Presumption Of Mootness .....................................91

B.      The BAP Correctly Concluded That Prudential Acted Diligently To Preserve Its Rights. .......................................94

v

C. The Bankruptcy Court Can Fashion Effective Relief For Prudential Given that the Debtors Liquidated Their Assets. ..............95

CONCLUSION ...................................................................................................101

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ahlers v. Norwest Bank Worthington (In re Ahlers)*,
   794 F.2d 388 (8th Cir. 1986) ..............................................................41

*Anderson v. City of Bessemer City*,
   470 U.S. 564 (1985)............................................................................56

*Baker & Drake, Inc. v. Public Serv. Comm'n (In re Baker & Drake, Inc.)*,
   35 F.3d 1348 (9th Cir. 1994) ..............................................................94

*Bank. of America v. N. LaSalle Street Ltd. P'ship (In re 203 N. LaSalle Street Ltd. P'ship)*, 246 B.R. 325 (Bankr. N.D. Ill. 2000)...........................79, 80

*Bayback-Middlesex v. Ralar Distribs., Inc.*,
   69 F.3d 1200 (1st Cir. 1995).........................................................30, 35

*Behrmann v. Nat'l Heritage Found., Inc.*,
   663 F.3d 704 (4th Cir. 2011) ..............................................................92

*Boston Edison Co. v. FERC*,
   856 F.2d 361 (1st Cir.1988)................................................................51

*Brite v. Sun Country Dev.,, Inc.(In re Sun Country Dev., Inc.)*,
   169 B.R. 229 (Bankr. M. D. Ga. 1994) ...............................................66

*Broadcasting Capital, Inc. v. Davis Broadcasting, Inc. (In re Davis Broadcasting, Inc.)*, 169 B.R. 229 (Bankr. M. D. Ga. 1994) ............................80

*Brooks v. AIG Sunamerica Life Assurance Co.*,
   480 F.3d 579 (1st Cir. 2007)..................................................................2

*Browning-Ferris Indus., Inc. v. Casella Waste Mgmt. of Massachusetts, Inc.*,
   79 Mass. App. Ct. 300, 945 N.E. 2d 964 (Mass. App. Ct. 2011)........50

*City Sanitation, LLC v. Allied Waste Servs. of Massachusetts, LLC (In re American Cartage, Inc.)*, 656 F.3d 82 (1st Cir. 2011) ...............................44, 45

*Cunningham v. Johnson*,
   241 F. App'x 913 (4th Cir. 2007).........................................................51

vii

*Drabkin v. Midland–Ross Corp. (In re Auto–Train Corp.),*
  810 F.2d 270 (D.C. Cir.1987)...................................................................72

*Fin. Sec. Assurance Inc. v. T-H New Orleans L.P. (In re T-H New Orleans
  L.P.),* 116 F.3d 790 (5th Cir. 1997) ...................................................34, 35

*Flora Mir Candy Corp. v. R.S. Dickson & Co. (In re Flora Mir Candy
  Corp.),* 432 F.2d 1060 (2d Cir. 1970)...................................................70

*Ford Motor Credit Co. v. Dobbins,*
  35 F.3d 860 (4th Cir. 1994) ................................................................37, 42

*Greenwich Collieries v. Dir., Office Workers Compensation Programs,*
  990 F.2d 730 (3d Cir. 1993) .....................................................................33

*Heins v. Ruti-Sweetwater, Inc. (In re Ruti-Sweetwater, Inc.),*
  836 F.2d 1263 (10th Cir. 1988) .........................................................81, 82

*Hicks, Muse & Co., Inc. v. Brandt (In re Healthco Int'l, Inc.),*
  136 F.3d 45 (1st Cir. 1998)......................................................................92

*In re ACA Real Estate LLC,*
  418 B.R. 155 (Bankr. M.D.N.C. 2009).....................................................83

*In re Adelphia Commc'ns Corp.,*
  361 B.R. 337 (S.D.N.Y. 2007) .................................................................89

*In re Aerosol Packaging, LLC,*
  362 B.R. 43 (Bankr. N.D. Ga. 2006) ...................................................79, 80

*In re Amco Ins.,*
  444 F.3d 690 (5th Cir. 2006) ...................................................................71

*In re Bank of New England Corp.,*
  404 B.R. 17 (Bankr. D. Mass. 2009) .......................................................79

*In re Blake,*
  No. 07–12445, 2009 WL 4349787 (Bankr. D. Mass. Nov. 30, 2009) .........41, 42

*In re Bryson Props., XVIII,*
  961 F.2d 496 (4th Cir. 1992) ...................................................................61

*In re Charles Street African Methodist Episcopal Church of Boston*,
481 B.R. 1 (Bankr. D. Mass. 2012) ...................................................53

*In re Charter Commc'ns, Inc.*,
691 F.3d 476 (2d Cir. 2012) ...............................................................91

*In re Chateaugay Corp.*,
10 F.3d 944 (2d Cir. 1993) ..................................................................96

*In re Consol. Props. Ltd. P'ship*,
152 B.R. 452 (Bankr. D. Md. 1993) .....................................................52

*In re Continental Airlines*,
91 F.3d 553 (3d Cir. 1996) ..................................................................91

*In re Curtis Center Ltd. P'ship*,
192 B.R. 648 (Bankr. E.D. Pa. 1996) ...................................................80

*In re D&F Constr., Inc.*,
865 F.2d 673 (5th Cir. 1989) ...............................................................66

*In re DeNofa*,
124 F. App'x 729 (3d Cir. 2005) .........................................................46

*In re Drexel Burnham Lambert Group, Inc.*,
138 B.R. 723 (Bankr. S.D.N.Y. 1992) ..................................................73

*In re Fiberglass Indus., Inc.*,
74 B.R. 738 (Bankr. N.D.N.Y. 1987) ....................................................46

*In re Future Energy Corp.*,
83 B.R. 470 (Bankr. S.D. Ohio 1988) ..................................................84

*In re Geijsel*,
480 B.R. 238 (Bankr. N.D. Tex. 2012)..................................................45

*In re Gen. Growth Props.*,
451 B.R. 323 (Bankr. S.D.N.Y. 2011)...................................................55

*In re Gen. Growth Props.*,
No. 09-11977, 2011 WL 2974305 (Bankr. S.D.N.Y. July 20, 2011).................55

ix

*In re Genesis Health Ventures, Inc.*,
266 B.R. 591 (Bankr. D. Del. 2001) ...................................................................83

*In re Harford Sands Inc.*,
372 F.3d 637 (4th Cir. 2004) ........................................................................84, 88

*In re Heritage Highgate, Inc.*,
679 F.3d 132 (3d Cir. 2012) ........................................................................31, 41

*In re Inter-Island Vessel Co.*,
98 B.R. 606 (Bankr. D. Mass. 1988) ............................................................85, 88

*In re James Wilson Assocs.*,
965 F.2d 160 (7th Cir. 1992) ............................................................................66

*In re JER/Jameson Mezz Borrower II, LLC*,
461 B.R. 293 (Bankr. D. Del. 2011) ...................................................................78

*In re Kent Terminal Corp.*,
166 B.R. 555 (Bankr. S.D.N.Y. 1994).........................................................63, 68

*In re KRC, Inc.*,
226 B.R. 112 (Bankr. D. Idaho 1998)..................................................................47

*In re Montgomery Courts Apartments of Ingham County, Ltd.*,
141 B.R. 324 (Bankr. S.D. Ohio 1992) ..............................................................67

*In re New Century TRS Holdings, Inc.*,
407 B.R. 576 (D. Del. 2009)...........................................................72, 73, 89, 96

*In re New Era Co.*,
125 B.R. 725 (S.D.N.Y. 1991) ..........................................................................47

*In re Owens Corning*,
419 F.3d 195 (3d Cir. 2005) ......................................................................passim

*In re Pullman Constr. Indus.*,
107 B.R. 909 (Bankr. N.D. Ill. 1989) .................................................................63

*In re PWS Holding Corp.*,
228 F.3d 224 (3d Cir. 2000) .............................................................................89

x

*In re Route One West Windsor Ltd. P'ship*,
    225 B.R. 76 (Bankr. D.N.J. 1998) ....................................................53

*In re Snider Bros., Inc.,*
    18 B.R. 230 (Bankr. D. Mass. 1982) ...............................................70

*In re Spookyworld, Inc.*,
    346 F.3d 1 (1st Cir. 2003)..................................................................2

*In re TCI 2 Holdings, LLC*,
    428 B.R. 117 (Bankr. D.N.J. 2010) ...........................................66, 67

*In re Terry Ltd. P'ship*,
    27 F.3d 241 (7th Cir. 1994) .............................................................52

*In re Thorpe Insulation Co.*,
    677 F.3d 869 (9th Cir. 2012) ...........................................................87

*In re Toy King Distribs., Inc.*,
    256 B.R. 1 (Bankr. M.D. Fla. 2000) ................................................46

*In re Tribune Co.*,
    464 B.R. 126 (Bankr. S.D.N.Y. 2011)..............................................78

*In re United Producers*,
    526 F.3d 942 (6th Cir. 2008) ...........................................................96

*In re Urban Communicators PCS L.P.*,
    379 B.R. 232 (Bankr. S.D.N.Y. 2008)..................................37, 38, 46

*In re Vanderveer Estates Holdings, Inc.*,
    283 B.R. 122 (Bankr. E.D.N.Y. 2002) .............................................83

*In re Weber*,
    209 B.R. 793 (Bankr. D. Mass. 1997) ..............................................84

*Institut Pasteur v. Cambridge Biotech Corp.*,
    104 F.3d 489 (1st Cir. 1997).......................................................94, 96

*Jorgenson v. Fed. Land Bank of Spokane (In re Jorgenson)*,
    66 B.R. 104 (B.A.P. 9th Cir. 1986) ..................................................92

*JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns)*,
    419 B.R. 221 (Bankr. S.D.N.Y. 2009).................................................................78

*Key Bank N.A. v. Milham (In re Milham)*,
    141 F.3d 420 (2d Cir. 1998) .................................................................43, 51

*Marine Midland Bank, N.A. v. Ladycliff College (In re Ladycliff College)*,
    56 B.R. 765,768 (S.D.N.Y. 1985) .................................................................46

*NationsBank of Virginia, N.A. v. DCI Publ'g of Alexandria, Inc.*,
    160 B.R. 538 (E.D. Va. 1993) .................................................................46

*New Hampshire v. Maine*,
    532 U.S. 742 (2001).................................................................36

*Norwest Bank Worthington v. Ahlers*,
    485 U.S. 197 (1988).................................................................87

*NPS, LLC v. Minihane*,
    451 Mass. 417, 886 N.E.2d 670 (2008).................................................................54

*Orix Credit Alliance, Inc. v. Delta Res., Inc. (In re Delta Res., Inc.)*,
    54 F.3d 722 (11th Cir. 1995) .................................................................41

*R.G. Fin. Corp. v. Vergara-Nunez*,
    446 F.3d 178 (1st Cir. 2006).................................................................48

*RadLax Gateway Hotel, LLC v. Amalgamated Bank*,
    132 S.Ct. 2065 (2012).................................................................66

*Rake v. Wade*,
    508 U.S. 464 (1993).................................................................40, 42

*Reider v. FDIC (In re Reider)*,
    31 F.3d 1102 (11th Cir. 1994) .................................................................70, 71

*Rochman v. Ne. Utils. Serv. Group (In re Pub. Serv. Co. of New Hampshire)*,
    963 F.2d 469 (1st Cir. 1992).................................................................passim

*Scotia Pacific Co. v. Official Unsecured Creditors' Comm. (In re Pacific Lumber Co.)*, 584 F.3d 229 (5th Cir. 2009).................................................................90

*Search Market Direct, Inc. v. Jubber (In re Paige)*,
    584 F.3d 1327 (10th Cir. 2009) ...................................................91, 97

*Snap-On Tools, Inc. v. Freeman (In re Freeman)*,
    956 F.2d 252 (11th Cir. 1992) ....................................................44

*South Bay Boston Mgmt. v. Unite Here, Local 26*,
    587 F.3d 35 (1st Cir. 2009)..........................................................79

*Southland Corp. v. Toronto-Dominion (In re Southland Corp.)*,
    160 F.3d 1054 (5th Cir. 1998) .........................................52, 55, 56

*Takisaki v. Alpine Group, Inc. (In re Alpine Group, Inc.)*,
    151 B.R. 931 (B.A.P. 9th Cir. 1993) ...........................................37

*Till v. SCS Credit Corp.*,
    541 U.S. 465 (2004).....................................................................58

*Torres v. Oakland Scavenger Co.*,
    487 U.S. 312 (1988)......................................................................2

*Union Sav. Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.)*,
    860 F.2d 515 (2d Cir. 1988) .......................................................70

*United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs.*,
    484 U.S. 365 (1988).............................................................31, 65

*United States v. GWI PCS 1 Inc. (In re GWI PCS 1 Inc.)*,
    230 F.3d 788 (5th Cir. 2000) ......................................................91

*United States v. Ron Pair Enters., Inc.*,
    489 U.S. 235 (1989)....................................................................30

*United States v. Tierney*,
    760 F.2d 382 (1st Cir.1985).........................................................49

*Winthrop Old Farm Nurseries, Inc. v. New Bedford Inst. For Savings (In re Winthrop Old Farms Nurseries, Inc.)*
    50 F.3d 72 (1st Cir. 1995).....................................................32, 40, 48

*Zimmermann v. Jenkins (In re GGM, P.C.)*,
    165 F.3d 1026 (5th Cir. 1999) ....................................................44

**STATUTES**

11 U.S.C. § 101(31) ...................................................................85

11 U.S.C. § 102(7) ....................................................................46

11 U.S.C. 361 ........................................................................ 48

11 U.S.C. 362 ........................................................................ 8

11 U.S.C. 362(d)(1) ...............................................................10, 47

11 U.S.C. 362(d)(2)(A) ...........................................................10, 47

11 U.S.C. § 502(b) ..................................................................85

11 U.S.C. § 506 .................................................................passim

11 U.S.C. § 506(a) .............................................................passim

11 U.S.C. § 506(b) .............................................................passim

11 U.S.C. § 1101(2) ................................................................92

11 U.S.C. § 1124(1) ................................................................76

11 U.S.C. §§ 1126 .....................................................28,76. 80, 81, 82

11 U.S.C. § 1126(a) ............................................................79, 80

11 U.S.C. §§ 1126(c) ..............................................................81

11 U.S.C. §§ 1126 (d) .............................................................81

11 U.S.C. § 1126(f) ................................................................81

11 U.S.C. § 1127(b) ................................................................93

11 U.S.C. § 1129 ...............................................................passim

11 U.S.C. § 1129(a)(3)........................................................83, 84, 87

11 U.S.C. §1129(a)(7)........................................................22, 82, 83

11 U.S.C. §§ 1129(a)(10)..................................... 18, 75, 76, 77, 78, 79

11 U.S.C. § 1129(b)(2)(A)(i) ................................................................passim

11 U.S.C. § 1129(b)(2)(A)(iii) .......................................................................65

11 U.S.C. § 1322(e) .......................................................................................40

28 U.S.C. § 158(d)(1)........................................................................1, 2, 25, 57

## OTHER AUTHORITIES

4 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶ 506.03[10]
(16th ed.) ................................................................................................42

7 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶¶ 1126.04
(16th ed.) ................................................................................................82

7 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶¶
1129.02[7][b][iii] (16th ed.)....................................................................82

7 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶¶
1129.02[8] (16th ed.) ..............................................................................82

Fed. R. App. P. 3(c)(1)(B) ........................................................................2, 3

Fed. R. Bankr. P. 8006...............................................................................44

Throughout the bankruptcy cases from which these appeals arise, all of the evidence adduced and the findings made, especially at the critical juncture of confirmation, demonstrated that appellee The Prudential Insurance Company of America ("Prudential") was "oversecured" — the collateral securing its loan to the Debtors held sufficient value to guarantee Prudential not just payment of its debt, but post-petition interest for the duration of the bankruptcy cases.  Because confirmation of the joint chapter 11 plan of liquidation for SW Boston Hotel Venture LLC ("SW Boston") and its Affiliate Debtors[1] (collectively, the "Debtors") deprived Prudential of its statutory right to post-petition interest, and a myriad of other statutory rights, Bankruptcy Appellate Panel ("BAP") properly vacated that plan after due consideration.  Prudential therefore respectfully requests that this Court affirm the decisions of the BAP.

## JURISDICTION

This Court has jurisdiction to review "*final* decisions, judgments, orders, and decrees" of the BAP, 28 U.S.C. § 158(d)(1) (emphasis added), and therefore, has jurisdiction over the appeals from the BAP's final decision with respect to post-petition interest (Nos. 12-9008 and 12-9011), except as discussed below.

---

[1]  The "Affiliate Debtors" are Auto Sales & Services, Inc., Frank Sawyer Corporation, General Trading Company, 30-32 Oliver Street Corporation, 131 Arlington Trust, General Land Corporation and 100 Stuart Street, LLC.

1

This Court lacks jurisdiction, however, over the appeals from the BAP's decision vacating and remanding the Bankruptcy Court's decision and orders confirming the Debtors' chapter 11 plan of liquidation (Nos. 12-9009 and 12-9012). As set forth in Prudential's motion to dismiss those two appeals for lack of jurisdiction and the supporting reply, the BAP's decision and judgment vacating confirmation of the plan are interlocutory rather than "final" orders within the meaning of 28 U.S.C. § 158(d)(1) because the BAP's remand necessarily entails significant further proceedings. This Court referred Prudential's motion to the merits panel and the motion and supporting reply are hereby incorporated by reference. Accordingly, those two appeals must be dismissed for lack of jurisdiction.

The BAP rendered separate decisions rejecting the Debtors' motions to dismiss Prudential's appeals as equitably moot. Debtors' Add. 43-76. This Court lacks jurisdiction to review those decisions, because the Debtors failed to designate those orders in any of their notices of appeal as required by Fed. R. App. P. 3(c)(1)(B). *See* Joint Appendix ("App.") 37-39, 43-45, 49-51, 291-93. This Court therefore lacks jurisdiction over the Debtors' challenge to those orders. *See In re Spookyworld, Inc.*, 346 F.3d 1, 6 (1st Cir. 2003) (citations omitted); *Brooks v. AIG Sunamerica Life Assurance Co.*, 480 F.3d 579, 585 (1st Cir. 2007); *see generally Torres v. Oakland Scavenger Co.*, 487 U.S. 312, 317 (1988) (holding that

2

compliance with Rule 3 is a jurisdictional requirement that cannot be excused or waived).

## COUNTER-STATEMENT OF THE ISSUES PRESENTED

1.     Whether Prudential was an "oversecured" creditor and therefore entitled under the Bankruptcy Code to post-petition interest accruing from the commencement of the bankruptcy cases when the Debtors' schedules, the Bankruptcy Court's findings in the Lift Stay Decision and at confirmation, and the sale price for certain of the Debtors' assets all demonstrated that the value of Prudential's collateral exceeded the value of its claims by $19 million to $24 million and no evidence to the contrary was submitted.

2.     Whether the Bankruptcy Court abused its discretion by using the contractually negotiated default interest rate specified in the governing loan agreement in its calculation of post-petition interest as permitted by both federal and Massachusetts law.

3.     Whether the Bankruptcy Court committed legal error by failing to read definitional provisions of the governing loan agreement together and thus failing to acknowledge that the agreement provided for the compounding of default interest just as it provided for compounding of regular interest.

4.     Whether, as the Debtors and the City do not dispute, the BAP properly vacated the confirmation order after awarding Prudential post-petition interest from

the commencement date of the bankruptcy cases when the Bankruptcy Court never calculated the amount due Prudential and there was no evidence that the Debtors could pay Prudential's claims inclusive of post-petition interest.

5.    Whether the Bankruptcy Court erred by confirming the Liquidating Plan over Prudential's objection when the Bankruptcy Court, among other things, (a) failed to require the Debtors to pay Prudential an amount equal to the value of its collateral as of the effective date of the Plan, (b) failed to require the Debtors to allow Prudential to retain its liens, (c) permitted the Debtors to substantively consolidate their estates in the absence of any supporting evidence solely to deprive Prudential of its legal and economic rights against each Debtor and (d) failed to scrutinize the claims of insiders as required by the good faith standard of the Bankruptcy Code.

