Nos. 12-9008, 12-9009, 12-9011 and 12-9012

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

**IN RE SW BOSTON HOTEL VENTURE, LLC, AUTO SALES & SERVICE, INC., GENERAL TRADING COMPANY, FRANK SAWYER CORPORATION, 100 STUART STREET, LLC, 30-32 OLIVER STREET CORPORATION, GENERAL LAND CORPORATION, AND 131 ARLINGTON STREET TRUST,**
*Debtors-Appellants.*

———————————————————

**THE PRUDENTIAL INSURANCE COMPANY OF AMERICA,**
*Appellee,*

v.

**SW BOSTON HOTEL VENTURE, LLC, et al.,** *Debtors-Appellants,* **and
CITY OF BOSTON,** *Appellant.*

———————————————————

**On Appeal from the Bankruptcy Appellate Panel
for the First Circuit**

———————————————————

**BRIEF OF THE MORTGAGE BANKERS ASSOCIATION,**
*Amicus Curiae in support of affirmance of memoranda and judgments
of the Bankruptcy Appellate Panel dated October 1, 2012*

**July 31, 2013**

Pamela Smith Holleman (1st Cir. No. 67571)
Patrick P. Dinardo (1st Cir. No. 25863)
**SULLIVAN & WORCESTER LLP**
**One Post Office Square**
**Boston, Massachusetts 02109**
**Telephone: (617) 338-2800**

# TABLE OF CONTENTS

Table of Authorities ................................................................................. ii

I.    INTEREST OF THE AMICUS CURIAE ...................................................... 1

    A.    Statement of Interest ......................................................... 1

    B.    Statement Pursuant to Fed. R. App. P. 29(c)(5) ................................. 5

II.   SUMMARY OF ARGUMENT ................................................................... 5

III.  ARGUMENT ......................................................................................... 6

    A.    Substantive Consolidation of the Debtors' Estates was Error. ............ 6

        1.    Background – substantive consolidation .................................. 8

        2.    Substantive consolidation of the Debtors ............................... 12

    B.    Consensual Assignments of Voting Rights Should Be Enforced. ..... 13

        1.    Assignment and enforcement of a junior lender's transfer
            of voting rights to a senior lender is common industry
            practice and helps to enhance the availability of
            commercial credit. .................................................................. 13

        2.    Enforcing a junior lender's contractual assignment of
            voting rights to a senior lender is consistent with the
            federal law and policy. ........................................................... 15

            a.    The reasoning of 203 North LaSalle Street
                Partnership, on which the bankruptcy court
                relied, is flawed. .................................................. 16

            b.    Rules should not favor a sophisticated
                creditor enhancing its bargaining leverage
                against other creditors under the guise of
                federal bankruptcy policy. .................................... 20

    C.    Rules for Determining a Lender's Secured Status Should Be
        Clear and Driven by the Purpose of the Determination. ................... 23

IV.   CONCLUSION ........................................................................... 27

# TABLE OF AUTHORITIES

## Cases

*American Hardwoods, Inc. v. Deutsche Credit Union*
   *(In re American Hardwoods, Inc.)*, 885 F.2d 621 (9th Cir. 1989) .................... 22

*Avondale Gateway Center Entitlement, LLC v. National Bank of Arizona*
   *(In re Avondale Gateway Ctr. Entitlement, LLC)*,
   Nos. CV10-1772-PHX-DGC, 02-09-BK-12153-CGC,
   2011 WL 1376997 (D. Ariz. April 12, 2011) .................................................... 20

*Bank of America, National Association v. North LaSalle Street*
   *Limited Partnership (In re 203 North LaSalle Street Partnership)*,
   246 B.R. 325 (Bankr. N.D. Ill. 2000) ..................................................... 16, 17, 18

*In re Blake*, No. 07-12445-FJB, 2009 WL 4349787
   (Bankr. D. Mass. Nov. 30, 2009) ...................................................................... 25

*Blue Ridge Investors, II, LP v. Wachovia Bank, N.A. (In re Aerosol*
   *Packaging, LLC)*, 362 B.R. 43 (Bankr. N.D. Ga. 2006) ................................... 19

*Butner v. United States*, 440 U.S. 48 (1979) ....................................................... 20

*In re Central European Industrial Development Company LLC*,
   288 B.R. 572 (Bankr. N.D. Cal. 2003) ............................................................ 8-9

*Contrarian Funds LLC v. Aretex LLC (In re Westpoint Stevens, Inc.)*,
   600 F.3d 231 (2d Cir. 2010) .............................................................................. 21

*Cukierman v. Mechanics Bank of Richmond (In re J.F. Hink & Son)*,
   815 F.2d 1314 (9th Cir. 1987) .......................................................................... 21

*DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Company*,
   540 F.2d 681 (4th Cir.1976) .............................................................................. 10

*Drabkin v. Midland-Ross Corporation (In re Auto-Train Corporation, Inc.)*,
   810 F.2d 270 (D.C. Cir. 1987) ............................................................................. 9

*Fiffy v. Nickless* (In re Fiffy), 293 B.R. 550 (B.A.P. 1st Cir. 2003) ..................... 13

*Financial Security Assurance Inc. v. T-H New Orleans Limited Partnership*
   *(In re T-H New Orleans Limited Partnership),* 116 F.3d 790 (5th Cir.) ............ 24

*Fish v. East*, 114 F.2d 177 (10th Cir. 1940) .......................................................... 10

*Ford Motor Credit Company v. Dobbins*, 35 F.3d 860 (4th Cir. 1994) ................. 24

*In re Gil-Bern Industries, Inc.*, 526 F.2d 627 (1st Cir. 1975) .................................. 4

*Hayes v. Gessner*, 315 Mass. 366, 52 N.E.2d 968 (1944) ...................................... 19

*In re Heritage Highgate, Inc.*, 679 F.3d 132 (3d Cir. 2012) .................................. 25

*HSBC Bank USA v. Branch (In* re Bank of New England Corp.),
   364 F.3d 355 (1st Cir. 2004) ........................................................................ 20, 22

*In re Indianapolis Downs, LLC,* 486 B.R. 286 (Bankr. D. Del. 2013)........ 21, 22-23

*In re Itemlab, Inc.*, 197 F. Supp. 194 (E.D.N.Y. 1961) .......................................... 18