6.    Whether the BAP properly refused to hold the Bankruptcy Court's errors unreviewable on grounds of equitable mootness where only modest payments had been made to creditors and equity interests were distributed to insiders under the Liquidating Plan, no other material transactions occurred, and the Debtors had a substantial number of units to liquidate as of the effective date of the Liquidating Plan.

## <u>STATEMENT OF FACTS</u>

In 2007, SW Boston sought financing to develop property located in Boston's downtown theater district into the "W" Hotel and Residences, a mixed-use property consisting of a 235-room hotel, 123 residential condominium units, and a two-story parking garage.  App. 1790.  Prudential provided more than $180 million of financing that made the development possible and protected itself by taking a security interest in property held by SW Boston and the Affiliate Debtors.  SW Boston defaulted on its loan, and it and the Affiliate Debtors declared bankruptcy.  The principal issues in this appeal concern Prudential's ability to rely on its collateral and the rights afforded to it under the Bankruptcy Code to protect its bargained-for investment in these bankruptcy cases.

### A.    Prudential Provides up to $192,200,000 in Financing to SW Boston and Its Affiliate Debtors for the W Hotel and Residences.

After financing with another lender fell through, Prudential agreed to provide up to $192,200,000 in financing for the project (the "Prudential Loan") pursuant to the Construction Loan Agreement (the "Prudential Loan Agreement"). *See generally* App. 2144-2253.  In addition to the Prudential Loan Agreement itself, Prudential and the Debtors executed a number of other documents to implement the transaction.  These additional documents included a mortgage and security agreement granting Prudential a first priority security interest on

5

substantially all of SW Boston's property and the proceeds thereof. Prudential

Proof of Claim p. 2; *id.,* Schedule 1, at pp. 1-4; App. 1793.

Moreover, given the degree of risk associated with the project, the Affiliate

Debtors agreed to guarantee the Prudential Loan and to pledge additional assets as

additional security. *See generally* App. 2189-2192, 2289-2438. A single

individual, Carol Sawyer Parks, controls SW Boston and all of the Affiliate

Debtors. App. 1464. The Affiliate Debtors have limited assets and operations of

their own, which often consist of no more than owning cash and securities, a parcel

of real property, or ownership interests in other Debtors. App. 1091-1098, 1789-

1790.

Additionally, the Prudential Loan Agreement required Affiliate Debtor-

guarantor Frank Sawyer Corporation ("FSC"), as the indirect parent of SW Boston,

to arrange for the issuance of a letter of credit for Prudential's benefit as additional

security for the loan. App. 2190-2191. As a result, FSC caused SE Berkeley

Street, LLC ("SE Berkeley") and SE McClellan Highway, LLC ("SE McClellan"),

two non-debtor entities also controlled by Ms. Parks, to obtain a letter of credit in

favor of Prudential in the approximate amount of $17.3 million (the "Letter of

Credit"). App. 1947, 2190-2191. Neither SW Boston nor its direct parent,

Affiliate Debtor 100 Stuart Street, LLC ("100 Stuart Street"), executed any

document or agreement assuming any obligation for any claim for reimbursement

made by SE Berkeley or SE McClellan in connection with the Letter of Credit. App. 1314-1318.

In the Prudential Loan Agreement, SW Boston agreed to pay interest to Prudential, during the normal life of the loan at an annual rate of 9.5 percent, compounded monthly, *see* App. 2154, 2183, and in the event of a default, interest at the same rate plus an additional 5 percent. App. 2154, 2158, 2184. In addition to scheduled principal payments, the Debtors were required to pay Prudential 92% of the proceeds of each residence sale upon its closing. App. 2231-2232. The Prudential Loan Agreement permitted Prudential, after an event of default, to apply monies received to the outstanding principal, accrued interest and fees in any order of priority in its discretion. App. 2235.

After construction of the project was underway, in lieu of an additional capital contribution by Ms. Parks to the Debtors, the City of Boston agreed to lend SW Boston $10.5 million under the terms of a "Subordinate Loan Agreement" (the "City Loan") to complete construction of certain amenities and facilities. App. 1794. As security for the City Loan, the Debtors granted the City second liens on much of the same collateral on which Prudential had a first lien. App. 1794. In addition, SW Boston pledged to the City an account not subject to Prudential's lien which held $4 million in cash. App. 1792. Prudential consented to this arrangement because the City contractually agreed to subordinate its right to

7

payment to Prudential and to assign its right to vote on any bankruptcy plan to Prudential through an Intercreditor and Subordination Agreement, dated as of December 29, 2009 (the "Intercreditor Agreement").  App. 2539-2567; Debtors' Add. 163.

**B.    After Defaulting, the Debtors Commence the Chapter 11 Cases.**

After failing to make a mandatory quarterly payment to Prudential, and thus defaulting under the Prudential Loan Agreement, five of the Debtors, including SW Boston, commenced voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the Bankruptcy Court on April 28, 2010 (the "Petition Date").  App. 1792, 1797.  The initiation of the bankruptcy cases triggered an automatic stay under section 362 of the Bankruptcy Code that precluded Prudential from invoking its remedies with respect to its collateral.  On June 4, 2010, the remaining three Debtors commenced their chapter 11 cases (collectively, all of the Debtors' cases are referred to as the "Chapter 11 Cases"). App. 1797.  As of the Petition Date, Prudential was the largest and most senior creditor of the Debtors, representing approximately 86% of the Debtors' aggregate non-insider indebtedness.  App. 1793, 1797, 2520.  At the outset of their Chapter 11 Cases, the Debtors stated under penalty of perjury in their schedules of assets and liabilities that the value of Prudential's collateral was, in the aggregate, approximately $241 million.  App. 2256-2263; Schedules of Auto Sales &

Services, Inc. pp. 4-7 [Case 10-14528, Dkt. 20][2]; Schedules of Frank Sawyer Corp.

pp. 4-8 [Case 10-14533, Dkt. 22]; Schedules of General Trading Co. pp. 4-8 [Case

10-14532, Dkt. 21]; Schedules of 30-32 Oliver Street Corp. p. 3 [Case 10-16173,

Dkt. 28]; Schedules of 131 Arlington Trust p. 3 [Case 10-16177, Dkt. 30];

Schedules of General Land Corp. p. 3 [Case 10-16174, Dkt. 28]; Schedules of 100

Stuart Street, LLC pp. 4-7 [Case 10-14534, Dkt. 22].

Prudential timely filed a proof of claim in each of the Chapter 11 Cases

asserting secured claims, as of the Petition Date, in the amount of not less than

$180,803,186, plus all fees, costs and interest accrued and unpaid prior to and

subsequent to the Petition Date.  *See* Prudential Proof of Claim.  When accrued

interest, fees and expenses are included, Prudential's pre-petition claims against

each of the Debtors totaled $182,892,659.  Debtors' Add. 170.  Shortly after the

Petition Date, when Prudential drew down the $17.3 million available under the

Letter of Credit, the aggregate amount of its claims was reduced to $165,592,659.

App. 2015; Debtors' Add. 163

### C. The Bankruptcy Court Finds and Determines that Prudential Is Oversecured by More than $19 Million in the Lift Stay Litigation.

When the Debtors failed to propose a plan of reorganization in the first 90

days of the Chapter 11 Cases, Prudential filed a motion to lift the automatic stay

---

[2]    "Dkt. __" refers to docket number in the referenced Bankruptcy Court case. Citations omitting a case reference are to the docket number in case 10-14535.

under sections 362(d)(1) and (d)(2) of the Bankruptcy Code to permit Prudential to

exercise its rights and remedies against its collateral (the "Lift Stay Motion").

App. 2067-2088.  Significantly for purposes of this appeal, the Lift Stay Motion

was denied in significant part because the Bankruptcy Court concluded that, based

on the testimony and other evidence, Prudential's collateral was worth

substantially more than its claims.

Prudential asserted, among other things, that it was not "adequately

protected" because the amount of Prudential's claim against SW Boston exceeded

the value of SW Boston's assets, that is, that Prudential was "undersecured," and

that the Debtors lacked the means to provide alternative forms of adequate

protection.  App. 2079-2080.  In support of the Lift Stay Motion, Prudential

submitted appraisals for the hotel and residences, which estimated their values, as

of May 24, 2010, to be $55 million and $86 million, respectively.  App. 2073-

2074; Exhibit P-1, Appraisal of Eric Lewis, from Evidentiary Hearing Held

November 8-10, 2010 p. 2 [Dkt. 205];  Exhibit P-4, Appraisal of Randell L.

Harwood, from Evidentiary Hearing Held November 8-10, 2010 p. 4 [Dkt. 202].

The Debtors opposed the Lift Stay Motion on various grounds, including by

claiming that the aggregate value of all of the collateral that secured Prudential's

claim exceeded the amount of Prudential's claim, that is, Prudential was

oversecured.  App. 2038-2039.  The City of Boston opposed the Lift Stay Motion

as well, arguing that Prudential had a large equity cushion.  App. 2063-2064.  The

Debtors filed appraisals for each of the Debtors' real property assets securing

Prudential's claim.  App. 2029; Exhibits A through E to Supplemental Opposition

by Debtors and Debtors-in-Possession to Prudential Motion for Relief from Stay

[Dkt. 307].  The values in the appraisals were: (1) for the hotel, as of August 1,

2010, $65.6 million, (2) for the residences, as of August 1, 2010, $90.6 million;

and (3) for the remaining real property collateral, as of September 14, 2010, $6.43

million.  App. 2029.  In addition, the Debtors estimated the value of cash and

securities subject to Prudential's lien as of September 30, 2010 to be $9,175,560.

App. 2029.

The Bankruptcy Court held a three-day evidentiary hearing on the Lift Stay

Motion on November 8-10, 2010, and during Prudential's opening argument, the

Bankruptcy Court expressed its conclusion that Prudential was oversecured by the

aggregate collateral package.  Transcript of Morning Session of Evidentiary

Hearing on November 8, 2010 pp. 6-12 [Dkt. 381].  In response, counsel for

Prudential indicated that if the Bankruptcy Court found that Prudential was

oversecured, Prudential would seek a finding it was entitled to post-petition

interest.  *Id.* at 11.

In an extensive memorandum decision and order of more than fifty pages,

issued on January 28, 2011 (the "Lift Stay Decision"), the Bankruptcy Court

11

denied the Lift Stay Motion.  The Bankruptcy Court acknowledged the volume of evidence it considered and held, in significant part, that the value of Prudential's collateral, when aggregated among all Debtors, exceeded its claims by more than $19,000,000.  App. 1980.  As a result, the Bankruptcy Court found that this equity cushion adequately protected Prudential's interest.  App. 1980.

### D.    The Hotel Sale Confirms the Findings in the Lift Stay Decision Regarding the Value of Prudential's Collateral.

On March 28, 2011, SW Boston filed two motions with the Bankruptcy Court seeking approval of the sale of the hotel and certain other related facilities to an unrelated third party for $89,500,000 (the "Hotel Sale Motion").  *See generally* App. 1919-1941.  The purchase price exceeded the value found by the Bankruptcy Court in the Lift Stay Decision two months earlier by approximately $24 million. App. 1710, 1973.  Prudential consented to the sale of the hotel, which the Bankruptcy Court subsequently approved.  App. 1835-1874.  Upon the closing of the hotel sale on June 8, 2011, Prudential received $83,322,017 in net sales proceeds.  Debtors' Add. 7, 166.

### E.    The Debtors File the Liquidating Plan Refusing to Pay Post-Petition Interest to Prudential and Terminating Certain of Its Liens.

Three days after they filed the Hotel Sale Motion, the Debtors also filed their joint chapter 11 plan (as amended, the "Liquidating Plan") and the accompanying disclosure statement.  App. 638-643.  As subsequently amended, the Liquidating

Plan provided for the sale of the remaining residence units and the payment of net proceeds to Prudential, but only after satisfaction of all taxes, condominium fees and operating expenses of all of the Debtors and unprecedented "working capital" reserves. App. 1734, 1739-1740, 1754. The Debtors proposed to pay over the sale proceeds until Prudential's allowed secured claims were "paid in full." App. 1739. Notwithstanding the findings of the Lift Stay Decision or the results of the hotel sale process, "payment in full" did not contemplate payment of any post-petition interest, fees or costs. App. 1062-1063, 1725, 1794. Moreover, the Debtors proposed in the Liquidating Plan that they would effectively transfer the equity interests in SW Boston from 100 Stuart Street to a newly created entity, 110 Stuart Street, LLC ("110 Stuart Street"), owned by two non-debtor affiliates controlled by Ms. Parks that were not creditors of SW Boston.[3] No party would contribute any "new value" to the Debtors in consideration for the equity interests, nor did the Liquidating Plan contemplate any new financing. App. 1819; Exhibit B to Amended Disclosure Statement p. 3 [Dkt. 550-1]. Except for the transfer of SW Boston's equity to insiders free and clear of Prudential's liens, the corporate ownership structure of the Debtors, their management and their marketing plan

---

[3]   The uncontroverted testimony adduced at trial established that the sole basis of the $17.3 million "claims" of these affiliates, SE Berkeley and SE McClellan, was an "understanding" Ms. Parks made with herself as the sole manager of each of SE Berkeley, SE McClellan and SW Boston. App. 1315-1316.

remained largely unchanged.  App. 1752-1753, 1141-1145, 1819-1820.  Neither

the Liquidating Plan nor the disclosure statement contained a liquidation analysis

as required by section 1129(a)(7) of the Bankruptcy Code.  App. 1110, 1425, 1723-

1834.

In addition to refusing to pay Prudential post-petition interest, the Debtors

substantially re-wrote the Prudential Loan Agreement, stripping many of its salient

terms.  App. 1738-1743; Exhibit A to Liquidating Plan [Dkt. 533]; *see also*

*generally* App. 2144-2253.  These wholesale revisions included:  (1) the reduction

of the interest rate from 9.50% compounded and payable monthly to 4.25% simple

interest due and payable only upon receipt of sale proceeds, App. 1739, 2154,

(2) the removal of significant financial covenants including budget approval by

Prudential, Exhibit A to Liquidating Plan [Dkt. 533]; App. 1787-1788, 2206-2218,

(3) the expansion of the Debtors' ability to liquidate "collateral" other than the

residences without Prudential's consent, App. 1106-1110, 1739-1740, 2189-2192,

(4) the reduction of the minimum prices for the remaining unsold residences, App.

1494; Prudential Exhibit 2 – Remaining Inventory from Evidentiary Hearing held

June 27-29, 2011; Exhibit E to Prudential Loan Agreement, and (5) the apparent

termination of any default interest payable to Prudential, App. 1739, 2158.  Indeed,

the full extent of the treatment of Prudential's claims and the Prudential Loan

Agreement and related documents was not entirely clear because no new loan

agreement or note was issued to Prudential.  App. 1748.  Undoubtedly, the

obligations to Prudential would be reduced depriving Prudential of its rights as a

lender because the Debtors relied on the terms of the Liquidating Plan, including

Section 4.2(*l*), which purported to cancel "any terms, covenants, representations

and warranties, and/or remedies" in the Prudential Loan Agreement and related

documents "that impose obligations upon the Debtors *that are inconsistent with or*

*more expansive than* the terms of the Plan[.]"  App. 1742-1743 (emphasis added).

What terms might be deemed "inconsistent" or "more expansive" remains unclear.

Furthermore, by its express terms, Section 5.8 of the Liquidating Plan

substantively consolidated the Debtors.  App. 1755-1756.  As a result, (i) all assets

and all liabilities of each Debtor were merged or treated as merged with the assets

and liabilities of all other Debtors; (ii) all guarantees of any Debtor of the

obligations of any other Debtor, including the obligations to Prudential under the

Prudential Loan Agreement, were deemed eliminated and extinguished; and

(iii) each claim filed in the bankruptcy case of any Debtor was deemed filed

against the Debtors on a consolidated basis.  App. 1755-1756.

In contrast to Prudential's treatment, the Liquidating Plan left the economic

terms of the City's claims largely unchanged.  In fact, the Debtors agreed to pay

the City interest on account of its claims at its original contract rate of 8%, 5% paid

monthly and 3% deferred, economic terms that are identical to its pre-petition loan

documents.  App. 1743.  Moreover, the City received post-petition interest from its

separate collateral during the course of the Chapter 11 Cases while Prudential did

not.  App. 1474, 1794.  Similarly, non-insider unsecured creditors would have been

paid in full in three annual installments, starting on the effective date of the

Liquidating Plan, with post-confirmation interest at a rate of 4.25%.  App. 1751-

1752.  Under the Liquidating Plan, Prudential's collateral was the sole source of

payments to general unsecured creditors.  App. 1099, 1234-1236, 1726, 1754.

> **F.      Prudential Files the Post-Petition Interest Motion and the Parties
> Stipulate to the Value of the Collateral for the Joint Hearing on
> Confirmation and the Post-Petition Interest Motion.**

Because the Bankruptcy Court had found it to be oversecured rather than

undersecured, Prudential sought to claim the benefit to which oversecured creditors

are entitled under the Bankruptcy Code: interest to compensate it for the lock-up of

its collateral during the Chapter 11 Cases.  On April 15, 2011, Prudential filed a

motion (the "Post-Petition Interest Motion") seeking post-petition interest, fees and

expenses pursuant to 11 U.S.C. § 506.  App. 1706-1722.[4]  The Post-Petition

Interest Motion explained that Prudential had been oversecured since the Petition

Date, that the Lift Stay Decision (based upon the Debtors' own evidence) had

found that Prudential was oversecured by $19 million, and that the actual equity

---

[4]      Specifically, Prudential sought authority to apply the payments of residence
sale proceeds to fees, costs and interest at the default rate before reduction of
principal, consistent with the terms of the Prudential Loan Agreement.  App.
1713-1714.

cushion must be much larger because the hotel had subsequently been sold for $24 million *more* than the value adopted in the Lift Stay Decision. App. 1707, 1710-1711, 1712-1713, 1716. The Debtors and the City objected to the Post-Petition Interest Motion. App. 1657-1692, 1693-1705.

As discussed further below, the Bankruptcy Court held a combined trial on Prudential's Post-Petition Interest Motion and confirmation of the Liquidating Plan on June 27-29, 2011. At that time, SW Boston still owned approximately eighty-one residences with a stipulated value of $63,772,219. App. 1053, 1590. The Debtors and Prudential stipulated that the value of the other assets, including cash, securities and other real property, was $14,555,469, App. 1587, establishing an aggregate collateral value, exclusive of all residence and hotel sale payment proceeds received during the Chapter 11 Cases, of $78,327,688. App. 1587, 1590. When reduced by the cash collateral paid to Prudential during the course of the Chapter 11 Cases, before consideration of post-petition interest or the application of such proceeds thereto, the balance of Prudential's secured claims against the Debtors was $53,537,825, leaving Prudential oversecured by $24,789,863 at confirmation. App. 2499. If accrued at the default rate on a compounded basis, the post-petition interest due to Prudential, as of April 25, 2011, was $24,740,835.30. App. 2287.

17

**G.    The Bankruptcy Court Confirms the Liquidating Plan by Cramdown over Prudential's Objections and Denies a Substantial Portion of the Post-Petition Interest Claim.**

The Bankruptcy Court conducted a joint evidentiary hearing over three days on both the Post-Petition Interest Motion and confirmation of the Liquidating Plan. Debtors' Add. 148; *see generally* App. 1032-1493.  The parties submitted expert reports and multiple factual and expert witnesses testified.  Debtors' Add. 148; *see generally* App. 1032-1493, 1496-1572, 2476-2538; Affidavit of Paul Griesmer [Dkt. 689].  In their Report on Plan Voting, the Debtors noted that numerous classes of creditors failed to cast votes, and therefore neither affirmatively accepted nor rejected the Liquidating Plan.  App. 1574-1577.  Prudential voted its claims and those of the City against each Debtor to reject the Liquidating Plan.  App. 1575, 2551.  In violation of its obligation to assign its right to vote to Prudential, the City also cast ballots on account of its claims, voting in each instance to accept the Liquidating Plan.  App. 1575, 2551.