*Miller v. United States*, 363 F.3d 999 (9th Cir. 2004) ........................................... 21

*Monarch Life Ins. Co. v. Ropes & Gray*, 65 F.3d 973 (1st Cir. 1995) ................... 22

*Montgomery Ward & Co. v. Meridian Leasing Corp.*
   (In re Montgomery Ward Holding Corp.), 269 B.R. 1 (D. Del. 2001) .............. 13

*In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005) ................................... 10-11, 12

*Pension Benefit Guaranty Corporation v. Ouimet Corporation*,
   711 F.2d 1085 (1st Cir. 1983) ........................................................................... 10

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065 (2012)........ 3

*Ravallo v. Refrigerated Holdings, Inc.*, No. 08-cv-8207 (CM),
   2009 WL 612490 (S.D.N.Y. Feb. 25, 2009) ..................................................... 19

*Robinson v. Shell Oil Company*, 519 U.S. 337 (1997) ........................................... 18

*Rosenfeld v. Coastal Broadcasting Systems, Inc. (In re Coastal Broadcasting Systems, Inc.)*, No. CIV. 12-5682, 2013 WL 3285936 (D.N.J. June 28, 2013) (unpublished) .................................... 16, 19

*In re Snider Bros., Inc.*, 18 B.R. 230 (Bankr. D. Mass. 1982) .............................. 10

*In re Stone & Webster, Incorporated*, 286 B.R. 532 (Bankr. D. Del. 2002) ............ 8

*In re SW Boston Hotel Venture, LLC*, 460 B.R. 38 (Bankr. D. Mass. 2011) ......... 12

*Till v. SCS Credit Corporation*, 541 U.S. 465 (2004) ........................................... 14

*Union Savings Bank v. Augie/Restivo Baking Company, Ltd. (In re Augie/Restivo Baking Company, Ltd.)*, 860 F.2d 515 (2d Cir. 1988)................... 9

*United Savings Association of Texas v. Timbers of Inwood Forest Associates*, Ltd., 484 U.S. 365 (1988) ................................................................ 27

*United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235 (1989) ........................... 3

*Woburn Associates. v. Kahn (In re Hemingway Transport, Inc.)*, 954 F.2d 1 (1st Cir. 1992)......................................................................... 8, 10, 12

## Statutes

11 U.S.C. §§ 101 et seq., ....................................................................................... 8

11 U.S.C. § 302(b)................................................................................................... 8

11 U.S.C. § 361 ...................................................................................................... 21

11 U.S.C. § 365(e)(1) ............................................................................................ 16

11 U.S.C. § 506 ...................................................................................................... 25

11 U.S.C. § 506(a)(1)  ........................................................................................... 25

11 U.S.C. § 510(a)........................................................................................... 17, 22

11 U.S.C. § 541(c)(1)(B) ....................................................................................... 16

{B1609260}

iv

11 U.S.C. § 1123(a)(5)(C) ........................................................................ 8

11 U.S.C. § 1125(b) ................................................................................ 22

11 U.S.C. § 1126(a) ...................................................................... 16, 17, 21

11 U.S.C. § 1126(e) ................................................................................ 22

11 U.S.C. § 1129(b) ................................................................................ 24

## Rules

Fed. R. Bankr. P. 3001(e) ........................................................................ 19

Fed. R. Bankr. P. 3012 ............................................................................ 26

Fed. R. Bankr. P. 3018 ...................................................................... 18, 19

## Other Authorities

Douglas G. Baird & Donald S. Bernstein, *Absolute Priority,*
  *Valuation Uncertainty, and the Reorganization Bargain*,
  115 Yale L.J. 1930 (2006) ............................................................ 4-5, 15

Richard E. Mikels et al., *Bankruptcy's Impact on Financial Markets*,
  Am. Bankr. Inst. J., Dec.-Jan. 2012 .................................................... 4

Shannon P. Pratt et al., *Valuing a Business: The Analysis and Appraisal of*
  *Closely Held Companies* (2008) ........................................................ 14

Marjorie O. Rendell, *2003-A Year of Discovery: Cybergenics and Plain*
  *Meaning in Bankruptcy Cases*, 49 Vill. L. Rev. 887 (2004) ............................. 18

3 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy*
  ¶ 361.03[2][a] (16th ed. 2013) ........................................................ 26

Elizabeth Warren, *Bankruptcy Policy*, 54 U. Chi. L. Rev. 775
  (Summer 1987) ...................................................................... 3-4, 22

Black's Law Dictionary (6th ed. 1990) .................................................... 17

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Fed. R. App. P. 26.1, the Mortgage Bankers Association, by its attorneys, hereby states that it is a not for profit membership corporation and that no public or private corporation owns any shares thereof.

With permission of the Court, the Mortgage Bankers Association (the "**Association**"), by its undersigned counsel, files its brief *amicus curiae*.

## I.     INTEREST OF THE AMICUS CURIAE

*A.     Statement of Interest*

The Association is the national association of the real estate finance industry, an industry employing more than 280,000 people in virtually every community in the country.  The Association represents approximately 2,200 members, including all elements of real estate finance – commercial, multifamily and residential companies, as well as industry-related service providers – who link housing, real estate and community financing needs to capital sources, both domestic and international.  The Association's members include mortgage companies, life insurance companies, commercial banks, thrifts, credit unions, savings and loan associations and savings banks.  The Association seeks, among other things, to ensure the continued strength of the residential and commercial real estate markets and to expand the availability of financing of residential, multifamily and commercial real estate.  The Association promotes fair and ethical lending practices and fosters professional excellence among real estate finance employees through a wide range of educational programs and a variety of

{B1609260}

publications.[1]  The Association is organized under the Illinois Not for Profit

Corporation Act of 1986, as amended, and is a business league exempt from

federal taxation under Section 501(c)(6) of the Internal Revenue Code.

The Association submits its brief *amicus curiae* because the Court's decision

in these appeals may have broad implications in the real estate finance industry and

impact the availability and cost of commercial and multifamily real estate credit

("commercial credit").  Lenders often lend up to 80 percent of a property's value,

and as such, they place paramount importance on their security interest in the

underlying property, the terms of carefully negotiated loan documents, and a

predictable legal regime in the event of default or bankruptcy.