The only classes voting to accept the Liquidating Plan were holders of two classes of claims against SW Boston and one class of claims against General Trading Company.  App. 1575-1576.  Consequently, the Debtors reported voting results on a consolidated basis, asserting that acceptance by one class of impaired creditors on a consolidated basis was sufficient to satisfy the requirements of Bankruptcy Code section 1129(a)(10).  App. 1574-1577.  When the voting results

were considered separately on a case by case basis, at least two Debtors, 100 Stuart

Street and Auto Sales & Services, Inc., lacked an impaired accepting class of

claims held by non-insider creditors – meaning no creditors whose claims were

impaired, or altered by the Liquidating Plan, had voted to accept the Liquidating

Plan.  App. 1579-1583.  In addition, if Prudential's votes on behalf of the City

under the Intercreditor Agreement were properly counted, six of the eight Debtors

lacked an impaired accepting class of creditors.  App. 1579-1583.

Moreover, the Debtors did not submit any evidence in support of substantive

consolidation at the trial.  In fact, the evidence adduced at trial confirmed that each

Debtor (1) maintained separate books and records, (2) maintained separate bank

accounts, and (3) had its own governing body.  App. 1103.  The Debtors further

testified that they did not commingle funds at any time.  App. 1103.  Pursuant to

the separate guarantees and pledges each Affiliate Debtor executed, Prudential had

the right to proceed separately against each of them.

Despite the joint hearing, the Bankruptcy Court bifurcated its decisions,

issuing its decision on the Post-Petition Interest Motion on October 4, 2011, while

waiting nearly six weeks before issuing its decision on confirmation.  Debtors'

Add. 91-140, 146-205.  In its decision on the Post-Petition Interest Motion (the

"506 Decision"), the Bankruptcy Court purported to consider six possible dates to

"fix the secured status of Prudential's claim" and concluded that the first date that

the value of Prudential's collateral "unequivocally" exceeded the value of its claims "beyond dispute" was June 8, 2011, the date the hotel sale closed. Debtors' Add. 192-193. After the Bankruptcy Court issued its decision, the Court entered two subsequent orders (the "Claim Orders"), which fixed the amount of Prudential's claims by adding post-petition interest accrued from June 8, 2011, notwithstanding the certainty of its decision on valuation in respect of the Lift Stay Motion. Debtors' Add. 142-145, 206-207.

The Bankruptcy Court refused to allow Prudential to compound interest in calculating the amount owed. The Bankruptcy Court did not address the presence of the term "compounding monthly" in the definition of Applicable Interest Rate, to which the Default Rate is pegged. Debtors' Add. 144; App. 2154.

Limiting the period of accrual of post-petition interest and denying the allowance of compounding resulted in a remaining claim for Prudential, as of October 4, 2011, in the amount of $51,835,721, rather than a claim in the amount of $78,327,688, as Prudential had asserted. Debtors' Add. 144-145, 169-170; App. 1587, 1590, 2501.

On November 14, 2011, the Bankruptcy Court issued its confirmation opinion (the "Confirmation Decision"), holding that the Liquidating Plan satisfied the requirements for confirmation. Debtors' Add. 91-140. Two days later, the Bankruptcy Court entered an order confirming the Liquidating Plan (the

20

"Confirmation Order"). Debtors' Add. 77-90. Largely premised on the

Bankruptcy Court's finding that Prudential will receive "payment in full" of its

allowed secured claim, and therefore was not harmed by its treatment, Debtors'

Add. 122, 131-132, 134-137, 139-140, the Confirmation Decision did not reflect

certain of the key evidence presented at trial and included several incorrect legal

findings. First, although the Bankruptcy Court found that Prudential would retain

its liens under the Liquidating Plan, it did not acknowledge (1) the delivery of new

interests in SW Boston to 110 Stuart Street free and clear of Prudential's liens and

(2) the use of Prudential's collateral as the sole source of funds used to finance the

Debtors' ongoing operations and payments to unsecured creditors. Debtors' Add.

122. Second, the Bankruptcy Court found that the Liquidating Plan did not

discriminate in favor of insiders despite the failure of the Debtors or the

Bankruptcy Court even to identify the legal or factual foundation for allowance of

SE McClellan's and SE Berkeley's purported claims against SW Boston. Debtors'

Add. 139-140. Third, the Bankruptcy Court ignored the uncontroverted evidence

that Prudential would have received more in a chapter 7 liquidation than it would

receive under the Liquidating Plan in violation of 11 U.S.C. §1129(a)(7). Debtors'

Add. 138. Fourth, the Bankruptcy Court held that the consolidation of the

Debtor's assets and liabilities for purposes of the Liquidating Plan did not, in fact,

constitute an impermissible use of substantive consolidation. Instead, the

21

Bankruptcy Court adopted an unprecedented "no harm, no foul" approach which excused the Debtors from satisfying their high burden for imposing substantive consolidation. Debtors' Add. 135-137. Finally, the Bankruptcy Court found the assignment of the City's vote to Prudential under the Intercreditor Agreement was not enforceable. Debtors' Add. 108-110.

### H.     The BAP Reverses, Vacates and Remands the Bankruptcy Court's Decisions.

Prudential timely appealed the 506 Decision and the Claim Orders to the BAP. App. 705,707. The Debtors cross-appealed the same orders and the BAP joined those appeals and cross-appeals. *See* App. 706, 708. Prudential also timely filed a notice of appeal of the Confirmation Decision and Confirmation Order. App. 711. Two days after entry of the Confirmation Order, Prudential filed an emergency Motion for Stay of the Confirmation Order Pending Appeal. App. 968-1012. The Bankruptcy Court denied that motion three days later, on November 21, 2011, without a hearing. App. 965-967. Three business days later (on November 28, 2011), Prudential filed an Emergency Motion for Stay of Confirmation Order Pending Appeal with the BAP. App. 521-559. The BAP denied that motion on November 30, 2011. *See* App. 468-482.

The effective date of the Liquidating Plan purportedly occurred on December 1, 2011, upon execution of a limited series of transactions that did not include any new financing or other investment. *See* App. 714, 1819. First, the

22

Debtors made partial distributions to general unsecured creditors and Bovis Lend Lease LMB, Inc.  Second, the Debtors issued new equity interests in SW Boston to 110 Stuart Street (rather than the existing Debtor 100 Stuart Street) and the equity interests of 110 Stuart Street were issued to insiders SE Berkeley and SE McClellan.  Third, the Debtors declared inter-debtor claims canceled.  App. 274, 1817.

On February 14, 2012, the same day they filed their opening briefs with the BAP, the Debtors moved to dismiss each of Prudential's appeals as equitably moot (the "Motion to Dismiss").  *See* App. 253-282.  Prudential opposed the Motion to Dismiss, arguing that the Liquidating Plan had not been substantially consummated because a large portion of the transactions to be made under the Liquidating Plan had not been completed.  App. 230, 242-244.  In the alternative, Prudential argued that even if substantial consummation had occurred, Prudential could still be afforded relief, in whole or in part, without undoing the Liquidating Plan and without undermining the Debtors' reorganization.  App. 244, 251.

The BAP denied the Motion to Dismiss on March 12, 2012.  While the BAP concluded that the Liquidating Plan had been substantially consummated, it held that relief could be granted to Prudential without unraveling the Debtors' reorganization and reversal of the Liquidating Plan would not adversely affect innocent third parties.  Debtors' Add. 58-59, 75.

23

Ultimately, the BAP issued two decisions on the merits of Prudential's appeals on October 1, 2012.  In the first decision (the "BAP 506 Decision"), the BAP affirmed, in part, and reversed, in part, the 506 Decision.  Debtors' Add. 2, 31.  The BAP concluded that the Bankruptcy Court (1) erred in holding that Prudential was entitled to accrue post-petition interest only from the date of the hotel sale, as the values revealed by the hotel sale and found by the Bankruptcy Court at the hearing on the Lift Stay Motion showed that Prudential was fully secured as of the Petition Date; (2) erred in holding that Prudential was not entitled to post-petition interest computed on a compounded basis; and (3) did not err in awarding Prudential post-petition interest at the default rate set forth in the Prudential Loan Agreement.  Debtors' Add. 21-22, 26, 30.  The BAP remanded to the Bankruptcy Court for further proceedings consistent with its holdings.  Debtors' Add. 31.

In its second decision (the "Confirmation Remand Order"), the BAP vacated and remanded the Confirmation Order.  In its decision, the BAP held that the Bankruptcy Court's 506 Decision and Claim Orders played an "integral" part in the confirmation of the Liquidating Plan.  Debtors' Add. 39.  As the BAP noted in the Confirmation Remand Order, its decision on the 506 Appeal altered "the landscape dramatically" and the "significant increase in the amount of Prudential's claim . . . impacts the evaluation of the Plan's terms under § 1129."  Debtors' Add.

24

39.  The BAP, without deciding whether the Liquidating Plan could ultimately accommodate the increase in the amount of Prudential's claim, remanded "to afford the Debtors an opportunity to amend the Plan's terms to account for the increased amount of Prudential's claim and the resulting pay out to Prudential and/or for the bankruptcy court to fashion alternative forms of relief for Prudential that would not unravel the reorganization."  Debtors' Add. 39-40.

The Debtors and the City of Boston filed notices of appeal to this Court with regard to the BAP 506 Decision and the Confirmation Remand Order (First Circuit case nos. 12-9008, -9009, -9011, -9012).  App. 37-39, 40-60.  Prudential moved to dismiss the appeals of the BAP Confirmation Remand Order because, in vacating and remanding the Liquidating Plan for refashioning or development of alternative relief, it was not a final order within the meaning of 28 U.S.C. § 158(d)(1).  The Debtors and the City opposed Prudential's motion.  This Court issued an order referring the jurisdictional issue to the merits panel and specifically instructing the parties to brief the appeal issues related to confirmation of the Liquidating Plan that Prudential had raised before the BAP.

## SUMMARY OF ARGUMENT

The Debtors presented to the Bankruptcy Court, not a plan of reorganization, but a plan of liquidation.  Having sold the W Hotel and a number of the condominium units while in bankruptcy, they intended to sell the balance of the

25

condominium residences under the Liquidating Plan.  Ultimately, there would be no continuing business.  The Affiliate Debtors owned either vacant lots, equity interests in the other Debtors, or cash and securities, but did not operate independent businesses requiring reorganization.

A secured creditor is entitled to receive not just the value of its secured claim, but the interest on that claim that accrues during the pendency of the bankruptcy case, unless its collateral is worth too little to secure the amount of the claim (making the creditor "undersecured").  That legal rule is undisputed here. Understanding that they could not pay Prudential the full amount of its claims and interest and still make distributions to equity, the Debtors convinced the Bankruptcy Court to award no interest for approximately the first year of the bankruptcy, even though there was no evidence in the record that the value of the collateral ever was low enough to render Prudential undersecured.  The Bankruptcy Court reached its arbitrary conclusion only by holding Prudential to an incorrect and impossible burden.  All the evidence — from the Debtors' own schedules to the Bankruptcy Court's own previous findings on the Lift Stay — demonstrated that Prudential was oversecured at every relevant time.  The experienced bankruptcy judges of the BAP recognized the Bankruptcy Court's inconsistencies and correctly reversed its unsupported valuation finding.

Because the Bankruptcy Court significantly undervalued Prudential's claim, the BAP vacated the Liquidating Plan and remanded for further proceedings. The Debtors and the City do not independently challenge that decision, and to the extent it is properly before this Court, the BAP decision is correct, because the Bankruptcy Court should evaluate the effect of the larger secured claim on the Liquidating Plan.

The Liquidating Plan would have to be vacated in any event, because the Bankruptcy Court disregarded a number of the statutory protections that the Bankruptcy Code affords to senior secured creditors. The Debtors effectively stripped Prudential of both economic as well as non-economic rights in the treatment of its claims, its voting rights in respect of the Liquidating Plan and its remedies post-confirmation. They accomplished this through a variety of means, all of which when taken together, left Prudential with few if any rights and less collateral than to which it was entitled. To achieve their goal, the Debtors crammed down the Liquidating Plan on Prudential with the approval of the Bankruptcy Court without the express statutory protection of maintaining Prudential's liens on its collateral and of fixing Prudential's claim at the value of its collateral. Then, the Debtors paid junior creditors prior to Prudential in a liquidation from Prudential's collateral. In addition, the Bankruptcy Court authorized the substantive consolidation of the Debtors' estates to deprive

27

Prudential of its rights against each Debtor for both payment and voting purposes. The Bankruptcy Court failed to require a class of impaired creditors of each Debtor to accept the Liquidating Plan — even those Debtors that only had Prudential as a creditor. Finally, the Bankruptcy Court adopted the flawed logic of earlier bankruptcy court decisions that precluded enforcement of the assignment of the City of Boston's voting rights in respect of the Liquidating Plan despite the existence of subsequent precedents that expressly identified the deficiencies of the decisions relied upon by the Bankruptcy Court. As the holder of more than 86% of the claims in the aggregate against these Debtors (and despite being the sole creditor in respect of some of them) and with those claims secured by first liens on the Debtors' assets, Prudential had these rights and protections as set forth under various provisions in sections 1129 and 1126 of the Bankruptcy Code.

As a last-resort attempt to cut off appellate review of the Bankruptcy Court's errors, the Debtors renew their argument that the appeal became equitably moot when the Liquidating Plan went effective. The BAP properly rejected that argument. As numerous courts of appeals have made clear, equitable mootness may not be used as a sword to cut off meaningful appellate review of questionable decisions. And here the Liquidating Plan does not give rise to any of the sort of reliance interests that could be invoked to justify withholding appellate review of highly complex plans, full of interconnected transactions that cannot be unwound.

There is no third-party financing and no reorganized business. All the Debtors can point to are transfers of equity interests among insiders and modest distributions to creditors. Moreover, Prudential diligently sought to obtain appellate review before even those developments occurred, timely filing its appeal and seeking a stay of plan confirmation both from the Bankruptcy Court and the BAP. Under these circumstances, the BAP properly concluded that providing Prudential relief on its post-petition interest claim would not make confirmation of a plan impracticable. This Court should affirm its decision to provide just such relief.

## ARGUMENT

**I.  The BAP Correctly Awarded Post-Petition Interest at the Default Rate to Prudential Based Upon the Totality of the Evidence and Multiple Determinations of the Bankruptcy Court that the Value of Prudential's Collateral Exceeded the Amount of Its Claims Throughout the Chapter 11 Cases.**

Prudential is entitled to receive not only the value of its secured claim, but also interest, fees and costs to compensate Prudential for the three years and counting that its collateral has been immobilized by the Chapter 11 Cases and the automatic stay. The *only* permissible ground to deny Prudential any portion of its right to interest, fees and costs would be if its collateral were worth less than the value of its claim, plus such interest, fees and costs. That was not true here. The undisputed record evidence showed that Prudential was "oversecured" — that its collateral was worth more than its claim at the Petition Date — and that the "equity

29

cushion" above the value of the claim was enough to cover a substantial portion of Prudential's claim for interest. That evidence of value establishes that the Bankruptcy Court was required to award Prudential its claim for interest.

### A.    Every Oversecured Creditor Is Entitled to Recover Post-Interest.

There is no dispute in these cases about the governing legal rule: the Bankruptcy Code gives the holder of an oversecured claim an unqualified right to post-petition interest on its claim. Section 506(b) "directs that post-petition interest be paid on all oversecured claims." *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 245 (1989); *Bayback-Middlesex v. Ralar Distribs., Inc.*, 69 F.3d 1200, 1202 (1st Cir. 1995) (explaining that "'oversecured' creditors are entitled to receive post-petition interest and loan-related fees and costs"). Specifically, section 506(b) provides that "to the extent that an allowed secured claim is secured by property the value of which . . . is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim[.]" 11 U.S.C. § 506(b). Further, section 506(a) provides that a claim is oversecured by the amount that the value of collateral securing the claim exceeds the value of the claim. 11 U.S.C. § 506(a) ("An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's  interest in the estate's interest in such property . . . ."). Together, these two provisions of section 506 provide that an oversecured creditor

is entitled to post-petition interest and fees in an amount up to the difference

between the value of its claim and the value of the collateral securing its claim.

*See United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365,

372 (1988).

　　　Once a proof of claim for a secured claim is filed, the debtor bears the initial

burden to refute that entitlement by presenting "sufficient evidence" that the

collateral is worth less than the amount of the secured claim plus interest. *In re*

*Heritage Highgate, Inc.,* 679 F.3d 132, 140, 145 (3d Cir. 2012) ("[T]he party

seeking to negate the presumptively valid amount of a secured claim – and thereby

affect the rights of a creditor – bears the initial burden."). The debtor at some point

must produce admissible evidence about the value of the collateral whether or not

the secured creditor bears the ultimate burden of proof. *See id.*

　　　As explained below, that simple evidentiary proposition is enough to dispose

of the appeals on the question of the entitlement to post-petition interest. Neither

the Debtors nor the City of Boston ever introduced any evidence in the Bankruptcy

Court to show that Prudential was *ever* undersecured. In fact, all of the unrebutted

evidence of the value of Prudential's collateral uniformly proved, by more than a

mere preponderance, that Prudential had established a substantial "equity cushion"

warranting payment of post-petition interest. That evidence included the

schedules of assets and liabilities filed by the Debtors, the proofs of claims filed by

Prudential, the express factual determination of the Bankruptcy Court in connection with the Lift Stay Motion, the sale of the hotel, and the values of Prudential's collateral established at confirmation.

Yet, despite that consistent evidence throughout the Chapter 11 Cases, the Bankruptcy Court denied Prudential any interest from the period from the Petition Date to the hotel sale closing, holding that only on the sale date was it "unequivocally established and beyond dispute that Prudential was an oversecured creditor."  Debtors' Add. 193.  "Unequivocal" and "beyond dispute" are not the equivalent of the preponderance of the evidence standards.  This legal error "infected" the Bankruptcy Court's analysis and thus subjects that analysis to *de novo* review.  *Winthrop Old Farm Nurseries, Inc. v. New Bedford Inst. For Sav. (In re Winthrop Old Farm Nurseries, Inc.)*, 50 F.3d 72, 73 (1st Cir. 1995) (application of section 506 "poses a mixed question of law and fact, subject to the clearly erroneous standard, unless the bankruptcy court's analysis was infected by legal error.")  Accordingly, the BAP was entirely correct in concluding that the Bankruptcy Court had committed reversible error.  Debtors' Add. 21-22.

It is not surprising, therefore, that in this appeal the Debtors and the City of Boston do not point to a single moment in the Chapter 11 Cases when the value of Prudential's collateral did not exceed the value of its claims.  Even if the burden were on Prudential, it sufficiently established that it had an equity cushion for the

32

entirety of the Chapter 11 Cases once it introduced the schedules, its proofs of claims, the Lift Stay Decision, the hotel sale and the confirmation values — all of which were uncontroverted by the Debtors.  The consistency of this evidence more than satisfied the applicable preponderance standard.  *Greenwich Collieries v. Dir., Office Workers Compensation Programs*, 990 F.2d 730, 733 (3d Cir. 1993) *aff'd on other grounds* 512 U.S. 267 (1994) ("Evidence which is of greater weight or more convincing than the evidence which is offered in opposition to it . . . which as a whole shows that the fact sought to be proved is more probable than not" (*quoting* Black's Law Dictionary 1182 (6th ed. 1990))).

### B.    Under Any Approach, the Hotel Sale Price, the Debtors' Schedules, and the Lift Stay Decision All Established an Equity Cushion that Entitled Prudential to Post-Petition Interest from the Petition Date.

The Bankruptcy Court found that at the time of the hotel sale, Prudential was oversecured, with an equity cushion of approximately $24 million.  App. 1572, 1587, 1590; Debtors' Add. 166-67.  Yet the Bankruptcy Court only permitted post-petition interest to start running as of that date, as if that equity cushion had materialized overnight.  In fact, there is no evidentiary basis whatsoever for distinguishing between the time periods before and after the sale.  Indeed, as the Bankruptcy Court's own findings show, the equity cushion at the time of the Lift Stay Motion was $19 million.  App. 1980.  For there to be even a colorable argument that Prudential was undersecured as of the Petition Date, the Bankruptcy

33

Court would have had to identify evidence that Prudential's collateral — consisting largely of real estate assets, cash and securities — increased in value by more than $20 million in less than six months. That proposition is not substantiated anywhere in the record or in either of the briefs filed by Debtors or the City of Boston. Indeed, the Debtors' own schedules listed the collateral as being worth more than the value that the Bankruptcy Court gave that same collateral in the Lift Stay Decision, in which it expressly found Prudential *over*secured.