The issues of concern to the Association in this case fundamentally rest upon

the ability of borrowers to pledge, and lenders to accept and rely upon, real

property as collateral for a loan.  A lender who agrees to finance real property does

so with the understanding that, in the event of default by its borrower, it can

enforce the remedial provisions of the loan documents.  The lender relies on courts

to enforce these provisions to ensure it receives the benefit of its bargain

notwithstanding the borrower's default.  Similarly, when a borrower is seeking

financing for a real estate transaction, a senior lender may often be willing to

---

[1] Further information regarding the Association may be found on its website,
http://www.mortgagebankers.org.

permit further encumbrances of its collateral by a junior lender but *only if* the junior lender consents to subordinate its rights in accordance with the terms and conditions of a negotiated subordination agreement. So long as there is a reasonable and credible basis in law for expecting enforcement of *all* contracts and agreements, the value of real estate and the cash flow generated from its operation can be underwritten and priced by the marketplace.

The risk that contract counterparties may disavow these bargained-for agreements, and that the courts cannot be counted upon to enforce them in a predictable manner, cannot be underwritten and would undermine the very nature of secured lending. Maintaining a body of established and predictable case law, including bankruptcy law, is of vital importance. As the Supreme Court recently stated: "The Bankruptcy Code standardizes an expansive (and sometimes unruly) area of law, and it is our obligation to interpret the Code clearly and predictably using well established principles of statutory construction." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2073 (2012), *citing United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 240-41 (1989).

It is undisputed that – as Professor (now Senator) Elizabeth Warren has observed – "Anyone who ever extends credit faces the possibility that repayment will not be forthcoming. Interest is structured, among other things, to pay the creditor for assuming the risk of nonpayment." Elizabeth Warren, *Bankruptcy*

*Policy*, 54 U. Chi. L. Rev. 775, 780 (Summer 1987) (hereinafter "*Warren*").

Borrower default, and even insolvency, is a known risk. Lenders can evaluate

known risks and structure around or price such risks accordingly. Ambiguous and

inconsistent rulings in bankruptcy cases lead to instability and uncertainty in the

credit markets.[2] If the law is not applied in a predictable manner, and a senior

lender's property rights in its collateral are disregarded, the viability of commercial

lending is compromised. This, in turn, inevitably affects the cost and availability

of commercial credit and ultimately the economic well-being of communities.

As two eminent bankruptcy scholars have observed: "A world in which

absolute priority is not respected is one in which entrepreneurs will have less

access to capital. Prospective investors take the dynamics of Chapter 11 into

account and either refuse to lend or demand higher rates of interest. *Some projects*

*with a positive expected value will not be funded*." Douglas G. Baird & Donald S.

---

[2] As this Court has commented (in the context of bankruptcy sales):

> It might not only be thought improper for a bankruptcy court to proceed in an irregular fashion merely to gain a few extra dollars in one case, but in the long run such a practice would be penny wise and pound foolish. Creditors in general would suffer if unpredictability discouraged bidders altogether.

*In re Gil-Bern Indus., Inc.*, 526 F.2d 627, 629 (1st Cir. 1975). Unpredictability will have the same effect on lenders. Indeed, commentators have observed that "changes in bankruptcy practice have had enormous impact on the financial markets and on the economy." Richard E. Mikels et al., *Bankruptcy's Impact on Financial Markets*, Am. Bankr. Inst. J., Dec.-Jan. 2012, at 1.

Bernstein, *Absolute Priority, Valuation Uncertainty, and the Reorganization Bargain*, 115 Yale L.J. 1930, 1940 (2006) (footnote omitted)(emphasis added). Valuation uncertainty creates option value for junior creditors. Thus, as Professors Baird and Bernstein observed:

> [A]ny valuation mechanism that does not involve a transaction that monetizes the senior investor's position (through a sale of the business or a buyout of the position) creates option value in the position of the junior investor. This will be priced into any deal the parties strike, which avoids the need to complete the valuation.

*Id. at 1955.* But enhancing option value for junior lenders comes at a cost to senior lenders, and that cost is likely to be passed along to borrowers as an increase in the price (or decrease in the availability) of senior loans, neither eventuality being good for the overall economy.

B.    **Statement Pursuant to Fed. R. App. P. 29(c)(5)**

The Association states that no party's counsel authored this brief, in whole or in part; no party's counsel contributed money intended to fund the costs related to preparing or submitting this brief; and no person, other than the Association or its counsel, contributed money intended to fund the costs related to preparing or submitting this brief.

## II.    SUMMARY OF ARGUMENT

Several issues raised in these appeals have implications for the availability and cost of commercial credit. These include the legal standard for substantive consolidation, the validity of intercreditor assignments of voting rights and the

timing of the determination of a creditor's secured status.  For the reasons set forth,

the Association respectfully requests that the Court affirm the decisions and

judgments of the Bankruptcy Appellate Panel for the First Circuit and reverse the

order of the bankruptcy court confirming the liquidating plan of Debtors-

Appellants.

### III.    ARGUMENT

*A.*    ***Substantive Consolidation of the Debtors' Estates was Error.***

Appellants SW Boston Hotel Venture, LLC et al. (the "**Debtors**") and the

City of Boston (the "**City**", and collectively with the Debtors, "**Appellants**") ask

this Court to affirm an order of the bankruptcy court, not considered by the

Bankruptcy Appellate Panel, confirming a plan of liquidation predicated upon the

so-called "deemed" substantive consolidation of the various Debtors.  As the

record shows, the bankruptcy court's decision to effect a substantive consolidation

of the Debtors' assets and liabilities for purposes of the plan was not based on

factual findings, and thus was clearly erroneous.  The Association's principal

concern is that the bankruptcy court's interpretation of the applicable standard

constitutes a departure from leading decisions by federal Circuit Courts of Appeal,

including this Court.  A decision by this Court reinstating the bankruptcy court's

order would unsettle markets that have come to rely on an established body of

decisional law.  Beyond its effects on the parties, such a decision would increase

the legal risk associated with the origination of mortgage loans, whether for portfolio or for pooling and securitization by banks, life insurance companies, investors in commercial mortgage-backed securities ("**CMBS**"), federally-backed capital sources and other investors in mortgage loans.  Among other things, the Association anticipates that counsel to borrowers in a range of transactions may be unwilling to issue reasoned nonconsolidation legal opinions that are required by whole loan investors and rating agencies.  The likely consequence would be a reduction in the availability of commercial credit and an increase in cost.  From an industry perspective, the potential implications are profound.