To justify its decision, the Bankruptcy Court purported to adopt a "flexible approach" to valuation of Prudential's collateral allegedly modeled after that taken in *Fin. Sec. Assurance Inc. v. T-H New Orleans L.P. (In re T-H New Orleans L.P.)*, 116 F.3d 790, 797-98 (5th Cir. 1997). Debtors' Add. 192. But the Bankruptcy Court applied the approach as nothing more than an ad-hoc invitation to the arbitrary consideration and disregard of the evidence presented during the Chapter 11 Cases. Unlike the Bankruptcy Court in the Chapter 11 Cases, the Fifth Circuit in *T-H New Orleans* did not disregard the quantum of evidence presented earlier in that case, but in fact relied upon it. Specifically, in *T-H New Orleans*, the bankruptcy court found in the context of the secured creditor's motion for adequate protection early in the case that the fair value of the debtor's hotel was $13.7 million, *T-H New Orleans*, 116 F.3d at 795, and that the value of the secured creditor's claim at the petition date was $18.4 million. *Id.* Over the course of the

34

case, the debtor, T-H New Orleans, did not sell any of its assets, but received payments of rents that it applied to reduce the secured creditor's claim. *Id*. at 794. As a result of those payments, the secured creditor went from being undersecured as of the adequate protection motion hearing to oversecured sometime between the confirmation hearing and confirmation of the plan. *Id.* at 798-99. Accordingly, it was incumbent upon the secured creditor in that context to seek a redetermination of its secured status and to use multiple valuations under a "flexible approach" because the record reflected a finding from the adequate protection hearing that the secured creditor was undersecured at that time. *Id*.

When *T-H New Orleans* is so considered, it is unsurprising that the Bankruptcy Court's misapplication of *T-H New Orleans* did not survive the scrutiny of the experienced bankruptcy judges of the BAP. To reach the conclusion it did, the Bankruptcy Court had to dismiss, at a minimum, not merely the Debtors' own schedules of assets, but even its own evidentiary finding in the Lift Stay Motion – a practice not countenanced in the bankruptcy context in this Circuit, *Baybank-Middlesex*, 69 F.3d at 1203 (bankruptcy judge's earlier finding that a secured creditor was "under water" at cash collateral hearing was not *dictum* and could be used at a subsequent hearing on motion for payment of post-petition interest), and not supported by the "flexible approach" in *T-H New Orleans*. *T-H New Orleans*, 116 F.3d at 798-99.

35

The Bankruptcy Court in these cases made extensive findings of fact regarding the value of Prudential's collateral in the context of the Lift Stay Motion. Specifically, the Bankruptcy Court "considered and weighed all of the appraisal evidence" in preparing a detailed 51-page decision containing its findings.  App. 1942-1992.   The Bankruptcy Court chose the Debtors' expert's appraisal value of $65 million as the appropriate value for the hotel, and valued the remaining residences at $88 million.  App. 1969-1970, 1973.  After adding the other collateral and comparing Prudential's claim, the Bankruptcy Court then expressly found that "[g]iven the total value of the collateral package, an equity cushion exists with respect to Prudential's claim in an amount in excess of $19 million."  App. 1980. Prudential lost the Lift Stay Motion in part on that basis.[5]

While the valuation determinations made in the Lift Stay Decision are admittedly less than the values contained in the Debtors' schedules of assets, prepared under the penalty of perjury, neither the values in the Schedules nor the findings from the Lift Stay Decision adversely affected Prudential's right to post-

---

[5]    The Debtors and the City of Boston attempt to preclude Prudential from relying upon the valuation result from the Lift Stay Motion, but a litigant is not judicially estopped from taking different position later in the case unless it prevails on its position in the first instance.  *New Hampshire v. Maine*, 532 U.S. 742, 749-51 (2001).  The Debtors always asserted that Prudential was oversecured in the aggregate.  *See, e.g.*, 2029-2030, 2039.  The Bankruptcy Court adopted the Debtors' position as its own.  Prudential accepted the Bankruptcy Court's conclusive finding on the subject and adapted its position accordingly.

petition interest despite the Bankruptcy Court's assertion that there was "no evidence to substantiate the values utilized by the Debtors in their Schedules of Assets."  Debtors' Add. 193; App. 2256-2263; Schedules of Auto Sales & Services, Inc. pp. 4-7 [Case 10-14528, Dkt. 20] ; Schedules of Frank Sawyer Corp. pp. 4-8 [Case 10-14533, Dkt. 22]; Schedules of General Trading Co. pp. 4-8 [Case 10-14532, Dkt. 21]; Schedules of 30-32 Oliver Street Corp. p. 3 [Case 10-16173, Dkt. 28]; Schedules of 131 Arlington Trust p. 3 [Case 10-16177, Dkt. 30]; Schedules of General Land Corp. p. 3 [Case 10-16174, Dkt. 28]; Schedules of 100 Stuart Street, LLC pp. 4-7 [Case 10-14534, Dkt. 22].

Ultimately, as the BAP correctly determined, and the Bankruptcy Court admitted, the sale was the best determinant of value for the hotel, a critical piece of Prudential's collateral.  Courts have consistently held that where collateral was actually sold during the pendency of the case (and where the terms of the sale were fair and arrived at on an arm's length basis), the actual sale price should be used to measure the property's value, as contrasted with some "earlier hypothetical valuation."  *Ford Motor Credit Co. v. Dobbins*, 35 F.3d 860, 870-71 (4th Cir. 1994) (using sale price to establish secured creditor as undersecured throughout the case); *see also Takisaki v. Alpine Group, Inc. (In re Alpine Group, Inc.)*, 151 B.R. 931, 935 (B.A.P. 9th Cir. 1993) (using sale price to establish secured creditor as oversecured throughout the case); *In re Urban Communicators PCS L.P.*, 379 B.R.

37

232, 244 (Bankr. S.D.N.Y. 2008), *aff'd in part, rev'd in part on other grounds*, 394
B.R. 325 (S.D.N.Y. 2008) (same).  In other words, when a market sale price is
available, that price is better evidence of the true inherent value of the collateral
than a calculation of value performed by the court with the assistance of expert
testimony.

As the BAP 506 Decision noted, "the Hotel sale price is the best evidence of
the value of the Hotel and establishes that Prudential was oversecured throughout
the cases."  Debtors' Add. 21.  The purchase price that the Debtors received in
exchange for the hotel confirmed the Bankruptcy Court's earlier determination that
Prudential was oversecured and revealed the extent to which the value of the
collateral exceeded Prudential's claims.  The bankruptcy court's decision in *Urban
Communicators* illustrates this point.  379 B.R. 232.  There, the bankruptcy court
used the sale price of the secured creditor's collateral achieved during the case
alone to establish its value.  *Id*. at 244.  It did *not*, however, fix the *sale date* as the
trigger date to start the clock for the running of post-petition interest.  *Id*. at 246.
Rather, the bankruptcy court awarded the secured creditor post-petition interest
from the petition date through confirmation based on the value achieved in the sale
despite extreme changes in value of the collateral during the course of the case, *id*.,
a point that both the Debtors and the City continue to miss in their briefs.  Debtors'
Brief 25-26; City Brief at 26-27.

38

Accordingly, as the BAP suggested, the Bankruptcy Court should have used the sale price as evidence of the value of Prudential's collateral throughout the Chapter 11 Cases. The Debtors offered no evidence, and the Bankruptcy Court made no finding, that the hotel sale price was not indicative of the value of the hotel throughout the Chapter 11 Cases.[6] To the contrary, the evidence and the Bankruptcy Court's findings preceding the hotel sale were remarkably consistent and satisfied Prudential's evidentiary burden under a preponderance of the evidence standard as opposed to the "unequivocal" and "beyond dispute" standard conjured up by the Bankruptcy Court.

### C.    Prudential Remained Oversecured at Confirmation of the Debtors' Cramdown Liquidating Plan, the Date Recognized to be of Paramount Importance for the Determination of a Secured Creditor's Right to Post-Petition Interest.

The Bankruptcy Court's decision rested on a further error, one that would require correction even if its decision to treat Prudential as undersecured before the sale could find any support in the record. Under the Bankruptcy Code, the value of the collateral must be determined as of the time a "cramdown" plan is confirmed,

---

[6]    The Bankruptcy Court suggested that a "variety of contingencies" associated with the hotel sale rendered the value of the sale uncertain until it finally closed on June 8, 2011. Debtors' Add. 193. However, this finding too defies logic and does not reflect application of the proper evidentiary standard. All transactions have contingencies without the satisfaction of which the transaction will not close. This does not mean that satisfaction of such contingencies creates new or additional value. Value is inherent; it does not spring into existence only when cash trades hands. The modest contingencies that the Debtors identify are not independently accretive. App. 1565-1566.

39

not at some other, arbitrarily determined point in time.  The weight of precedent and scholarly authority recognizes the confirmation date as that relevant point in time.  It is undisputed here that Prudential was oversecured as of the confirmation date.  *See, e.g.*, Debtors' Brief at 23-24.  The Bankruptcy Court's failure to award post-petition interest in accordance with that valuation is a legal error, reviewed *de novo*, that provides an alternative ground for affirmance.

The Supreme Court has admonished parties against reading section 506 in isolation, requiring it to be read in the proper context.  *See Rake v. Wade*, 508 U.S. 464, 471-72 (1993), *superceded on other grounds by statute* 11 U.S.C. § 1322(e).  Section 506(a) provides that the "value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest."  11 U.S.C. § 506(a)(1); *Winthrop Old Farms Nurseries*, 50 F.3d at 74.  While section 506(b) does not provide a date upon which the value of the property securing the claim is to be fixed, the "value" referenced in section 506(b) relates back to the purpose of the valuation pursuant to section 506(a) and ties the timing of the valuation to its purpose.  In other words, the purpose of the valuation directs its timing.

Accordingly, in the context of distributions made under a plan, most courts have consistently held that the confirmation date is the appropriate date under

section 506 upon which to value collateral and to determine the extent to which post-petition interest is payable to a secured creditor. *Heritage Highgate,* 679 F.3d at 145 (fair market value of the asset as of the confirmation date "controls" whether a creditor's claims are secured or not); *Ahlers v. Norwest Bank Worthington (In re Ahlers)*, 794 F.2d 388, 398 (8th Cir. 1986), *rev'd on other grounds*, 485 U.S. 197 (1988) ("For purposes of the reorganization plan, the value of the collateral is to be determined at the time of confirmation of that plan."); *Orix Credit Alliance, Inc. v. Delta Res., Inc. (In re Delta Res., Inc.)*, 54 F.3d 722, 729 (11th Cir. 1995) ("[A]n oversecured creditor's allowed secured claim for post-petition interest . . . is determined near the conclusion of the bankruptcy case . . ."); *In re Blake*, No. 07–12445, 2009 WL 4349787, at *5 (Bankr. D. Mass. Nov. 30, 2009) (unpublished) (holding that the proper date to value collateral for purposes of distribution under a cramdown plan under section 1129(b)(2)(A)(i) of the Bankruptcy Code was the confirmation date). Indeed, the leading bankruptcy treatise states plainly that, "[i]n general, courts generally agree that, for purposes of determining the amount of a secured creditor's claim in the cramdown context, the relevant collateral should be valued as of the effective date of the plan." 4 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶ 506.03[10] (16th ed.).

The rationale for this proposition is apparent: a bankruptcy court can only authorize at confirmation a distribution of the value of the assets a debtor actually

41

has to distribute.  As the Fourth Circuit noted in *Ford Motor Credit Co. v. Dobbins*, regardless of prior valuations that may have occurred, a secured creditor can never recover more than the collateral available at the time of distribution because every dollar of interest paid above the collateral value at the time of distribution is "a dollar usurped from the estate's unencumbered assets, a dollar that would otherwise be available for distribution to unsecured creditors." 35 F.3d at 870-71.  In the case of plan confirmation, certain variables affecting the value of a secured claim cannot be known at the beginning of a case including the purpose of the valuation itself.  *In re Blake*, 2009 WL 4349787 at *4.  Therefore, regardless of whether sufficient evidence existed that Prudential was oversecured at times prior to the closing of the hotel sale, Prudential is entitled as a matter of law to accrue post-petition interest from the Petition Date solely as a result of the Bankruptcy Court's finding that it was oversecured as of confirmation.  This conclusion is required by the language of section 506, existing precedent and the logistics of plan confirmation.  *See, e.g., Rake v. Wade*, 508 U.S. at 471 (post-petition interest "accrues as part of the allowed claim from the petition date until the confirmation or effective date of the plan.").

In these cases, the Post-Petition Interest Motion was, by consent, heard simultaneously with the hearing to consider the confirmation by cramdown of the Liquidating Plan over Prudential's objection.  Debtors' Add. 148.  Thus, the

42

valuation of Prudential's collateral to determine whether Prudential was
oversecured was part and parcel to the evaluating whether Prudential's treatment
under the Liquidating Plan satisfied the requirements of section 1129 of the
Bankruptcy Code. This is especially true in the context of a cram down of a
secured creditor because, as discussed below, section 1129(b)(2)(A)(i)(II) states
that the non-consenting secured creditor, such as Prudential, must receive deferred
cash payments of a value equal to the value of its interest in its collateral as of the
effective date of a plan. *See* 11 U.S.C. § 1129(b)(2)(A)(i)(II). That value
necessarily includes any amounts allotted under section 506(b). *See, e.g., Key
Bank N.A. v. Milham (In re Milham)*, 141 F.3d 420, 423 (2d Cir. 1998) ("On the
date of confirmation, the allowed claim of an oversecured creditor is augmented by
the inclusion of section 506(b) pendency interest.").

### D.  The Bankruptcy Court and the BAP Correctly Aggregated the Value of Prudential's Collateral to Establish Prudential's Right to Post-Petition Interest.

The Bankruptcy Court held that, to determine whether Prudential was
oversecured, the value of Prudential's collateral must be aggregated across all of
the Debtors. Debtors' Add. 194-195. Neither the Debtors nor the City of Boston
properly appealed this determination. This was not surprising in view of the
benefits the Debtors and the City received from aggregation and substantive
consolidation in the Liquidating Plan. Accordingly, as a threshold matter, the

43

Debtors and the City waived any appeal of this particular ruling by the Bankruptcy Court. Rule 8006 of the Federal Rules of Bankruptcy Procedure requires that an appeal include "a statement of the issues to be presented." Fed. R. Bankr. P. 8006. Numerous courts, including the First Circuit Court of Appeals, have held that where a party fails to include a particular issue in the Rule 8006 statement of issues to be presented, that issue is waived unless the party can demonstrate "exceptional circumstances." *See City Sanitation, LLC v. Allied Waste Servs. of Massachusetts, LLC (In re American Cartage, Inc.)*, 656 F.3d 82, 91 (1st Cir. 2011); *Zimmermann v. Jenkins (In re GGM, P.C.)*, 165 F.3d 1026, 1032 (5th Cir. 1999); *Snap-On Tools, Inc. v. Freeman (In re Freeman)*, 956 F.2d 252, 255 (11th Cir. 1992).

The Debtors identified three issues on cross-appeal, each of which dealt with some aspect of the Bankruptcy Court's award of default interest to Prudential. Supplemental Appendix to Prudential's Opposition to Motion to Dismiss Appeal pp. 1-2. More precisely, the Debtors failed to identify the propriety of the aggregation of collateral across Debtors as an issue "to be presented" on appeal and there is no factual or legal connection between the issue of aggregating collateral across Debtors, on the one hand, and the appropriate default rate of

44

interest on the other hand.  Accordingly, any appeal of this issue has been waived.

*American Cartage*, 656 F.3d at 91.[7]

Regardless, the Bankruptcy Court's decision on this point should again be affirmed.  Section 506(a) defines a secured claim in reference to "property in which the estate has an interest" and a lien on which secures the creditor's claim.  11 U.S.C. § 506(a).  In turn, section 506(b) explicitly links the right to post-petition interest to the extent "an allowed claim is secured by property the value of which . . . is greater than the amount of such claim . . ."  11 U.S.C. § 506(b).  The focus of section 506(a) and (b) is on the property securing the claim and allows post-petition interest to be accrued up to the value of all collateral securing a claim.  They are presented from the creditor's point of view.  This is consistent with the reality that creditors often bargain for collateral owned by affiliates of a borrower in order to adequately secure a loan in a larger amount than the borrower could secure itself.  These arrangements benefit both borrowers and creditors.  On this basis, the weight of the case law on the point holds that collateral held by affiliated debtors' should be aggregated when determining whether a secured creditor is oversecured.  *See, e.g., In re Geijsel*, 480 B.R. 238, 244, 264 n.18 (Bankr. N.D.

---

[7]    After the Debtors raised the Bankruptcy Court's aggregation of their collateral in their brief before the BAP, App. 146-148, Prudential pointed out that no appeal of that issue had been taken.  App. 111-112.  The BAP did not address the issue, although its holding implicitly recognized that aggregation was appropriate and any challenge had been waived.  *See* Debtors' Add. 21-22.

Tex. 2012); *Urban Communicators*, 379 B.R. at 244; *In re Fiberglass Indus., Inc.*, 74 B.R. 738, 740 (Bankr. N.D.N.Y. 1987); *Marine Midland Bank, N.A. v. Ladycliff College (In re Ladycliff College)*, 56 B.R. 765,768 (S.D.N.Y. 1985).

In response, the Debtors cite numerous cases that are inapplicable to the circumstances. First, the Debtors rely on cases[8] that merely hold that non-debtor collateral may not be considered in the determination of whether a creditor is oversecured. Although this proposition may be correct in light of the definition of the relevant property in section 506(a) as that in which the "estate has an interest", the Bankruptcy Court did not consider any non-debtor owned collateral in determining the amount of Prudential's equity cushion, either at the hearing on the Lift Stay Motion or at confirmation. *See* 11 U.S.C. § 506(a); App. 1969-1973; Debtors' Add. 164-166, 193-195.[9]

Second, the Debtors cite cases[10] under section 362(d)(2)(A) of the Bankruptcy Code that hold that other collateral cannot be considered when

---

[8]     *See* Debtors' Brief at 39, citing *In re Toy King Distribs., Inc.*, 256 B.R. 1, 187 (Bankr. M.D. Fla. 2000) (in single debtor case, excluding collateral owned by non-debtor guarantors); *In re DeNofa*, 124 F. App'x 729, 731 (3d Cir. 2005) (unpublished) (non-debtor property not included in post-petition interest calculation).

[9]     The rules of construction also permit the interpretation of estates to include all of the Debtors' estates because "the singular includes the plural." 11 U.S.C. § 102(7). This would only preclude consideration of non-debtors.