Numerous provisions of commercial real estate lending agreements are drafted with a view to mitigating bankruptcy risk.  For example, commercial real estate finance transactions typically are structured and documented so as to minimize the risk of substantive consolidation, among other objectives.  Thus, the borrower is often structured as a "special purpose entity" formed solely to own the real property being financed and which is bound by its formation documents to abide by numerous "separateness covenants" to ensure its existence as a stand-alone entity.  Most CMBS transactions above a certain monetary threshold also include, as a condition precedent to closing, a requirement that borrower's counsel deliver to the lender a legal opinion with respect to substantive nonconsolidation. It is a well accepted practice for rating agencies to require such opinions as

conditions to issuing the ratings that the marketplace requires for the pooling and

securitization of mortgage-backed securities.  These are "reasoned" opinions that

include significant qualifications, but provide comfort to the lender that, given

current case law, a borrower's compliance with the terms of the loan documents

and its own formation documents will greatly reduce the risk that the borrower

(and its assets) will be drawn in as an affiliated debtor in the bankruptcy of its

parent or affiliates.  A would-be commercial real estate borrower would not be

financed if it refused to comply with such conditions.

### *1.*     *Background – substantive consolidation*

The doctrine of substantive consolidation refers to the power of a bankruptcy

court to consolidate the assets and liabilities of separate, but related, entities.

*Woburn Assocs. v. Kahn (In re Hemingway Transp., Inc.)*, 954 F.2d 1, 11 (1st Cir.

1992).  Substantive consolidation merges the assets and liabilities of the

consolidated debtor entities into a unitary debtor estate.  *Id.*  Other than § 302(b)

(relating to the estates of debtor spouses), substantive consolidation is not

expressly provided for either under the Code[3] or federal bankruptcy rules.[4]  The

---

[3] As used herein, the terms "Bankruptcy Code", "Code", "section" and "§" shall refer to 11 U.S.C. §§ 101 et seq., unless otherwise indicated.

[4] *But see In re Stone & Webster, Inc.*, 286 B.R. 532 (Bankr. D. Del. 2002) (11 U.S.C. § 1123(a)(5)(C) authorizes the 'merger or consolidation of the debtor with one or more persons'); *contra In re Central European Indus. Dev. Co. LLC,* 288 B.R. 572 (Bankr. N.D. Cal. 2003) (substantive consolidation cannot be

Association believes that substantive consolidation should be employed rarely and carefully in line with prevailing precedent.

Courts have developed several tests as to whether to grant the equitable remedy of substantive consolidation, each involving similar factors. *See Drabkin v. Midland-Ross Corp. (In re Auto-Train Corp.)*, 810 F.2d 270, 276 (D.C. Cir. 1987) (proponent must show (a) substantial identity between the entities to be consolidated, (b) that substantial consolidation is necessary to avoid some harm or to realize some benefit, and (c) if a creditor objects and demonstrates that it relied on the separate credit of one of the entities and that it will be prejudiced by consolidation, the demonstrated benefits of consolidation must heavily outweigh the harm to be caused to objecting creditors); *Union Savings Bank v. Augie/Restivo Baking Co. Ltd. (In re Augie/Restivo Baking Co.)*, 860 F.2d 515, 518 (2d Cir. 1988) (court must consider whether (a) creditors deal with the entities as a single economic unit and did not rely on their separate identity in extending credit, or (b) the affairs of the debtors are so entangled that substantive consolidation will benefit all creditors).

This Court has cited with approval decisions of other Circuits which have identified other criteria to consider when determining whether a parent company

---

achieved through a plan provision without an affirmative vote of each class of each debtor's creditors, counted before consolidation).

could be held liable for a subsidiary's debt.  *Pension Benefit Guar. Corp. v. Ouimet Corp.*, 711 F.2d 1085, 1093 (1st Cir. 1983), *citing, e.g.*, *Fish v. East*, 114 F.2d 177, 191 (10th Cir. 1940), and *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 684-90 (4th Cir. 1976).  The factors developed in these tests serve as guidelines in substantive consolidation analysis.  *See In re Snider Bros., Inc.*, 18 B.R. 230, 234, 239 (Bankr. D. Mass. 1982) ("There is no one set of elements which, if established, will mandate consolidation in every instance.").

Courts have repeatedly instructed that substantive consolidation should be granted sparingly and in rare cases, since it can work harsh inequities on the creditors of the respective estates.  This Court has stated that "[c]onsolidation is permitted only if it is first established that the related debtors' assets and liabilities are so intertwined that it would be impossible, or financially prohibitive, to disentangle their affairs."  *In re Hemingway Transp., Inc.*, 954 F.2d at 11 n.15, *citing Augie/Restivo*, 860 F.2d at 519 (finding creditor reliance and entanglement of debtors' affairs are only real considerations).  Even where an estate representative seeks consolidation to conserve estate resources, the bankruptcy court must balance such potential benefits against any potential harm to interested parties.  *Hemingway Transport*, 954 F.2d at 11 n.15.

In its decision in *In re Owens Corning*, the Third Circuit Court of Appeals refused to uphold a "deemed consolidation" of a debtor and its non-debtor

subsidiaries, where the subsidiaries were borrowers and guarantors of debt used to benefit the corporate parent. *See In re Owens Corning*, 419 F.3d 195, 209, n.15 (3d Cir. 2005) (disagreeing "with the assertion of a 'liberal trend' toward increased use of substantive consolidation"). Observing that "substantive consolidation is extreme (it may affect profoundly creditors' rights and recoveries) and imprecise", the Third Circuit concluded that "this 'rough justice' remedy should be rare and, in any event, one of last resort after considering and rejecting other remedies (for example, the possibility of more precise remedies conferred by the Bankruptcy Code)." 419 F.3d at 211. Consequently, "what must be proven (absent consent) concerning the entities for whom substantive consolidation is sought is that (i) prepetition [such entities] disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors". *Id.* (footnotes omitted). The court determined that there had been no prepetition disregard of corporate separateness, based on, among other things, the fact that the banks obtained detailed information about each subsidiary guarantor and relied on that information in accepting guarantees, each subsidiary observed governance formalities and maintained its own business records, intercompany transactions were regularly documented, and there was no meaningful evidence of hopeless commingling of the debtors' assets and liabilities.