[10]    *See* Debtors' Brief at 40, citing *NationsBank of Virginia, N.A. v. DCI Publ'g of Alexandria, Inc.*, 160 B.R. 538, 540-41 (E.D. Va. 1993) (detailing why

determining whether a debtor has equity in property from which a creditor is attempting to lift the automatic stay.  The Debtors' argument fails to recognize the fundamental difference between the determinations made under section 362(d)(2)(A) and section 506(a).  Section 362(d)(2)(A) focuses on whether there is any residual value in the property beyond what is spoken for by all secured claims, not the value of the secured claims themselves.  Therefore, the property is considered from the perspective of the debtor's remaining interest, not that of the creditor.  *See* 11 U.S.C. 362(d)(2)(A) ("equity in such property" referring to a creditor's request for relief from "a stay of an act against property").  In contrast, the focus in section 506(a) is on determining whether there is adequate property value to secure a creditor's claim, such that the secured portion of the claim should be limited or the creditor should receive interest and fees.  Thus, in this context, the property is considered from the creditor's perspective.  *See* 11 U.S.C. § 506(a) (the term "such property" relating to a claim "secured by a lien on property in which the estate has an interest . . .").  Therefore, the analysis under section 506 is more akin to that under section 362(d)(1) regarding adequate protection because both provisions work from the creditor's rather than the debtor's perspective.  Indeed,

---

aggregation of collateral was appropriate for determination of an equity cushion for purposes of section 362(d)(1) but not for determining equity in the property for purposes of section 362(d)(2)); *In re New Era Co.*, 125 B.R. 725, 728-28 (S.D.N.Y. 1991) (same); *In re KRC, Inc.*, 226 B.R. 112, 115 (Bankr. D. Idaho 1998) (same).

this Court has found valuation for adequate protection purposes under section 361
to be an apt comparison to valuation for plan purposes under section 506.
*Winthrop Old Farms Nurseries*, 50 F.3d at 74.  If the Bankruptcy Court aggregated
the collateral for adequate protection purposes, then it should do so at confirmation
as well.  *See id.*

Beyond this, the Debtors' argument that the collateral should be considered
separately does not square with the Liquidating Plan that they proposed and the
basis for its confirmation.  The Liquidating Plan affirmatively disregarded the
separateness of the various Debtors for both voting and distribution purposes.
Only through such consolidation could the Liquidating Plan have successfully
disenfranchised Prudential as to certain of the Debtors with respect to plan voting,
limited Prudential's distributions and stripped Prudential's post-confirmation rights
and remedies.[11]  Most significantly for these purposes, Prudential was deemed, for
purposes of confirmation, to only have a single combined claim against all of the
Debtors.  App. 1756.  The Bankruptcy Court noted that the aggregation of
Prudential's collateral for determination of Prudential's secured status was
"consistent with the Debtors' merger for purposes of Plan payments . . ."  Debtors'
Add. 195.  Therefore, the Debtors cannot aggregate their assets only when it serves
their interests.  *R.G. Fin. Corp. v. Vergara-Nunez*, 446 F.3d 178, 186 (1st Cir.

---

[11]   For further discussion of this issue, see Section III.B *infra*.

2006) ("Vergara simply cannot have it both ways: either the R-G companies are in privity with one another for both liability and res judicata purposes, or they are not in privity for either purpose."); *United States v. Tierney*, 760 F.2d 382, 388 (1st Cir.1985) ("Having one's cake and eating it, too, is not in fashion in this circuit.").

Thus, in light of the existing case law, and the particular facts of this case, whether Prudential is oversecured should be determined by considering Prudential's entire collateral package across all Affiliate Debtors. The Debtors waived their right to challenge this and the Bankruptcy Court and the BAP correctly so ruled whether or not it had been waived.

### E.    The Prudential Loan Agreement Expressly Provided for Compounding of Interest as Permitted under Massachusetts Law.

The Bankruptcy Court unequivocally stated that "[t]he [Prudential] Loan Agreement, which is governed by Massachusetts law . . . does not provide for compound interest either at the default rate or the non-default rate of interest." Debtors' Add. 144.  The Bankruptcy Court further stated that "compound interest is only permitted in certain proceedings in equity or by express statutory or contractual authority."  *See* Debtors' Add. 144-145 (citing *Berman v. B.C. Assocs.*, 219 F.3d 48, 50 (1st Cir. 2000)).  While the Bankruptcy Court got the law right, it got the facts wrong because, as the BAP indicated, the Prudential Loan Agreement expressly does provide for compound interest.  Debtors' Add. 24-26.  While the Bankruptcy Court's order recites paragraphs 2, 2.1, 2.2.2, 2.2.3, 2.3.1 and 2.3.3, it

does not indicate that the Bankruptcy Court considered the definitions in the

Prudential Loan Agreement.  Debtors' Add. 144-145.  Compound interest is

included in the definition of "Applicable Interest Rate," a provision that was not

cited or acknowledged by the Bankruptcy Court.  App. 2154.  Specifically, the

Prudential Loan Agreement defines "Applicable Interest Rate" as "9.50% per

annum, *compounding monthly*".  App. 2154 (emphasis added).  The operative

provision in the Prudential Loan Agreement, in turn, provides that "interest on the

principal balance of the Loan outstanding from time to time shall accrue from the

Closing Date up to and including the Maturity Date at the Applicable Interest

Rate."  App. 2183.  "Default Rate" is defined under the Prudential Loan

Agreement to be "a rate per Annum equal to the lesser of (i) the maximum rate

permitted by applicable law or (ii) five percent (5%) above the Applicable Interest

Rate."  App. 2158, 2184.  It unambiguously incorporates the compounding

included in the definition of Applicable Interest Rate.  Ambiguity in a contract

only "arises from language susceptible of different meanings in the eyes of

reasonably intelligent persons."  *Browning-Ferris Indus., Inc. v. Casella Waste

Mgmt. of Massachusetts, Inc.*, 79 Mass. App. Ct. 300, 307, 945 N.E. 2d 964, 971

(Mass. App. Ct. 2011).  In this light, nothing about Prudential's entitlement to

compound interest can be "susceptible of different meanings in the eyes of

reasonably intelligent persons."  *Id.*  Thus, following the payment default that

50

precipitated the filing of these cases, Prudential's secured claims included claims for interest at the rate of 14.5% compounded monthly.  The Bankruptcy Court's failure to acknowledge the express terms of the Prudential Loan Agreement constituted an error of law and was, therefore, necessarily an abuse of discretion. *See Boston Edison Co. v. FERC*, 856 F.2d 361, 365 (1st Cir.1988) (interpretation of an unambiguous contract is a matter of law); *Cunningham v. Johnson*, 241 F. App'x 913, 917 (4th Cir. 2007) (unpublished) (holding court's grant of compound interest when note expressly provided for simple interest to be abuse of discretion).

### F.    Federal Law Favors, and Massachusetts Law Permits, the Award of Post-Petition Interest at the Contractual Default Rate to Prudential in the Absence of Contrary Equitable Considerations.

The BAP correctly affirmed the Bankruptcy Court's holding authorizing Prudential to accrue post-petition interest at the default rate provided for under the Prudential Loan Agreement.  Debtors' Add. 30.  Consistent with federal bankruptcy law, the Bankruptcy Court appropriately applied a presumption that post-petition interest should accrue at the contractual default rate because the Debtors failed to put forth evidence that satisfied their burden of rebutting that presumption.  Debtors' Add. 200-202.  This Court should not disturb the Bankruptcy Court's discretionary finding that the default rate was the appropriate rate of interest to apply.  *See Milham*, 141 F.3d at 423 (determination of the appropriate rate of pendency interest is within the limited discretion of the court);

51

*Southland Corp. v. Toronto-Dominion (In re Southland Corp.)*, 160 F.3d 1054,

1060 (5th Cir. 1998) (finding bankruptcy court did not abuse its discretion in

balancing the equities and awarding post-petition default interest).

### 1.    Federal Law Favors Application of a Negotiated and Agreed Contractual Default Rate.

The Debtors freely admit that entitlement to default interest is a matter of

federal law.  Debtors' Brief at 50; *see also In re Route One West Windsor Ltd.*

*P'ship*, 225 B.R. 76, 86 (Bankr. D.N.J. 1998) (citing *Vanston Bondholders*

*Protective Committee v. Green*, 329 U.S. 156, 162-63 (1947)); *In re Consol. Props.*

*Ltd. P'ship*, 152 B.R. 452, 456 (Bankr. D. Md. 1993).  The secured creditor is

entitled to the presumption that the contractual default rate of interest is the

applicable rate for purposes of section 506(b) of the Bankruptcy Code.  *See, e.g., In*

*re Terry Ltd. P'ship*, 27 F.3d 241, 243 (7th Cir. 1994) ("What emerges from the

post-*Ron Pair* decisions is a presumption in favor of the contract rate[.]");

*Southland*, 160 F.3d at 1059-60; *Milham*, 141 F.3d at 423.  The presumption exists

because like every other provision of the agreement, default interest is a

contractually agreed term.

While that presumption can be rebutted "based upon equitable

considerations,"  *see Terry*, 27 F.3d at 243, or by a showing that the default interest

rate would be unenforceable under applicable state law, *Route One*, 225 B.R. at 86-

87, the burden of rebutting the default rate presumption rests squarely on the

debtor.  *See Id*. at 87 ("The effect of the rebuttable presumption . . . is to impose upon the debtor the burden of proving that equities favor allowing interest at a different rate.").  The Bankruptcy Court appropriately applied the presumption in favor of default interest and placed the burden on the Debtors to rebut that presumption.  Debtors' Add. 197, 199, 201-202.  The Debtors failed to do so.  Debtors' Add. 197,199, 201-202 ("The Debtors have not shown any reason for avoiding the contractual default rate of interest.").  On that basis, the Bankruptcy Court concluded that post-petition interest should accrue at the contractual default rate.

## 2. Interest at the Contractually Agreed Default Rate Does Not Violate Massachusetts Law.

The Debtors not only assert that the agreed default rate violates federal law but also that application of the default rate constitutes an unenforceable penalty under Massachusetts law.  Debtors Brief at 43-45.  The Debtors bore the burden of proving that the default rate the parties agreed to in the Prudential Loan Agreement constituted an unenforceable penalty under Massachusetts law.  *In re Charles Street African Methodist Episcopal Church of Boston*, 481 B.R. 1, 10 (Bankr. D. Mass. 2012) (". . . the party challenging the default interest rates . . . bears the burden of proving their unenforceability.").  Specifically, it was the Debtors' "burden to show that the amount of liquidated damages is 'unreasonably and grossly disproportionate to the real damages from a breach' or 'unconscionably

53

excessive.'" *NPS, LLC v. Minihane*, 451 Mass. 417, 421, 886 N.E.2d 670, 674

(2008).  Yet the Debtors failed to produce any evidence that the default rate

provided for in the Prudential Loan Agreement was contrary to Massachusetts law.

The Debtors attempt to shift this burden of showing that the default interest

rate was unenforceable by alleging that "all the facts respecting whether the default

rate was a reasonable estimate of damages expected to occur in the event of default

were uniquely within Prudential's control."  Debtors' Brief at 44.  However, the

Debtors do not identify any obligation for Prudential to offer any evidence

regarding its anticipated damages.  The Debtors could have sought discovery

related to such damages but failed to do so.  In the absence of any evidence

showing that the amount of default interest was "grossly disproportionate" to

Prudential's anticipated costs, the Bankruptcy Court found that the default rate

charged by Prudential did not constitute an unenforceable penalty.  Debtors' Add.

200-201.  Thus, the presumption in favor of the contract rate was not rebutted and

the Bankruptcy Court rightly awarded post-petition interest at the default rate.  *See*

Debtors' Add. 29-30.

### 3.    Equitable Considerations in the Chapter 11 Cases Did Not Weigh Against Application of the Contractually Agreed Default Rate.

Although the Debtors complain that the "Bankruptcy Court failed to

properly evaluate the reasonableness of the default rate using" the four factors set

forth in *In re Gen. Growth Props.*, 451 B.R. 323, 328 (Bankr. S.D.N.Y. 2011), they

still fail to identify specifically what they believe to be the Bankruptcy Court's

alleged errors. Debtors' Brief at 46. In fact, the Bankruptcy Court, although

quoting a different decision[12] in the *General Growth* bankruptcy, did consider the

factors cited by the Debtors in detail. Debtors' Add. 199-202. Based on that

analysis, the Court found that the circumstances of the Debtors' Chapter 11 Cases

presented "none of the factors that had justified the imposition of an interest rate

lower than the default rate." Debtors' Add. 202.

Indeed, the facts of the Chapter 11 Cases support the Bankruptcy Court's

finding. Significantly, the additional interest imposed by using the default rate

does not impact the recovery of unsecured creditors – it only impacts equity

holders. Exhibit B to Amended Disclosure Statement p. 3 [Dkt. 550-1]; App.

1124, 1239-1240. In such situations, courts have held that application of the

contractual default rate is appropriate. *See, e.g., Southland*, 160 F.3d at 1059-60

(citing *Terry*, 27 F.3d at 243-44). Further, the Debtors have identified no other

---

[12] The decisions in *General Growth* stated that courts are "reluctant to modify
private contractual arrangements imposing default interest rates . . . except
where: (1) there has been creditor misconduct; (ii) application of a contractual
interest rate would cause harm to unsecured creditors; (iii) the contractual
interest rate constitutes a penalty; and (iv) its application would impair the
Debtors fresh start." No. 09–11977, 2011 WL 2974305, at *4 (Bankr.
S.D.N.Y. July 20, 2011) (unpublished); 451 B.R. at 328 (same).

"equitable considerations" that require any rate other than the default rate under the Prudential Loan Agreement to be applied.[13]

The Bankruptcy Court and the BAP correctly identified and applied the proper standards to determine whether the default rate in the Prudential Loan Agreement should be applied in this case. The Debtors have not identified any evidence that could leave this Panel "with the definite and firm conviction that a mistake has been committed." *See Anderson v. City of Bessemer City,* 470 U.S. 564, 573 (1985) (quotations omitted). The Bankruptcy Court did not err in awarding Prudential post-petition interest at the default rate set forth in the Prudential Loan Agreement and this Court should follow the BAP in reaffirming its finding.

## II. Upon the Allowance of Post-Petition Interest to Prudential at the Default Rate Resulting in a Vastly Higher Claim, the Liquidating Plan Could Not Stand.

The Debtors do not truly contest the finding that the change in the amount of Prudential's claim fundamentally quashed the Liquidating Plan. Indeed, the material increase in the amount of Prudential's senior secured claim as a result of the proper application of section 506 dramatically altered the landscape in respect of the Liquidating Plan. When the BAP determined that the Bankruptcy Court had

---

[13]    The City of Boston claims now that the compounding of interest at the default rate would be inequitable as well. By taking this position, the City has violated the Intercreditor Agreement that it executed, which expressly acknowledged and accepted the terms of the Prudential Loan Agreement. App. 2542-2544.

erred in vastly undervaluing Prudential's claim for post-petition interest, the

Bankruptcy Court's confirmation of the Liquidating Plan necessarily needed to be

revisited.  Accordingly, the BAP correctly vacated the Confirmation Order and

remanded the Chapter 11 Cases back to the Bankruptcy Court to allow the

Bankruptcy Court to reconsider whether the Liquidating Plan could stand or to

facilitate the parties' efforts to fashion an alternative solution.  Debtors' Add. 39-

40.

       That the amount of Prudential's claim was significant in the Bankruptcy

Court's decision to confirm the Liquidating Plan is beyond dispute.  The

Liquidating Plan elements are fact-sensitive and a change in the facts that "alters

the landscape dramatically" renders any decision based on the prior findings

irrelevant.[14]  This change had a ripple effect through the Liquidating Plan.  For

example, in determining the feasibility of the Liquidating Plan, the Bankruptcy

Court evaluated the Debtors' ability to pay its creditors in light of its cash flow

projections.  Debtors' Add. 123-127.  Prudential's claims were approximately 86%

of all of the outstanding debt as of Petition Date and Prudential remained the

largest creditor by far even at confirmation.  Debtors' Add. 167; App. 1793-1797,

---

[14]   As set forth above in section regarding "Jurisdiction" *supra* and at greater
       length in Prudential's motion to dismiss the appeals presently pending before
       this Court, the BAP's Confirmation Remand Order is interlocutory and not
       subject to review by this Court.  28 U.S.C. § 158(d)(1) (giving this Court
       "jurisdiction of appeals from all final decisions . . ." entered by the BAP).

2520.  As a result, the amount that the Debtors had to pay Prudential under the

Liquidating Plan increased substantially following the BAP 506 Decision.

Accordingly, the Bankruptcy Court could not avoid re-examining the Debtors'

ability to pay that amended claim.

Similarly, the Bankruptcy Court's determination that Prudential would

receive deferred cash payments in the allowed amount of its secured claim "of a

value, as of the effective date of the plan, of at least the value of . . . [its] interest"

in its collateral as required by section 1129(b)(2)(A)(i) of the Bankruptcy Code

was made using the formula approach set forth in *Till v. SCS Credit Corp.*, 541

U.S. 465 (2004).  Debtors' Add. 112-122.  The *Till* analysis of the appropriate

post-confirmation interest rate requires the Bankruptcy Court to consider, among

other things, the loan-to-value ratio, the feasibility of the plan and the likelihood of

success in the formulation of an appropriate interest rate.  Debtors' Add. 116.  The

Bankruptcy Court here specifically adopted the opinion of the Debtors' expert,

who relied on a 33% loan-to-value ratio, the nature and value of Prudential's

collateral and the Debtors' prospects for meeting their obligations under the

Liquidating Plan, in selecting an appropriate interest rate and finding that section

1129(b)(2)(A)(i) was satisfied.  Debtors' Add. 116-117.  Certainly, the loan-to-

value ratio and the probability of the Debtors' having adequate cash to make

58

Liquidating Plan payments would have changed materially when more than $20 million was added to Prudential's claim.

Accordingly, the Bankruptcy Court's factual findings would no longer be applicable to the circumstances of the Debtors' debt obligations following the BAP's decision. Consequently, the BAP correctly vacated the Confirmation Order and returned the Chapter 11 Cases to the Bankruptcy Court for reevaluation of the Liquidating Plan in light of the changed circumstances.

## III. Regardless of the Post-Petition Interest Payable to Prudential, the Liquidating Plan Improperly Disenfranchised Prudential and Did Not Satisfy the Requirements of Sections 1129 or 1126.

Whether or not Prudential was entitled to post-petition interest, the Liquidating Plan was fatally flawed in at least several key respects. First, the Debtors deprived Prudential of its liens and the value of its collateral as of the effective date of the Liquidating Plan as required by the cramdown provisions of section 1129(b). Second, the Liquidating Plan deprived Prudential through the offensive use of substantive consolidation, of its right to proceed against each Debtor on separate guarantees and its right to vote its claims against each Debtor. The Bankruptcy Court's failure to enforce Prudential's bargained-for rights under the Intercreditor Agreement compounded this problem. Third, the Debtors proposed to pay junior creditors and equity holders in full from Prudential's collateral before Prudential and failed to establish that Prudential would receive the

59

same value under the Liquidating Plan as it would in a chapter 7 liquidation.

Finally, the Liquidating Plan, contrary to the requirement of good faith, provided

the Debtors' affiliates would receive equity distributions on account of

undocumented, invalid claims.  While the law requires that such treatment be

closely and heavily scrutinized, the Bankruptcy Court failed to fulfill "its

independent obligation to review the Plan to make sure that it satisfies the

requirements for Plan confirmation set forth in § 1129."  Debtors' Add. 108.

Instead, the Bankruptcy Court shifted the burden to Prudential to show why the

Debtors' failures to adhere to section 1129 should not be excused.  In doing so, the

Bankruptcy Court confirmed the Liquidating Plan in error.

### A. The Liquidating Plan's Treatment of Prudential's Impaired Senior Secured Claims Was Not Fair and Equitable by its Terms or on its Face.

The Bankruptcy Court erred in finding that the Liquidating Plan was "fair

and equitable" to Prudential.  Section 1129(b)(2)(A)(i) requires that in order for a

plan that pays a secured creditor over time to be fair and equitable, the plan must

provide that a secured creditor (1) retains its liens and (2) receives on account of its

claim "deferred cash payments totaling at least the allowed amount of such claim,

of a value, as of the effective date of the plan, of at least the value of such holder's

interest in the estate's interest in such property . . ." 11 U.S.C. § 1129(b)(2)(A)(i).

The "fair and equitable" standard also requires that the Liquidating Plan had to "be

60

fair and equitable in a broad sense." *In re Bryson Props., XVIII*, 961 F.2d 496, 505

(4th Cir. 1992). In particular, where a plan adjusts the interests of only one

creditor, the court must "scrutinize closely the equities involved." *Id*. Prudential

was the only stakeholder whose claim amounts, contractual rights and priority

were adversely affected by the Liquidating Plan. The City was to receive payment

in full at its contract rate (including post-petition, pre-confirmation interest) and

unsecured creditors were to be paid in full with interest before the Debtors would

have paid Prudential on account of its senior secured claims. App. 1739-1748,

1751-1753. Equity holders, either directly or indirectly, would have retained all of

their interests free and clear of any lien in favor of Prudential. App. 1753-1754.