2.    *Substantive consolidation of the Debtors*

The Association believes that, as a matter of law, the record fails to support grounds for ordering a "deemed" or "partial" consolidation of the Debtors, absent findings of fact of the sort deemed relevant by the *Owens Corning* court (or by this Court). *In re SW Boston Hotel Venture, LLC*, 460 B.R. 38, 64-65 (Bankr. D. Mass. 2011). The bankruptcy court acknowledged that the Debtor's substantive consolidation "[did] not constitute substantive consolidation in the usual bankruptcy sense recognized by the Third Circuit", but nonetheless concluded that nothing prevented such a consolidation. *See id*.

In so doing, the bankruptcy court held that substantive consolidation was legally permissible without applying any of the customary tests to the evidentiary record and failing to consider whether the Debtors exhibited any of the factors cited with favor by this court in *Hemingway* or by any other courts that have historically militated in favor of consolidation. Instead, the bankruptcy court allowed consolidation simply based upon a conclusion, unsubstantiated by the record, that no one was harmed by it.

The Association believes that the bankruptcy court erred as a matter of law in ordering substantive consolidation of the Debtors' estates without first, or contemporaneously, making appropriate findings affirmatively supporting such consolidation. Accordingly, the lower court's order should be reversed. *Compare*

*Fiffy v. Nickless (In re Fiffy)*, 293 B.R. 550, 556 (B.A.P. 1st Cir. 2003), *vacating*

281 B.R. 451 (Bankr. D. Mass. 2002) (a finding made on an issue without

developing an evidentiary record is clearly erroneous); *compare Montgomery*

*Ward & Co. v. Meridian Leasing Corp. (In re Montgomery Ward Holding Corp.)*,

269 B.R. 1, 10-11 (D. Del. 2001), *aff'd and remanded*, 326 F.3d 383 (3d Cir. 2003)

(bankruptcy court erred in basing conclusion of law upon speculation).

B.    ***Consensual Assignments of Voting Rights Should Be Enforced.***

1.    ***Assignment and enforcement of a junior lender's transfer of voting rights to a senior lender is common industry practice and helps to enhance the availability of commercial credit.***

The transfer of voting rights in bankruptcy contained in a subordination

agreement is common practice in the commercial real estate lending industry.  The

bankruptcy court's refusal to enforce the assignment of voting rights was not

predicated upon a finding that the parties' contract was unenforceable under state

law (and no such finding was made).  Instead, the lower court followed a minority

of lower courts that bar such assignment by (incorrectly) invoking federal policy.

We have located no case in which a federal Circuit Court of Appeals has decided

the question, and from an industry perspective, the potential implications of the

issue are troubling.

Most commercial real estate transactions are complex.  Debt placed on a

commercial real estate property is often part of the "capital stack", comprised of

owner equity and one or more layers of debt.  The senior debt holder has the most

"secure" position because it has first payment priority in the event of liquidation of

the collateral.  Junior lenders are behind the senior lenders in order of repayment

when a property is liquidated.  Accordingly, the interest rates charged by these two

classes of lenders reflect their respective position in the capital stack, with senior

lenders charging a lower interest rate than junior lenders.  The higher interest rates

charged by junior lenders reflect the increased risk that they are assuming as a

result of their junior position.  In the commercial real estate finance industry, both

junior and senior lenders are typically sophisticated parties that perform due

diligence and price the loan, in large part, based upon the risk being assumed.

Availability and access to collateral causes secured loans to pose less risk to

a lender and, in turn, result in less costly financing to borrowers than unsecured

loans.  *See, generally*, Shannon P. Pratt et al., *Valuing a Business: The Analysis*

*and Appraisal of Closely Held Companies* 557-58 (2008); s*ee also Till v. SCS*

*Credit Corp.*, 541 U.S. 465, 479 (2004).  In case of default, the secured lender is

not relegated to seeking recourse solely from the defaulting borrower (indeed, in

many cases, the loan is non-recourse), but may recover on its collateral.  A

borrower bankruptcy may delay a secured lender's access to its collateral, but that

is a known risk factored into the pricing of credit.

Loan agreements routinely prohibit a borrower from allowing further liens to attach to the lender's collateral without its consent because junior liens introduce a threat to the senior lender's control of the property.  Thus, a senior lender will condition its consent upon the would-be junior lender executing an acceptable subordination agreement to manage and mitigate this dilution of the senior lender's control.[5]  Since voting rights are a tool by which secured creditors can assert a measure of control over their collateral when a defaulting borrower is in bankruptcy, subordination agreements commonly require the junior lender to transfer these rights to the senior lender.  If the courts do not respect the parties' bargained-for allocation of rights, including voting rights, control is shifted to the junior lender – thereby, in Professors Baird and Bernstein's terms, enhancing the value of the junior's option while shifting risk to the senior lender.  Douglas G. Baird et al., *Absolute Priority, Valuation Uncertainty, and the Reorganization Bargain*, 115 Yale L.J. 1930, 1939.

### 2.    *Enforcing a junior lender's contractual assignment of voting rights to a senior lender is consistent with the federal law and policy.*

The Association believes the unequivocal assignment of voting rights provided in a subordination agreement is fully enforceable as a matter of law and policy.

_____

[5] Accordingly, a subordination agreement allows a borrower to obtain additional financing without committing an event of default under the senior loan agreement.

        **a.**      **The reasoning of *203 North LaSalle Street Partnership*,**
                **on which the bankruptcy court relied, is flawed.**

The bankruptcy court followed and adopted the reasoning of another

bankruptcy court decision, *203 North LaSalle Street Partnership*.[6]  That decision

was poorly reasoned and has met with mounting criticism from other federal

courts.  *See, e.g., Rosenfeld v. Coastal Broadcasting Sys., Inc. (In re Coastal*

*Broadcasting Sys., Inc.)*, No. CIV. 12-5682, 2013 WL 3285936 (D.N.J. June 28,

2013) (unpublished).