Not only did the Debtors deny Prudential the full value of its claims, but they

deprived Prudential of its liens both directly and indirectly. Under these

circumstances, the Bankruptcy Court should not have crammed down Prudential

and thus, erred in confirming the Liquidating Plan over Prudential's objection.

### 1.    The Liquidating Plan Did Not Satisfy the Express "Fair and Equitable" Requirements of Section 1129(b)(2)(A)(i).

The Liquidating Plan failed to satisfy express "fair and equitable" test under

section 1129(b)(2)(A)(i) because Prudential did not retain its liens on its collateral,

specifically the interests in SW Boston. For a plan to be crammed down on a

dissenting secured creditor whose claim is being paid over time, that secured

creditor must (1) "retain the liens securing [its] claims" and (2) receive "deferred

61

cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property . . ."  11 U.S.C. § 1129(b)(2)(A)(i).  The Liquidating Plan fails both prongs of the test.

### i.     Prudential Did Not Retain Its Liens on the Equity of SW Boston and All Proceeds of Its Collateral Under the Liquidating Plan.

The Debtors side-stepped the first prong of the cramdown test by transferring material portions of Prudential's collateral free and clear of Prudential's liens.  The equity interests of SW Boston owned by 100 Stuart Street were transferred to 110 Stuart Street, but 110 Stuart Street did not pledge its newly-received interests in SW Boston to Prudential.  App. 1752-1753.  The Debtors admitted that Prudential was stripped of its liens on the equity interests of SW Boston and that the equity interests in 110 Stuart Street, the entity that acquired these interests, were distributed to insiders SE Berkeley and SE McClellan.  Debtors' Brief at 53-54; *see also* App. 263.

Nevertheless, the Debtors inexplicably maintain that the Liquidating Plan satisfied section 1129(b)(2)(A) despite this transfer, arguing that the loss of liens on SW Boston's interests is not significant because those interests have no value. Debtors' Brief at 53.  This is not the test required by the Bankruptcy Code; the test is whether a secured creditor retained its liens, not the value of the liens of which

the creditor has been deprived. *See In re Kent Terminal*, 166 B.R. 555, 564 (Bankr. S.D.N.Y. 1994) ("Section 1129(b)(2)(A)(i) permits cramdown if the dissenting class of secured claims retains its lien regardless of whether the debtor retains or transfers the collateral.").  Prudential unquestionably had a lien on the equity interests of SW Boston, but upon confirmation, the Liquidating Plan canceled Prudential's liens when these equity interests and those equity interests were distributed to insiders.  App. 263.  Those interests provided an important remedy to Prudential in the event that the Debtors had failed to meet their obligations under the Prudential Loan Agreement and then under the Liquidating Plan.  *See, e.g., In re Pullman Constr. Indus.*, 107 B.R. 909, 939 (Bankr. N.D. Ill. 1989) (finding a plan is not fair and equitable where it deprives secured creditor of its state law rights of foreclosure).

The Debtors also liquidated cash and additional securities pledged to Prudential to fund the Liquidating Plan's effective date payments to other creditors.  App. 1234-1236, 1280-1281, 1726, 1754.  Prudential has had a lien on all of the assets that have been liquidated, yet the proceeds of its collateral were used to fund the Debtors' ongoing expenses and make payments to unsecured creditors before its senior secured claims were paid in full.  App. 1099-1101, 1107. While that may be acceptable in a true reorganization in which a reorganized debtor can fund payments to creditors from ongoing operations, that is not the case

here where the Debtors' primary remaining assets, that is the condominium units, are being liquidated. That difference is critical. The Debtors' assets are not renewable – the Debtors own a finite amount of property. App. 1819. Accordingly, once each asset was sold or liquidated, it was converted to cash for distribution. Then, once distributed, Prudential's collateral was irrevocably diminished even though Prudential had not been "paid in full." Such a result directly contradicts the requirements of section 1129(b)(2)(A)(i)(I). The Debtors contend that Prudential has "confused the retention of liens on collateral with the ability to use that collateral." Debtors' Brief at 54-55. It is the Debtors that sow the seeds of confusion about their Liquidating Plan. The Debtors were not just "using" the collateral, they were selling it and thus, Prudential's lien would no longer attach. While section 1129(b)(2)(A)(i)(I) allows such transfers to be made, it requires that Prudential's lien attach to the proceeds of the transfer and Prudential must retain those liens until its claim is satisfied, before which the proceeds cannot be used to pay junior claims. Yet, the Debtors continue to assert incorrectly that Prudential was to retain "its lien on all its collateral until the Prudential claim had been paid in full." Debtors' Brief at 53. That is simply incorrect in a liquidation.

**ii.     Prudential Did Not Receive Deferred Cash Payments of a Value Equal to Its Interest in Its Collateral as of the Effective Date of the Liquidating Plan.**

Section 1129(b)(2)(A)(i)(II) requires a court to ensure that a secured creditor receives deferred cash payments of a value equal to the holder's interest in its collateral as of the effective date. *See Timbers of Inwood Forest,* 484 U.S. at 377 ("[A secured creditor] must be rendered payments that assure him that value *as of the effective date of the plan.*") (emphasis in original). In spite of the Debtors' and Prudential's agreement that as of the Confirmation Hearing the value of Prudential's collateral was $78,327,788, the Bankruptcy Court set Prudential's secured claims at $51,835,721 in the decision regarding post-petition interest. Debtors' Add. 144; App. 1587, 1590. As discussed in Section I.C *supra*, the Debtors failed to value Prudential's collateral appropriately for purposes of section 1129(b)(2)(A)(i)(II) and, accordingly, did not provide it with deferred cash payments sufficient to equal the value of Prudential's interest in its collateral.

**2.     The Debtors Cannot Use the Indubitable Equivalence Test to End-Run the Requirements of Section 1129(b)(2)(A)(i).**

In an attempt to evade compliance with the literal requirements of section 1129(b)(2)(A)(i), the Debtors cite to cases decided under section 1129(b)(2)(A)(iii), which allows an objecting secured creditor to be crammed down if a plan provides the secured creditor with the realization of the "indubitable

equivalent" of its collateral.[15]  In fact, the Bankruptcy Court made a vague finding of indubitable equivalence as an alternative predicate for confirming the Liquidating Plan.  *See* Debtors' Add. 122.  However, the Supreme Court ruled in *RadLax Gateway Hotel, LLC v. Amalgamated Bank*, 132 S.Ct. 2065 (2012), that the indubitable equivalence test can no longer save a defective plan that fails to meet the explicit requirements of the other more applicable tests evaluating the fair and equitable treatment of crammed down creditors.

### 3.    The Liquidating Plan Was Not Fair and Equitable on Its Face.

As noted earlier, a plan must be both fair and equitable in a broad sense and must not "unduly shift the risk of reorganization."  *In re Montgomery Courts Apartments of Ingham County, Ltd.,* 141 B.R. 324, 346 (Bankr. S.D. Ohio 1992).  Thus, mere technical compliance with section 1129(b)(2), whether or not achieved, is insufficient to sustain a finding that a plan is "fair and equitable."  *See, e.g.*, *In re D&F Constr., Inc.*, 865 F.2d 673, 675 (5th Cir. 1989); *In re TCI 2 Holdings, LLC*,

---

[15]    *See* Debtors' Brief at 53-54 citing *Brite v. Sun Country Dev., Inc. (In re Sun Country Dev., Inc.)*, 764 F.2d 406, 409 (5th Cir. 1985) (upholding Bankruptcy Court finding that new real property pledged to secure new notes provided indubitable equivalent to real property secured pre-petition indebtedness) and *In re James Wilson Assocs.*, 965 F.2d 160, 171-72 (7th Cir. 1992) (allowing use of pledged rent collateral to fund administrative expenses and adequate protection payments to junior secured creditor "provided the plan of reorganization gives the secured creditor the 'indubitable equivalent' of his secured interest").  Notably, in each of these cases, the debtor could offer alternative or recurring security to the secured creditor.

428 B.R. 117, 168 (Bankr. D.N.J. 2010).  Courts have considered a number of

factors in determining whether a plan impermissibly shifts reorganization risk,

including (i) the protections and risks to the secured creditor, (ii) the general

reasonableness of the proposals in light of the circumstances, (iii) whether the

primary risk of reorganization remains with the equity interests of the reorganized

debtor, (iv) whether any secured loan restructure, including default provisions and

other covenants, is reasonable when compared to the parties' previous

understandings and practices, and (v) whether other particular inequities exist,

including special prejudice to a dissenting class arising from its particular

circumstances.  *See Montgomery Courts,* 141 B.R. at 346; *TCI 2 Holdings*,

428 B.R. at 168.

On this basis, not only was Prudential the only party aggrieved by the

Liquidating Plan, but also the primary party on which the risk of the Liquidating

Plan had rested.[16]  First, the Debtors would have paid general unsecured creditors

and made distributions to or for the benefit of the equity from Prudential's

collateral before Prudential was paid in full.  App. 1733, 1739.  In fact, according

to the Debtors' projections, over $10.3 million of proceeds from Prudential's

---

[16]  The Debtors claim that this argument is an attempt by Prudential to contest the
Bankruptcy Court's feasibility finding, which Prudential did not formally raise
on appeal.  Debtors' Brief at 57-58.  This is inaccurate.  The allocation of that
risk primarily to a secured creditor is impermissible, regardless of whether a
plan has been found to be feasible.

collateral were to go to parties other than Prudential before Prudential would have received "payment in full." Exhibit B to Amended Disclosure Statement [Dkt. 550-1]. Prudential, as the secured creditor with first priority liens in these liquidating cases should have received 100% of the proceeds of its collateral (subject only to allowable section 506(c) expenses or any expenses paid with its consent) until Prudential was paid in full. *See Kent Terminal*, 166 B.R. at 567, n. 18 (holding that in order for a liquidating plan to be fair and equitable, the secured creditor must be paid 100% of the proceeds from the liquidation of its collateral until its claim is paid in full and its lien must attach to the proceeds of the sale).

Second, if the Debtors missed their projections modestly, Prudential would again not have been "paid in full" (without regard to the amount of post-petition interest owed on Prudential's claims). *See, e.g.*, App. 1282-1286. Thus, Prudential alone bore the burden of any payment shortfall, not (1) general unsecured creditors who would have received payment in full with post-confirmation interest or (2) insiders who would have received a distribution of SW Boston's equity and could use that to control disposition of the property.

Third, the Debtors dramatically reduced the rights and protections originally afforded to Prudential under its original loan documents. In fact, the Liquidating Plan specifically provided that any terms contained in the Prudential Loan Agreement that are "inconsistent with or *more expansive than*" the terms of the

68

Liquidating Plan are void. App. 1742-1743. It contained what amounted to phantom covenants, all less onerous on the Debtors than those under the Prudential Loan Agreement, as they were not negotiated with Prudential, but imposed on it. Exhibit A to Liquidating Plan [Dkt. 533]; App. 2206-2218. Additionally, while the Debtors left the City's economic terms largely undisturbed, they unilaterally amended Prudential Loan (1) to lower the applicable interest rate by nearly 50 percent, App. 1739, 2154; (2) to provide for *no* default interest in the event of a breach by the Debtors, App. 1739, 2158, 2184; (3) to eliminate monthly interest payments, App. 1739, 2183-2184; (4) to decrease the amount of proceeds Prudential is entitled to from the sale of each residence, App. 1733, 1739, 2231-2232; (5) to lower (in almost all instances) the minimum sales price of each residence, App. 1494; Prudential Exhibit 2 – Remaining Inventory from Evidentiary Hearing held June 27-29, 2011; Exhibit E to Prudential Loan Agreement; and (6) to dispense with the pledge of equity of SW Boston, App. 1752. Notably, there were no apparent remedies provided for in the event the Debtors defaulted on their obligations.

### B. The Debtors Improperly Consolidated Their Estates Solely to Deprive Prudential of Its Contractual and Statutory Rights Against Each Debtor.

When employed, substantive consolidation materially changes the negotiated rights and remedies of creditors of the entities to be consolidated.

Distribution rights change and voting rights change.  Used offensively, substantive consolidation prejudices certain creditors to benefit others.  Generally described as the pooling of assets of, and claims against, related, but distinct corporate entities, or the merging of claims against companies, substantive consolidation allows a proponent to control distributions and voting in a manner inconsistent with a group's organizational structure.  *See, e.g., Union Sav. Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.)*, 860 F.2d 515, 518 (2d Cir. 1988).  As substantive consolidation upsets existing legal framework, the Courts of Appeals that have decided this issue unanimously agree that substantive consolidation is an extreme remedy that must be used sparingly.  *See, e.g., id.* at 518; *In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2005); *Reider v. FDIC (In re Reider)*, 31 F.3d  1102, 1109 (11th Cir. 1994).  It cannot be used for "procedural convenience" or to "facilitate" payments under a plan of reorganization.  *Flora Mir Candy Corp. v. R.S. Dickson & Co. (In re Flora Mir Candy Corp.)*, 432 F.2d 1060, 1062 (2d Cir. 1970); *Owens Corning*, 419 F.3d at 211.  The party *seeking* consolidation must demonstrate (1) harm necessitating the remedy of consolidation and (2) a unity of interest or intermingling of assets that caused that harm.  *In re Snider Bros., Inc.,*18 B.R. 230, 235 (Bankr. D. Mass. 1982).  The Bankruptcy Court's interpretation of the Liquidating Plan's substantive consolidation provisions is a matter of law and, therefore, reviewed by this Court *de novo*.  *In re*

*Amco Ins.*, 444 F.3d 690, 694 (5th Cir. 2006). The determination of whether, under that standard and given the facts, substantive consolidation is warranted is reviewed under an abuse of discretion standard. *Reider*, 31 F.3d at 1104-05.

In these cases, not only did the Bankruptcy Court permit the Debtors to consolidate their estates substantively, but it did so without considering whether the Debtors met *any* test articulated by *any* Court of Appeals. *See* Debtors' Add. 133-137. The Debtors failed to present any evidence that substantive consolidation was warranted. To the contrary, prior to the submission of the Liquidating Plan and even at confirmation, the Debtors always operated as separate and distinct entities precluding invocation of substantive consolidation. App. 1103. The Bankruptcy Court excused the Debtors' failure to introduce any factual evidence to support substantive consolidation by finding that creditors were not being "harmed by virtue of the limited consolidation provision." Debtors' Add. 136. This is not the standard. Absent substantive consolidation, the Debtors could not have confirmed the Liquidating Plan over Prudential's objection. Its use harmed, prejudiced, and disenfranchised Prudential.

The Debtors continue to allege that Prudential has not been harmed by the substantive consolidation. Not only is this false, but it also improperly attempts to impose the Debtors' considerable burden to prove that substantive consolidation is proper upon Prudential and compels Prudential to prove that it is not. *See Owens*

71

*Corning*, 419 F.3d at 211-12.  The Debtors bear this burden because substantive

consolidation is an equitable remedy that often leads to an inequitable result:

because each debtor entity is likely to have a different asset to debt ratio, one

creditor group will necessarily receive more than it should, while another receives

less.  *See Drabkin v. Midland–Ross Corp. (In re Auto–Train Corp.),* 810 F.2d 270,

276 (D.C. Cir.1987).  Under the best of circumstances, it is "rough justice"

designed to remedy as best as possible the harm that has been caused by the

debtors from operating distinct entities as one unit.  *See In re New Century TRS*

*Holdings, Inc.*, 407 B.R. 576, 591 (D. Del. 2009).  Indeed, courts have explicitly

rejected the Bankruptcy Court's apparent adoption of a "no harm, no foul" policy

for substantive consolidation.  *Id*. at 591-92.

The Bankruptcy Court excused the Debtors from satisfying the factual

predicates necessary for substantive consolidation by asserting that the Debtors

were not using substantive consolidation "offensively".  Debtors' Add. 135-136.

Yet, that is exactly what the Debtors did.  Under the Liquidating Plan, all assets

(and all proceeds thereof) and liabilities of each Debtor were merged into and with

the assets and liabilities of all other Debtors, at least for a "moment" in time.  App.

1755-1756.  The Debtors then argue that this type of consolidation is not the type

of substantive consolidation courts have found "impermissible" because, according

to the Debtors, it did not impair the substantive rights of creditors.  Debtors' Brief

at 62.  In addition to being contrary to the facts, this legal argument has been flatly
rejected by the Third Circuit in *Owens Corning*.  *Owens Corning*, 419 F.3d at 211,
216.  Substantive consolidation, deemed or otherwise, is still consolidation.
Prudential has claims against each Debtor secured by different assets.  Prudential
had the right to seek payment from the assets of each entity at all times.
Substantive consolidation deprived Prudential of its independent rights against
each Debtor.

The heavy burden required to impose substantive consolidation over the
objection of a creditor cannot be avoided by merely calling it something else or by
imposing some, but not all, of the "hallmarks" of substantive consolidation.  Either
a plan combines assets and liabilities of various debtors or it does not.  If it does
consolidate assets, a debtor must establish the existence of the factual predicates
for substantive consolidation.  *See, e.g., In re Drexel Burnham Lambert Group,
Inc.*, 138 B.R. 723, 765-66 (Bankr. S.D.N.Y. 1992) (prima facie showing required
to support partial consolidation).  Provisions designed to ameliorate the effect of
consolidation cannot rescue a plan.  *New Century*, 407 B.R. at 591-92.  In fact, the
Liquidating Plan has the primary hallmark of substantive consolidation that *Owens
Corning* warns against – the deleterious effect of forcing senior creditors to share
recoveries with junior creditors of another debtor.  *Owens Corning*, 419 F.3d at
206.

1.    "Deemed" Consolidation of the Debtors' Estates Stripped
      Prudential of Its Separate Debtor Guarantees and Their
      Attendant Remedies.

Under the Liquidating Plan's consolidation provisions, "all guaranties of any

Debtor of the obligations of any other Debtor shall be deemed eliminated and

extinguished" and "each and every Claim . . .  filed in the Chapter 11 Case of any

Debtor shall be deemed filed against the consolidated Debtors."  App. 1755-1756.

This aspect of the Debtors' consolidation allows the Debtors to transfer the

collateral from one Debtor to another Debtor in order to pay that second Debtor's

creditors. This harms Prudential by impairing its ability to seek recourse against

the $14 million of collateral securing the guarantees provided by the Affiliate

Debtors to Prudential.  Under the Liquidating Plan, that collateral may be used to

pay junior creditors of SW Boston.   App. 1099-1101, 1107.  Once it is used to pay

those junior creditors, the collateral is no longer available to Prudential for

satisfaction of its secured claim against each Debtor.

Yet, the Debtors fail to ascribe any value to the protection provided by the

guarantees and the collateral securing them.  Rather, they claim Prudential was not

harmed by consolidation because it was being paid in full through deferred cash

payments.  However, the Debtors fail to recognize the fact that these are guarantees

of payment, not of collection, and that the guarantees provide the non-economic

remedies when a default occurs before "payment in full" is made.  This is why

74

section 1129(b)(2)(A)(i) requires that when a secured creditor is being satisfied through deferred cash payments, it must retain its liens. Loss of the protection against this risk provided by the ability to look directly, as holder of a senior lien, to the Affiliate Debtors' assets is a harm to Prudential in and of itself.

Indeed, in a chapter 7 liquidation, Prudential would be entitled to the first proceeds upon the liquidation of each Debtor's assets that constitute Prudential's collateral. Here, it loses its right of recourse to certain or all of that collateral. The likelihood of Prudential recovering the full amount of its claim is therefore necessarily less than it would be in a chapter 7 liquidation. FSC proves this point. Prudential had a full recourse guaranty claim against FSC and a first priority security interest in its securities account – an account that held securities worth approximately $6.1 million as of confirmation. App. 1094-1095, 1100, 2289-2304. FSC had no creditors other than Prudential and the City of Boston. App. 1094-1095, 1793, 1796. Prudential would be the first creditor entitled to those funds until its claims were paid in full. However, Prudential must now share a portion of these funds with all junior creditors of all of the Debtors even though Prudential's claim against FSC far exceeded the value of the collateral held by FSC. This diminishes the collateral that Prudential can look to in the event SW Boston cannot satisfy its claims.