The *North LaSalle* court began by begging the question whether an

assignment of voting rights is contrary to the Code and asserted that prebankruptcy

agreements cannot override the statute.  However, the case law cited by the *North*

*LaSalle* court deals with pre-petition waivers by *debtors*, which are inapposite.  No

Code provision – including § 1126(a) – expressly bars assignments of voting

rights.  Further, when Congress wishes to invalidate attempts to contract around

the Code, it usually does so explicitly.[7]  The Court need not read into § 1126(a)

protections for a sophisticated creditor.

---

[6] *Bank of America, N.A. v. N. LaSalle St. P'Ship (In re 203 N. LaSalle St. P'ship)*,
246 B.R. 325 (Bankr. N.D. Ill. 2000) ("*North LaSalle*").

[7] *Compare, e.g.*, 11 U.S.C. § 365(e)(1) (an executory contract or unexpired lease
may not be terminated or modified solely because of a provision in such contract
or lease that is conditioned on the insolvency or financial condition of the debtor or
the commencement of a case under title 11), 11 U.S.C. § 541(c)(1)(B) (an interest
of the debtor in property becomes property of the estate notwithstanding any

The *North LaSalle* court went on to misinterpret and ignore the context of § 510(a), concluding that this section does not contemplate a "waiver" [sic] of voting rights.  246 B.R. at 331.  Code § 510(a) states simply: "A subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law."  Observing that the Code does not define the term "subordination agreement", the *North LaSalle* court turned to a dictionary definition of "subordination" as "The act or process by which a person's rights or claims are ranked below those of others."  246 B.R. at 331, *citing Black's Law Dictionary* 1426 (6th ed. 1990).  The court inferred from this definition that subordination in bankruptcy "affects the order of priority of payment of claims in bankruptcy, but not the transfer of voting rights."  246 B.R. at 331.

In turning first to the dictionary, the court took for granted that the statutory term "subordination agreement" is nothing more than the sum of its common law parts.  Moreover, the court's inference does not follow from the dictionary definition: an allocation of voting rights may not effect a reordering of claims, but it surely effects a reordering of *rights*.

---

provision in an agreement that is conditioned on the insolvency or financial condition of the debtor or on the commencement of a bankruptcy case).

Furthermore, the *North LaSalle* court's narrow interpretation of the meaning of "subordination agreement" ignores the context and integrated nature of these agreements. "Regardless of the theory of the derivation of the superior creditor's rights [under a subordination agreement], they would be vitiated unless full control by means of vote or otherwise were simultaneously vested in him." *In re Itemlab, Inc.*, 197 F. Supp. 194, 198 (E.D.N.Y. 1961) (interpreting the Bankruptcy Act of 1898). No canon of construction justifies interpreting a term so narrowly as to strip an agreement of the means of enforcement.[8]

The *North LaSalle* court's interpretation of Fed. R. Bankr. P. 3018 is simply incorrect. Rule 3018(c) provides that an acceptance or rejection of a plan shall be signed "by the creditor or equity security holder or *an authorized agent*" (emphasis added). The *North LaSalle* court reasoned that a senior creditor cannot act as a junior creditor's agent under Rule 3018(c) because the law of agency does not allow an agent acting in its own interests, rather than the interests of its principal. *See North LaSalle*, 246 B.R. at 331-32. The court failed to recognize that one may create by contract an agency coupled with an interest, or given as security, which

---

[8] As Third Circuit Court Judge Marjorie Rendell has explained, even textualists do not eschew context in interpreting statutory text. Marjorie O. Rendell, *2003-A Year of Discovery: Cybergenics and Plain Meaning in Bankruptcy Cases*, 49 Vill. L. Rev. 887 (2004), *quoting Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.").

allows the agent to act in its own interest.  *See Blue Ridge Investors, II, LP v. Wachovia Bank, N.A. (In re Aerosol Packaging, LLC)*, 362 B.R. 43, 47 (Bankr. N.D. Ga. 2006); *accord Ravallo v. Refrigerated Holdings, Inc.*, No. 08-cv-8207 (CM), 2009 WL 612490 (S.D.N.Y. Feb. 25, 2009) (decision and order granting defendant's motion to dismiss; interpreting New York law); *Hayes v. Gessner*, 315 Mass. 366, 370, 52 N.E.2d 968, 969 (1944) (Massachusetts law).  Moreover, another federal court recently opined that the rules require an "authorized agent" only to prove his bona fides by providing the instrument empowering him to act, and that "[n]o showing as to the agent's interests, and its alignment, or lack thereof, with the creditor is required."  *Rosenfeld v. Coastal Broadcasting Sys., Inc. (In re Coastal Broadcasting Sys., Inc.),* No. CIV. 12-5682, 2013 WL 3285936, at *6 (D.N.J. June 28, 2013) (unpublished).

Finally, another federal rule, Fed. R. Bankr. P. 3001(e), recognizes that creditors are free to sell their claims against a debtor.  As one court recently noted: "It would make little sense that a creditor could be free to sell its rights in full, but be barred from selling a portion."  *Coastal Broadcasting*, 2013 WL 3285936, at *5. Thus, as a matter of federal law and policy, there is no reason to conclude that, in voting a junior lender's claim, which has been assigned in a subordination agreement, a senior lender is acting other than as an authorized agent under Rule 3018.

b. **Rules should not favor a sophisticated creditor enhancing its bargaining leverage against other creditors under the guise of federal bankruptcy policy.**

Even if the Court were to construe the contractual assignment of voting rights as a "waiver" of a statutory right (rather than a contractual assignment or subrogation),[9] the parties' subordination agreement should be enforced in accordance with its terms. Absent an actual conflict with federal policy, bankruptcy law respects state law. Suspension of state laws that conflict with federal laws is enforced "only to the extent of actual conflict with the system provided by the Bankruptcy Act of Congress." *Butner v. United States*, 440 U.S. 48, 54 n.9 (1979). As to intercreditor subordination agreements, this Court has stated that the "applicable nonbankruptcy law referred to in § 510(a) is state law (and, particularly, state contract law)." *HSBC Bank USA v. Branch (In re Bank of New England Corp.)*, 364 F.3d 355, 363 (1st Cir. 2004). The bankruptcy court did not find that the parties' subordination agreement was unenforceable under state law; rather, the court invalidated the voting rights assignment as a matter of federal law and policy.