### 2. "Deemed Consolidation" of the Debtors' Estates and the Disregard of Other Voting Requirements Diminished Prudential's Voting Rights and Prejudiced Prudential.

Substantive consolidation also contributed to the Bankruptcy Court's disenfranchisement of Prudential. Disenfranchisement of Prudential allowed the Debtors to confirm their Liquidating Plan, which would not have been possible had the separateness of the entities and the provisions of the Bankruptcy Code governing plan voting not been disregarded by the Bankruptcy Court. The right to vote to accept or reject a plan of reorganization is granted to each impaired creditor. 11 U.S.C. §§ 1126, 1129(a)(10). Impairment includes any alteration of the legal, equitable and contractual rights to which such a claim entitles the holder. 11 U.S.C. § 1124(1). The Debtors' assertion that the substantive consolidation in the Liquidating Plan did not adversely affect the rights of creditors is incorrect as well as irrelevant. No provision of the Bankruptcy Code overrides the right to vote provided to the impaired, dissenting creditor simply because such creditor is being paid in full over time. If a creditor is impaired, it has the right to vote under sections 1126 and 1129(a)(10) and any dilution of the effect of that vote is harm in and of itself.

At the time Prudential entered into the Prudential Loan Agreement, the Debtors agreed to provide Prudential with certain credit enhancements, including secured guarantees from the Affiliate Debtors. App. 2189-2193. By virtue of

76

these guarantees, Prudential was the *only* creditor of 100 Stuart Street and Auto Sales; other Affiliate Debtors had only two significant creditors – Prudential and the City.  App. 1094-1095, 1579-1583, 1793-1797.  Absent substantive consolidation, the Debtors could not have confirmed the Liquidating Plan with respect to 100 Stuart Street and Auto Sales because these Debtors did not have an impaired accepting class vote in favor of the Liquidating Plan as required by section 1129(a)(10) of the Bankruptcy Code.  App. 1579-1583.  Furthermore, had the Bankruptcy Court properly enforced the City's assignment of its vote to Prudential, the Debtors would not have had an impaired accepting class for any Debtor other than SW Boston and General Trading.  App. 1579-1583.  The Bankruptcy Court allowed the Debtors to avoid the limitations imposed by section 1129(a)(10) through three erroneous legal determinations that effectively disenfranchised Prudential.

> **i.   The Bankruptcy Court's Failure to Require an Impaired Accepting Class for Each Debtor Violated § 1129(a)(10) and Thus, Deprived Prudential of the Voting Rights Arising from its Guarantees.**

First, the Bankruptcy Court erroneously held that the Liquidating Plan need only be accepted by one impaired class as to a single Debtor as opposed to every separate Debtor in order to satisfy section 1129(a)(10).  Debtors' Brief at 63-64.[17]

---

[17]   The Debtors cite *JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns)*, 419 B.R. 221, 264, 266 (Bankr.

Simply put, this conclusion is wrong as a matter of law.  *In re Tribune Co.*, 464

B.R. 126, 183 (Bankr. S.D.N.Y. 2011).  Section 1129(a)(10) sets forth as a

prerequisite for confirmation of a plan that it must be accepted by "at least one

class of claims that is impaired under the plan . . . determined without including

any acceptance of the plan by any insider."  11 U.S.C. § 1129(a)(10).  While it is

often a matter of administrative convenience to file a single plan for multiple

debtors, procedural convenience does not obviate the need for compliance with

section 1129, including section 1129(a)(10), as to every Debtor.  *See Tribune*, 464

B.R. at 183.  It is only where multiple debtors are substantively consolidated that

the requirements of section 1129(a)(10) are not enforced as to each distinct debtor

entity.  *See In re JER/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 302-03

(Bankr. D. Del. 2011) (dismissing chapter 11 case where confirmation of a plan

would not be possible absent substantive consolidation because of the debtors'

inability to satisfy requirement of section 1129(a)(10)); *see also Tribune*, 464 B.R.

at 183 ("I find nothing ambiguous in the language of § 1129(a)(10), which, absent

---

S.D.N.Y. 2009) for the proposition only a single impaired accepting class is
needed to confirm a joint plan of reorganization.  Not only has the legal
conclusion in *Charter* been subsequently rejected by the same court, the facts
of *Charter* differed materially from those present here.  The Liquidating Plan
was not accepted by 'numerous' other impaired accepting classes as in *Charter*
but rather was accepted by the general unsecured creditors of SW Boston, a
single creditor holding a convenience claim against General Trading, and the
City of Boston.  The Debtors are also not managed on an integrated basis or as
an integrated unit as were the Debtors in *Charter*.

substantive consolidation or consent, must be satisfied by each debtor in a joint

plan."). The Bankruptcy Court's ruling in these cases shows the Liquidating Plan

for what it is: substantive consolidation in form and substance.

> ii.    **The Assignment of the City of Boston's Voting Rights to Prudential Constituted an Enforceable Obligation that Did Not Violate Federal Bankruptcy Policy.**

Second, the Bankruptcy Court further prejudiced Prudential when it

erroneously failed to enforce the City of Boston's assignment of its voting rights in

respect of the Liquidating Plan.   The City of Boston unequivocally assigned its

right to vote to Prudential in the parties' Intercreditor Agreement.  App. 2550-

2551.  The Bankruptcy Court's conclusion that the assignment in that agreement

was not enforceable as a policy matter contravened the Bankruptcy Code as a

matter of law and should be reversed.  *See South Bay Boston Mgmt. v. Unite Here,*

*Local 26*, 587 F.3d 35, 40 (1st Cir. 2009) (determination that a contract is

preempted by federal law or otherwise unenforceable is a legal conclusion

reviewed *de novo*).

Subordination agreements are enforced according to their terms in

bankruptcy.  *See, e.g., In re Bank of New England Corp.*, 404 B.R. 17, 22 (Bankr.

D. Mass. 2009).  The majority of courts have enforced the assignment of a junior

creditor's right to vote in bankruptcy.  *See, e.g., In re Aerosol Packaging, LLC*, 362

B.R. 43, 47 (Bankr. N.D. Ga. 2006) (enforcing subordination provision assigning

79

junior creditor's bankruptcy voting rights to senior creditor); *In re Curtis Center Ltd. P'ship*, 192 B.R. 648, 659-660 (Bankr. E.D. Pa. 1996) (same); *Broadcasting Capital, Inc. v. Davis Broadcasting, Inc., (In re Davis Broadcasting, Inc.)*, 169 B.R. 229, 233-34 (Bankr. M. D. Ga. 1994), *rev'd on other grounds*, 176 B.R. 290 (M.D. Ga. 1994) (same)

Despite this authority, the Bankruptcy Court adopted the contrary, flawed reasoning of *Bank. of America v. N. LaSalle Street Ltd. P'ship (In re 203 N. LaSalle Street Ltd. P'ship)*, 246 B.R. 325, 331 (Bankr. N.D. Ill. 2000).  Debtors' Add. 109-110.  In *203 N. LaSalle*, the court precluded an assignment of the right to vote from a junior lender to a senior lender based on a series of incorrect conclusions identified in *Aerosol Packaging*, among other cases.  *Aerosol Packaging*, 362 B.R. at 47.  First, section 1126(a) states that "[t]he holder of a claim or interest allowed under section 502 of this title may accept or reject a plan."  11 U.S.C. § 1126(a).  Nothing in the language of section 1126(a), either expressly or implicitly, prohibits delegation of the right to vote to another party.  Second, the cases cited by the *203 N. LaSalle* court all involved a *debtor* waiving *its* rights – not creditors waiving theirs.  Protection of a debtor from waiving its bankruptcy rights is entirely distinct from the waiver of such rights by a sophisticated non-debtor party.  The cases cited in *203 N. LaSalle* and relied upon by the Bankruptcy Court do not prohibit the latter.  246 B.R. at 331.  Accordingly,

80

the Bankruptcy Court erred as a matter of law in failing to enforce the Intercreditor

Agreement.

### iii. The Bankruptcy Court's Determination that Non-Voting Classes Accepted the Liquidating Plan Violated Section 1126.

Third, the Bankruptcy Court deemed that certain impaired classes to have

accepted the Liquidating Plan despite the failure of *any* class members to cast

votes.  Debtors' Add. 108.  Section 1126 of the Bankruptcy Code sets forth

minimum percentages of creditors and amounts of claims within a class that must

vote to accept a plan in order for a class to have accepted the plan.  11 U.S.C. §§

1126(c), (d).  It further provides "a class that is not impaired under the plan, and

each holder of a claim or interest of such class, are conclusively presumed to have

accepted the plan . . ."  11 U.S.C. § 1126(f).  There is no provision that similarly

sets forth that non-voting classes and creditors are deemed to have accepted a plan.

The Bankruptcy Court relied for its conclusion on *Heins v. Ruti-Sweetwater,*

*Inc. (In re Ruti-Sweetwater, Inc.)*, 836 F.2d 1263 (10th Cir. 1988), a widely-

criticized decision that the leading treatise on bankruptcy law described as

"unfortunate" and "not correctly decided", noting that "[t]he trend of decisions

since *Ruti-Sweetwater* rejects its holding, and interprets section 1126 as written."

7 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy,* ¶¶ 1129.02[8],

1126.04 (16th ed.); Debtors' Add. 108.  *Ruti-Sweetwater* is entirely distinguishable

81

on the facts.  In *Ruti-Sweetwater* (i) no party objected to the plan and the deemed

acceptances were the difference between consensual confirmation under 1129(a)

and cram down confirmation under 1129(b), (ii) the court was considering an

objection made by a non-voting creditor raised *after* the plan had been confirmed,

and (iii) the classes that were deemed to accept actually had *existing* creditors that

had failed to vote, rather than no creditors at all.  836 F.2d at 1264-1265.

Significantly, *Ruti-Sweetwater* fails to explain why Congress, if it had intended

non-voting classes to have been deemed to accept a plan, failed to state as much in

section 1126 while explicitly indicating that non-impaired classes should be

deemed to have accepted.

> **C.** **The Payment of Junior Unsecured Creditors Before Payment of Senior Secured Creditors and the Debtors' Failure to Provide a Liquidation Analysis Means that the Liquidating Plan Did Not Satisfy the Best Interests of Creditors Test under Section 1129(a)(7).**

Section 1129(a)(7) of the Bankruptcy Code requires that any impaired class

of claims that has not accepted the plan must "receive or retain . . . property of a

value, as of the effective date of the plan, that is not less than the amount such

holder would receive or retain if the debtor were liquidated under chapter 7 . . ."

11 U.S.C. § 1129(a)(7).  To satisfy this burden, a debtor must submit a liquidation

analysis, which "establish[es] compliance with section 1129(a)(7)."  7 *Collier on*

*Bankruptcy* ¶ 1129.02[7][b][iii] (16th ed.) ("Without a liquidation analysis, the

requirement of section 1129(a)(7) cannot be met."). "The court must independently determine the value of the distributions under the plan in order to ascertain whether this requirement is satisfied, utilizing information that the proponent must provide." *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 610 (Bankr. D. Del. 2001).

At trial, only Prudential's expert provided a liquidation analysis. It demonstrated that Prudential would recover more in a chapter 7 case than under the Liquidating Plan. App. 2522, 2534-2535. The Debtors submitted no evidence to the Bankruptcy Court that the Liquidating Plan satisfied the best interests of creditors test. The Debtors' own expert testified that the Debtors did not perform a liquidation analysis. App. 1110.

In a chapter 7 liquidation, Prudential would have received the full amount of its principal, plus interest, fees and expenses from the Petition Date, up to the value of its collateral before any junior creditor would receive a distribution consistent with section 506. *See In re Vanderveer Estates Holdings, Inc.*, 283 B.R. 122, 127 (Bankr. E.D.N.Y. 2002); *In re ACA Real Estate LLC*, 418 B.R. 155, 160 (Bankr. M.D.N.C. 2009) (computing secured creditors claims in a hypothetical liquidation for purposes of section 1129(a)(7) as inclusive of default interest from the petition date in solvent case). As of the hearing on confirmation, the full amount of the value of its collateral was $78,327,688, but Prudential only received a claim for

$51,740,786 under the Liquidating Plan.  App. 1590; Debtors' Add. 144.

Therefore, as demonstrated by Prudential's uncontroverted liquidation analysis,

Prudential would receive substantially more in a chapter 7 liquidation than under

the Liquidating Plan.  App. 2534-35.  Contrary to the Debtors' assertions, this

constitutes real, tangible harm to Prudential.  The Bankruptcy Court's failure to

require the Debtors to perform such an analysis or hold the Debtors to their burden

was clear error.

### D.  The Liquidating Plan Was Not Proposed in Good Faith, But To Benefit Insiders By Depriving Prudential of Its Rights to Full Recovery and to Vote.

In order to be confirmed, a plan must be "proposed in good faith."  11

U.S.C. § 1129(a)(3); *In re Weber*, 209 B.R. 793, 797 (Bankr. D. Mass. 1997)

("[e]ven where all creditors vote to accept the plan, the good faith requirement

contained in § 1129(a)(3) must still be satisfied.").  Here, the Liquidating Plan fell

far short.   Its transfer of the equity interests of the entity that owns SW Boston to

insiders SE Berkeley and SE McClellan on account of an undocumented claim

subject to an objection was plainly an "attempt by a debtor-in-possession to give

favorable treatment to an insider."  *In re Future Energy Corp.*, 83 B.R. 470, 487

(Bankr. S.D. Ohio 1988) (holding that "clearly" such an attempt "is violative of

§1129(a)(3)'s good faith requirement.").  Chapter 11 plans where insiders receive

distributions require heightened scrutiny.  *See In re Harford Sands Inc.*, 372 F.3d

637, 640-41 (4th Cir. 2004); *In re Inter-Island Vessel Co. ,* 98 B.R. 606, 608-09 (Bankr. D. Mass. 1988).  In such situations, the "burden is on an insider claimant to show the inherent fairness and good faith of the challenged transaction." *Inter-Island Vessel Co.*, 98 B.R. at 608-09.

SE Berkeley and SW McClellan are owned by the Frank Sawyer Revocable Trust, the same ultimate parent as SW Boston and the Affiliate Debtors.  App. 1319, 1790-1791.  Thus, they are both insiders within the meaning of section 101(31) of the Bankruptcy Code.  App. 1319; 11 U.S.C. § 101(31)(E).  Despite (i) the common ownership of the Debtors and SE Berkeley and SE McClellan and (ii) Prudential's objection to SE Berkeley and SE McClellan claims, the Bankruptcy Court did not subject the purported claims of SE Berkeley or SE McClellan to any, let alone, "rigorous" or "strict" scrutiny.  The Bankruptcy Court never scheduled or held a hearing on Prudential's objection to these claims, in violation of 11 U.S.C. § 502(b).  Nor did the Debtors ever investigate the validity of the insider claims or proffer any evidence establishing their validity.  App. 15-18.  The Bankruptcy Court's resolution of this issue therefore is entitled to no deference.

If the Bankruptcy Court had reviewed these claims at all, it would have determined that the claims of SE Berkeley and SE McClellan are against FSC, not SW Boston.  As security for the Prudential Loan, FSC, the ultimate parent of the

Debtors, executed (i) that certain Completion Guaranty, (ii) that certain Payment

Guaranty, and (iii) that certain Carve-out Guaranty.  As additional security for the

Prudential Loan, FSC, not SW Boston, was required to arrange for the issuance of

a Letter of Credit in the amount of $17.3 million naming Prudential as the

beneficiary.  App. 1326-1327, 1472-1473, 2190-2191.  To arrange for the issuance

of the Letter of Credit on FSC's behalf, SE Berkeley and SE McClellan pledged

their collateral to Sovereign Bank.  Prudential's Objection to Claims of SE

Berkeley Street LLC and SE McClellan Highway, LLC p. 9 [Dkt. 696]; App.

1326-1327, 2439-2474.  Although SW Boston's obligations to Prudential were

reduced by $17.3 million when Prudential drew down the Letter of Credit, SW

Boston posted no collateral for the Letter of Credit, nor was it a party to any

agreement with SE McClellan or SE Berkeley regarding reimbursement of the

Letter of Credit.  App. 1315-1317, 1474.  No documentation supporting the alleged

obligation of SW Boston to "reimburse" SE Berkeley or SE McClellan exists.

App. 1314-1318, 2439-2475.  Thus, the claims (if valid) were not properly asserted

against SW Boston.

FSC, in turn, could not have asserted a claim against SW Boston because

FSC waived "any and all rights" to assert claims or seek any kind of contributions

from SW Boston or any other party liable on a related guaranty obligation pursuant

to the Frank Sawyer Payment Guaranty.  App. 2292-2293.  FSC further waived its

right to be deemed a creditor in any bankruptcy case where SW Boston was a

debtor.  App. 2292-2293.  Therefore, none of the "obligations" associated with the

Letter of Credit are properly asserted against SW Boston by FSC, SE Berkeley or

SE McClellan, and no distributions on account of these "claims" should have been

made from the SW Boston estate.

Through the artifice of distributing the equity interests of 110 Stuart Street to

SE Berkeley and SE McClellan on account of their "claims", the Frank Sawyer

Revocable Trust, of which Ms. Parks is a beneficiary, retained control of the

Debtors without contributing any new value, in derogation of the requirements of

section 1129(a)(3).  The Debtors argue that Prudential was not harmed by this

because no cash distributions will be made to insiders on account of the equity

interests until all non-insider creditors are paid in full.  Debtors' Brief at 59.

However, again, the Debtors overlook the non-economic rights attendant to a lien.

Prudential's lien provides it with security and corresponding remedies in the event

the Debtors are unable to make payment in full.  When the Bankruptcy Court

allowed the Debtors' principal to retain the equity interests free of Prudential's lien

on the basis of illusory claims, the loss of these protections harmed Prudential.

Accordingly, bankruptcy law treats a distribution of equity under a plan the same

as it treats a distribution of cash.  *See Norwest Bank Worthington v. Ahlers*, 485

U.S. 197, 208 (1988) ("[w]hether the value is 'present or prospective, for dividends

or only for purposes of control' a retained equity interest is a property interest to 'which the creditors [are] entitled . . . before the stockholders [can] retain it for any purpose whatever.'" (quoting *Northern Pacific R. Co. v. Boyd*, 228 U.S. 482, 508 (1913))).

Because these insiders received a distribution under the Liquidating Plan, the Bankruptcy Court should have subjected these claims to higher scrutiny.  *See Harford Sands*, 372 F.3d  at 640-41; *Inter-Island Vessel*, 98 B.R. at 609.  It erred in failing to apply the proper scrutiny and, consequently, the finding of good faith must be reversed.

## IV.    The BAP Correctly Found that Equitable Mootness Did Not Preclude It from Correcting the Bankruptcy Court's Errors On Appeal.

At the tail end of their brief, the Debtors contend that even if Prudential is correct about every one of the Bankruptcy Court's legal errors, the BAP should have afforded no relief and dismissed Prudential's appeals as "equitably moot" because "appellate relief cannot be granted without vitiation of the Plan."  Debtors' Brief at 75.  Equitable mootness is a judge-made doctrine that withholds appellate review under certain rare circumstances:  when granting appellate relief would shred a completed and confirmed reorganization plan and preclude the confirmation of a new one.  In a pair of 17-page decisions, the BAP considered and rejected the Debtors' arguments against appellate review, because the courts could remedy the Bankruptcy Court's multimillion-dollar error without unraveling the

Debtors' purported reorganization. Debtors' Add. 43-76. As noted above (p. 2-3, *supra*), the Debtors failed to preserve a challenge to that ruling. But even if it were properly before the Court, the BAP's ruling correctly weighed the relevant facts and should be affirmed.