---

[9] *Compare Avondale Gateway Ctr. Entitlement, LLC v. Nat'l Bank of Ariz. (In re Avondale Gateway Ctr. Entitlement, LLC)*, Nos. CV10-1772-PHX-DGC, 02-09-BK-12153-CGC, 2011 WL 1376997 (D. Ariz. April 12, 2011) (senior creditor was subrogee entitled to vote junior creditor's claim).

While a creditor's right to vote on a Chapter 11 plan is a "bedrock component of Chapter 11", *In re Indianapolis Downs, LLC*, 486 B.R. 286, 295 (Bankr. D. Del. 2013), courts have recognized that a non-debtor generally may waive a statutory right arising under the Code provided that the intent to waive is clearly stated.  *See*, *e.g., Cukierman v. Mechanics Bank of Richmond (In re J.F. Hink & Son)*, 815 F.2d 1314, 1317–18 (9th Cir. 1987) (statutory prohibition against modification of unexpired lease based on debtor's assumption or assignment thereof could be waived by assignee); *compare Miller v. United States*, 363 F.3d 999, 1006 (9th Cir. 2004) (right to collect nondischargeable debt not waived absent explicit statement of intent); *Contrarian Funds LLC v. Aretex LLC (In re Westpoint Stevens, Inc.)*, 600 F.3d 231, 262 (2d Cir. 2010) (same, as to the right to adequate protection under 11 U.S.C. § 361).

The text of § 1126(a) is spare, stating that the "holder of a claim or interest . . . may accept or reject a plan," but silent as to whether such a holder may assign or delegate its voting rights.  Importing into the provision an implied prohibition on assignment or delegation serves no federal policy.  Such an interpretation would, however, allow a sophisticated junior lender to avoid a contractual obligation that it could not avoid under state law and restore to it a right it freely

bargained away.[10]  No federal policy impels this Court to construe the Code in

such a way as to provide a sophisticated non-debtor party with the *gift* of a release

from its contractual obligations.[11]

A well-respected bankruptcy court recently considered a similar case in

which a junior creditor attempted to gain bargaining leverage over a senior creditor

by urging a cramped interpretation of a statutory creditors' rights provision.  *See*

*Indianapolis Downs*, 486 B.R. at 295-96 (interpreting 11 U.S.C. § 1125(b)).  The

court in *Indianapolis Downs*, in rejecting a request to "designate"[12] votes of non-

---

[10] As this Court has observed, § 510(a) was enacted in recognition of the need to enforce subordination agreements "to prevent junior creditors from receiving windfalls after having explicitly agreed to accept less lucrative payment arrangements".  *See HSBC Bank (Bank of New England Corp.)*, 364 F.3d at 362. The former Bankruptcy Act did not mention subordination agreements, but they were enforced in bankruptcy.  "Equity dictated enforcement because '[e]quality among creditors who have lawfully bargained for different treatment is not equity but its opposite.'"  *Id.* (internal citation and quotations omitted).

[11] A debtor who complies with the provisions of the Bankruptcy Code is entitled to a discharge of its obligations.  *See Warren* at 778-79 ("[A] contract requires a party to do the thing promised or to pay the money equivalent *or* to discharge the promise through the bankruptcy system").  Non-debtors generally are not entitled to such relief from their promises.  *Compare Monarch Life Ins. Co. v. Ropes & Gray*, 65 F.3d 973 (1st Cir. 1995) (distinguishing, e.g., *Am. Hardwoods, Inc. v. Deutsche Credit Union (In re American Hardwoods, Inc.)*, 885 F.2d 621 (9th Cir. 1989), where courts had refused to approve releases of non-debtor liabilities because the non-debtor did not contribute to the debtor's plan; noting the significance of overwhelming creditor consent to a third party release).

[12] Code § 1126(e) authorizes a bankruptcy court to "designate" (not count the vote of) "any entity whose acceptance or rejection of [a] plan was not in good faith, or was not solicited or procured in good faith *or in accordance with the provisions of this title*." (emphasis added).

debtor parties to a so-called Restructuring Support Agreement on the grounds that the votes had been improperly solicited, set forth a reason "perhaps more to the point" for declining the requested relief:

> The Restructuring Support Parties, by contrast, are all sophisticated financial players and have been represented by able and experienced professionals throughout these proceedings. It would grossly elevate form over substance to contend that § 1125(b) requires designation of their votes because they should have been afforded the chance to review a court-approved disclosure statement prior to making or supporting a deal with the Debtor.

*Indianapolis Downs*, 486 B.R. at 295-96.

For all these reasons, the Court should enforce the assignment of voting rights as fully consistent with federal bankruptcy law and policy.

## C.     *Rules for Determining a Lender's Secured Status Should Be Clear and Driven by the Purpose of the Determination.*

This Court has also been asked to rule that, for purposes of determining whether a secured creditor is entitled to receive post-petition interest, courts may use a "flexible" approach to determine when to measure the valuation of a secured creditor's interest in its collateral. The Association asserts that the timing of valuation must be tethered to its purpose – here, whether to "cramdown" a Chapter 11 plan upon an unwilling secured creditor – both to adhere to the statutory text and to avoid serious practical consequences.

The Bankruptcy Appellate Panel rejected the bankruptcy court's factual analysis and concluded that Prudential was oversecured because the sale price of

its collateral, in an arm's length transaction, was the best evidence of the property's value from the petition date.  *See Ford Motor Credit Co. v. Dobbins*, 35 F.3d 860, 870-71 (4th Cir. 1994) (actual sale price is conclusive evidence of property's value, notwithstanding earlier hypothetical valuation).  Both lower courts rejected the contention that collateral should be valued *only* as of the confirmation date for purposes of cramdown under § 1129(b), preferring a "flexible" test.  The Association submits that the wisdom of a "flexible" approach lies in one's definition of the term.