This Court has described equitable mootness as a prudential doctrine, rooted in a court's "discretion in matters of remedy and judicial administration not to determine a case on its merits." *Rochman v. Ne. Utils. Serv. Group (In re Pub. Serv. Co. of New Hampshire)* ("*PSNH*"), 963 F.2d 469, 471 (1st Cir. 1992) (citation omitted) (contrasting equitable mootness with Article III mootness, which is mandatory). Equitable mootness must be cautiously applied. *See In re PWS Holding Corp.*, 228 F.3d 224, 236 (3d Cir. 2000); *In re Thorpe Insulation Co.*, 677 F.3d 869, 881 (9th Cir. 2012). The right to appeal is a crucial aspect of bankruptcy. *See, e.g., In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 367 (S.D.N.Y. 2007) ("[t]here is a significant public interest in vindicating the rights of the minority and preventing the will of the majority to go unchecked by appellate review."). Denial of that right under a theory of equitable mootness should be a rare occurrence. *See, e.g., New Century*, 407 B.R. at 588. This is especially true where finding equitable mootness would have market implications well beyond the confines of the current case. As the Fifth Circuit emphatically stated in *Scotia Pacific Co. v. Official Unsecured Creditors' Comm. (In re Pacific Lumber Co.)*:

89

> Equitable mootness should protect legitimate expectations of parties
> to bankruptcy cases but should not be a shield for sharp and
> unauthorized practices. Applying equitable mootness too broadly to
> disfavor appeals challenging the treatment of secured debt carries a
> price. It may promote the confirmation of reorganization plans, but
> it also destabilizes the credit market for financially troubled
> companies. Lenders will be reluctant to work with debtors who may
> unilaterally decide to file bankruptcy, propose a plan that
> aggressively undervalues the collateral, and may then thwart
> appellate review by rotely incanting equitable mootness. On the
> whole, it is preferable to create an environment in which firms can
> avoid bankruptcy rather than one in which bankruptcy litigiousness
> will thrive.

584 F.3d 229, 244 n.19 (5th Cir. 2009). Further, cases in which a plan is crammed

down on a secured creditor require even closer scrutiny. *Id*. at 244 (stating that

"the complexity of cramdown often cries out for appellate review" and that

appellate review of cramdown plans encourages debtors to seek consensual plan

confirmation in the majority of cases). The concerns expressed by the Fifth Circuit

in *Pacific Lumber* were particularly relevant here, where the Debtors proposed a

self-serving plan that reconfigured the Prudential Loan on terms highly favorable

to the Debtors, transferred the value of the security, for which Prudential had

bargained, to junior creditors and insiders without payment to Prudential in full,

and crammed that plan down on Prudential.

    As this Court has explained, the BAP's decision to entertain Prudential's

appeal reflects an exercise of its own remedial "discretion" in favor of appellate

review. *PSNH*, 963 F.2d at 471. That decision should be set aside only if the BAP

abused that discretion.  *See Search Market Direct, Inc. v. Jubber (In re Paige)*, 584

F.3d 1327, 1335 (10th Cir. 2009); *In re Continental Airlines*, 91 F.3d 553, 560 (3d

Cir. 1996) (en banc).  The Debtors incorrectly equate the BAP's discretionary

ruling with a *legal* ruling by the Bankruptcy Court that would be reviewed *de novo*.

*See In re Charter Commc'ns, Inc.*, 691 F.3d 476, 483 (2d Cir. 2012) ("[I]n an

equitable mootness dismissal, the district court is not reviewing the bankruptcy

court at all, but exercising its own discretion in the first instance.").  Furthermore,

in these cases the BAP determined as a factual matter that granting relief to

Prudential would not require an unraveling of the Debtors' reorganization.  As

even the Debtors' precedent recognizes, factual findings made in the course of an

equitable-mootness determination cannot be disregarded unless clearly erroneous.

*See United States v. GWI PCS 1 Inc.* (*In re GWI PCS 1 Inc.*), 230 F.3d 788, 799

(5th Cir. 2000) (agreeing with the argument that "fact findings by the district court

[in its appellate capacity] should be accepted unless clearly erroneous"); *accord*

*Continental Airlines*, 91 F.3d at 560.  This Court need not resolve the standard of

review in this appeal, however, because the BAP's decision was correct under any

standard.

### A.    The BAP Correctly Weighed All Relevant Factors Rather Than Apply A Presumption Of Mootness

The BAP appropriately weighed four factors in its decision, which it drew

from the Fourth Circuit's decision in *Behrmann v. Nat'l Heritage Found., Inc.*, 663

F.3d 704, 713 (4th Cir. 2011).  As the BAP explained, Prudential's diligence in

pursuing its appellate remedies, the ability to award Prudential relief without the

"disruption of the entire plan of reorganization," and the lack of any deleterious

effect on the interests of third parties all weighed strongly in favor of entertaining

Prudential's appeal, even if (as the BAP thought) the Liquidating Plan had been

substantially consummated.  Debtors' Add. 53-58.[18]

The Debtors insist that this Court's precedent treats as presumptively

dispositive a finding of "substantial consummation," Debtors' Brief at 74-75, a

concept that the Bankruptcy Code uses to limit the *Debtors'* power to propose

modifications to their own plan.  *See* 11 U.S.C. § 1127(b); *Hicks, Muse & Co., Inc.*

*v. Brandt (In re Healthco Int'l, Inc.)*, 136 F.3d 45, 48 (1st Cir. 1998)

(distinguishing substantial consummation from inability to afford appellate relief).

In fact, this Court has never applied an automatic presumption in favor of equitable

---

[18]  In fact, the Liquidating Plan had not been substantially consummated as the
Bankruptcy Code uses that term.  *See* 11 U.S.C. § 1101(2).  Even if the Debtors
had "commence[d] . . . distribution under the plan," they had not yet
"transfer[red] . . . all or substantially all of the property proposed by the plan to
be transferred."  11 U.S.C. § 1101(2)(A), (C).  As of the time the BAP
considered equitable mootness, sixty residences to be sold under the
Liquidating Plan remained unsold.  *See* App. 238, 1754.  The Debtors therefore
did not establish the "substantial consummation" on which they rely so heavily.
*See, e.g.,  Jorgenson v. Fed. Land Bank of Spokane (In re Jorgenson)*, 66 B.R.
104, 106-07 (B.A.P. 9th Cir. 1986) (holding that the plan had not been
substantially consummated where only four out of eighteen months of timber
sales proposed by the plan had been completed).  In any event, as explained in
the text, even "substantial consummation" does not automatically cut off
appellate rights as the Debtors would have it.

mootness.  The Debtors rely on a single footnote in *PSNH* that has no direct

application here.  Throughout the *PSNH* decision, this Court emphasized that the

record reflected "so substantial a consummation of the reorganization plan as to

render the requested appellate relief impracticable."  963 F.2d at 474.  Even in the

footnote on which the Debtors rely, the Court's emphasis was on the impracticality

of appellate relief, not on the mere fact that the plan had been consummated.  *See*

*PSNH*, 963 F.2d at 473-74 n. 13 ("'[S]ubstantial consummation' *per se* is

insufficient to moot an appeal from an order of confirmation, but it raises a 'strong

presumption' *that an appellate court will not be able to fashion an equitable and*

*effective remedy*." (quoting *In re AOV Industries, Inc.*, 792 F.2d 1140, 1147-48

(D.C. Cir. 1986))) (emphasis added; citations omitted).

As this Court has since explained, *PSNH* set out no "simplistic" rule of

mootness, but "rested . . . primarily on . . . circumstantial considerations" specific

to that case.  *Institut Pasteur v. Cambridge Biotech Corp.*, 104 F.3d 489, 491 (1st

Cir. 1997).  One of these was the "extraordinarily intricate" nature of the plan

provisions, which could not have practicably been dismantled following appellate

review.  *Id.* at 492.  As the BAP correctly explained, the *PSNH* footnote creates no

presumption of mootness on appeal; it merely recognizes that equitable relief will

likely be difficult to fashion once a highly complex plan has been well and truly

implemented.  Debtors' Add. 56.

Here, by contrast, the BAP reasonably found that the Liquidating Plan was not overly complex and did not feature numerous innocent non-parties acting in reliance upon on the Liquidating Plan's finality. As the BAP put it, the Debtors' "reorganization plan does not involve intricate transactions or affect third party interest," meaning that the substantial consummation of that plan carries less weight in the equitable-mootness analysis than the factors favoring Prudential's right to appellate review. Debtors' Add. 58-59 (*citing* 7 *Collier on Bankruptcy* ¶ 1101.01[1][c] (15th ed. 2005)); *see also Baker & Drake, Inc. v. Public Serv. Comm'n (In re Baker & Drake, Inc.)*, 35 F.3d 1348, 1351 (9th Cir. 1994) (substantial consummation of a "relatively simple reorganization plan" is not fatal to an appeal). In such a situation, application of a presumption against appellate review is simply not appropriate.

### B. The BAP Correctly Concluded That Prudential Acted Diligently To Preserve Its Rights.

The Debtors repeatedly assert that Prudential failed to seek a stay of the 506 Decision, but as they ultimately acknowledge, Prudential *did* seek a stay of the Confirmation Decision. As the BAP correctly held, precisely which order Prudential sought to stay was "not material," because Prudential's actions were sufficient to preserve its rights in the context of these two closely related decisions. Debtors' Add. 54. Indeed, when the Bankruptcy Court rejected a significant portion of Prudential's claim to post-petition interest in the 506 Decision, it did

nothing that required a stay; it simply declared the amount of Prudential's claim, a

decision that could be undone by simple reversal. *See PSNH*, 963 F.2d at 473 n.10

("A stay pending appeal . . . is necessary only if what might be done under the

judgment is beyond the power of the appellate court to undo by its judgment."

(*quoting* 9 *Collier on Bankruptcy,* ¶ 8005.4 (15th ed. 1992))). Prudential appealed

both the 506 Decision and the related claim-determination order prior to the

Bankruptcy Court's Confirmation Decision. App. 705, 707-08. Only through

implementation of the Liquidating Plan did a stay become necessary, to avert the

harmful effects of the Bankruptcy Court's underestimation of Prudential's claim.

Accordingly, Prudential pursued a stay from both the Bankruptcy Court and the

BAP to prevent the Liquidating Plan from taking effect; those stay applications

were denied before the effective date of the Liquidating Plan. *See generally* App.

468-559, 965-1012. And of course, "the failure to *obtain* a stay is not sufficient

ground for a finding of mootness." *PSNH*, 963 F.2d at 473. Prudential's actions

certainly do not bespeak the sort of "inexplicabl[e]" and "notable lack of

diligence" that would cause "the equities [to] weigh[] heavily against" its appeal,

as in *PSNH*. *Institut Pasteur*, 104 F.3d at 491-92.

### C.    The Bankruptcy Court Can Fashion Effective Relief For Prudential Given that the Debtors Liquidated Their Assets.

It was clear to the BAP, and remains clear today, that effective relief can be

fashioned in these Chapter 11 Cases post-appeal. The Debtors mistake the need to

preserve a path to reorganization with the need to preserve every jot and tittle of the Liquidating Plan. The greater concern is whether the possibility of reorganization will be doomed by implementation of the relief sought. *See In re Chateaugay Corp.*, 10 F.3d 944, 953 (2d Cir. 1993) (considering whether relief will affect "the re-emergence of the debtor as a revitalized entity"); *In re United Producers*, 526 F.3d 942, 950 (6th Cir. 2008) (focus of equitable mootness inquiry is "what the consequences of reversal of the confirmed plan would be for the success of the reorganization and for interests of third parties who have relied upon the confirmed plan"). So long as alternative reorganizations are possible, dismissal of an appeal is not required. *New Century*, 407 B.R. at 590 (finding that the lack of any evidence suggesting that "undoing the current liquidation plan will affect debtors' ability to liquidate in the future under a different plan" weighs against equitable mootness).

Here, the BAP has not ordered that any aspect of the Liquidating Plan be unwound, nor did it order any specific treatment of Prudential's claim under any future plan. *See* Debtors' Add. 39-40. Precisely what relief Prudential will obtain remains to be determined on remand. And the Debtors' equitable-mootness argument must fail so long as "practicable" avenues remain to provide Prudential with the relief to which it is entitled. *PSNH*, 963 F.2d at 473.

The Bankruptcy Court could grant many different forms of relief.  The Debtors may simply be able to seek re-confirmation of their Liquidating Plan with payment to Prudential in the proper amount of its claim.  As Prudential noted before the BAP, at the time of the Confirmation Hearing, the Debtors' professionals testified that the Debtors would have approximately $20 million in cash and $15 million in other collateral and investments remaining after making the distributions under the Liquidating Plan including Prudential's Claim (valued by the Debtors to be $51 million).  Exhibit B to Amended Disclosure Statement p.3 [Dkt. 550-1]; App. 1124, 1239-1240.  Thus, the Debtors should have sufficient value under the Liquidating Plan to satisfy Prudential's increased allowed claim, assuming their financials were reasonably accurate.  If it transpired that the Debtors' Liquidating Plan could not be re-confirmed as currently formulated, the Debtors could propose a new plan.  Alternatively, the Bankruptcy Court could confirm the amended plan proposed by Prudential. *See Paige*, 584 F.3d at 1347-48 (finding that, where appellee had failed to prove that alternative plan would not be viable or substantial likelihood of a new successful reorganization of the debtor would not otherwise be possible, appeal was not equitably moot).  Moreover, the parties could, at long last, negotiate a consensual plan that satisfies all constituencies.

The issues that the Debtors argue render the Bankruptcy Court's position "untenable" can be resolved with relative ease on remand.  There is no reason that any potential reorganization that comes out of the BAP's remand will require disgorgement of the minimal payments made thus far.   Given the $35 million dollar cushion of remaining cash and saleable assets projected by the Debtors and the fact that Prudential may accrue interest only up to the value of its own collateral, there will likely be enough remaining value to require the payments made to unsecured creditors and Bovis Lend Lease LMB, Inc. under any plan of reorganization in the Debtors' cases.  *See* Exhibit B to Amended Disclosure Statement p. 3 [Dkt. 550-1]; App. 124, 1239-1240.  To the extent any such payments on account of another Debtors' unsecured creditors occurred due to the substantive consolidation provisions in the Liquidating Plan, a simple solution would be an inter-Debtor payment to the extent necessary to make each Debtor whole for any payment made on account of a claim against another Debtor. Further, effectuating a remedy to "undo" the impact of substantive consolidation on the equity holders is similarly straightforward.  The only alteration in the post-petition ownership structure is (1) the cancellation of equity interests in SW Boston, (2) the reissuance of those equity interests to the "newly-formed" entity 110 Stuart Street, which were in existence when the Liquidating Plan was introduced to the Bankruptcy Court, and (3) the issuance of the equity of 110

Stuart Street to insiders SE McClellan and SE Berkeley.  App. 273-274.

Unwinding these steps would be an elementary task within the power of

Bankruptcy Court.

Finally, the Debtors argue an appropriate remedy cannot be fashioned

because certain claims and causes of action which were discharged on the effective

date would need to be reinstated.  First, the Debtors indicate they would reinstitute

an adversary proceeding versus Prudential to avoid certain of Prudential's liens.

Second, the Debtors assert without further detail or explanation that intra-Debtor

claims will have to be reinstated.  The aggregate amount of inter-Debtor claims,

without regard to offset, is $10,718,118.  App. 1796-1797.  These claims primarily

consist of claims by Frank Sawyer ($6,633,332.88) and General Trading

($1,384,735.23) against SW Boston and are merely entries on the Debtors' general

ledgers.  App. 2271-2272.  Finally, the Debtors point out that the claims of insiders

SE Berkeley and SE McClellan against the Debtors' estates would have to be

reinstated.  These claims are currently disputed and form one of the bases of

Prudential's appeal of the Confirmation Order.  *See* Section III.D *supra*.  Not a

single one of these matters involves a third party.  Rather, they concern only the

Debtors' insiders.  The unwinding of insider transactions is a logical consequence

of the Liquidating Plan being overturned, but not a basis for a determination that

the Appeals are equitably moot.

The BAP rejected identical contentions by the Debtors and concluded that relief that "would not require unraveling of the reorganization" was available. Debtors' Add. 59. The Debtors have failed to show that that finding was clearly erroneous — or erroneous in any way.

Nor do subsequent proceedings in the Bankruptcy Court in any way undermine the BAP's finding that relief is possible. In particular, the Debtors accuse Prudential of failing to make good on its offer to accept alternative or partial relief if necessary to facilitate the Debtors' reorganization. Debtors' Brief at 79. That accusation is unfounded. The fact is that Prudential has had no opportunity to consider what relief it may obtain, because no further proceedings have occurred in the Bankruptcy Court — despite Prudential's best efforts. App. 740-47. Prudential has sought to move the cases forward through filing of an amended plan of reorganization. App. 915-964. The Debtors were free to propose their own alternative plan, or to seek to re-confirm their Liquidating Plan, but chose not to. Instead, the Debtors brought about the current standstill in the Bankruptcy Court, challenging the Bankruptcy Court's jurisdiction to implement the BAP's instructions on remand. App. 818-825, 771-777. That challenge led the Bankruptcy Court to decline to exercise jurisdiction altogether so long as these appeals are pending. App. 767-70.

Resolving these appeals, therefore, will free the parties and the Bankruptcy Court to return to the task of achieving a proper reorganization: one that accounts for Prudential's full claim, resolves any outstanding issues related to the Prudential and insider claims, and unlike the Debtors' previous Liquidating Plan, complies with the Bankruptcy Code. The BAP concluded that task is not an impossible one — and certainly is not so *clearly* impossible as to justify refusing to hear Prudential's appeal of legal errors in the calculation of its secured claim. The BAP's decision was correct and, indisputably, well within its sound discretion. The Debtors' invocation of equitable mootness cannot shield the Bankruptcy Court's errors from appellate review.

## **CONCLUSION**

For the foregoing reasons, the decisions and judgments of the BAP should be affirmed and the Bankruptcy Court's decision and order regarding confirmation of the Debtors' Liquidating Plan reversed.

Dated: July 25, 2013

Respectfully submitted,

THE PRUDENTIAL INSURANCE
COMPANY OF AMERICA, ON
BEHALF AND SOLELY FOR THE
BENEFIT OF, AND WITH ITS
LIABILITY LIMITED TO THE ASSETS
OF, ITS INSURANCE COMPANY
SEPARATE ACCOUNT, PRISA

By their attorneys,

/s/  Emanuel C. Grillo
Emanuel C. Grillo
(1st Cir. # 1155059)
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
Tel.:  (212) 813-8800
Fax:  (212) 355-3333
egrillo@goodwinprocter.com

and

William M. Jay
(1st Cir. # 111872)
GOODWIN PROCTER LLP
901 New York Avenue, N.W.
Washington, DC 20001-4432
Tel.:  (202) 346-4190
Fax:  (202) 204-7169
wjay@goodwinprocter.com

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and the Order of the Court dated June 28, 2013 granting in part Prudential's motion for leave to file an oversized brief because this brief contains 24,632 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 word processing software in 14 point Times New Roman font.

Dated: July 25, 2013                    /s/  Emanuel C. Grillo

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on July 25, 2013, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system, which will send notification

of such filing to the e-mail addresses denoted on the attached Service List.  I

further certify that, on July 25, 2013, I served a copy of the foregoing document by

first-class mail, postage prepaid, on the parties or counsel of record indicated on

the attached Service List as non-registered participants.

/s/  Emanuel C. Grillo

Service List

| Party | Service Method |
|---|---|
| Harold B. Murphy, Esq.<br>Charles R. Bennett, Esq.<br>D. Ethan Jeffrey, Esq.<br>John C. Elstad, Esq.<br>Natalie B. Sawyer<br>Christopher Michael Condon<br>Murphy & King, PC<br>One Beacon Street, 21st Floor<br>Boston, Massachusetts 02108 | Email:<br>hbm@murphyking.com<br>crb@murphyking.com<br>dej@murphyking.com<br>jce@murphyking.com<br>nbs@murphyking.com<br>cmc@murphyking.com |
| Bruce F. Smith, Esq.<br>Michael J. Fencer, Esq.<br>Jager Smith, P.C.<br>One Financial Center<br>Boston, Massachusetts 0221 | U.S. Mail |
| Joseph F. Ryan, Esq.<br>E. Kate Buyuk, Esq.<br>Lyne, Woodworth & Evarts LLP<br>12 Post Office Square<br>Boston, Massachusetts 02109 | Email:<br>jryan@lwelaw.com<br>kbuyuk@lwelaw.com |