The "flexible" approach requires that, if collateral value fluctuates, a creditor must request repeated valuations (at least two and perhaps more) to assess the extent of its security.  There is a serious difficulty with that approach:  the fair market value of collateral inevitably fluctuates.  The extent of the fluctuation is a function of many factors, including the type of property, the length of time and various market forces:  for example, the value of unimproved land is more likely to remain constant, the value of softer assets like accounts receivable, much less so.  Such reasoning contains no limiting principle other than, perhaps, the depth of the litigants' pockets.[13]

---

[13] The Fifth Circuit Court of Appeals expressly acknowledged but dismissed this risk, asserting that "bankruptcy courts are not precluded from fashioning remedies to prevent unwarranted multiple redeterminations." *Fin. Sec. Assurance, Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790,

The timing, like the method, of valuing collateral should be determined "in light of the purpose of the valuation and of the proposed disposition or use of such property."  *See* 11 U.S.C. § 506(a)(1).  This approach would be in contrast to what has been termed a "single valuation approach."  As the lower courts suggest, a single valuation approach is oversimplistic; it requires that collateral be valued at one time *for all purposes*, contra § 506.[14]  If a creditor petitions for adequate protection and for relief from stay early in a Chapter 11 case, the debtor may, at that time, challenge the creditor to prove that the value of its collateral is declining, to warrant the requested relief.  When a creditor opposes plan confirmation, its claim and the fair market value of its collateral will be evaluated at confirmation to determine the extent of its security.  *In re Heritage Highgate, Inc.*, 679 F.3d 132, 143 (3d Cir. 2012); *see also In re Blake*, No. 07-12445-FJB, 2009 WL 4349787, at *6 (Bankr. D. Mass. Nov. 30, 2009) (the availability of adequate protection is not cause to value a secured claim as of the commencement of the case; for purposes of plan confirmation, secured claim is valued as of the date of confirmation).  If its collateral is sold during the bankruptcy, the secured lender's interest in the sale

---

798 (5th Cir.).  Under the "flexible" approach, however, multiple redeterminations may be warranted in many, if not most, bankruptcy cases.

[14] A "dual valuation" approach, as discussed by the lower courts, is likewise oversimplistic; but such an approach has the further defect of encouraging litigation early in the case.

proceeds at the time of confirmation is the measure of its security for purposes of cramdown.[15]

Policy considerations, as well as fidelity to the statutory text, require that a creditor not be forced to seek *two* valuations of its collateral to preserve its rights at confirmation. The "flexible" approach appears to provide that an early valuation is not only *relevant* but *essential* to determining a creditor's secured status at confirmation. Such an approach, if generally accepted by the courts, would create a perverse incentive: well-counseled secured creditors – even if substantially oversecured – will routinely request adequate protection hearings in the first days of the case to preserve the right to post-petition interest under a plan.[16] The resulting litigation would further burden the courts and increase costs to debtors and lenders – costs that would likely be passed on to borrowers. The whole point of Chapter 11 is to allow the debtor breathing room and time to fashion a reorganization plan. Encouraging oversecured creditors to act aggressively at the inception of a case, at the risk of pushing an estate into liquidation, is entirely at

---

[15] On occasion, a creditor who successfully argues for adequate protection payments early in the case may be found to be oversecured at confirmation and therefore entitled to post-petition interest from the petition date. Such a creditor does not obtain a windfall because the adequate protection payments reduce its allowed claim. 3 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶ 361.03[2][a] (16th ed. 2013).

[16] *See* Fed. R. Bankr. P. 3012 ("on motion of any party in interest, the court may determine the value of a claim secured by a lien on property in which the estate has an interest. . . .").

odds with that purpose. *Compare United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 374 (1988).

## IV.    CONCLUSION

For all of the foregoing reasons, the decisions and judgments of the Bankruptcy Appellate Panel for the First Circuit should be affirmed and the order confirming the Debtors' Liquidating Plan reversed.

Dated:  July 31, 2013                     Respectfully submitted,

                                                 THE MORTGAGE BANKERS ASSOCIATION, amicus curiae

                                                 By its attorneys,

                                               /s/ Patrick P. Dinardo
                                               Pamela Smith Holleman (1st Cir. No. 67571)
                                               Patrick P. Dinardo (1st Cir. No. 25863)
                                             SULLIVAN & WORCESTER LLP
                                             One Post Office Square
                                             Boston, Massachusetts 02109
                                             (617) 338-2800
                                             pholleman@sandw.com
                                             pdinardo@sandw.com

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Patrick P. Dinardo, attorney for *amicus curiae* the Mortgage Bankers Association, do hereby certify that this brief complies with the type-volume limitations of Fed. R. App. P. 29(d) and 32(a)(7) because this brief contains 6,528 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14-point font.

Dated:  July 31, 2013               /s/ Patrick P. Dinardo
                                    Patrick P. Dinardo
                                    Sullivan & Worcester LLP

                                    *Attorney for the Mortgage Bankers*
                                    *Association, amicus curiae*

## <u>CERTIFICATE OF SERVICE</u>

I, Patrick P. Dinardo, do hereby certify that on _____, I electronically filed the foregoing Brief of the Mortgage Bankers Association, *Amicus Curiae* in support of affirmance of memoranda and judgments of the Bankruptcy Appellate Panel dated October 1, 2012 with the United States Court of Appeals for the First Circuit by using the CM/ECF System.  The following counsel of record for appellants and appellee are registered as ECF Filers and they will be served by the CM/ECF System.

Harold B. Murphy, Esq.
Charles R. Bennett, Jr., Esq.
D. Ethan Jeffery, Esq.
John C. Elstad, Esq.
Natalie B. Sawyer, Esq.
Christopher M. Condon, Esq.
MURPHY & KING, P.C.
One Beacon Street
Boston, Massachusetts 02108

Joseph F. Ryan, Esq.
E. Kate Buyuk, Esq.
Lyne, Woodworth & Evarts LLP
12 Post Office Square, 2d Floor
Boston, Massachusetts 02109

Gina L. Martin, Esq.
GOODWIN PROCTER LLP
53 State Street
Exchange Place
Boston, Massachusetts 02109

Meagan E. Costello, Esq.
Emanuel C. Grillo, Esq.
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018

William M. Jay, Esq.
GOODWIN PROCTER LLP
901 New York Avenue, N.W.
Washington, D.C. 20001-4432

Bruce F. Smith, Esq.
JAGER SMITH, P.C.
One Financial Center
Boston, Massachusetts 02111

Dated: _____            _____
                                Patrick P. Dinardo

{B1609260}